### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 21-CR-0575 (EGS)** |
| | : | |
| **DAVID JOHN LESPERANCE** | : | |
| **CASEY CUSICK** | : | |
| **JAMES VARNELL CUSICK JR.** | : | |

### *EX PARTE* AND UNDER SEAL

## REPORT AND RECOMMENDATION REGARDING SINGLE ATTORNEY REPRESENTING THREE CO-DEFENDANTS IN THE SAME CASE

Pursuant to the Court's November 30, 2021, Minute Order undersigned counsel respectfully submits the instant report and recommendation regarding whether defense counsel John Pierce's representation of all three codefendants in the above-captioned case creates a conflict between any of them and Mr. Pierce, and, if so, whether the conflict can be waived by the codefendants. Below is a thumbnail recitation of the factual scenario of the charges against Messrs. David Lesperance, Casey Cusick, and James Varnell Cusick, the representations made to undersigned counsel by each of the three codefendants and Katie Cusick (sister of Casey Cusick and daughter of James Cusick), attorney John Pierce, and Assistant United States Attorney Maria Fedor, followed by a discussion of both the applicable ethical rules,[1] caselaw and other legal authority on the issues, and the potential conflicts that could arise through Mr. Pierce's joint representation of all three codefendants in this case. Thereafter is a discussion of the Court's oversight powers in a situation that raises a potential conflict followed by a suggested recommendation regarding how to proceed to resolve any conflict issues in this case.

---

[1] All ethical rules cited herein are D.C. Rules of Professional Conduct.

I.    **Factual Background**

A. **Charges**

In this case David Lesperance, Casey Cusick and James Varnell Cusick are each charged by criminal information with Entering and Remaining in a Restricted Building, in violation of 18 U.S. Code §1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S. Code §1752(a)(1), Violent Entry and Disorderly Conduct in a Capitol Building, in violation of in violation of 40 U.S. Code §5104 (e)(2)(D), and Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 U.S. Code §1752(e)(2)(G).

B. **Facts**

From a review of the Statement of Facts filed in each 21-CR-439-EGS (*United States v. David Lesperance*) (Doc. No. 1-1), 21-CR-440-CJN (*United States v. Casey Cusick*) (Doc. No. 1-1), and 21-CR-441-RDM (*United States v. James V. Cusick, Jr.*) (Doc. No. 1-1)[2] it appears that through a consensual non-custodial interview with David Lesperance on January 19, 2021, law enforcement agents secured evidence incriminating Messrs. Casey Cusick and James Varnell Cusick. Specifically, Mr. Lesperance made admissions regarding his presence, as well as that of his pastor, James Varnell Cusick, at both a speech by then-President Donald Trump and thereafter on the grounds of the U.S. Capitol. Beyond implicating James Varnell Cusick, the information Mr. Lesperance provided law enforcement was a link in the chain used to connect Casey Cusick to the charged offenses as the latter is the assistant pastor at the church where his father, James Varnell Cusick, is pastor.

---

[2] Before Messrs. Lesperance, Casey Cusick and James V. Cusick were charged together in 21-CR-575 (EGS) each was charged separately in his own case that had been pending before three separate judges. For ease of reference the Statements of Facts in each of those cases is being filed as attachments to this Report and Recommendation.

Moreover, during the January 19, 2021, interview Mr. Lesperance provided law enforcement agents with his cell phone number which was used to obtain a search warrant for both Mr. Lesperance's icloud account and his Verizon Wireless account.  Information obtained through those warrants further established Mr. Lesperance's presence within the United States Capitol on January 6, 2021.  Additionally, from Mr. Lesperance's icloud account law enforcement obtained evidence incriminating James Varnell and Casey Cusick including photographs of Messrs. Cusick on the grounds of the United States Capitol as well as geolocation information supporting Messrs. Cusick's presence on the United States Capitol, albeit on January 5, 2021.

In addition to the statements made by Mr. Lesperance to law enforcement agents during his January 21, 2021, interview with law enforcement agents, both James Cusick and Casey Cusick made statements in this case.  While he was being arrested Casey Cusick said "even though the cops were waving **us** inside, what about the kids?"[3]  During his initial appearance in Florida, counsel for James Varnell Cusick (who was not Mr. Pierce and was a court-appointed lawyer) stated on the record that his client, James Varnell Cusick, had said to him that he had "only gone inside the capitol building because [his] **son** had to use the restroom" and that **they** had only been inside the Capitol building for two minutes.[4]

### C. Mr. Pierce's Compensation

According to Katie Cusick Mr. Pierce's services have been paid for by check she wrote him. Ms. Cusick said she was the person who contacted Mr. Pierce to represent her father, her brother and Mr. Lesperance and that she wrote a check from her personal account made out to Mr. Pierce to

---

[3] Assistant United States Attorney Maria Fedor disclosed this statement to undersigned counsel during a conversation on January 26, 2022.

[4] Assistant United States Attorney Maria Fedor disclosed this statement to undersigned counsel during a conversation on January 26, 2022.

cover Mr. Pierce's representation of the three codefendants. Ms. Cusick related that she obtained the funds Katie Cusick, sister of Casey Cusick and daughter of James Cusick o cover Mr. Pierce's fee through a "Give Send Go" account. Ms. Cusick also explained that through media accounts a gentleman named Jordan Sarmo, who has a podcast, learned of the arrests of Messrs. Cusick and Lesperance and started a "Give Send Go" account to which persons who learned of the case donated funds. Ms. Cusick said Mr. Sarmo then contacted her and transferred the funds needed to secure Mr. Pierce's services into her checking account and she, in turn, wrote Mr. Pierce a check to cover representation of the three co-defendants in this case.

II.     **Investigation**

In the course of preparing the instant report and recommendation undersigned counsel spoke separately with Casey Cusick (on December 29, 2021), James Cusick (on December 29, 2021), David John Lesperance (on December 30, 2021), Katie Cusick (on January 19, 2022), John Pierce (on January 26, 2022), and Assistant United States Attorney Maria Fedor (January 26, 2022).

### A. Casey Cusick

Regarding conflicts Casey Cusick reported to undersigned counsel that Mr. Pierce discussed possible conflicts with him. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

### B. James Cusick

In a conversation separate from that which undersigned counsel had with Casey Cusick, his father, James Cusick, said that he had "no clue about criminal cases," ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████ Mr. (James) Cusick indicated that his daughter, and Casey Cusick's sister, Katie Cusick, had arranged for Mr. Pierce to represent them, and that she had written a check for Mr. Pierce's services from her bank account, and that Mr. Lesperance had paid for Mr. Pierce's services separately, but had put funds into Ms. Cusick's account for her to transmit them to Mr. Pierce.

### C. David John Lesperance

On the issue of conflicts Mr. Lesperance indicated to undersigned counsel that he had had a conversation with Mr. Pierce about conflicts and he understood that it would be a conflict for Mr. Pierce to represent all three co-defendants if one turned against the others and wanted to testify against them ████████████████████████████████████████ Regarding payment for Mr. Pierce's services, Mr. Lesperance said that initially he had given a check to Katie Cusick to cover his legal representation but that he got that check back because money was donated to them by supporters.

### D. John Pierce (Attorney)

Preliminarily, when undersigned counsel spoke with John Pierce he offered that he was new to federal criminal practice and that he wanted to understand the process regarding undersigned counsel's role. Specifically, he wanted to ensure that any disclosures he made about conversations he had had with his clients in the above-captioned case would not be disclosed to the government as they were privileged attorney-client communications. Undersigned counsel explained that she had been informed that her report and recommendation was to be submitted under seal and on an *ex parte* basis to the Court and that the Court would then determine whether to disclose it more broadly.

When asked whether he had discussed the possible conflict with his clients in this case, Mr. Pierce responded that he had. Explaining that Katie and Stacey Cusick, daughters of James Cusick and sisters of Casey Cusick, were desperately trying to secure counsel for their father and brother, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Mr. Pierce believed he had had that conversation at the beginning of his representation, although he freely acknowledged the fast pace at which the matter was proceeding and the many clients he has, adding several times throughout the conversation that he had 25-26 January 6 cases and that his memory on the details was not always entirely certain. In response to a question from undersigned counsel about whether he had notes of any of the conversations, Mr. Pierce also openly stated that he was not good at taking notes and strongly suggested, if not stating explicitly, that he had no notes of any of these conversations. Mr. Pierce specifically noted that the three codefendants are not trained in the law, volunteering that they are lay people with varying abilities to understand.

Undersigned counsel specifically asked Mr. Pierce whether he had had the conversations regarding a possible conflict with the three co-defendants together or with each separately to which he responded that he was careful to have substantive conversations with clients separately and therefore believed that every time he had a conversation, it was separately. ▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

�â–ˆâ–ˆ Based on the videos and discovery and the reports from law enforcement agents, Mr. Pierce indicated that he did not see any conflict in his representing all three codefendants in this case. Finally, when undersigned counsel asked Mr. Pierce whether any plea offers had been extended to any of the codefendants in this case, he responded that he did not believe any plea offers had been extended in this case but that based on his involvement in many of the January 6 cases, he thought plea offers would be forthcoming.

The final area about which undersigned counsel asked Mr. Pierce was his compensation, although undersigned counsel specifically stated that she was not inquiring about how much he was being paid, but rather only about the mechanism by which he was being paid. Mr. Pierce said that his memory was that there were separate engagement agreements for each codefendant and that each was to pay a certain amount that was a flat fee. Mr. Pierce stated that he had been paid and believed he had received three separate checks, one from each of the codefendants, although he was uncertain, adding that he was certain he had received multiple checks and that he thought they had been from each codefendant.

### E. **Maria Fedor** (Assistant United States Attorney)

Assistant United States Attorney told undersigned counsel that the government believes Mr. Pierce has a conflict in representing all three codefendants in this matter. Specifically, with respect to resolving the case(s) short of trial, Ms. Fedor stated that thus far the government has not extended any plea offers because it views Mr. Pierce as having a conflict. Ms. Fedor explained that any plea offer extended would require an insulating statement to ensure that the defendant entering the plea could not be called as a defense witness at a trial of the other two defendants. As such, and because the government views Mr. Pierce as having a conflict, Ms. Fedor said the government has not extended plea offers to any of the codefendants in this case.

Separately, Ms. Fedor indicated that she believes the statements made by each of the co-defendants, *i.e.*, Mr. Lesperance's statement when he spoke to law enforcement on January 21, 2021, and the two statements she disclosed Messrs. Cusick making,[5] mean that there is a *Bruton* issue,[6] and additionally that at a joint trial, Mr. Pierce would be in a position where he would have to cross-examine a client he represented.

When asked about the discovery the government already has provided to Mr. Pierce, Ms. Fedor stated that to date the only discovery provided to Mr. Pierce was that provided to all the January 6 defendants' counsel.  She said that with respect to Mr. Lesperance's icloud account, counsel for Messrs. Cusick would receive "scoped" discovery, omitting anything from the icloud account that did not pertain to the January 6 incident, whereas counsel for Mr. Lesperance would receive "unscoped" discovery since it was his icloud account and there would not be the privacy concerns about providing it in its entirety to his counsel.  Finally, with respect to discovery, Ms. Fedor indicated that like all defense counsel in the January 6 cases, Mr. Pierce was given the opportunity for a tour of the United States Capitol the weekend of January 22-23, 2022, but he indicated that, due to his son's health, he was unable to participate in that tour.

Undersigned counsel further inquired about the various elements of the charged offenses and the existence of any draft jury instructions that might illuminate possible defenses. Ms. Fedor responded that she was unaware of any jury instructions yet drafted by the Office of the United States Attorney but that each of the charged offenses had a *mens rea* requirement, *i.e.*, that the act constituting the offense have taken place knowingly and willfully.

---

[5] *See* Notes 2, and 3, and accompanying text, *supra.*

[6] *Bruton v. United States,* 391 U.S. 123 (1968).

III.   **Relevant Ethical Rules**

Although a number of ethical rules are implicated when a single lawyer represents multiple

codefendants in a case,[7] two ethical rules are directly implicated.  One is Rule 1.7 dealing with

conflicts of interest generally, and the second is Rule 1.8 regarding specific situations that may

present a conflict for a lawyer.

A.   **Rule 1.7**

With respect to the general considerations regarding conflicts Rule 1.7 states:

(a) A lawyer shall not advance two or more adverse positions in the same
    matter.
(b) Except as permitted by paragraph (c) below, a lawyer shall not
    represent a client with respect to a matter if:

> (1) That matter involves a specific party or parties and a position to
> be taken by that client in that matter is adverse to a position taken or to
> be taken by another client in the same matter even though that client is
> unrepresented or represented by a different lawyer;
> (2) Such representation will be or is likely to be adversely affected
> by representation of another client;
> (3) Representation of another client will be or is likely to be
> adversely affected by such representation;
> (4) The lawyer's professional judgment on behalf of the client will
> be or reasonably may be adversely affected by the lawyer's
> responsibilities to or interests in a third party or the lawyer's own
> financial, business, property, or personal interests.

---

[7]Among the other ethical rules relevant where one lawyer represents multiple codefendants in a criminal case
is Rule 2.1 (in his capacity as an advisor "a lawyer shall exercise **independent** professional judgment and
render candid advice. In rendering advice, a lawyer may refer not only to law but to other considerations
such as moral, economic, social, and political factors, that may be relevant to the client's situation.")
(emphasis supplied).  While Rule 1.3 regarding a lawyer's duty of diligence and zeal states that "(a) A
lawyer shall represent a client zealously and diligently within the bounds of the law" and that "(b) A lawyer
shall not intentionally: . . . (2) Prejudice or damage a client during the course of the professional
relationship," Comment 10 to that Rule explicitly states that "Rule 1.3 is a rule of general applicability, and it
is not meant to enlarge or restrict any specific rule. In particular, Rule 1.3 is not meant to govern conflicts of
interest, which are addressed by Rules 1.7, 1.8, and 1.9."

(c) A lawyer may represent a client with respect to a matter in the
circumstances described in paragraph (b) above if

(1) Each potentially affected client provides informed consent to
such representation after full disclosure of the existence and nature of
the possible conflict and the possible adverse consequences of such
representation; and
(2) The lawyer reasonably believes that the lawyer will be able to
provide competent and diligent representation to each affected client.

D.C. Rules of Professional Conduct, Rule 1.7: Conflict of Interest: General Rule.

**B.      Rule 1.8**

As Rule 1.8 recognizes, a specific concern arises when co-defendants, or even a single

defendant, is represented by a lawyer being compensated by someone other than the person the

lawyer is representing as the lawyer's allegiance to the client may be compromised.  Rule 1.8(e)

states:

(d) A lawyer shall not accept compensation for representing a client
from one other than the client unless:

(1) The client gives informed consent[8] after consultation;
(2) There is no interference with the lawyer's independence of
professional judgment or with the client-lawyer relationship; and
(3) Information relating to representation of a client is protected
as required by Rule 1.6.

D.C. Rules of Professional Conduct, Rule 1.8: Conflict of Interest: Specific Rules

**IV.      Potential Conflicts**

The Sixth Amendment's guarantee of counsel in a criminal case includes the "right to

representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981).

*See also Glasser v. United States*, 315 U.S. 60, 70 (1942) (the Sixth Amendment right to counsel

---

[8] Rule 1.0(e) explains that informed consent is "the agreement by a person to a proposed course of conduct
after the lawyer has communicated adequate information and explanation about the material risks of and
reasonably available alternatives to the proposed course of conduct."

"contemplates that such assistance be untrammeled and unimpaired.") Because "[t]he Sixth Amendment's 'essential aim' 'is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers,'" "a criminal defendant's right to counsel of his choice is not absolute." *United States v. Lorenzana-Cordon*, 125 F.Supp.3d 129,134 (D.D.C. 2015), citing *Wheat*, 486 U.S. 153, 159 (1988). *See also Wheat, supra*, 486 U.S. at 164 (while the court "must recognize a presumption in favor of [the accused's] counsel of choice, . . . that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict.") It has been well recognized that "there are significant dangers inherent in the representation [by a single attorney] of multiple defendants in the course of the same criminal investigation." *United States v. Bikundi*, 80 F.Supp. 3d 9, 22 (D.D.C. 2015).

The six stages and scenarios in which there may be a conflict when a single lawyer represents multiple codefendants in the same case include 1) during plea bargaining, 2) where the defendants have inconsistent defenses, 3) where one or more of the defendants wishes to exercise his right to testify at trial, 4) where the government's evidence may be more damaging to one codefendant than to another, 5) during closing arguments and 6) at sentencing. *See generally*, John Stewart Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney*, 62 MINN.L.REV. 119, 125-134 (1978).

In *Holloway v. Arkansas*, 435 U.S. 475 (1978), the Supreme Court recognized some of the conflicts that may arise from joint representation of codefendants by a single attorney:

> Joint representation of conflicting interests is suspect because of what it prevents the attorney from doing . . . [A conflict may] . . . preclude . . . defense counsel . . . from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution, provided a lesser charge or a favorable sentencing recommendation would be acceptable . . .[A] conflict may also prevent an attorney from challenging the admission of evidence prejudicial to one client but

11

> perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another.

435 U.S. at 489-490. *See also Holloway*, 435 U.S. at 490 ("[I]n a case of joint representation of conflicting interests the evil --- it bears repeating --- is in what the advocate finds himself compelled to **refrain** from doing, not only at trial, but also as to possible pretrial plea negotiations and in the sentencing process.") (emphasis in original)

As set forth in The Restatement Third of The Law Governing Lawyers the following is one example of conflicts arising from a single lawyer representing more than one client charged in the same criminal case:

> [I]f one defendant is offered favorable treatment in return for testimony against a co-defendant, a single lawyer could not give advice favorable to one defendant's interests while adhering to the duty of loyalty to the other. Similarly, individual defendants might have had different motives for and understandings of events, so that establishing a common position among them is difficult. Witnesses who would be favorable to one defendant might be subject to cross-examination that would be unfavorable to another defendant. In closing argument, counsel must choose which facts to stress. For example, stressing the minor role of one defendant might imply the major role of another.

Restatement Third, The Law Governing Lawyers §129.

### A. Potential Conflicts in This Case

Based on the factual scenario in the above-captioned case, it appears that there are several potential conflicts that might arise in this case: one in the area of plea negotiations with the government for each of the three codefendants; a second in the area of seeking to suppress the incriminating evidence the government garnered as a result of the non-custodial consensual interview of Mr. Lesperance; the third in the event of a trial where a) the government may have different quanta of proof against each of the three co-defendants, b) the codefendants may have inconsistent defenses, c) one or more of the co-

defendants might testify and, in service to one client, Mr. Pierce would be forced to cross-examine another client he represents, and/or d) in closing during which Mr. Pierce might have to argue inconsistent positions for each client or argue relative culpabilities among the three codefendants.  A fourth stage that could present a conflict is at sentencing where, to zealously advocate on behalf of one client, Mr. Pierce might have to argue another client he represents is more culpable.

### 1.   Plea Negotiations

The government already has indicated that in its view the need for insulating statements to be part of any of the codefendants guilty pleas creates a conflict for Mr. Pierce's representation of the three codefendants in this matter.  Moreover, were the government's plea offers to each of the three defendants in the above-captioned case to be "wired" such that for any one client to accept a plea offer, all three would have to do so, the common lawyer's duty of loyalty to a client who wanted to reject a government plea offer that the other two clients wanted to accept would be compromised and adversely affected. Such a scenario also would mean that the client who wanted to reject the plea offer would be taking a position adverse to another client implicating Rule 1.7(b)(1).

Even if a plea offer were not wired, during plea negotiations, in an effort to secure a more favorable plea offer for one client, a lawyer representing all three defendants might have to argue the relative culpability of another client, and were a plea offer extended to one client that required cooperation and testimony against another client, that scenario would present a conflict for Mr. Pierce.

### 2.   Suppression of Evidence

While their standing to do so might be an impediment, were Messrs. Casey and James Varnell Cusick to want to challenge the search warrants for Mr. Lesperance's icloud account

Verizon cell phone that yielded incriminating evidence against them,[9] a single lawyer representing all three might have to argue that Mr. Lesperance's statements to law enforcement should not have been used to support issuance of the search warrant, although Mr. Lesperance's position might be that his open and voluntary cooperation with law enforcement negated his guilt.  It is difficult to see how one lawyer representing all the codefendants in this case could take these inconsistent positions.

       3.  Trial
          a.  Severance/*Bruton*

Seemingly there are three separate "*Bruton* statements" at play in this case.  The statements David Lesperance made implicating at least James Varnell Cusick arguably raise a potential motion for severance of defendants pursuant to *Bruton*.  Similarly, according to the government, Casey Cusick made a statement about law enforcement "waving **us** inside," thereby implicating more than just himself, although that statement could be redacted to avoid incriminating others.[10]  Likewise, the government has stated that James Cusick apparently made a statement to his lawyer that implicated his son, Casey Cusick, and that was divulged during his initial appearance in Florida, although that statement, too, might be subject to redaction in a way that would not incriminate Casey Cusick.[11]  Beyond the foregoing, each of the three co-defendants may have different and inconsistent positions with respect to pursuing a severance.  For a single lawyer to represent all three interests and exercise independent judgment on behalf of each client seems challenging.

---

[9] *See Franks v. Delaware*, 438 U.S. 154 (1978); *United States v. Leon*, 468 U.S. 897 (1984)
[10] *Richardson v. Marsh*, 481 U.S. 200 (1987)

[11] *Id.*

b.  Co-Defendant Testimony

There is also the potential that at a joint trial, were one or more of the three defendants to want to testify and if the testimony of a testifying co-defendant were to incriminate the others, a single lawyer would be forced to cross-examine his own client.  Were he to do so less than vigorously due to his allegiance to the testifying-client-codefendant, arguably the non-testifying clients would not be receiving the full zealous representation to which they are entitled under the Sixth Amendment.  Were he to do so forcefully, or at all, he would be violating his obligation to the testifying-client-co-defendant.

Where a single lawyer has been allowed to represent both the accused and an adverse witness the government calls against the accused, courts have deemed the conflict issue to have been avoided where a second lawyer handles the cross-examination of the adverse-witness client. *See e.g.*, *United States v. Lorenzana-Cordon, supra* (where second counsel was appointed to cross-examine witness who was represented by the same lawyer as the accused).  Thus, one possible remedy for this eventuality would be to have a second lawyer involved whose sole responsibility would be the cross-examination of the testifying co-defendant.

c.  Inconsistent Defenses

Also at trial, were the three co-defendants to have inconsistent defenses, or the government's quantum of proof to be greater against one of the co-defendants than the others, a single lawyer's allegiance to one client might be compromised while serving the others.  For example, and without knowing the defenses each of the three defendants is contemplating, arguably one or more of them could raise a defense based on duress exerted by one of the other two.  This would put the single defense attorney in the untenable position of having to contend that one of his clients was exerting duress on another.  As far as the relative quanta of proof the government has against each of the codefendants in this case, at this juncture undersigned counsel cannot tell whether there are

disparate quanta of proof against each codefendant, and so cannot opine on whether that would give

rise to a conflict for Mr. Pierce.

### d.  Closing Argument

As in the presentation of evidence, in closing argument, a single lawyer representing all

three codefendants in this case might need to inculpate or impugn one of the co-defendants in

service to defending another.

### 4.  Sentencing

At sentencing to secure the most favorable possible sentence for one client, a lawyer

representing all three might have to make arguments regarding the relative culpability of the three

co-defendants, thereby requiring him to make arguments adverse to a client he maintains is more

culpable than the others.

## V.    **Waiver**

Notwithstanding the foregoing, as contemplated by Rule 1.7(c)(1), a single lawyer may

represent codefendants in the same matter if "[e]ach potentially affected client provides informed

consent to such representation after full disclosure of the existence and nature of the possible

conflict and the possible adverse consequences of such representation." Rule of Professional

Conduct 1.7(c)(1).  To establish a valid waiver of any potential conflicts that may arise from a

single attorney representing multiple co-defendants requires a knowing and intelligent waiver.

*United States v. Lorenzana-Cordon*, 125 F.Supp.3d at 135, citing *Holloway v. Arkansas*, 435 U.S. at

483 n.5. The standard for a knowing and intelligent waiver in the context of a potential conflict born

of a single lawyer representing multiple co-defendants in the same case is the same as the standard

for waiver of the Sixth Amendment right to counsel.  *Glasser v. United States*, 315 U.S. at 71.  In

*Glasser* the Supreme Court explained

16

> The trial court should protect the right of the accused to have the assistance of counsel. 'This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused. While the accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting for that determination to appear upon the record.'

*Id.*, quoting *Johnson v. Zerbst*, 304 U.S. 458, 465 (1938).

With respect to waivers, at least one commentator has observed that "one must seriously question the ability of most criminal defendants to appreciate fully the significance of conflicts of interest," adding that "[b]ecause of the relationship of trust between attorney and client and the defendant's relative ignorance of criminal trial dynamics, a defendant is likely to defer to the judgment of his counsel and rely on counsel's representation that he can adequately serve the interests of all defendants." John Stewart Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney, supra*, 62 MINN.L.REV. at 154 (citations omitted). In a similar vein the Supreme Court also has recognized that potential conflicts arising from a single lawyer representing multiple co-defendants "are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics." *Wheat v. United States*, 486 U.S. at 163. Beyond the challenges of a layperson fully grasping the possibilities for potential conflicts that arise from multiple codefendants being represented by the same attorney, the Supreme Court also has acknowledged that "the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them." *Id.*

The validity of a waiver of the right to conflict-free counsel depends on whether it is voluntary and intelligent, which in turn, "'must depend, in each case, upon the particular facts and

**17**

circumstances surrounding that case, including the background, experience and conduct of the accused.'" *United States v. Carlyle*, 964 F.Supp.8, 14 (D.D.C. 1997) quoting *United States v. Garcia*, 517 F.2d 272, 277 n.5 (5th Cir. 1975) (citing *Johnson v. Zerbst*, 304 U.S. at 464). While undersigned counsel does not know the educational backgrounds of each of the three defendants in this case, it is her understanding that they have little, if any, prior experience with the criminal legal system. Indeed, in his conversation with undersigned counsel Mr. Pierce specifically remarked that the three codefendants in this case are lay people, not trained in the law, and who have varying abilities to understand.

Additionally, the fact that Casey Cusick and James Varnell Cusick are father and son, and that Katie Cusick paid Mr. Pierce through a personal check, ought to be considered when evaluating the validity, *i.e.*, voluntariness, of any waiver. *See*, *United States v. Bikundi*, 80 F.Supp.3d at 21 (finding waiver invalid where, *inter alia*, there was "a strong possibility" that familial dynamics played a role in accused's willingness to waive conflict-free counsel). To be clear, given undersigned counsel's limited role in this matter, she did not undertake with each Messrs. Cusick and Lesperance, an explanation of possible conflicts and an assessment of whether each of the three co-defendants understood them.

VI.    **The Court's Oversight Powers**

The Supreme Court has recognized that "[t]he Sixth Amendment right to choose one's counsel is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. at 159 (citations omitted). It also has acknowledged the broad oversight powers of federal courts in ensuring that the ethical rules are followed in criminal cases. *Wheat v. United States*, 486 U.S. at 159-160 ("While 'permitting a single attorney to represent codefendants . . . is not *per se* violative of constitutional guarantees of effective assistance of counsel,' a court confronted with and alerted

**18**

to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant

separate counsel.") citing *Holloway v. Arkansas*, 435 U.S. at 482.  In *Wheat*, a case involving a

single lawyer's representation of multiple clients, the Court explained that "[f]ederal courts have an

independent interest in ensuring that criminal trials are conducted within the ethical standards of the

profession and that legal proceedings appear fair to all who observe them," and acknowledged that

"[n]ot only the interest of a criminal defendant but the institutional interest in the rendition of just

verdicts in criminal cases may be jeopardized by unregulated multiple representation."  486 U.S. at

160.

      Regarding the difficulty of a trial court's task in ruling on whether to allow a waiver of a

conflict of interest by a client whose lawyer also represents her/his codefendants, the Supreme

Court observed,

> Unfortunately for all concerned, a district court must pass on the
> issue whether or not to allow a waiver of a conflict by a criminal
> defendant not with the wisdom of hindsight after the trial has taken
> place, but in the murkier pre-trial context when the relationships
> between parties are seen through a glass, darkly.  The likelihood and
> dimensions of nascent conflicts of interest are notoriously hard to
> predict, even for those thoroughly familiar with criminal trials.

*Wheat, supra*, 486 U.S. at 162-163.  In elaborating on a trial court's oversight powers the Court in

*Wheat* also indicated that "the district court must be allowed substantial latitude in refusing waivers

of conflicts of interest not only in the rare cases where an actual conflict may be demonstrated

before trial, but in the more common cases where a potential for conflict exists which may or may

not burgeon into an actual conflict as the trial progresses."  *Wheat, supra*, 486 U.S. at 163.

      Beyond the Supreme Court's recognition of the oversight powers of federal courts in

ensuring compliance with the ethical rules in criminal cases, the Federal Rules of Criminal

Procedure also assign a role to the Court in ensuring conflict-free counsel.  Specifically, Federal

Rule of Criminal Procedure 44(c) directs that when "two or more defendants have been charged

**19**

jointly . . . and [they] are represented by the same counsel," the Court "must promptly inquire about

the propriety of joint representation and must advise each defendant of the right to effective

assistance of counsel, including separate representation." Fed.R.Cr.P 44(c). Significantly the rule

further directs that "[u]nless there is good cause to believe that no conflict of interest is likely to

arise, the court must take appropriate measures to protect each defendant's right to counsel."

In *United States v. Garcia*, the Fifth Circuit explained that the standard for waiver of

conflict-free counsel is the same as that for waiver of any constitutional right. *Garcia*, 517 F.2d at

275-277. It further explained that the "Supreme Court [had] recognized the need for affirmative

judicial involvement in the waiver process" as follows:

> [A] judge must investigate as long and as thoroughly as the
> circumstances of the case before him demand. The fact that an
> accused may tell him that he is informed of his right to counsel and
> desires to waive this right does not automatically end the judge's
> responsibility. To be valid such a waiver must be made with an
> apprehension of the nature of the charges, the statutory offenses
> included within them, the range of allowable punishments
> thereunder, possible defenses to the charges and circumstances in
> mitigation thereof, and all other facts essential to a broad
> understanding of the matter. A judge can make certain that an
> accused's waiver of counsel is understandingly and wisely made
> only from a penetrating and comprehensive examination of all the
> circumstances under which such a plea is tendered.

*United States v. Garcia*, 517 F.2d at 277-278, quoting *Von Moltke v. Gillies*, 332 U.S. at 708, 723-

724 (1948).

## VII.   **Recommendation**

At this stage of the case it does not appear possible to determine whether there is an actual

conflict that exists in having the same lawyer represent all three co-defendants in the above-

captioned matter. That said, at this juncture it is impossible to "predict the myriad paths [this case

may] take." *United States v. Carlyle*, 964 F. Supp. at 13. The need to ensure that the waiver of the

right to conflict-free counsel in this case is particularly supported by Mr. Pierce's recollection that

the sole conflict he recalled identifying for the codefendants was if one of them testified and he was forced to cross-examine someone who is his own client.[12] It is further supported by Mr. Pierce's acknowledgement that he is inexperienced in federal criminal practice and has a general memory of the conversations he had with each of the codefendants about the conflict issue but no notes about those conversations. Finally, it is also supported by Mr. Pierce not having identified the *Bruton* issues reported by government counsel based on the statements of each of the three codefendants although he said he had reviewed the police reports in the case. Given that there appear to be possible *Bruton* issues that might give rise to a severance, possible issues of relative culpability among the three defendants, and that the government has indicated that any plea offers extended would require insulating statements that would implicate the non-pleading codefendants, it is critical that any waivers by the codefendants be clearly established on the record.

As other courts in this district have done, out of an abundance of caution, before inquiring of each defendant about whether he wishes to continue with Mr. Pierce as his lawyer, it would be prudent for the Court to appoint an independent "experienced counsel having no stake in an on-going attorney-client relationship or the fees that may be generated therefrom" to advise each co-defendant about potential conflicts that could arise. *United States v. Carlyle, supra*, 964 F. Supp. at 9, 13 (D.D.C. 1997). *See also United States v. Lopesiera-Gutierrez*, 708 F.3d 193, 199 (D.C. Cir. 2013); *United States v. Lorenzana-Cordon*, 125 F.Supp.3d at 132, 140 (appointing a separate lawyer "'for the limited purpose of advising" the accused about a potential conflict); *United States v. Bikundi*, 80 F.Supp.3d at.15-16 (regarding appointment of "independent and conflict-free counsel" before making a decision regarding waiver of the right to conflict-free counsel). Mr. Pierce's acknowledgement that the three codefendants are laypeople with varying abilities to

_____

[12] As discussed *supra* at pp. 12-16, there are more potential, if not yet actual, conflicts in this case than the one Mr. Pierce has identified.

understand the ramifications of his representing all three, underscores the wisdom of appointing

independent conflict counsel in this case for each of the codefendants. This is all the more true

given Rule 1.0(e)'s definition of "informed consent." *See* Note 8, *supra*. Under Rule 1.7(c)(1) it

does not appear that any of the codefendants has been provided sufficient information and

explanation about the existence and nature of possible conflicts and the material risks of, and

reasonably available alternatives to, having Mr. Pierce represent all three to allow the Court to make

a finding that they have validly waived any actual or potential conflict.

In addition to appointing independent conflict counsel for reach of the three co-defendants,

and given the requirements of the law and the unknowns in this case, it would be wise to inquire on

the record of each of the co-defendants, as well as of John Pierce, the lawyer presently representing

all three (independently), about what discussions and explanations of possible conflicts have

occurred and about each defendant's understanding of those potential conflicts and the willingness

of each to waive them.

In making such inquiries of each of the three co-defendants in this case, it would be

advisable to make each inquiry independently of the others, and outside the presence of the other

co-defendants, and outside of Mr. Pierce's presence. *See Bikundi*, 80 F.Supp.3d at 15 (referring to

colloquy between one codefendant and the court occurring "outside the presence of" the second co-

defendant). It also would make sense for the colloquies between the Court and each defendant, and

between the Court and Mr. Pierce, to be under oath. *See Bikundi*, 80 F.Supp.3d at 15 (referring to

the "testimony" of each of the two co-defendants). In addition, in "engaging in a comprehensive

Rule 11-type colloquy" with each co-defendant, the Court should "'personally and forthrightly

advise [each defendant] of the potential dangers of representation by counsel with a conflict of

interest.'" *United States v. Carlyle*, *supra*, 964 F. Supp. at 13, n.4 (quoting *United States v. Garcia*,

517 F.2d at 278). Importantly each "defendant must be at liberty to question the [Court] as to the

nature and consequences of his legal representation[, and m]ost significantly, the [C]ourt should seek to elicit a narrative response from [each] defendant that he has been advised of his right to effective representation, that he understands the details of [Mr. Pierce's] possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with ]Mr. Pierce] . . . or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections.'"
*Id.*

Rather than asking questions that require a "yes or no" answer, ideally each defendant ought to explain in his own words how a conflict could arise at each of the stages outlined above, *i.e.*, plea negotiations, pre-trial litigation, trial, and sentencing, were Mr. Pierce to represent more than one codefendant in the instant case. *See United States v. Garcia*, *supra*, 517 F.2d at 278 ("Mere assent in response to a series of questions from the bench may in some circumstances constitute an adequate waiver, but the court should nonetheless endeavor to have each defendant personally articulate in detail his intent to forego [the] significant constitutional protection" of conflict-free counsel). After each codefendant has conferred with an attorney to advise him on the conflict issue and depending on how each defendant answers the questions posed in the colloquy with the Court, the Court should be able to develop a record that can support a finding that any waiver of conflict-free counsel has been established by """clear, unequivocal, and unambiguous language.""" *United States v. Carlyle*, *supra*, 964 F. Supp. at 13, n.4 (quoting *United States v. Garcia*, 517 F.2d at 278).

Dated: January 31, 2022                    Respectfully submitted,

                                           s/Santha Sonenberg
                                           _____
                                           Santha Sonenberg (D.C. Bar No. 376-188)
                                           (202) 494-7083
                                           santhasonenberg@yahoo.com