UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .
          Plaintiff,               .    CR No. 21-0575 (JDB)
                                   .
      v.                           .
                                   .
01 DAVID JOHN LESPERANCE,          .    Washington, D.C.
02 CASEY CUSICK,                   .    Wednesday, July 12, 2023
03 JAMES VARNELL CUSICK JR.,       .    10:00
                                   .
          Defendants.              .    Pages 418 through 618
. . . . . . . . . . . . . . . .    .


DAY 3
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:            FRANCESCO VALENTINI, ESQ.
                              U.S. Department of Justice
                              Criminal Division
                              950 Pennsylvania Avenue NW
                              Washington, DC 20530

                              SONIA MURPHY, ESQ.
                              U.S. Department of Justice
                              Civil Division
                              1100 L Street NW
                              Washington, DC 20530

For Defendants:               JOHN M. PIERCE, ESQ.
                              ROGER ROOTS, ESQ.
                              John Pierce Law, P.C.
                              21550 Oxnard Street
                              Suite 3rd Floor OMB 172
                              Woodland Hills, CA 91367

Court Reporter:               BRYAN A. WAYNE, RPR, CRR
                              U.S. Courthouse, Room 4704-A
                              333 Constitution Avenue NW
                              Washington, DC 20001

**C O N T E N T S**

TESTIMONY

CHRISTOPHER            Direct Examination...................422
CARTWRIGHT:            Cross-Examination....................443
                      Redirect Examination.................446
                      Recross-Examination..................449

WALTER GIARDINA:       Direct Examination...................450
                      Cross-Examination....................507
                      Redirect Examination.................523
                      Recross-Examination..................526

KRIS MIYASATO:         Direct Examination...................527
                      Cross-Examination....................552
                      Redirect Examination.................561

JOSHUA STRAIT:         Direct Examination...................562
                      Cross-Examination....................573

RUTH CUSICK:           Direct Examination...................582
                      Cross-Examination....................591
                      Redirect Examination.................599

CASEY CUSICK:          Direct Examination...................601

\*   \*   \*

EXHIBITS RECEIVED

Government Exhibit No. 153 ................................ 428
Government Exhibit No. 154 ................................ 434
Government Exhibit No. 151 ................................ 438
Government Exhibit No. 152 ................................ 440
Government Exhibit No. 201 ................................ 453
Government Exhibit No. 203 ................................ 454
Government Exhibit No. 204A ............................... 456
Government Exhibit No. 204B ............................... 457
Government Exhibit No. 202 ................................ 459
Government Exhibit Nos. 205-224 .......................... 460
Government Exhibit Nos. 225-231 .......................... 502
Government Exhibit No. 232 ................................ 506
Government Exhibit No. 176 ................................ 531
Government Exhibit No. 178 ................................ 542
Government Exhibit No. 601 ................................ 548
Government Exhibit No. 602 ................................ 549
Government Exhibit No. 603 ................................ 551
Government Exhibit No. 177 ................................ 565
Government Exhibit No. 604 ................................ 570
Government Exhibit No. 605 ................................ 571

*  *  *

1              P R O C E E D I N G S

2          THE DEPUTY CLERK:  Criminal case No. 2021-0575, United

3    States of America versus David John Lesperance, Defendant

4    No. 1; Casey Cusick, Defendant No. 2; and James Varnell Cusick

5    Jr., Defendant No. 3.  Francesco Valentini and Sonia Murphy

6    representing the government.  John Pierce and Roger Roots

7    representing the defendants.  All three defendants are present

8    in the courtroom.  This is day three of the jury trial.

9          THE COURT:  All right.  We are ready to go.  We had one

10   juror who was delayed by car trouble but that juror is now

11   here and I think we are ready to begin.  Is there anything

12   preliminarily before we bring the jury in?

13          MR. VALENTINI:  Not for the government.

14          MR. PIERCE:  Not for the defense.

15          THE COURT:  All right.

16      I will, by the way, try to give you a draft of the final

17   jury instructions at noontime, either before lunch or right

18   after lunch, depending on whether I have anything further to

19   look at.

20      We do have another matter today at 12:30, so we'll need to

21   give some room at counsel table for the lawyers on that other

22   matter.

23      Oh, it's Zoom?  I guess it's a proceeding that is not in

24   person so probably we won't need room at counsel table.

25          (Jury in at 10:05 a.m.)

 1          THE COURT:  Good morning, ladies and gentlemen.  I hope

 2     you had a pleasant evening.  We're ready to go.  And for that

 3     I turn to the government for their next witness.

 4          MS. MURPHY:  Thank you, Your Honor.  Prosecution calls

 5     MPD Officer Christopher Cartwright.

 6     CHRISTOPHER CARTWRIGHT, WITNESS FOR THE GOVERNMENT, SWORN

 7                         DIRECT EXAMINATION

 8     BY MS. MURPHY:

 9     Q.   Good morning, and thank you for being here.

10     A.   Good morning.

11     Q.   Would you please state your name for the record, spelling

12     your last?

13     A.   My name is Christopher Cartwright.  My last name is

14     spelled C-A-R-T-W-R-I-G-H-T.

15     Q.   And are you employed?

16     A.   Yes, ma'am.

17     Q.   Where are you employed?

18     A.   With the D.C. Metropolitan Police Department.

19     Q.   How long have you been with the Metropolitan Police

20     Department?

21     A.   Approximately 18 years.

22     Q.   Do you work in any specific division or section of the

23     MPD?

24     A.   Yes, ma'am.

25     Q.   What section do you work in?

1    A.   The Special Operations Division.

2    Q.   Can you tell us what your duties and responsibilities are

3    as a part of the Special Operations Division?

4    A.   Sure.  More specifically I'm a member of the emergency

5    response team which you would call a SWAT team.  Well, there

6    are multiple duties.  We are called in to handle hostage

7    situations, barricade situations, barricaded subjects, be they

8    criminal or mental health issues, suicide attempts like

9    jumpers, active shooter situations, various threats, all sorts

10   of -- well, not all sorts, but other duties and assignments

11   that are I guess you could say a little too much for the usual

12   patrol officer, that require special weapons and tactics,

13   basically.

14   Q.   And how long have you been with the Metropolitan Police

15   Department SWAT team?

16   A.   Full time almost eight years.

17   Q.   And do you work in segments or groups or do you work

18   individually?

19   A.   We work in groups generally.

20   Q.   Let's turn your attention, if we may, to the events that

21   transpired on January 6, 2021.  Were you working that day?

22   A.   Yes, ma'am.

23   Q.   And where were you assigned on January 6?

24   A.   Where was I assigned?  I and a couple other officers on

25   my team were assigned to threat response.  We were posted on

1        the east side of the Capitol building.

2        Q.    And what did it mean to be assigned to threat response?

3        A.    So usually when we handle -- when there are

4        demonstrations, depending on the assessment of the

5        demonstration -- that's not usually done by us.  Higher

6        command will decide that there is a need for, say, I guess

7        active -- I'm sorry -- you would say to respond to the

8        demonstration, as you do with regular Civil Disturbance Unit

9        response, but also we would have a contingency for an active

10       threat.

11       Q.    Were you wearing body-worn camera on January 6?

12       A.    Yes, ma'am.

13       Q.    Are you always wearing body-worn camera?

14       A.    Yes, ma'am.

15       Q.    Can you explain for the jury --

16       A.    Wait.  I'm sorry.  Specifically when in the field on

17       duty, yes.

18       Q.    Can you explain for the jury how your body-worn camera

19       works?

20       A.    When it's on it's in a standby mode, meaning it's

21       continually -- in that instance it's continually recording.

22       It's keeping a two-minute buffer of everything that it's

23       seeing visually.  So let's say if I were to have it on right

24       now, while it's on, if I were going to -- when you activate

25       the button, you double-tap it, the audio begins to record

1       along with the video.  But the preceding two minutes is also

2       recorded but there's no audio.

3       Q.   And in your experience, have you had an opportunity to

4       review your body-worn camera on any occasion?

5       A.   Yes, ma'am.

6       Q.   And in your experience, is it an accurate representation

7       of what you saw while you were wearing the camera?

8       A.   Yes, ma'am.

9       Q.   And does the body-worn camera include time stamps?

10      A.   Yes, ma'am.

11      Q.   And in your experience are the time stamps an accurate

12      representation of what occurred during that time while you

13      were wearing the body-worn camera?

14      A.   Yes, ma'am.

15      Q.   Turning your attention back to January 6, how did you

16      begin your day?

17      A.   Okay.  So I don't know exactly --

18      Q.   If you remember.

19           THE COURT:  You rolled out of bed...

20        (Laughter.)

21           THE WITNESS:  Sure.  I got out of bed --

22           THE COURT:  Let's focus more on the employment aspect

23      of his life.

24      BY MS. MURPHY:

25      Q.   Do you recall what time you arrived at the Capitol on

1    January 6?

2    A.    To be honest, I don't.  I don't recall.  So I was going

3    to say I don't know -- I couldn't say specifically what shift

4    we started at.  Sometimes they'll stagger it.  We may have

5    reported there at 06:30, 6:30 a.m.  Honestly, I don't

6    remember.  It could have been a staggered shift to get up

7    there at 10:00 because we knew the January 6 demonstration was

8    coming, we knew that was going to take place.  So our division

9    and our commanders allotted for that.

10       What my specific tour of duty was, I don't know, but I

11   know at some point I came to work, got my assignment and

12   responded to the Capitol, the east side, with my team.

13   Q.    You were working with a team on January 6.

14   A.    Yes, ma'am.

15   Q.    Do you recall who your team members were?

16   A.    Yes, ma'am.

17   Q.    Who were they?

18   A.    Officers Eric Watson and Officer Stephen Chih.

19   Q.    So there were three of you working as a team that day.

20   A.    Yes, ma'am.

21   Q.    Did there come a time when your team decided to go into

22   the Capitol building or to approach the Capitol building?

23   A.    Yes, ma'am.

24   Q.    And what drove that decision?

25   A.    So we were hearing lots of distress over the radio, calls

1    for help, calls for service, what we call a 1033.  That's a

2    radio code saying we need help, basically the officer needs

3    assistance, officers are in jeopardy.  So we were hearing

4    1033, we decided to change our assignment and go.

5    Q.   Ms. Roberts, if you would pull up Government Exhibit 153,

6    which has not been admitted yet.

7         Officer Cartwright, with the jury's indulgence, I'm going

8    to ask Ms. Roberts to play this video and ask you to notify us

9    when we get to a point where you can orient yourself as to

10   what you're looking at and can answer a few questions about

11   it.

12   A.   Sure.

13        (Video played.)

14        Stop right there.

15   Q.   So are you comfortable describing what we might be

16   looking at?

17   A.   Yes.  That is -- well, that's me.  I'm comfortable saying

18   that's me opening the trunk of my vehicle, the vehicle that's

19   labeled 8738.  And I'm familiar with -- mostly familiar with

20   what my trunk looked like on that day.

21   Q.   And are you able to tell if this was recorded on

22   January 6?

23   A.   Yes, ma'am.

24   Q.   And are you able to see the time stamp to see when it

25   was recorded?

```
 1      A.   Yes, ma'am.
 2           MS. MURPHY:  Your Honor, we move to admit Exhibit 153
 3      into evidence and to publish to the jury.
 4           MR. ROOTS:  No objection with the assurance that it
 5      depicts these defendants at some point.
 6           THE COURT:  That's the representation that it will?
 7           MS. MURPHY:  It absolutely does.
 8           THE COURT:  Government 153 is admitted, may be
 9      published.
10                              (Government Exhibit No. 153
11                                received into evidence.)
12      BY MS. MURPHY:
13      Q.   Just for the jury's sake, can we go back and play what
14      you looked at so you can orient yourself as to what we were
15      watching.
16      A.   Yes, ma'am.
17      Q.   We'll just play about the first 30 seconds of the video.
18           (Video played.)
19      A.   So this is me, this is my rifle stock here, the butt of
20      my rifle slung, my M4.  That's Officer Watson there.  I can't
21      remember who these officers were.  They were patrol officers
22      assigned to CDU that day.  That's my tag number, and that's my
23      cruiser number there.  And that's me using a key to open it up.
24      Q.   And can you tell us why there's no audio with the video
25      at this point?
```

1    A.   Because I had not tapped -- I had not activated my

2    body-worn camera yet.

3    Q.   As you testified earlier, when you activate your

4    body-worn camera, then it will start recording audio as well?

5    A.   Audio plus visual.  But it keeps a two-minute buffer of

6    video.

7    Q.   So what we just watched would be part of that two-minute

8    buffer.

9    A.   Yes, ma'am.

10   Q.   Ms. Roberts, can we continue playing up to about a minute

11   and 20 seconds, please?

12        (Video played.)

13        And Officer Cartwright, please feel free to tell us what

14   we're seeing.

15   A.   I unloaded my M4 rifle.  I'm preparing to stow it.

16   Q.   Would you explain to the jury why you decided to load

17   your rifle before you entered into the Capitol area?

18   A.   Load my rifle?

19   Q.   Why you decided to put -- I thought you said you were

20   putting it --

21   A.   Oh.  No, I stowed it.

22   Q.   Oh, stowed.  Stowed.

23   A.   Yeah.  Because we were going to respond in a less lethal

24   capacity.  There was no -- at the time there was no indicator

25   for us to respond for an active threat, so we were going in as

1    more of a CDU assistance role.

2    Q.   Will you explain to the jury what CDU is?

3    A.   Civil disturbance.  So we have a unit called the Civil

4    Disturbance Unit.  So we generally use CDU as that general

5    blanket term for civil disturbance -- riots, demonstrations,

6    the spectrum in between.

7    Q.   So given that you stowed that weapon, what, if any,

8    weapon did you carry into the Capitol?

9    A.   Just my service pistol which I already had on me.

10   Q.   So were you then walking hands free?

11   A.   Yes, ma'am.

12   Q.   What about your teammates?  Do you recall what they

13   carried, if anything?

14   A.   Yes, ma'am.  My teammate, Officer Chih, decided to take

15   his 40mm launcher.  And Officer Watson, if I recall correctly,

16   was hands free, along with me.

17   Q.   Will you explain to the jury what the 40mm launcher is?

18   A.   So the 40mm launcher is a less lethal projectile device.

19   It will project -- we use the term "less lethal."  You can use

20   foam baton rounds.  We also use it to project OC spray and

21   other chemical munitions, but generally it's used as an

22   extended impact weapon is what we call it.

23   Q.   Ms. Roberts, if we could skip ahead to about a minute

24   and 42 seconds and play, stopping at just about two minutes.

25        (Video played.)

1      Can you tell us who the other officers are that we see

2      in the footage we just watched?

3      A.    That, who you're seeing now, is Officer Chih.  Right

4      before that walking with us was Officer Eric Watson.

5      Q.    And was the orange device being carried by Officer Chih

6      the 40mm you described a moment ago?

7      A.    Yes, ma'am.

8      Q.    Can we skip ahead to about 4:15 and play to about 4:53,

9      please.

10      (Video played.)

11      So, Officer Cartwright, what was the environment like

12      when you arrived at the Capitol that day?

13      A.    It was somewhat of a mixed bag.  It was anger, it was

14      chaotic, it was like a lot of other demonstrations that I've

15      seen, especially the year prior.  But a lot of mixed

16      sentiments.  Some, you know, we hate you, how could you do

17      this to us, you betrayed us, and then a lot of also we love

18      you, we back you, you know, we know you're here to protect us.

19      So there was a lot flying our way that day.

20      Q.    Can we continue playing till about 6 minutes and 23

21      seconds, please, or 28 seconds?

22      (Video played.)

23      Officer Cartwright, what was going through your head as

24      you were making your way towards the Capitol and around the

25      Capitol building that day?

1    A.    Uncertainty, as with a lot of these demonstrations.

2    Just preparing mentally to -- for confrontation, for -- keeping

3    an eye out for my teammates as I always do in these situations.

4    Like I said, it was a very mixed bag.  You had a lot of

5    compliance on one hand and you had a lot of rowdy and, you know,

6    disorderly and angry behavior.  A lot of aggression directed

7    towards us, and also a lot of love.  So it was a lot to look

8    out for.

9      So you gain experience going through these demonstrations

10   and you start to understand what you should look for.  So my

11   general attitude was one of -- well, I'm a God-fearing man,

12   so I was saying prayers to myself.  For one thing, I have a

13   family, I have people I want to make it home to, in any situation.

14   So silent prayers to myself, and also scanning and looking out

15   for threats to myself or my teammates or any other officer.

16   Q.    And what was your goal at this point, as you guys are

17   making your way towards the Capitol building?

18   A.    Just to get inside and to respond to where we were

19   hearing the calls for assistance.

20   Q.    And were the people who were there creating any type of

21   obstacle to you getting to accomplish your goal?

22   A.    Yes.  Some of them were.

23   Q.    Let's continue playing if we can and stop at about 8:24,

24   please.

25        (Video played.)

1      Officer Cartwright, how did you feel as people were
2   addressing you over the last few minutes of the video we just
3   watched?
4   A.   Just trying to keep a stoic demeanor.  You learn to
5   understand people have valid -- well, people get angry.
6   People have causes and they back those causes passionately.
7   So I'm not -- at that point I'm not so much listening to
8   what they say; I'm just watching for what people are doing.
9   Q.   And we could hear video.  It didn't sound like you
10  responded.  Is there a reason why you didn't respond?
11  A.   Because once again, the words aren't going to hurt me;
12  the brick is.  I didn't see any of that.  I didn't see any
13  projectiles being prepped to be thrown my way or any other
14  officers' way.
15      But no, once you start responding and getting into it
16  with somebody, that's the moment your attention is drawn away
17  and you put yourself and your other officers in a vulnerable
18  position if you risk doing that.
19  Q.   And again, were these individuals impacting or impeding
20  your ability to get to the other law enforcement officers you
21  were trying to reach inside the Capitol?
22  A.   These people specifically at this time, no, they weren't.
23  Q.   Could we pull up Exhibit 154, please, which has not been
24  admitted into evidence.
25      Officer Cartwright, do you recognize this?

1    A.    Yes, ma'am.

2    Q.    What do you recognize it to be?

3    A.    This is a fair and accurate representation of myself,

4    Officer Chih, and Officer Watson standing at the door on the

5    north side of the Capitol, waiting to be let in.

6    Q.    Does this photograph correspond in time to the footage we

7    just watched when you were waiting to be let into the Capitol?

8    A.    Yes, ma'am.

9          MS. MURPHY:   Your Honor, we move Exhibit 154 into

10   evidence, please.

11         MR. ROOTS:   We'll object.   Relevance.   This doesn't

12   seem to be very relevant to this case, these defendants.

13         THE COURT:   The objection is overruled.   It's just one

14   photograph.   It shows the officers who were there, including

15   this officer, at the time.   So we will admit it.   That is 154

16   and it may be published.

17                              (Government Exhibit No. 154

18                               received into evidence.)

19   BY MS. MURPHY:

20   Q.    Officer Cartwright, can you describe for the jury what

21   we're looking at here in this photograph?

22   A.    So you see me standing in front of the group of people.

23   Officer Watson has his hand on my vest, basically securing me

24   just in case the worst did happen and one of them decided to

25   put their hands on me and drag me into the crowd and do me

1    harm.  Just as an anchor, basically.  And you see Officer

2    Chih, basically fussing with Capitol Police, trying to get in

3    the door.

4    Q.   And does this photo correspond in time to the body-worn

5    camera we just watched when you were standing and there were

6    demonstrators all around you?

7    A.   Yes, ma'am.

8    Q.   Can we pull Exhibit 153 back up, please?  And continue

9    playing till about 8:34.

10        (Video played.)

11        Officer Cartwright, did you eventually make your way

12   inside the Capitol?

13   A.   Yes, ma'am.

14   Q.   And did you hear a loud piercing noise when you went

15   through the doors coming into the Capitol?

16   A.   Yes, ma'am.

17   Q.   Can we continue playing and stop at about 9:12, please.

18        (Video played.)

19        Did you hear a loud piercing noise at this door as well?

20   A.   Yes, ma'am.

21   Q.   Was it even more crowded with more rioters or

22   demonstrators in this area?

23   A.   In this, among other various spots, yes, ma'am.

24   Q.   And were the people in the crowd at this point impeding

25   your ability to accomplish your goal in getting to other law

1    enforcement officers?

2    A.    Yes.   The people and the officers trying to deal with the

3    people.   Yes, ma'am.

4    Q.    Can we continue playing and stop at about 10:17, please.

5         (Video played.)

6         If we could maybe go back one frame or -- I think go back

7    one frame would be helpful.   There we go.

8         Officer Cartwright, do you recognize the gentleman --

9    do you recall seeing the gentleman here in the black jacket,

10   white turtleneck and white hat?

11   A.    No, ma'am.

12   Q.    Can you tell us what the time stamp is on the body-worn

13   camera for what time this individual would have been in your

14   purview inside the Capitol?

15   A.    It reads 15:18 hours and 30 seconds.   3:18 p.m.

16   Q.    3:18 p.m. on January 6.

17   A.    Yes.

18   Q.    Thank you.

19        Can we continue playing and stop at 10:43, please.

20        (Video played.)

21        Officer Cartwright, do you recognize the gentleman in

22   the black North Face jacket and the red hat toward the left

23   side of the screen here?

24   A.    From that day?  No, ma'am.

25   Q.    Can you tell us the time stamp as to what time that

1      individual would have appeared on your body-worn camera on

2      January 6?

3      A.    It reads 15:18:57, or 3:18 p.m. and 57 seconds.

4      Q.    Thank you.  If we continue playing just a bit.

5            (Video played.)

6            Right behind the gentleman in the black jacket and

7      the red hat, there's a gentleman in a blue hat to his left.

8      Do you recognize or do you recall him?

9      A.    No, ma'am.

10     Q.    Can you tell us what time approximately, according to

11     this time stamp, that individual would have passed you inside

12     the Capitol?

13     A.    15:18:58, or 3:18:15 p.m.

14     Q.    Officer Cartwright, where did you go after this period

15     of time in the Capitol?

16     A.    After this we ended up in the tunnel, the tunnel on the

17     west side of the Capitol.  That's where we were trying to make

18     our way to.

19     Q.    So you did make it to -- you eventually made it to your

20     destination?

21     A.    Yes, ma'am.

22     Q.    And again, were the individuals who you encountered on

23     this path here in the way of you making it to your destination

24     in terms of trying to assist other law enforcement officers?

25     A.    In certain areas, yes.

1    Q.   Can we pull up Exhibit 151 now, please.

2         This exhibit has not yet been admitted.  With the jury's

3    indulgence, I'd ask that we do the same.  I'll play a little

4    bit for you, if you'll let us know when you're able to orient

5    yourself so you can answer questions about this video.

6         (Video played.)

7    A.   Stop.

8    Q.   Are you able to explain what this is?

9    A.   Yes, ma'am.

10   Q.   And what is it?

11   A.   This is Officer Chih's trunk.  He drives -- or used to

12   drive cruiser 8710.  I recognize his trunk.  He has "Firearms

13   Instructor" because he did that for a while.  And I know that

14   patch:  It is what it is.  It's in his trunk.

15        MS. MURPHY:  Your Honor, we would move Exhibit 151 into

16   evidence at this time.

17        MR. ROOTS:  No objection.

18        THE COURT:  Without objection, Government 151 is

19   admitted and may be published.

20                           (Government Exhibit No. 151

21                            received into evidence.)

22   BY MS. MURPHY:

23   Q.   So you were testifying that this is Officer Chih's

24   body-worn camera?

25   A.   Yes, ma'am.

1    Q.   And is it dated January 6 as well?

2    A.   Yes, ma'am.

3    Q.   Okay.  And Officer Chih is one of the -- and you

4    testified that Officer Chih is one of your teammates or was

5    one of the teammates with you on that day?

6    A.   Yes, ma'am.

7    Q.   Can we forward to 9:30, please, and play through about

8    10:18.

9         (Video played.)

10        So Officer Cartwright, from this different angle down

11   from Officer Chih's body-worn camera, do you recall this

12   individual here in the white turtleneck, white hat, and black

13   jacket?

14   A.   No, ma'am.

15   Q.   Okay.  Can you tell us the time stamp for what time this

16   individual would have appeared on Officer Chih's body-worn

17   camera on January 6?

18   A.   15:18:31 or 3:18 p.m.

19   Q.   Thank you.  Can we play until about 10:47, please.

20        (Video played.)

21        Right here.  Officer Cartwright, here in the black North

22   Face jacket, are you able to recall that individual?

23   A.   No, ma'am.

24   Q.   Can you tell us what time that individual appeared on

25   Officer Chih's body-worn camera on January 6?

1    A.    Yes.  15:18:59 or 3:18 p.m.

2    Q.    And if we can advance just a little.  What about this

3    individual?  Do you recall that individual?

4    A.    No, ma'am.

5    Q.    Can you tell us what time he would have appeared on

6    Officer Chih's body-worn camera on January 6?

7    A.    Exactly 15:19 hours, or 3:19 p.m.

8    Q.    Thank you.  Can we pull up Exhibit 152, please.

9         And again, this one has not yet been admitted, so with

10    the jury's indulgence, I'd ask you, Officer Cartwright, to

11    watch a few seconds of the video, let us know once you're

12    oriented and can answer questions about it.

13         (Video played.)

14    A.    Stop right there.

15    Q.    Are you able to tell us what this is?

16    A.    Yes, ma'am.  This is Officer Watson's body camera

17    depicting him holding me with his left hand at my vest.

18         MS. MURPHY:  Your Honor, we would move to admit Exhibit

19    152 into evidence at this time.

20         MR. ROOTS:  No objection.

21         THE COURT:  Without objection, Government 152 is

22    admitted and may be published.

23                              (Government Exhibit No. 152

24                                received into evidence.)

25

1      BY MS. MURPHY:

2      Q.   Can we skip to about 2:46, please?  And then play until

3      about 3:09.

4           (Video played.)

5           Actually, will you pause there?

6           Officer Cartwright, are you still able to hear the

7      piercing alarm at this point?

8      A.   I heard it.  Yes, ma'am.

9              MR. ROOTS:  Objection.  Leading.

10             THE COURT:  Sustained.  The answer has already been

11     given, though.  So just avoid the leading questions.

12     BY MS. MURPHY:

13     Q.   We can continue to play, please, until about 3:09.

14          (Video played.)

15          Once again, from this angle, Officer Cartwright, do you

16     recall seeing the guy in the black jacket, white turtleneck

17     and white hat?

18     A.   No, ma'am.

19     Q.   Can you tell us what time he would have appeared on

20     Officer Watson's body-worn camera on January 6 inside the

21     Capitol?

22     A.   It reads 15:18:29, about 3:18 p.m.

23     Q.   Thank you.  Can we play until about 3:36, please.

24          (Video played.)

25          Officer Cartwright, do you recognize the individual to

1    the left with the black North Face jacket on and the red hat?

2    A.    No, ma'am.

3    Q.    Could you tell us what time he would have appeared on

4    Officer Watson's body-worn camera on January 6 inside of the

5    Capitol?

6    A.    It reads 15:18:56 or 3:18 p.m.

7    Q.    And if we could play just a little further, do you see

8    the individual in the blue hat and the gray jacket all the way

9    to the left of the frame?

10   A.    Yes, ma'am.

11   Q.    And again, do you recall him?

12   A.    No, ma'am.

13   Q.    Can you tell us approximately what time he would have

14   appeared on Officer Watson's body-worn camera on January 6

15   inside of the Capitol?

16   A.    At 15:18:57 or 3:18 p.m.

17   Q.    And Officer Cartwright, about how many people do you

18   think you saw at the Capitol on January 6?

19          THE COURT:  At or in?

20          MS. MURPHY:  In.  Inside the Capitol on January 6.

21          THE WITNESS:  I'm bad with that.  Maybe hundreds?  In

22   the hundreds.  I would say in the hundreds, yes.

23   BY MS. MURPHY:

24   Q.    So you saw and/or interacted with a lot of people on

25   January 6.

1    A.    Yes, ma'am.

2    Q.    Can you tell us what time you eventually left the Capitol

3    on that day?

4    A.    I don't think I know, ma'am.  It was a long day, but it

5    was dark.  We were there all day.  I hate to get locked into

6    an exact time because I didn't look at my watch but it was

7    definitely dark and people had left, and it's January so it

8    gets dark early.  8:00?  I honestly don't recall.

9    Q.    Thank you.

10         MS. MURPHY:  I have no further questions for the

11    witness at this time.

12         THE COURT:  Mr. Roots.

13                      CROSS-EXAMINATION

14    BY MR. ROOTS:

15    Q.    Thank you, Officer Cartwright.

16    A.    Sir.

17    Q.    So in the segments that we saw played just now, you were

18    directed to some individuals, and I believe you said with each

19    case you didn't really recognize those individuals.

20    A.    Correct.

21    Q.    You didn't have much memory of those particular people.

22    A.    Correct.

23    Q.    Those individuals that were pointed out to you did not

24    push you in any way, did they?

25    A.    No, sir.

1    Q.    Did they contact you in any way?

2    A.    No, sir.  Not that I recall.

3    Q.    Did they say anything?

4    A.    Not that I recall, sir.

5    Q.    Now, there was at some point -- you were asked something

6    like they were in the way.  Were they in the way of you, did

7    they stop you from walking or going where you needed to go?

8    A.    It could be said that we had to slow down and stay on the

9    side of the hallway as many of them progressed by.  Them --

10   they were among many that we had to stop and wait for to

11   proceed through the hallway to let them out, yes.

12   Q.    Now, also in the segments we saw, we didn't see a lot of

13   arrests being made.  Was there arrests being made around you

14   in those segments?

15   A.    I didn't see any arrests going on around me.  Not in

16   those segments, no.

17   Q.    I didn't even see much confrontation between law

18   enforcement and the rioters or protesters or demonstrators.

19   Was there -- I didn't see much.  Did you see in those

20   segments --

21   A.    In those segments?

22   Q.    In those segments.

23   A.    I saw interactions.  It depends on how you term

24   confrontations.  Near the end of what we saw, you would see

25   the officers telling the individuals to move back, and they

 1    were complying.  So I would see that.

 2    Q.   Now, we saw the body cams of yourself and your two

 3    colleagues.  We didn't see all of it, obviously, but we didn't

 4    see you crossing any barricades to get into the Capitol.  Did

 5    you have to jump over any barricades?

 6    A.   We had to traverse some overturned items and obstacles.

 7    I'd say that.

 8    Q.   Did you encounter any signs that said don't be here or

 9    don't come, closed area?

10    A.   I can't say I saw that.

11    Q.   Now, you said your goal was to get inside.  You heard a

12    lot of chanting from the crowd there?

13    A.   We heard a lot of chanting, a lot --

14    Q.   People were saying "Whose house?  Our house."

15    A.   Things of that nature.  Yes, sir.

16    Q.   I heard one person say "This is our building.  We want to

17    be heard."  Do you recall that?

18    A.   There were things of that nature being said.  I won't say

19    I recall that specific statement.

20    Q.   Now, you did indicate you've seen other protests, other

21    riots and things in your time.

22    A.   Yes, sir.

23    Q.   Would you say the atmosphere was less violent or more

24    violent, at least in those segments that we saw, than what

25    you've seen elsewhere?

1    A.    Okay.  So in those segments that we viewed, no, they were

2    not more violent.  But they weren't atypical.  In those

3    segments, no.  But there was more.

4    Q.    Now, to get into the building, into the U.S. Capitol

5    there, did you go through a metal detector?

6    A.    I don't recall specifically.

7    Q.    Did you go through any security?

8    A.    I gotta be honest.  I don't recall a metal detector

9    device.  We were just trying to go.  Looking at the body

10   camera might refresh my memory.  But I don't say specifically

11   that I went through a metal detector.  I don't remember that.

12   Q.    Were you asked to show ID?

13   A.    No, sir.

14   Q.    Seemed like many people were just walking around without

15   being stopped by police.  Was that the case?

16   A.    There was a lot of that happening, yes.

17        MR. ROOTS:  I actually have no further questions.

18   Thank you so much.

19        THE WITNESS:  Yes, sir.

20        THE COURT:  Ms. Murphy?

21        MS. MURPHY:  Very brief redirect, Your Honor.

22                      REDIRECT EXAMINATION

23   BY MS. MURPHY:

24   Q.    Officer Cartwright, as a part of this SWAT team, when

25   you arrive at a scene would you normally go through metal

1    detectors or security?

2    A.    In certain -- not normally in most buildings, no.

3    Q.    Particularly if you're responding to an incident or a

4    1033 I think you called it?

5    A.    It depends on the location.  If they have metal

6    detectors, we would have to proceed through them like everyone

7    else, but not get stopped and examined; we would just go.

8    Q.    We're going to pull up Exhibit 153 again, please.  I'm

9    going to show you a little bit more of your body-worn camera

10    footage from that day.

11        (Video played.)

12        If you look at this frame over in the area where the flag

13    is, does this help recall your recollection as to whether or

14    not there were bike racks and other sort of barriers around

15    the perimeter of the Capitol or around the Capitol?

16    A.    Yes.

17    Q.    And do you see those bike racks?

18    A.    I do.

19    Q.    And do you know what those bike racks are normally used

20    for?

21    A.    For barriers.  Usually used for -- barriers just for

22    general boundaries, but also for demonstrations.

23        MS. MURPHY:  Thank you, Officer Cartwright.

24        THE COURT:  Just for clarity, this still actually

25    doesn't show all bike racks, does it?  Are all those bike

448

 1    racks?  Can you look at it?

 2           THE WITNESS:  I can see right now two bike racks,

 3    Your Honor.

 4           THE COURT:  They're changing it on me.

 5       That's a bike rack.  Right?

 6           THE WITNESS:  The large one you see, yes, sir, is a

 7    bike rack, and the object next to it, there's a separation,

 8    and right to the right edge of that American flag, that's

 9    another bike rack adjoined to it.

10           THE COURT:  Now if you show the frame that -- those

11    other metal objects are not bike racks; those are permanent

12    gates, if you will, or --

13           THE WITNESS:  Fixtures?

14           THE COURT:  Fixtures of some kind.  They're metal gates

15    and fences that direct people into the Capitol at that place.

16    Right?

17           THE WITNESS:  Yes, Your Honor.

18           MS. MURPHY:  We'll play a little bit more so you can

19    get a better visual there.

20       (Video played.)

21    BY MS. MURPHY:

22    Q.  Are you able to see here the difference between whether

23    those are bike racks there like the one in the frame here

24    versus the black --

25    A.  Yes, ma'am.  Yes, ma'am.

 1            MS. MURPHY:  Thank you.  We have no further questions.

 2      Thank you.

 3            MR. ROOTS:  One question on redirect about the bike

 4      racks?

 5            THE COURT:  I'll go ahead and allow it with respect

 6      to --

 7            MR. ROOTS:  Re-cross.

 8            THE COURT:  -- what he's just testified to.

 9                    RECROSS-EXAMINATION

10      BY MR. ROOTS:

11      Q.   Just to clarify, what we just saw was on the east side

12      of the Capitol, not the west side of the Capitol, correct?

13      A.   East going on -- really edging on to the north side

14      actually.  So the first thing we were talking about, you could

15      say it was on the northeast corner.  The second clip that we

16      looked at was on the north side.

17            MR. ROOTS:  Okay.  Thank you.

18            THE WITNESS:  Yes, sir.

19            THE COURT:  Officer Cartwright, thank you very much.

20      We appreciate your coming.

21            THE WITNESS:  Thank you, Your Honor.

22            THE COURT:  Have a good day.

23            THE WITNESS:  You too.

24        (Witness steps down.)

25            THE COURT:  Next witness, please.

1          MR. VALENTINI:  Government calls Special Agent Walter

2     Giardina.

3          WALTER GIARDINA, WITNESS FOR THE GOVERNMENT, SWORN

4                         DIRECT EXAMINATION

5     BY MR. VALENTINI:

6     Q.   Could you please state and spell your name for the

7     record.

8     A.   Sure.  Walter Giardina.  W-A-L-T-E-R, G-I-A-R-D-I-N-A.

9     Q.   What do you do for a living?

10    A.   I'm a special agent with the FBI assigned to Washington

11    Field Office.

12    Q.   And how long have you been a special agent with the FBI?

13    A.   Approximately 18 years.

14    Q.   What kind of training, briefly, did you undergo to become

15    a special agent with the FBI?

16    A.   Sure.  At the FBI academy you undergo training in

17    conducting interviews, conducting interrogation, physical

18    surveillance, how to serve grand jury subpoenas and analyze

19    results, how to execute search warrants and arrests.

20    Q.   How about since you became an FBI special agent, could

21    you summarize for the jury what kind of training you undergo?

22    A.   Sure.  You're constantly undergoing additional training

23    periodically throughout the year on new techniques in law

24    enforcement, any changes in the law or policy and how those

25    would affect your job.

```
1    Q.   Now, I would like to turn to the investigation at hand
2    in this case.  Were you involved in the investigation of an
3    individual named David John Lesperance?
4    A.   Yes, I was.
5    Q.   How did Mr. Lesperance come to your attention?
6    A.   Sure.  He came to my attention, I became aware from a
7    colleague that the Tampa division of the FBI had had a tip
8    that he had been in the Capitol on January 6, 2021.
9    Q.   Did there come a time when you opened an investigation
10   into Mr. Lesperance?
11   A.   Yes, there was.
12   Q.   And did you work with any other FBI agents in conducting
13   that investigation?
14   A.   Yes.  I worked with several FBI agents and several what
15   we call task force officers who are agents or officers of
16   other agencies that are deputized to work with the FBI.
17   Q.   Did there come a time when you obtained a warrant to
18   search certain electronic records that you had reason to
19   believe belonged to Mr. Lesperance?
20   A.   Yes, there was.
21   Q.   Which electronic records are we talking about?
22   A.   Sure.  Specifically, we did a search warrant for an Apple
23   iCloud account that belonged to Mr. Lesperance.
24   Q.   Excuse me.  Let me -- did you say Apple iCloud account?
25   A.   Yes, I did.
```

1    Q.    Okay.  And did you obtain any records in response to the

2    search warrant that was served on Apple for Mr. Lesperance's

3    records?

4    A.    Yes, I did receive records.  Apple provided the contents

5    of Mr. Lesperance's iCloud account.

6    Q.    Now, those contents that were provided by Apple, did they

7    also include a certification from Apple about the records that

8    you received?

9    A.    Yes.  The service provider, Apple in this case, they

10   provided certification of the validity of the results.

11   Q.    If we could pull up Exhibit 201, please.

12         Before coming to court today did you have an opportunity

13   to review Exhibit 201?

14   A.    Yes, I did.

15   Q.    Is this a certification from Apple about the records that

16   they produced in connection with -- in response to your search

17   warrant?

18   A.    Yes, it is.

19   Q.    And if I may ask you to turn your attention to paragraph

20   No. 3.  Does this certification establish that the records

21   were extracted by Apple pursuant to a reliable process?

22         THE COURT:  Actually, we should probably -- before we

23   do the substance of the document, we should admit the

24   document.

25         MR. VALENTINI:  At this point, the government would

1    move to admit Exhibit 201 into evidence.

2             MR. ROOTS:  No objection.

3             THE COURT:  Without objection, Government 201 is

4    admitted and may be published.

5                              (Government Exhibit No. 201

6                               received into evidence.)

7    BY MR. VALENTINI:

8    Q.   Did the records that accompanied Exhibit 201 come to you

9    in electronic format?

10   A.   Yes, they did.

11   Q.   And what did you do with those records?

12   A.   I downloaded the records and then made them available to

13   a member of the FBI's CART team -- that's our computer

14   analysis team.  It stands for Computer Analysis Response

15   Team -- so they could make them -- they could analyze them and

16   make them viewable to me.

17   Q.   And did your colleagues at the FBI make the documents and

18   the records viewable to you?

19   A.   Yes.  Exactly.  So when I download, they're not in a

20   format that I can review.  They have to go through a process.

21   So an agent colleague who specializes in that decrypted them

22   and then made them available for me for review.

23   Q.   And before coming to court today did you have -- well,

24   let's strike that.

25             Did your colleagues at the FBI also provide a

1     certification of the type of processing that they conducted

2     with respect to these records?

3     A.   Yes, they did.

4     Q.   Let's pull up what has been marked as Exhibit 203.

5         Special Agent Giardina, before coming to court today,

6     did you have an opportunity to review what has been marked

7     as Exhibit 203?

8     A.   Yes, I did.

9     Q.   And is this the certification that your colleagues at

10    the FBI prepared in connection with -- in connection to their

11    processing of these records?

12    A.   Yes, it is.

13         MR. VALENTINI:  Government would move to admit Exhibit

14    203 into evidence.

15         MR. ROOTS:  No objection.

16         THE COURT:  Without objection, Government 203 is

17    admitted and may be published.

18                      (Government Exhibit No. 203

19                        received into evidence.)

20   BY MR. VALENTINI:

21    Q.   And just in sum or substance, what does the certification

22    state?

23    A.   Sure.  It states -- first of all it identifies the agent,

24    in this case Robert Pfannkuch.  It identifies his

25    qualifications, where he works, and that he is the one who

1    took the evidence from Apple, decrypted it and made it

2    available for my review.

3    Q.    This certification in paragraph 7 also address -- if we

4    could zoom in on paragraph 7, does this certification also

5    address some specific exhibits that have been prepared in

6    connection -- in preparation for trial in this case?

7    A.    Yes, it does.

8    Q.    And which exhibits does it reference?

9    A.    It appears to reference Exhibits 204A, 204B, and 205

10   through 232.

11   Q.    And so -- what does the certification say about those

12   exhibits?

13   A.    It describes the exhibits, that they consist of digital

14   videos, digital photographs, text messages, and then summary

15   account data, subscriber information that pertains to the

16   iCloud account.

17   Q.    So those exhibits are fair and accurate copies of the

18   records that were produced by Apple in response to your search

19   warrant?

20   A.    Yes, they are.

21   Q.    Okay.  We can take down the exhibit.

22         And so if we turn to the records that Apple in fact

23   produced, before coming to court did you yourself have an

24   opportunity to review the exhibits that are listed in this

25   certification?

1    A.    Yes, I did.

2    Q.    So let's start with Exhibit 204A and 204B.  And let's

3    start with 204A.

4          What type of record is Exhibit 204A?

5    A.    Sure.  So this Excel spreadsheet is the subscriber

6    information that Apple sends pursuant to the search warrant.

7    So it identifies --

8    Q.    We can stop there.

9          MR. VALENTINI:  The government will move to admit

10   Exhibit 204 into evidence.

11         MR. ROOTS:  With the assurance that this is

12   Mr. Lesperance's iCloud account, no objection.

13         THE COURT:  I believe that is the assurance.  If it

14   turns out not to be true, we can revisit the exhibit, but at

15   the moment it is admitted without objection, and 204A may be

16   published.

17                              (Government Exhibit No. 204A

18                               received into evidence.)

19         MR. VALENTINI:  Before we publish, if we may pull

20   up Exhibit 205A, which is not in evidence at this point.

21         THE COURT:  205A?

22         MR. VALENTINI:  204B.  Apologies.

23   BY MR. VALENTINI:

24   Q.    And what type of file is Exhibit 204B?

25   A.    204B, this looks like it'll be a similar type of

1    information from Apple pursuant to the search warrant.

2    This particular tab is going to talk about the different apps

3    that were installed on the iCloud account.

4            MR. VALENTINI:  So the government would move to admit

5    Government Exhibit 204B into evidence.

6            MR. ROOTS:  No objection.  Same reservations.

7            THE COURT:  Same reservation is noted, and 204B will

8    be admitted, may be published.

9                            (Government Exhibit No. 204B

10                           received into evidence.)

11   BY MR. VALENTINI:

12   Q.   So let's pull up Exhibit 204A which is now in evidence.

13   Special Agent Giardina, what is the email account that is

14   listed in connection with the iCloud account?

15   A.   Sure.  The subscriber's email to this iCloud account is

16   LesperanceD@iCloud.com.

17   Q.   What are the first and last names of the person listed in

18   connection with this account?

19   A.   David Lesperance.

20   Q.   And if we could scroll to the right, what is the street

21   address that is listed in connection with the account holder?

22   A.   ███████████████████████████████, Florida.

23           MR. ROOTS:  Your Honor, we do request that those be

24   redacted just from public records just so people can't bother

25   that address, without objection.

1          THE COURT:  I'm sorry?  Mr. Valentini?

2          MR. VALENTINI:  We have no objection to that.

3          THE COURT:  And that will be redacted.  The actual

4     address will be redacted from the record.

5     BY MR. VALENTINI:

6     Q.   And is the address that is listed on this record, does

7     it correspond to -- well, let's strike that.  As part of your

8     investigation, were you able to find out the address where

9     Mr. Lesperance resides?

10    A.   Yes.

11    Q.   And is the address that you found as part of your

12    investigation the same address as listed on this account?

13    A.   Yes.

14    Q.   We can pull down this exhibit and pull up Exhibit 202.

15         Special Agent Giardina, after you received the extracted

16    materials from your colleagues at the FBI, did you review the

17    records that you received?

18    A.   Yes, I did.

19    Q.   What was the purpose, what was the goal of your review?

20    A.   Sure.  So when you conduct a search warrant on an iCloud

21    account, you get many different results.  You get, you know,

22    all the photos that are in somebody's album, a number of text

23    messages, whatever they saved on their iCloud.  And the

24    purpose of this review, the initial review is to identify

25    everything that's in the scope of your investigation and then

1    segregate those items so you only focus on the items that are

2    pertinent to the investigation going forward.

3    Q.    And what kind of information does -- in very general

4    terms, what kind of information does Exhibit 202 show?

5    A.    202 will show -- it's going to show the 325 items that I

6    marked as in scope of this investigation.

7           MR. VALENTINI:  Your Honor, the government moves to

8    admit Exhibit 202 into evidence.

9           MR. ROOTS:  No objection with all those reservations.

10          THE COURT:  Without objection, 202 is admitted and may

11   be published.

12                              (Government Exhibit No. 202

13                                received into evidence.)

14   BY MR. VALENTINI:

15   Q.    Let's talk about Exhibits 205 through 224.  Before coming

16   to court did you have an opportunity to review those exhibits?

17   A.    Yes, I did.

18   Q.    Are all those exhibits, 205 through 224, videos obtained

19   from the extraction of Mr. Lesperance's iCloud account?

20   A.    Yes, they were.

21          MR. VALENTINI:  The government moves to admit Exhibits

22   205 through 224 into evidence.

23          MR. ROOTS:  No objection.  Same sentiments.

24          THE COURT:  Without objection, Government's Exhibits

25   205 through 224 will be admitted and may be published, and

1    that removes the conditional admission of 221 from earlier in

2    the case.

3                        (Government Exhibit Nos. 205-224

4                        received into evidence.)

5            MR. VALENTINI:  Thank you very much, Your Honor.

6    BY MR. VALENTINI:

7    Q.   Let's pull up Exhibit 206.  Special Agent Giardina, are

8    you familiar with the grounds of the Capitol?

9    A.   Yes, I am.

10   Q.   Now, the exhibit that you see is -- the run time -- this

11   is the first frame in the exhibit.  Are you able to determine

12   based on what you see what area of the Capitol we're looking

13   at?

14   A.   Yes.  This appears to be the west side of the U.S.

15   Capitol.

16   Q.   Let's play the first 14 seconds of the exhibit, please.

17   And please pay attention to what you hear.

18        (Video played.)

19        Let's pay attention to what you hear from here on.

20        (Video played.)

21        What did you hear?

22   A.   Sure.  I heard somebody close to the microphone, they

23   were saying, "it looks like they're up on the stage and

24   everything, it looks like they're in," words to those effect.

25   Q.   And you said the voice that you heard was the voice of

1    someone who was close to the recording device?

2    A.    That's what -- that's how I interpret it, yes.

3    Q.    And this video was retrieved from Mr. Lesperance's iCloud

4    account?

5    A.    Yes, it was.

6    Q.    Let's play to -- let's play a few more seconds, and again

7    let's pay attention to what you hear.

8         (Video played.)

9         What, if anything, did you hear -- and for the record we

10   stopped playing the exhibit about 37 seconds into the exhibit.

11   What, if anything, did you hear?

12   A.    I heard some words to the effect about the inauguration.

13   It was very difficult to discern more specifically on this

14   review.

15   Q.    Let's try one more time and let's rewind a few seconds

16   and let's see what, if anything, at all you can hear.

17        (Video played.)

18   A.    I'm sorry.  I heard some talk about the basement.

19   It's difficult for me to be more specific.

20   Q.    You heard some talk about the inauguration?

21   A.    Yes.

22   Q.    And shortly after that about the basement?

23   A.    Yes.

24   Q.    Let's keep playing.

25        (Video played.)

1          Special Agent Giardina, what do you see on the bottom

2     portion of the screen at 1 minute and 22 seconds into the

3     exhibit?

4     A.    Sure.  It appears to be some type of fencing or barrier

5     that's been ripped down.

6     Q.    I'm sorry.  You said the barrier's been ripped out?

7     A.    Ripped down.

8     Q.    Let's continue playing and stop at 1 minute and 28

9     seconds into the exhibit.

10          (Video played.)

11          Okay.  Now we're going to play the next few seconds, and

12    I'm going to ask you to pay attention again to the sound of

13    the exhibit.  If you can discern what you hear.  And we will

14    stop from time to time to ascertain whether you can hear

15    anything.

16    A.    Very good.

17    Q.    Let's play.

18          (Video played.)

19          Let's stop.  What did you hear, Special Agent Giardina?

20    A.    Sure.  I heard somebody say "Hoo hoo, all right," and

21    then "Come on down."

22    Q.    Did you hear a reference to an open house?

23    A.    Yes.  Absolutely.  I heard "Open house.  Come on down.

24    Open house."

25    Q.    Let's continue playing the exhibit and let me know when

1    you can discern any other statements in the recording.

2         (Video played.)

3         What did you hear?

4    A.   It sounded like "One of them's in" and then "Let's go."

5    Q.   Did you hear perhaps "We are almost in, man.  Let's go"?

6         MR. ROOTS:  Objection.  Leading.

7         MR. VALENTINI:  Okay.

8         THE COURT:  Sustained.

9         MR. VALENTINI:  May I ask Ms. Roberts to play the last

10   few seconds of the exhibit again for clarity?

11        THE COURT:  You may.

12      (Video played.)

13        THE WITNESS:  Sure.  Under further review, I heard

14   "We're almost in.  Let's go."

15   BY MR. VALENTINI:

16   Q.   And again, does the voice seem to come from someone who

17   is speaking close to the microphone of the recording device?

18   A.   Yes, it does.

19   Q.   Let's continue playing.

20        (Video played.)

21        What did you hear?

22   A.   I heard "They're almost up the stairs.  They're in, let's

23   go."

24   Q.   And again from a voice presumably in close proximity to

25   the recording device?

1    A.    Yes.   The voice seems similar to somebody who's been

2    close to this microphone throughout this.

3    Q.    Let's keep playing.

4         (Video played.)

5         What did you see first visually in the last few seconds

6    of the exhibit?

7    A.    Sure.   I saw somebody who was wearing a red beanie cap

8    turn and face the camera and then say, "Somebody just fell

9    from the wall."

10   Q.    Let's keep playing.

11        (Video played.)

12        Again, what did you hear?

13   A.    Again, it was a different voice.   Somebody appeared close

14   to the microphone saying "Somebody just fell from the top of

15   the wall."

16   Q.    Let's keep going.

17        (Video played.)

18        What did you hear?

19   A.    Somebody saying "He's hanging from the edge."

20   Q.    Did that last voice seem to you to -- may I ask you to

21   compare that voice to the voice that you heard in prior

22   portions of this recording?

23   A.    It seems to be the same.

24   Q.    The same voice who was speaking closer to the recording

25   device?

1    A.    Yes, that's correct.

2    Q.    Let's keep going.

3         (Video played.)

4         What did you hear?

5    A.    Sure.  There's a discussion between the person who

6    appears to be holding the phone or close to the microphone

7    saying "Oh, he's still there," and then the person with the

8    red beanie cap turns and says "No, it was a different guy,"

9    probably referring to somebody else who might have fallen.

10   Q.    Let's keep playing.

11        (Video played.)

12        Can we stop and rewind maybe 7 seconds back?  Can we play

13   from there?

14        (Video played.)

15        Stop.

16           THE COURT:  How much more on this video?

17           MR. VALENTINI:  Excuse me?

18           THE COURT:  We need to take a morning break.  How much

19   more on this video?

20           MR. VALENTINI:  We have 34 seconds and maybe five

21   minutes of examination.

22           THE COURT:  Well, let's take our break now.  Otherwise,

23   it's going to get too late in the morning.  So let's resume at

24   11:30.

25        (Jury out at 11:18 a.m.)

1          THE COURT:  All right.  I'll see you in 12 minutes.

2      (Recess from 11:19 a.m. to 11:41 a.m.)

3          THE COURT:  Welcome back, members of the jury.  Special

4      Agent Giardina, please have a seat and I remind you you're

5      under oath.  Mr. Valentini.

6          MR. VALENTINI:  Welcome back.

7          THE WITNESS:  Thank you.

8      BY MR. VALENTINI:

9      Q.  Let's move back before we move forwards.  If we could go

10     back to time stamp 1:10 in Exhibit 206, please.  If I may ask

11     Ms. Roberts to play from here.  And I'm going to ask you to

12     look out if you see anything scattered on the floor that the

13     recorder of this video walks over?

14         THE COURT:  The ground?

15         MR. VALENTINI:  On the ground.  I said floor, I'm

16     sorry.  Ground, of course.

17     (Video played.)

18     BY MR. VALENTINI:

19     Q.  Let's stop here.  And let's maybe advance frame by frame

20     briefly?  I've circled an area here.  Do you see anything laid

21     on the grass in this location?

22     A.  Yes.  It appears to be some type of fencing.

23     Q.  Some kind of fencing?  Does that appear to be right in

24     front of and in the direction of travel of the person

25     recording this video?

1    A.   Yes, it does.

2    Q.   So we can continue playing for about 10 seconds.

3         (Video played.)

4         And let's stop now.  We've now stopped at 1:22, and

5    again, what do you see on the left-hand side?

6    A.   Sure.  It appears to be some type of fencing, green in

7    color, that's been torn from its post.

8    Q.   And at this point in the video the person recording the

9    video appears to already have walked over some of this

10   fencing.

11   A.   Yes, it does.

12   Q.   Let's skip forward to where we were before the break,

13   about three minutes into the exhibit.  And let's proceed frame

14   by frame.

15        (Video played.)

16        We can stop here.

17        Do you see a gentleman wearing a white baseball cap?

18   A.   Yes, I do.

19   Q.   Do you also see other items of clothing that this

20   gentleman appears to be wearing?

21   A.   Yes.  This man is wearing a white baseball cap, black

22   earmuffs, white turtleneck, black jacket and blue jeans.

23   Q.   Let's keep playing from here.

24        (Video played.)

25        What, if anything, did you hear in this last segment of

1    the exhibit before we stopped at 3 minutes and 14 seconds into

2    the exhibit?

3    A.    Sure.  There's a repeated chant of "USA, USA."

4    Q.    Did you hear the person close to the recording device

5    join in that chant?

6    A.    Yes, I did.

7    Q.    At this frame at 3 minutes and 14 seconds into the

8    exhibit, can you describe the crowd and the density of that

9    crowd compared to earlier frames in this exhibit?

10    A.    Sure.  It appears as they're getting closer to the

11    Capitol, advancing closer, the crowd is getting more dense

12    and less spread out.

13    Q.    Let's keep playing this exhibit until the end.

14          (Video played.)

15          Before coming to court today, Special Agent Giardina,

16    did you have an opportunity to go back and check the file

17    name of the video that corresponds to Exhibit 206 that we

18    just watched?

19    A.    Yes, I did.

20    Q.    And do you remember what that file name is?

21    A.    Yes.  This exhibit was IMG_0567.

22    Q.    So I'm going to ask Ms. Roberts to please pull up Exhibit

23    202.  And Exhibit 202, you testified before I believe is a

24    report of the contents of the iCloud account that you marked

25    as relevant?

1    A.    That's correct.

2    Q.    I'm going to direct your attention to page 210 in this

3    exhibit.  Maybe you can scroll down.  Okay.

4          Actually on page 211 of the exhibit.  And do you see an

5    entry in this report corresponding to a file named IMG_0567?

6    A.    Yes, I do.

7    Q.    And based on this entry, are you able to tell the jury

8    when that video was captured?

9    A.    Yes.

10   Q.    What time was it captured?

11   A.    So if you look at the bottom right of this entry, you'll

12   see a creation date and time.  And so it's in UTC, which is

13   Universal Coordinated Time, that's Greenwich Mean Time set in

14   England.  So the conversion factor for all these videos, and

15   this one as well, is minus 5.  So this would have been created

16   at 2:32 p.m. on January 6, 2021.

17          MR. VALENTINI:  I'm going to ask the courtroom deputy

18   to please publish 202, which is in evidence.

19          THE DEPUTY CLERK:  It was?

20          THE COURT:  The whole series from 201 through 224 is

21   now in evidence.

22          THE DEPUTY CLERK:  Thank you.

23          MR. VALENTINI:  With the Court's indulgence and the

24   jury's indulgence, I'm going to ask the same question again.

25

1    BY MR. VALENTINI:

2    Q.   You testified a moment ago that you were able to

3    determine that the file name for the video in Exhibit 206 is

4    IMG_0567?

5    A.   Yes.

6    Q.   And on page 211 of Exhibit 202 there's an entry that

7    corresponds to that video file?

8    A.   Yes, there is.

9    Q.   Were you able to determine based on the information

10   extracted from the iCloud account at what time that video was

11   recorded?

12   A.   Yes.

13   Q.   And how were you able to determine that?

14   A.   Sure.  So as I explained a moment ago, if you look at the

15   bottom right you can see the creation date.

16   Q.   And let me interrupt you.  You have the ability -- the

17   screen in front of you is actually a touch screen.  So you can

18   circle that information.

19   A.   Okay.  So if you see there where I circled, and as I

20   explained, the time conversion is a minus 5.  So it would have

21   been created at 2:32 p.m. on January 6, 2021.

22   Q.   If you can now pull up Exhibit 207.  If you can play the

23   first 10 seconds of the exhibit.

24        (Video played.)

25        And how does this exhibit appear to relate to the exhibit

1    we just watched before, Exhibit 206?

2    A.    Sure.  A couple things.  One, just by sequence, it

3    appears to be the next created video.  It appears to be closer

4    to the Capitol than the prior video.

5    Q.    Same general area?

6    A.    Yes.

7    Q.    And you said before that is -- which area is it

8    generally?

9    A.    The west side, looking at the West Terrace of the

10   Capitol.

11   Q.    And do you see a wall sort of in the background of the

12   exhibit?

13   A.    Yes.

14   Q.    And do you understand that to be a wall between the Lower

15   West Terrace and the Upper West Terrace?

16   A.    Yes, I do.

17   Q.    Let's play the exhibit, and let's pay attention to what

18   you hear.

19        (Video played.)

20        Do you see anything unusual on the wall that connects the

21   Lower West Terrace to the Upper West Terrace?

22   A.    Sure.  I see two people that are scaling the wall.

23   Q.    And did you hear anything in this last portion of the

24   exhibit that we just played?

25   A.    Yes.  I heard words to the effect of "Look Ma, your

1    troublemaking son is at it again."

2    Q.    And did that sound like the same voice as -- that we have

3    heard previously in Exhibit 206?

4    A.    Yes.

5    Q.    The voice that appeared to be close to the recording

6    device?

7    A.    Yes.

8    Q.    And let's play the exhibit.

9         (Video played.)

10        For the next few seconds I'm going to ask you to again

11   pay attention to what you can hear in the exhibit.

12        (Video played.)

13        What did you hear?

14   A.    Sure.  There's talk about "bigly."  "We're doing it

15   bigly."

16   Q.    Let's continue playing the exhibit.

17        (Video played.)

18        So again, what did you hear in these last few seconds of

19   the exhibit?

20   A.    Again, "Bigly.  We're doing this bigly."

21   Q.    Or words to that effect?

22   A.    Yes.  That's correct.

23   Q.    So, again, same question as before.  Before coming to

24   court today, did you take the time to ascertain which -- the

25   name of the video file that corresponds to Exhibit 207?

1    A.    Yes.

2    Q.    Do you recall what the file name was?

3    A.    Yes.  It's IMG_0568.

4    Q.    Okay.  Let's play the exhibit to the end.

5          (Video played.)

6          Before we proceed, may I ask you, do you have an

7    understanding of what the reference to the word "bigly" is?

8    A.    I'm not -- no, not particularly.

9    Q.    Let's pull up what has been marked as Exhibit 202.  And

10   before, you said that Exhibit 207 corresponds to video file

11   No. 0568.  Is that correct?

12   A.    Yes.

13   Q.    I'm going to ask you to turn to page 211 of Exhibit 202.

14   Do you see an entry that corresponds to that file name?

15   A.    Yes, I do.

16   Q.    Based on that entry, are you able to determine at what

17   time the video file was created?

18   A.    Yes.

19   Q.    Could you please circle on the screen where that

20   information comes from?

21         (Witness complies.)

22         Could you tell the jury what that information means in

23   terms of the time of creation of the file?

24   A.    Sure.  So this video would have been created at 2:36 p.m.

25   on January 6, 2021.

1    Q.   Okay.  Let me clear this screen and let's pull up Exhibit

2    208.

3         (Video played.)

4         Special Agent Giardina, do you have a general

5    understanding of where this exhibit was recorded?

6    A.   Yes.  This is on the Upper West Terrace of the U.S.

7    Capitol.

8    Q.   So this is now on the top of the wall that you were

9    looking at before, up the stairs from that location.

10   A.   That's correct.

11   Q.   Do you see in this frame an individual wearing a white

12   baseball cap?

13   A.   Yes, I do.

14   Q.   And could you circle it for the jury?

15        (Witness complies.)

16        Does that same individual also appear to be wearing other

17   headgear?

18   A.   Yes.  Yes, he is.

19   Q.   What type of headgear?

20   A.   Appears to be wearing black earmuffs.

21   Q.   Thank you.  Let's play to 20 seconds into the exhibit.

22        (Video played.)

23        Could you describe the individuals walking immediately

24   ahead of the individual in the white cap?

25   A.   Sure.  It's a white male wearing a red stocking cap and a

1     black North Face jacket.

2     Q.   As part of your investigation, were you able to determine

3     the identity of these two individuals?

4     A.   Yes.

5     Q.   Who are they?

6     A.   The man wearing the red stocking cap is Casey Cusick,

7     and the man wearing the white ball cap is James Cusick.

8     Q.   So I'm going to refer to these individuals as Casey

9     Cusick and James Cusick from here on out.  Let me ask, in

10    which directions are Casey Cusick, James Cusick, and the

11    individual recording this video moving?

12    A.   They're moving towards the Capitol.

13    Q.   Let's play the next 17 seconds of the exhibit.

14         (Video played.)

15         Special Agent Giardina, what do you see on the right-hand

16    side of the frame at 31 seconds into the exhibit?

17    A.   Sure.  I see, looks like a signage here that says Area

18    Closed.

19    Q.   What color is the lettering?

20    A.   Red.

21    Q.   It's in bold type?

22    A.   Yes.

23    Q.   What does the sign -- what is it affixed to?

24    A.   It appears to be affixed to some type of security barrier

25    or bike rack.

1    Q.   Let's play the next few seconds.  I'm going to ask you if

2    you can determine or come to a reasonable estimate of how far

3    the individual recording these events is from this bike rack.

4         (Video played.)

5         Were you able to get a general sense based on the images

6    depicted in the video?

7    A.   I'm sorry.  What was the question you preceded the video

8    with?

9    Q.   A general estimate of how far do you estimate the person

10   recording this video was from the barricade and Area Closed

11   sign?

12   A.   It appeared to be very close, no more than a body length

13   or two.

14   Q.   And what did you just hear in the video?

15   A.   I heard kind of a taunting voice, sounded like words to

16   the effect of "We're home."

17   Q.   Words to the effect of "We are home"?

18   A.   Yes.

19   Q.   Thank you.  Who made that statement?  Let me ask a better

20   question.  Does the voice who made the statement seem to be

21   the same voice we've heard in this exhibit and prior exhibits?

22   A.   Yes, it appears to be consistent.

23   Q.   Consistent with the voice of the person close to the

24   recording device.

25   A.   That's correct.

1    Q.    And again, which direction is the person holding the

2    recording device moving at this point?

3    A.    They appear to still be moving towards the Capitol.

4    Q.    And towards the barricades?

5    A.    Yes.  That's correct.

6    Q.    Towards the Area Closed sign?

7    A.    Yes.

8    Q.    Let's play until 55 seconds into the exhibit.

9          (Video played.)

10         Special Agent Giardina, if I may ask you to give us an

11   update of the direction in which the videographer has moved.

12   A.    Sure.  They're moving still on the Upper West Terrace

13   towards the Senate side door, towards the Capitol.

14   Q.    How about the individuals immediately in front of him at

15   this point, 55 seconds into the exhibit?  Which direction is

16   that person moving?

17   A.    Towards the Capitol.

18   Q.    That individual before we identified as James Cusick?

19   A.    That's correct.

20   Q.    I'm going to ask you to, in the next segment of the

21   exhibit, to pay attention on what type of ground the

22   individual recording the events as well as Mr. James Cusick

23   and Mr. Casey Cusick are walking on.

24         (Video played.)

25         Did you hear the gentleman in the red beanie -- could you

1    understand what he was saying at that point?

2    A.   It sounds like he was saying words to the effect of

3    "we're on" -- or "we're on or at the federal building, can you

4    believe that."

5    Q.   Or words to that effect.

6    A.   That's correct.

7    Q.   That's how you understood it.

8    A.   Yes.

9    Q.   Let's keep playing.

10       (Video played.)

11       We stopped playing the Exhibit at 1:54 into the exhibit.

12   What do you see on the left-hand side of the exhibit?

13   A.   I see a line of police officers.  They're wearing typical

14   riot gear, helmets and masks.

15   Q.   Let's continue playing the next four seconds of the

16   exhibit.

17       (Video played.)

18       We can stop now.  What did you hear?

19   A.   I heard a voice consistent with the person who's been

20   close to the microphone saying words to the effect of "the

21   people are home."

22   Q.   Let's keep playing.

23       (Video played.)

24       For the next five or six seconds, could you please pay

25   attention to the direction in which the officers, if you see

1      any, are moving.

2      A.   Very good.

3           (Video played.)

4      Q.   You can stop here.  Which direction were they moving?

5      A.   Sure.  It looked like a group of officers moving in file

6      towards or into the Capitol.

7      Q.   You can continue playing the exhibit until the end.

8           (Video played.)

9           Let me ask you the same question I asked you before about

10     other exhibits.  Before coming to court today did you have an

11     opportunity -- did you go back and cross-check the file name

12     of Exhibit 208?

13     A.   Yes, I did.

14     Q.   And do you remember what the file name for that exhibit

15     is?

16     A.   Yes.  It was IMG_0570.

17     Q.   0570?  If I may ask Ms. Roberts to please pull up Exhibit

18     202.  And again on page 211, were you able to find video file

19     IMG_0570 in Exhibit 202?

20     A.   Yes.

21     Q.   And were you able to determine at what time the video in

22     that recording was captured?

23     A.   Yes, I was.

24     Q.   And at what time was it captured?

25     A.   Sure.  It was captured at 2:41 p.m. on January 6, 2021.

1    Q.   And again, you explained this before, but you know it's

2    2:41 p.m. and 12 seconds because the entry is listed as

3    7:41:12 p.m. in UTC time?

4    A.   That's correct.

5    Q.   And that's five hours off.

6    A.   That's right.

7    Q.   Let's pull up Exhibit 209.  And let's play the first five

8    seconds of the exhibit.

9         (Video played.)

10        We can stop there.  Did you hear a female voice?

11   A.   Yes, I did.

12   Q.   What did you hear that voice say?

13   A.   I heard a female voice explaining something about pepper

14   spray.

15   Q.   Was that voice soft, loud, high?

16   A.   No.  It sounded like an excited voice talking about

17   pepper spray.

18   Q.   Let's continue playing the exhibit.

19        (Video played.)

20        Let's stop here for a second.  And for the next few

21   seconds, as I did before, I'm going to ask you to please pay

22   attention to what you hear in the recording.

23        (Video played.)

24        Let's stop.  Did you hear a voice?

25   A.   Yes, I did.

1    Q.   Could you understand what he said?

2    A.   Yes.  He said words to the effect of "I've never been up

3    here before."

4    Q.   And that voice, to be clear, did it sound the same or

5    different from the voice of the person closest to the

6    recording device that we've been hearing so far?

7    A.   It's difficult for me to determine based on that clip.

8    Q.   Understood.  Let's play until 56 seconds into the

9    exhibit.

10        (Video played.)

11        What, if anything, did you hear the crowd chanting?

12   A.   It was a repeated chant of "Whose house is this?  This

13   is our house."

14   Q.   Or words to that effect.

15   A.   Words to that effect.

16   Q.   Let's play the exhibit until the end.

17        (Video played.)

18        Let's talk about timing again.  Before coming to court,

19   did you have an opportunity to go back and cross-check the

20   file name for Exhibit 209?

21   A.   Yes.

22   Q.   Do you remember what that file name is?

23   A.   Yes.  IMG_0571.

24   Q.   I'm going to ask Ms. Roberts to again pull up Exhibit

25   202.  This time we're going to page 212.  Do you see an entry

1    for video file 0571?

2    A.   Yes.

3    Q.   And based on that entry, were you able to determine at

4    what time the video was recorded?

5    A.   Yes, I was.

6    Q.   Could you please give that information to the jury?

7    A.   Sure.  This video was recorded at 2:45 p.m. on January 6,

8    2021.

9    Q.   So all the videos that you have been shown so far today

10    were recorded somewhere between 2:25 and 2:45 p.m. on

11    January 6 thus far.

12    A.   Yes.

13        THE COURT:  We're going to do 15 more of these videos?

14    Maybe you can figure out a more efficient way to get in the

15    time of the videos than to go through the same series of six

16    or eight questions.

17        MR. VALENTINI:  We're planning on six videos.

18        THE COURT:  Do it as best you can.

19        MR. VALENTINI:  I'm planning on six of the videos.

20        THE COURT:  Okay.

21        MR. VALENTINI:  They get shorter.

22    BY MR. VALENTINI:

23    Q.   Let's pull up Exhibit 210.  If we can skip to 1:50 into

24    the video.  And I'm going to ask you over the next few seconds

25    of the exhibit if you hear a female voice.

```
 1              (Video played.)
 2              Let's go back a minute.  I was going to ask you to try
 3       and see if you can hear a male voice, not a female voice.
 4       I apologize.
 5              (Video played.)
 6              What, if anything, did you hear?
 7       A.   Sure.  I heard a discussion about the mayor issued a
 8       curfew until 6 p.m.  Words to that effect.
 9       Q.   Now, to be clear, you don't recognize that voice.
10       A.   Not particularly.
11       Q.   You don't know whom it belongs to?
12       A.   No, I do not.
13       Q.   But those statements are clearly audible on the
14       recording.
15       A.   Yes, they are.
16       Q.   Before coming to court today, let me ask you the same
17       question as before:  Were you able to determine the file name
18       of Exhibit 210?
19       A.   Yes.
20       Q.   What is it?
21       A.   IMG_0572.
22       Q.   If we can go back to Exhibit 202, do you see an entry
23       corresponding to that video file?
24       A.   Yes.
25       Q.   And at what time was this video recorded?
```

1    A.    This video was recorded at 2:53 p.m. on January 6, 2021.

2    Q.    We can take down this exhibit.  Can pull up Exhibit 211.

3    Let's stop at the first frame.

4          You testified before that you watched this video in

5    Exhibit 211 before coming to court?

6    A.    Yes.

7    Q.    Where does it appear that the video takes place?

8    A.    Sure.  This video appears to take place in front of the

9    Senate door of the U.S. Capitol.

10    Q.    And let's -- Senate door is also referred to sometimes

11    as the Senate Wing door?

12    A.    That's correct.

13    Q.    So let's focus on the first frame of this video.

14    Do you see a gentleman in the foreground?

15    A.    Yes.

16    Q.    What is he wearing?

17    A.    He's wearing a red stocking cap.

18    Q.    Is that consistent with the gentleman who earlier in your

19    testimony you had identified as Casey Cusick?

20    A.    Yes.

21    Q.    What do you see on the background of the picture?

22    A.    Sure.  In the background of the picture you see a door

23    that's open and the glass is broken out of it.

24    Q.    Let's play the first four seconds of the exhibit.

25          (Video played.)

1          Stop.  Did you hear any statements at this point in the

2     exhibit?

3     A.   Yes.  I heard a male voice say words to the effect of

4     "Pepper spray, Dad."

5     Q.   Was that voice consistent with the voice coming from

6     Casey Cusick?

7     A.   It's clearly audible in the video.

8     Q.   And which direction is the person in the red beanie,

9     Casey Cusick, moving at this point in the exhibit?

10    A.   It's moving from outside towards inside the Capitol.

11    Q.   Did you hear any other sounds at this point in the

12    exhibit?

13    A.   Yes.  You can hear a audible security alarm.

14    Q.   Okay.  Let's continue playing the exhibit until 9 seconds

15    into the exhibit.

16         (Video played.)

17         Do you see anyone else who appeared at this point,

18    7 seconds into the exhibit?

19    A.   Yes.

20    Q.   Who do you see?

21    A.   I see the gentleman wearing the white ball cap with the

22    black earmuffs and the black jacket.

23    Q.   I'm going to ask you to pay attention to the left-hand

24    side of the exhibit over the next few seconds.

25         (Video played.)

1          What do you see in the far background of the exhibit

2     where I have circled?

3     A.     Sure.   There's a grouping of police officers, or at least

4     a pair are visible there, with helmets and visors down.

5     Q.     Did you continue to hear a blaring alarm sound at this

6     point in the exhibit?

7     A.     Yes.

8     Q.     Let's play the next few seconds of the exhibit until 34.

9          (Video played.)

10         Did you hear a voice in this exhibit?

11    A.     Yes.

12    Q.     What did he say, if you could hear?

13    A.     I heard a repeated, "Dad, Dad."

14    Q.     And at that point, after that, did you see the person

15    in the white baseball cap turn in a different direction?

16    A.     Yes, I did.

17    Q.     In which direction?

18    A.     He turned towards the voice that was saying "Dad, Dad"

19    as I understood it.

20    Q.     That also happens to be turn to the right?

21    A.     Yes.

22    Q.     Away from the officers.

23    A.     Yes.

24    Q.     Let's keep playing.

25         (Video played.)

1           We're now 34 seconds into the exhibit.  Has this group of

2      individuals that we've been following in these exhibits moved

3      further deeper into the building at this point?

4      A.    Yes, they have.

5      Q.    Let's keep playing until 43 seconds into the exhibit.

6           (Video played.)

7           Okay.  Can we stop now.  Did you hear a voice say

8      anything at this point in the exhibit?

9      A.    Yes.  I heard a male voice say words to the effect of

10     "Don't break nothing.  This is my house."

11     Q.    Okay.  Let's continue playing.

12          (Video played.)

13          Okay.  Stopping at a minute and 21 seconds.  Did you hear

14     any chanting by the crowd at this point?

15     A.    Yes.  There appears to be a repeated chanting of "USA."

16     Q.    What is the density of the people at this point in the

17     exhibit?

18     A.    Hard to describe density.  I mean it's a fairly good

19     crowd of people, though.

20     Q.    Okay.  Let's keep playing.

21          (Video played.)

22          Did you hear a voice say something?

23     A.    Yes, I did.

24     Q.    What did you hear?

25     A.    I heard words to the effect of, sounded like a question,

1     "Did he say we're not supposed to be here?"

2     Q.   Let's continue playing.

3          (Video played.)

4          Let's stop here.  What do you see at this point in the

5     exhibit at 1 minute and 52 seconds into the exhibit?

6     A.   Sure.  Visible in the background there is a group of

7     approximately four or more police officers.

8     Q.   Okay.  Let's keep playing.

9          (Video played.)

10         Let me ask you about timing.  Were you able to

11    determine -- let's pull up Exhibit 202.  Before coming here

12    today did you cross-check the video file corresponding to

13    Exhibit 211?

14    A.   Yes, I did.  It was IMG_0575.

15    Q.   Were you able to determine at what time that video was

16    recorded?

17    A.   Yes.

18    Q.   At what time was it recorded?

19    A.   Sure.  You can see at the bottom of the screen right

20    there is 3:09 p.m. on January 6, 2021.

21    Q.   So 3:09 p.m.?

22    A.   3:09 p.m.  Yes.

23    Q.   Let's pull up Exhibit 213.  Let's just play the exhibit.

24         (Video played.)

25         Okay.  Let's stop here.  What did you hear?

489

```
1    A.   Sure.  I heard a conversation, sounds like the man in the
2    red beanie cap says "I don't know where he is," and then the
3    voice that sounds close to the microphone says some words to
4    the effect of "He's in the men's room."
5    Q.   Okay.  And can we go back maybe a couple of seconds?
6    Let's keep playing.
7         (Video played.)
8         Let's stop here.  Did you understand -- what, if
9    anything, did you hear at this point in the exhibit?
10   A.   Sure.  I heard a voice say "I don't want to leave him but
11   I don't want to get hit with a billy club."  And I believe
12   there was some discussion about how they had looked in the
13   bathroom and hadn't found him.
14   Q.   Or words to that effect.
15   A.   Words to that effect.  Yes.
16   Q.   Let's continue playing this exhibit to the end.
17        (Video played.)
18        What, if anything, did you hear in this last segment
19   of the exhibit?
20   A.   The last thing I heard was, "I didn't see him."
21   Q.   Let's pull up Exhibit 214.  And if we can play to the
22   first 13 seconds of the exhibit.
23        (Video played.)
24        We can stop here.  Did you see anyone whom you recognized
25   from prior exhibits at this point in the exhibit?
```

1    A.    Yes.    I saw Casey Cusick, the man with the red beanie

2    cap.

3    Q.    Okay.    I'm going to ask you to pay attention and see

4    if you can make out what is being said in the exhibit.

5          (Video played.)

6          What did you hear?

7    A.    I'm sorry.    I did not discern the audio clearly enough

8    to describe it.

9    Q.    Understood.    Let's continue.

10          (Video played.)

11          We can stop here.    What area of the Capitol do you see

12    at this point in the exhibit?

13    A.    Sure.    This is the Upper West Terrace.

14    Q.    Okay.    But we're now outside the building?

15    A.    Yes.    Outside the Capitol on the terrace.

16    Q.    Let's keep playing.

17          (Video played.)

18          And we can stop the exhibit here.    Were you able to

19    go back and cross-check the file name for this particular

20    exhibit?

21    A.    Yes.    IMG_0578.

22    Q.    Let's pull up Exhibit 202.    And I think we are going to

23    page 213.

24          And do you see an entry for a file IMG_0578?

25    A.    Yes.

1    Q.   What is the time of creation for that video?

2    A.   Sure.  The time of creation was 3:28 p.m. on January 6,

3    2021.

4    Q.   Again, that was a video of the outside of the Capitol.

5    A.   That's correct.

6    Q.   Let's pull up 216.  This is only a few seconds long, if

7    you can play the exhibit.

8        (Video played.)

9        What, if anything, were you able to see on the far back

10   of the exhibit?

11   A.   Sure.  In the back of the exhibit you can see what

12   appears to be a grouping of police officers -- I'll circle

13   right there -- looks like there's almost like a formation of

14   police officers.

15   Q.   What is the file name again?

16   A.   This file is IMG_0581.

17   Q.   And let's pull up Exhibit 202.  Are you able to determine

18   at what time file 581 was recorded?

19   A.   Yes.

20   Q.   What time was it?

21   A.   It would be 3:44 p.m. on January 6, 2021.

22   Q.   Now, the exhibit immediately before that, right outside

23   the building, I believe you testified it was recorded at 3:28

24   p.m.?

25   A.   Yes.  That sounds correct.

1    Q.   So that's about 14, 15 minutes difference?

2    A.   Yes, it is.

3    Q.   And what is the general area that is depicted in the

4    exhibit that we just saw, Exhibit 216?

5    A.   Sure.  That's the Upper West Terrace.

6    Q.   The person recording the video was still in the Upper

7    West Terrace, it appears?

8    A.   Yes, it does.

9    Q.   Let's pull up Exhibit 217.  And let's skip forward to

10   1 minute and 30 seconds into the exhibit.  And let's play

11   from there until 1:50.

12        (Video played.)

13        Actually, let's continue playing a few more seconds.

14   Thank you.

15        (Video played.)

16        Okay.  Let's stop here.  What did you hear in this last

17   few seconds of the exhibit?

18   A.   Sure.  I heard words to the effect of "I don't know, but

19   there's still a heck of a lot of people up here."

20   Q.   What, if anything, did you see in the far end, the back

21   of the exhibit?

22   A.   Sure.  The background of the video, you could see there's

23   a group of police officers.

24   Q.   Let's talk about timing again.  What video file

25   corresponds with this exhibit?

1    A.    Yes.  It's IMG_0583.

2    Q.    Let's pull up Exhibit 202 at page 215.  Were you able to

3    determine at what time video file 583 was recorded?

4    A.    Yes.

5    Q.    What time was it?

6    A.    I'm sorry.  There we go.  It would be 3:53 p.m. on

7    January 6, 2021.

8    Q.    Again, the first video that was recorded outside the

9    Capitol building was recorded, I believe you testified before,

10   at 3:28 p.m.?

11   A.    Yes.

12   Q.    So this is 25 minutes after that?

13   A.    Yes.

14   Q.    Still on the Upper West Terrace?

15   A.    Yes.

16   Q.    Let's pull up Exhibit No. 219.  Let's play the first nine

17   seconds of this exhibit.

18        (Video played.)

19        Okay.  Let's stop.  First, geographically can you orient

20   the jury as to what area we are seeing at this point in the

21   exhibit?

22   A.    Sure.  This appears to be still on the Upper West

23   Terrace.

24   Q.    What did you hear over the last few seconds -- first few

25   seconds and last few seconds of this exhibit?

1    A.    Heard voices saying "Don't back down."

2    Q.    Now, compared to prior exhibits, does the camera view

3    appear to be -- to have retreated?  Or moved back?

4    A.    Yes.  It appears to --

5    Q.    Or forward.

6    A.    I think it appears to have maybe moved back from -- if

7    you were to say from the front of the Capitol, like the front

8    entrance, the center of the Capitol.

9    Q.    Would that be closer to or farther back from where the

10   police line was in the prior exhibit?

11   A.    Farther back.

12   Q.    Let's continue playing until 15 seconds into the exhibit.

13         (Video played.)

14         Let's talk timing.  Were you able to determine before

15   coming to court which video file corresponds to this exhibit?

16   A.    Yes.  It's IMG_0585.

17   Q.    If you can pull up Exhibit 202.  We're now going to page

18   216.  Were you able to determine at what time this video was

19   recorded?

20   A.    Yes.  It would have been recorded at 4:25 p.m., January

21   6, 2021.

22   Q.    Again, going back to Exhibit 214 before, which was the

23   first exhibit outside the building, your testimony was that it

24   was recorded at approximately 3:28 p.m.?

25   A.    Yes.  That's right.

1    Q.    So this is almost an hour later?

2    A.    Yes.

3    Q.    And what area of the Capitol does it depict?

4    A.    The Upper West Terrace.

5    Q.    Okay.  If you could play Exhibit 220.  Let's play one

6    second.

7          (Video played.)

8          Did you see anything move across the screen in this

9    exhibit?

10   A.    I'm sorry?

11   Q.    Did you see anyone move across the screen in this

12   exhibit?

13   A.    Not in that one second.

14   Q.    Let's try again.  Let's proceed frame by frame.

15         (Video played.)

16   A.    Sure.  I see a red beanie cap in the frame right now.

17   Q.    Consistent with the red beanie cap worn by Casey Cusick

18   on that day?

19   A.    Yes.

20         MR. ROOTS:  Objection.  Leading.

21         THE COURT:  It's pretty incidental stuff, so the

22   objection's overruled.

23   BY MR. VALENTINI:

24   Q.    And what area of the Capitol is depicted at this point in

25   Exhibit 220?

```
1    A.    This is the east side of the Capitol.

2    Q.    How can you tell?

3    A.    I can tell by my knowledge of the Capitol, in particular

4    this kind of like reflecting pond right there, which is unique

5    to that side of the Capitol.

6    Q.    It looks like a skylight?

7    A.    Yes.  It's a skylight.  Yes.

8    Q.    Let's keep playing the exhibit.

9          (Video played.)

10         Were you able to determine at what time this exhibit was

11   recorded?

12   A.    Yes.  Although I don't recall the number of this one.

13   Q.    Okay.  Is there anything that would help refresh your

14   memory?

15   A.    Yes.  Of course.

16         MR. VALENTINI:  May I approach?

17         THE COURT:  You may.

18   BY MR. VALENTINI:

19   Q.    I'm handing the witness an exhibit list.

20   A.    Which exhibit number was this again?

21   Q.    220.

22   A.    Sure.  So Exhibit 220 would pertain to IMG_0586.

23   Q.    Pull up Exhibit 202.  And were you able to determine

24   at what time the video in Exhibit 220 was recorded?

25   A.    Yes.
```

1   Q.   What time was it recorded?

2   A.   That would be at 4:36 p.m., January 6, 2021.

3   Q.   So that is approximately how long after the videos that

4   we were just watching before?

5   A.   I think we said the first video that they came out of the

6   Capitol -- I don't know -- in reference to which other video?

7   Q.   Of the last video of the Upper West Terrace?

8   A.   I'd have to refresh my recollection of the exact time of

9   that video.

10  Q.   Did you testify that Exhibit -- well, let's look up at

11  video file 585.  Yeah, 585, that corresponds to Exhibit 219.

12  A.   So 585 took place at 4:25 p.m., and I believe I just said

13  586 took place at 4:36 p.m., so 11 minutes after.

14  Q.   Okay.  Before we break, if we can just show you one

15  exhibit that is already in evidence, which is Exhibit 106.

16  And I'm showing you Exhibit 106 at 8:28.  Do you recognize the

17  general area that is depicted at this point in the exhibit?

18  A.   Yes.

19  Q.   What is it?

20  A.   It's the Upper West Terrace of the Capitol.

21  Q.   Is this generally the same area in which the person

22  recording the videos was standing in Exhibit 218?

23  A.   Yes, as I understand it.

24  Q.   And what is the time stamp at this point in the exhibit?

25  A.   The time stamp of this video is 4:30:00 p.m., January 6,

1    2021.

2    Q.   So at some point between the time of Exhibit 218 on the

3    west side and the time of Exhibit 220 on the east side.

4    A.   Yes.

5    Q.   And what do you see at 4:30 on the Upper West Terrace?

6    A.   So this time I see there's a group of people kind of in

7    the foreground there, and in the background appears to be a

8    group of police officers with riot gear on.

9         MR. VALENTINI:  I think we can pull down this exhibit.

10        THE COURT:  All right.  And we'll take our lunch break.

11   We will resume at 1:45, ladies and gentlemen.  Have a good

12   lunch, and remember not to talk about the case among

13   yourselves or with anyone else.

14      (Jury out at 12:34 p.m.)

15        THE COURT:  You may step down, Agent Giardina.

16   Thank you.  And we have another proceeding that I need to get

17   on now, so everybody please go about your business quietly.

18      (Recess from 12:35 p.m. to 1:48 p.m.)

19        THE COURT:  All right.  Are we ready to proceed?

20        MR. VALENTINI:  Yes, Your Honor.

21        THE COURT:  All right.  Let's bring in the jury.

22   See how quickly you can get them into the hall.

23        THE DEPUTY CLERK:  All right.

24      (Deputy exits.)

25        THE COURT:  She'll find out they're already in the hall.

```
 1          (Jury in at 1:49 p.m.)
 2              THE COURT:  Very quick.
 3          Welcome back, members of the jury.  I hope you had a
 4     pleasant lunch.
 5          Special Agent Giardina, I remind you you're still under oath.
 6          Mr. Valentini.
 7     BY MR. VALENTINI:
 8     Q.    Welcome back.
 9     A.    Thank you.
10     Q.    Let's pull up Exhibit 221, which is already in evidence.
11     Let's freeze on the first frame of the exhibit if you can.
12          Special Agent Giardina, do you know what this exhibit
13     shows?
14     A.    Sure.  It shows the U.S. Capitol with some security
15     fencing around it.
16     Q.    Are you able to tell which side of the Capitol this
17     exhibit shows?
18     A.    No, not specifically.  Not without some further
19     reference.
20     Q.    You mentioned some fencing around the Capitol?
21     A.    Yes.
22     Q.    Is this to your knowledge the type of fencing that was in
23     place before January 6, 2021?
24     A.    No.
25     Q.    Let's talk time with respect to the exhibit as well.
```

1    Before coming to court, were you able to cross-check the file

2    name for this exhibit which has been marked as Exhibit 221?

3    A.   Yes.

4    Q.   And so let's -- what is that file name?

5    A.   IMG_0593.

6    Q.   Let's pull up Exhibit 202 on page 216.  Do you see

7    an entry corresponding -- page 216.  Do you see an entry

8    corresponding to a video named file name 0593?

9    A.   Yes, I do.

10   Q.   And are you able to determine at what time that video was

11   recorded?

12   A.   Yes.  That video was recorded at 11:53 a.m. on January 7,

13   2021.

14   Q.   You said January 7, not January 6.

15   A.   Yes, I did.

16   Q.   So the person who recorded this video in Exhibit 221

17   appears to have been at the Capitol on January 7?

18   A.   Yes.

19   Q.   And the video was retrieved from Mr. Lesperance's iCloud

20   account?

21   A.   Yes.

22   Q.   We can pull down this exhibit.

23        MR. ROOTS:  Your Honor, we would like to just sort of

24   object to that as irrelevant to this case.

25        THE COURT:  You're objecting to what?

1           MR. ROOTS:  It's irrelevant.

2           THE COURT:  To what exhibit?

3           MR. ROOTS:  It's I guess 221.  It was taken on the

4    7th of January.  The day after has no relevance to the charges

5    in this case.

6           THE COURT:  I understand the objection.  We've talked

7    about it before.  But you didn't raise the objection when the

8    exhibit was moved into evidence and therefore it's probably

9    forfeited, but in any event, based on things I've said in

10   earlier discussions with you, I find that there is marginal

11   relevance to this exhibit, but it does pass the relevance test

12   and it does not fall on the wrong side under a 403 analysis.

13   And therefore your objection is overruled.

14      You may proceed.

15   BY MR. VALENTINI:

16   Q.  Special Agent Giardina, let's talk about Exhibit 225

17   through 231.  Are Exhibits 225 through 231 exhibits you had

18   an opportunity to review before coming to court today?

19   A.  Yes.

20   Q.  Are they all photographs obtained from the extraction of

21   Mr. Lesperance's iCloud account?

22   A.  Yes.  That's my recollection of those exhibits.

23          MR. VALENTINI:  The government moves to admit Exhibits

24   225 to 231 into evidence.

25          THE COURT:  Any objection?

1          MR. ROOTS:  No objection at this time subject to all

2     the concerns I've expressed previously.

3          THE COURT:  All right.  Those concerns are noted, but

4     not sufficient to warrant rejection of these exhibits.  And

5     therefore 225, 226, 227, 228, 229, 230 and 231 are all

6     admitted and may be published.

7                              (Government Exhibit Nos. 225-231

8                                received into evidence.)

9     BY MR. VALENTINI:

10    Q.   If we may publish Exhibit 225.  Having published Exhibit

11    225, we can move on to Exhibit 226.

12         Special Agent Giardina, do you recognize any of the

13    individuals in this picture?

14    A.   Yes.

15    Q.   Whom do you recognize?

16    A.   I recognize Casey Cusick on the left and James Cusick on

17    the right.

18    Q.   That would be the left of the picture.

19    A.   The left of the picture, yes.

20    Q.   Can move on to Exhibit 227.  If we could zoom in on this

21    area.

22         Special Agent Giardina, are you able to tell the jury

23    what is depicted in this exhibit?

24    A.   Sure.  I mean, it looks like a large crowd on the Upper

25    West Terrace of the U.S. Capitol.

1    Q.   What do you see in the area I've circled?

2    A.   There appears to be a cloud of white smoke.

3    Q.   Thank you.  We can pull down this exhibit.  Move on to

4    Exhibit 228.  Do you see a man on the right-hand side of this

5    picture?

6    A.   Yes.

7    Q.   What items of clothing does this man appear to be

8    wearing?

9    A.   He appears to be wearing a white turtleneck and a black

10   jacket.

11   Q.   And which direction does that gentleman appear to be

12   facing?

13   A.   He appears to be facing that open door with the broken

14   glass.

15   Q.   Let's -- before coming to court, were you able to

16   determine the file name corresponding to this exhibit?

17   A.   Yes, I was, although I don't recall the file name at

18   this moment.

19   Q.   Would an exhibit list help to refresh your memory?

20   A.   Yes, it would.

21            MR. VALENTINI:  Permission to approach?

22            THE COURT:  You may.

23            THE WITNESS:  So Exhibit 228 corresponds with the file

24   IMG_0573.

25            MR. VALENTINI:  Thank you.

1    BY MR. VALENTINI:

2    Q.    You may pull up Exhibit 202 and go to page 143.

3         Do you see an entry corresponding to Exhibit -- stop

4    publishing for a second.

5              MR. VALENTINI:  Brief indulgence?

6         (Government conferring.)

7              MR. VALENTINI:  If we could resume publishing, please.

8    BY MR. VALENTINI:

9    Q.    If you look at line item 179 do you see a reference to

10   an image number on the right-hand side of the column?

11   A.    Yes, I do.

12   Q.    What number is that?

13   A.    IMG_0573.

14   Q.    And that is the same file name as Exhibit 228?

15   A.    Yes.

16   Q.    And are you able to determine based on the information

17   in this report of what time that photograph was captured?

18   A.    Yes.

19   Q.    What time was it captured?

20   A.    This was captured at 3:09 p.m. on January 6, 2021.

21   I would note here that it doesn't reference UTC, so this is

22   in its local time.

23   Q.    Real 3:09 p.m.

24   A.    That's correct.

25   Q.    If we may pull up, please, Exhibit No. 229.

1           What general area of the Capitol does this picture

2      reflect, if you're able to tell?

3      A.   Sure.  This appears consistent with the Upper West

4      Terrace of the U.S. Capitol.

5      Q.   What do you see on the left-hand side of the picture?

6      A.   On the left side in the foreground where you circled I

7      see a man wearing camouflage pants, plaid shirt, some type

8      of body armor, tactical vest and helmet with eye protection

9      and a night vision mount on it.

10     Q.   We can pull down this exhibit and stop publishing for a

11     second, please.  If we can now pull up what has been marked

12     as Exhibit 232, which is not yet in evidence.

13          Before coming to court today, did you have an opportunity

14     to review Exhibit 232?

15     A.   Yes, I did.

16     Q.   And what does it consist of?

17     A.   So this is an extraction report from Mr. Lesperance's

18     iCloud.

19     Q.   Does it contain a subset of text messages or the entire,

20     full scope of the iCloud account?

21     A.   This should just be the scoped iCloud account.

22     Q.   Is this particular exhibit limited to text messages?

23     A.   Yes, it does.

24          MR. VALENTINI:  The government moves to admit Exhibit

25     232 into evidence.

1          MR. ROOTS:  These are text messages.  We would object

2      on hearsay grounds.

3          THE COURT:  That objection is overruled.  I guess I

4      don't understand the exhibit.  Does the exhibit include actual

5      text messages?

6          MR. VALENTINI:  If we may scroll down, the exhibit is a

7      collection of text messages extracted from the iCloud account

8      of Mr. Lesperance.

9          THE COURT:  All right.  The objection is overruled and

10     232 is admitted and may be published.

11                              (Government Exhibit No. 232

12                                received into evidence.)

13     BY MR. VALENTINI:

14     Q.   If we may scroll to page 5 of this exhibit, and if we can

15     zoom in on the top portion of the exhibit.

16          Do you see a text message at this point in the exhibit,

17     Special Agent Giardina?

18     A.   Yes.

19     Q.   And when was this text message sent?

20     A.   This text message appears to have been sent at 12:39 p.m.

21     on January 12, 2021.

22     Q.   Who sent this text message?

23     A.   It appears to be sent by somebody in the address list

24     who's listed as Jim Cuzik.

25     Q.   And whom was this text message sent to?

1    A.   This text message was sent -- extracted from

2    Mr. Lesperance's iCloud into a phone number that I know from

3    the investigation to be associated with Mr. Lesperance.

4    Q.   And what does Jim Cuzik's message from January 12 to

5    Mr. Lesperance say?

6    A.   It says "Hi Dave.  I think that $125 is all that I need

7    for the trip.  I loved you being with us and hopefully we get

8    to do something again sometime."

9         MR. VALENTINI:  Court's indulgence.

10        Thank you very much.  We have no further questions.

11             THE COURT:  All right.  Mr. Roots, cross-examination.

12                        CROSS-EXAMINATION

13   BY MR. ROOTS:

14   Q.   Thank you so much, Special Agent Giardina.

15        Now, you are a special agent for the FBI.

16   A.   Yes.

17   Q.   And are you a case agent in this case?

18   A.   Yes.  I participated in the case with several other

19   agents.

20   Q.   How many case agents are there in this case?

21   A.   By my understanding there were three primary agents.

22   Q.   How many total FBI agents have worked in this case?

23   A.   I'll be honest, I do not know, sir.

24   Q.   What about any undercover FBI agents or informants in

25   this case?

1          MR. VALENTINI:  Objection.  Beyond the scope.

2          THE COURT:  Overruled.  You can answer that.

3          THE WITNESS:  I have no information of any undercover

4     or I believe you said informants.

5     BY MR. ROOTS:

6     Q.   Okay.  Let me just ask you some general questions.  These

7     gentlemen here, these defendants on trial, were any of these

8     gentlemen on the FBI's radar before January 6?

9     A.   I have no information about that, sir.

10    Q.   They're not known criminals to the FBI?

11    A.   I can only answer for myself.  I had never heard of them

12    prior to this.

13    Q.   Okay.  All right.

14         Now, you did say that the FBI -- as I understand it, you

15    said they received an anonymous tip in this case?

16    A.   Yes.  That's my recollection of how we first became aware

17    of Mr. Lesperance in this case.

18    Q.   And it was a tip that Mr. Lesperance had been inside the

19    Capitol on January 6.  Was that the essence of it?

20    A.   I believe that's the essence of it, yes.

21    Q.   Did you ever come to discover who sent that tip?

22    A.   I didn't personally conduct any follow-up on that.

23    Another agent did.  I do not know who sent that tip in.

24    Q.   To your knowledge, did the FBI ever discover who that was?

25    A.   I don't -- I do not know if the FBI knows who sent that

1    in.

2    Q.   I'd like to go into Government 208, which was played.

3    We'll just start the first few seconds of it.

4         (Video played.)

5              THE COURT:  Turn that volume down.

6              MR. ROOTS:  If we can start at the beginning.  Maybe

7    stop right there.

8    BY MR. ROOTS:

9    Q.   So did you see the woman with the baby and the stroller

10   there?

11   A.   Yes, I did.

12   Q.   To your knowledge, were there children there on January 6

13   at the Capitol?

14   A.   I don't have any information one way or another.  I mean,

15   I saw one woman with a stroller.

16   Q.   And there's a dog there on the screen.  Do you see that?

17   A.   Yes.  I do see a dog.

18   Q.   I'd like to -- this same video, this is 208, Government's

19   208, I'd like to go forward to about 50 seconds in.

20        Okay.  We can start playing right here.  This is at

21   minute mark 53 seconds into Government's 208, and we'll play

22   it.

23        (Video played.)

24        Okay.  Right there.  Do you see that on the screen?

25   A.   What are --

1    Q.   Do you see that police officer moving that barricade?

2    A.   I see him lifting the barricade.  I don't see what

3    happens next.

4    Q.   Let's play that whole scene again here.

5         (Video played.)

6         Maybe we can play that one more time, just a couple

7    seconds.

8         (Video played.)

9         Okay.  We stopped it at 59 seconds.  So that was about 53

10   seconds to about 59 seconds.  Did you see that police officer

11   moving that barricade?

12   A.   Yes.

13   Q.   And it appeared he was sort of opening the barricaded

14   area, almost inviting people there.  Did you see that?

15        MR. VALENTINI:  Objection.  Mischaracterizes the

16   evidence.

17        THE COURT:  Overruled.  The witness can answer based

18   on what the witness observed.

19        THE WITNESS:  So I observed, just for the few moments

20   it was up, the officer lift the barricade, appeared to move

21   it back several feet.  And I can't recall if I saw it or if I

22   just heard it.  You could hear the clank of it go down.

23   BY MR. ROOTS:

24   Q.   Okay.  It appeared that he was almost opening it for the

25   crowd.

1    A.   I can't determine whether he's opening it or

2    repositioning it for some other reason.

3    Q.   Why don't we play that segment just one more time.

4         (Video played.)

5         Okay.  And this was taken from David Lesperance's cell

6    phone camera.

7    A.   Yes, it appears to be.  We extracted from his iCloud

8    account.

9    Q.   And directly in front of him in that scene from the

10   camera was -- appeared to be Mr. Jim Cusick.  Correct?

11   They were walking together.

12   A.   Yes.  They were walking in that video.

13   Q.   Now, you're an FBI case agent in this case.  You've no

14   doubt scoured Mr. Lesperance's videos very carefully.

15   Correct?

16   A.   I reviewed the contents of the iCloud account to

17   determine what was in the scope and what was relevant to the

18   investigation.

19   Q.   And you can say you have pretty much seen

20   Mr. Lesperance's recorded videos that he took from his cell

21   phone that day?

22   A.   Yes.

23   Q.   You did point out on your direct examination that at one

24   point earlier there was -- appeared to be some snow fencing

25   laying on the ground.  Do you recall that?

 1    A.    Yes.  I saw some fencing.  I didn't know if I

 2    characterized it -- you said snow fencing?

 3    Q.    Or some rolled up plastic type fencing?

 4    A.    Yes.  There appeared to be some fencing on the ground.

 5    Q.    And that was laying on the ground, and I believe, in your

 6    own words, you said it had been torn down or torn out?

 7    A.    It looked like, by the nature of some of the posts laying

 8    down, that somehow they had been removed from the ground and

 9    the fencing was now on the ground.

10    Q.    But Mr. Lesperance's cell phone that you scoured

11    carefully never showed anyone ripping that out, did it?

12    A.    It did not from my review of that.

13    Q.    And would you say that in all the detail, all the

14    attention that you've paid to Mr. Lesperance's cell phone

15    video on January 6, the only person seen on the video actually

16    moving a barricade is a cop.  Would you agree with that?

17    A.    I don't know that I reviewed -- I couldn't characterize

18    one way or another.  I don't know that I reviewed it for the

19    specificity of anybody who might have moved any barrier or

20    fencing.

21    Q.    Let's talk about signs.  At one point in this video or

22    set of videos you pointed out there appeared to be at least

23    one Area Closed type sign.  Do you recall that?

24    A.    I do recall.

25    Q.    And I believe you said it was hanging on a bike rack-type

1    barricade somewhere?

2    A.   That's what I recall.

3    Q.   Isn't it true that was sort of on the side of the

4    walkway, not in front of the walkway?

5    A.   I recall it being printed on the walkway visible to the

6    camera as we viewed it.

7    Q.   I think you said "a body length or two away from the

8    camera."

9    A.   It appeared to be, as I recall looking at that evidence,

10    it appeared to be close to the camera as it was taken.

11    Q.   But just to really dig into this and to be clear, it was

12    not a barricade in front of the walker; it was not a barricade

13    in front of the person walking with the camera.

14    A.   Yes.  As I recall, it appeared to be maybe to the side

15    and not directly in front.

16    Q.   It was to the side of where the person was walking.

17    A.   That's -- yes.  I guess as I recall it appeared to be to

18    the side.

19    Q.   So the person walking with the camera -- who you presume

20    to be Mr. Lesperance, correct?

21    A.   It was extracted from his iCloud account, so I would

22    presume it would be the person who owns the iCloud and owns

23    the phone associated with the iCloud took the video.

24    Q.   So that person would have been walking, let's say in a

25    forward direction, and that sign would have been on the side,

1    not in the path.

2    A.    As that person was moving forward, as I recall reviewing

3    that video today, it appeared to be just off to the right as

4    they were moving forward.

5    Q.    Okay.  And just, you know, we all see signs around us,

6    signs that say don't go here, whatever --

7            MR. VALENTINI:  Objection.  Is he testifying?

8            MR. ROOTS:  Okay.  I'll just --

9    BY MR. ROOTS:

10   Q.    Let me ask the question like this:  Assume a public area

11   and there's a ladies restroom sign.  And let's assume you're a

12   man and you have the preference or the choice, you have a

13   personal rule of not going into ladies' rooms.  If you walk

14   past that sign, would you be violating your --

15           MR. VALENTINI:  Objection.  Calls for speculation.

16           THE COURT:  As framed, sustained.

17   BY MR. ROOTS:

18   Q.    If you walked into the ladies room, if you're a man and

19   you had a personal preference not to walk into ladies' rooms,

20   you'd be violating that sign.  Right?

21           MR. VALENTINI:  Objection.  Also calls for speculation.

22           THE COURT:  No.  It's asking about his personal

23   preference.  So it's not really speculation.  You may answer.

24           THE WITNESS:  Can you repeat the question.

25

WALTER GIARDINA - CROSS

1    BY MR. ROOTS:

2    Q.   If you had a personal rule not to walk into a ladies'

3    room, you see a sign that says ladies' room, and you walk in,

4    you'd be violating that preference.  Correct?

5    A.   Yes.  I would not walk into the ladies' room.

6    Q.   And if you walked past it you would not be violating it?

7    A.   Right, because I would not be walking into the ladies'

8    room.

9    Q.   Okay.  I think I've made my point there.  Let's see.

10        Okay.  I objected to 221, but let's get 221, the January

11   7th up again.  And we objected on the grounds of relevance

12   here.  But this was taken from Mr. Lesperance's phone?

13   A.   Well, we recovered it from his iCloud account.

14   Q.   And this shows that the next day, the day after January

15   6, the government or people are putting up this high fencing

16   barricade around the Capitol.  Correct?

17   A.   Yes.  This appears to be newly installed fencing on

18   January 7.

19   Q.   So in a way this is exculpatory evidence.  You agree?

20        MR. VALENTINI:  Objection.

21        THE COURT:  Sustained.

22   BY MR. ROOTS:

23   Q.   This is evidence where Mr. Lesperance was driving past

24   and noticed that things had changed after January 6.

25        MR. VALENTINI:  Objection.

1          THE COURT:  Asks for speculation about what was in

2     Mr. Lesperance's mind.  Sustained.

3     BY MR. ROOTS:

4     Q.   Mr. Lesperance took this video the next day of -- he took

5     interest enough to take this video.

6          MR. VALENTINI:  Objection.  That calls for speculation

7     too.

8          THE COURT:  It does, but it's minimal speculation.

9     He took it.

10          THE WITNESS:  What I can say is we recovered this video

11     from Mr. Lesperance's iCloud account, and as I recall, it was

12     taken on January 7, 2021.

13     BY MR. ROOTS:

14     Q.   And to your knowledge -- you're an FBI case agent

15     investigating January 6, correct? -- this kind of fencing was

16     not there on January 6, was it, anywhere?

17     A.   I can't speak to the entire nature of the fencing on

18     January 6, but I believe this particular stretch of fencing

19     was installed after January 6.

20     Q.   Okay.  The videos were played and there was some joking

21     on some of the videos.  Do you recall some of that?

22          MR. VALENTINI:  Objection.  Is that a question?

23          THE COURT:  I think it is a question.

24          MR. VALENTINI:  Objection to the characterization of

25     the evidence.

1           THE COURT:  I don't remember seeing something like

2    that.  So I'm going to sustain, based on what appears to be

3    a mischaracterization of the evidence.

4    BY MR. ROOTS:

5    Q.  Do you recall statements such as apparently

6    Mr. Lesperance saying such things as "Look Ma, your

7    troublemaking son is at it again"?

8    A.  I do recall a statement or words to that effect.

9    Q.  Elsewhere I think he said something about it looks like

10    there -- might have to hold the inauguration in the basement.

11    Do you recall that on the videos?

12    A.  Yes.  I recall something or words to that effect.

13    Q.  Would you call that joking around?

14    A.  I don't really know what was in their state of mind or

15    what they were thinking when they said that.

16    Q.  Let me just ask you, is joking around disorderly conduct?

17         MR. VALENTINI:  Objection.  Calls for a legal

18    conclusion.

19         THE COURT:  I guess as framed I'll sustain the

20    objection.  I think you can ask the same thing in a different

21    way that would not be objectionable.  But that's up to you,

22    Mr. Roots.

23    BY MR. ROOTS:

24    Q.  I have to think of how I can -- well, is talking

25    disorderly conduct?

```
 1              MR. VALENTINI:  Same objection.

 2              MR. ROOTS:  I'll try to rephrase.  Let's just think.

 3      BY MR. ROOTS:

 4      Q.   Also on some of these videos there were statements such

 5      as "It's an open house."  "Whoa, someone just fell from the

 6      wall."  I actually want to ask about that.  You recall

 7      Mr. Lesperance or someone on his video said something like

 8      "Whoa, it looks like someone just fell from the wall."

 9           Do you recall that?

10      A.   I do recall that.

11      Q.   To your knowledge, a policeman had pushed that individual

12      off that wall.  Correct?

13              MR. VALENTINI:  Objection.

14              THE COURT:  What's the basis?  He asked for his

15      knowledge.  The objection's overruled.

16              MR. VALENTINI:  Lacks foundation, but the witness can

17      answer if he knows.

18              THE COURT:  The witness may answer.  The objection is

19      overruled.

20              THE WITNESS:  Could you repeat the question?

21      BY MR. ROOTS:

22      Q.   To your knowledge, a police officer had pushed an

23      individual off the wall?

24              THE COURT:  That individual off the wall?

25              MR. ROOTS:  That individual.  I think there's only one.
```

WALTER GIARDINA - CROSS

1    I could be wrong.

2         THE WITNESS:  I have no information of how that person

3    fell off the wall.

4    BY MR. ROOTS:

5    Q.   Okay.  A couple other statements.  The crowd was chanting

6    "USA, USA, USA."  Is that at all unusual at the U.S. Capitol

7    of the United States?

8         MR. VALENTINI:  Objection.  Lacks foundation too.

9         THE COURT:  Well, if you know, if from your experience

10   you know what happens at the Capitol of the United States, you

11   can answer.  If you don't, then you can't.

12        THE WITNESS:  I have no information about how often the

13   chant "USA" is done at the Capitol.

14   BY MR. ROOTS:

15   Q.   To your experience, is it inappropriate at the U.S.

16   Capitol to chant "USA, USA"?

17        MR. VALENTINI:  Calls for opinion testimony.

18        THE COURT:  Overruled.  I'll allow it.

19        THE WITNESS:  I mean, I guess there's times it could

20   be appropriate and there's times it could be inappropriate, if

21   Congress is in session or it's disturbing other activities.

22   BY MR. ROOTS:

23   Q.   A recurring chant in some of these videos had been the

24   chant "Whose house?  Our house."  Do you recall that?

25   A.   I do.

1    Q.   And that is recurring in these videos.  Many times is

2    that said, correct?

3    A.   I heard it several times.

4    Q.   Let me just ask you, whose house is the U.S. Capitol?

5         MR. VALENTINI:  Objection.  Relevance.

6         THE COURT:  Sustained.

7    BY MR. ROOTS:

8    Q.   I'll ask another question:  Isn't it a quite common chant

9    among protesters, both left wingers and right wingers, to

10   chant, "Whose house?  Our house"?

11        MR. VALENTINI:  Objection.  Lacks foundation.

12        THE COURT:  Well, if you know.

13        THE WITNESS:  I don't really have any information of

14   how common that chant is among any group.

15   BY MR. ROOTS:

16   Q.   Just to be clear, Congress was already in recess by the

17   time these three gentlemen arrived at the Capitol.  Correct?

18        MR. VALENTINI:  Objection.  Lacks foundation.  It's

19   also beyond the scope.

20        MR. ROOTS:  I'll build some foundation.

21   BY MR. ROOTS:

22   Q.   Are you aware when Congress --

23        THE COURT:  We still have the scope issue.  And I think

24   it's borderline in terms of the scope.  I'll allow the

25   question if there's a sufficient foundation laid.

1    BY MR. ROOTS:

2    Q.    Are you aware of what time of the day Congress went into

3    recess?

4    A.    No.   I'm not aware of the specific time that they

5    recessed.

6    Q.    Was it -- you said you're not aware of the specific time.

7    Would you say it was between 2:00 and 2:30?

8              MR. VALENTINI:   Same objection.

9              THE COURT:   If you know, you can answer.

10             THE WITNESS:   I don't know the specific time.   That

11   time sounds familiar to me as about the time they might have

12   gone into recess.

13   BY MR. ROOTS:

14   Q.    You're a case agent in this case.   Correct?

15   A.    Yes.

16   Q.    You have vast knowledge of this case.

17   A.    I'm familiar with the contents of Mr. Lesperance's iCloud

18   through my participation in the investigation.

19   Q.    And by the time these three gentlemen arrived at the

20   Capitol, Congress had long since gone into recess.   Correct?

21   A.    I don't know how to characterize "long since."   If we

22   were to say between 2:00 and 2:30, that's fairly proximate to

23   the time I believe we were talking on the iCloud videos.

24   Q.    Okay.   At some point in one of these videos, a voice is

25   heard talking about a curfew.   Do you recall that?

1    A.    I do.

2    Q.    The mayor of D.C. on January 6 had proclaimed or declared

3    a curfew.

4    A.    Yes.

5    Q.    And isn't it true that curfew was announced for 6 p.m.

6    that day?

7    A.    I recall hearing those voices.  I cannot recall the

8    specifics of the D.C. curfew that day.

9    Q.    But it was about the 3 p.m. hour when these three

10   gentlemen were up near the Capitol, in the Capitol area.

11   Three o'clock or so?

12   A.    That seems consistent with my recollection of the time

13   stamp on those videos.

14   Q.    And let me just ask a few questions about Mr. Lesperance,

15   his hearing.  Would you regard him as a particularly young

16   man?

17   A.    No, not particularly young.

18        THE COURT:  It's all in the eyes of the perceiver.

19      (Laughter.)

20   BY MR. ROOTS:

21   Q.    And he works in the field of heating and

22   air-conditioning.  Correct?

23        MR. VALENTINI:  Objection.  This is beyond the scope.

24        THE COURT:  Agreed.  I don't see how this witness is

25   appropriate for that question.

1          MR. ROOTS:  I have no further questions.  Thank you so

2     much.

3          THE WITNESS:  Thank you, sir.

4          THE COURT:  Mr. Valentini, redirect?

5                    REDIRECT EXAMINATION

6     BY MR. VALENTINI:

7     Q.   If we could please pull up Exhibit 208 at time stamp

8     2:08.  And if you could proceed from here.

9          (Video played.)

10         We can stop.  Did you see law enforcement officers

11    turning the corner at this point in the Capitol?

12    A.   Yes.  You said turn the corner there at the Capitol?

13    Q.   Yeah.  Follow along and turn the corner following the

14    perimeter of the Capitol?

15    A.   Yes, I did.

16    Q.   And those were within the field of view of this camera?

17    A.   Yes.

18    Q.   Was that before or after, in this exhibit, the point

19    where a law enforcement officer lifted a barricade, if you

20    recall?

21    A.   Yeah.  It's my recollection that it's after the barricade

22    moved.

23    Q.   So there were law enforcement officers after that point

24    entering the building.

25    A.   Yes.

1    Q.   Going back to the portion of the clip that you were shown

2    of a law enforcement officer lifting a barricade, did you

3    testify that -- how far approximately did you see the law

4    enforcement officer move that barrier?

5    A.   From my recollection reviewing that just now, it's really

6    impossible to tell how far.  You see him lift it, maybe move

7    it a couple feet, and then I hear a clank.  I don't remember

8    how far, but maybe just a couple feet.

9    Q.   Okay.  Let's go back to -- at that point in the clip,

10   if you recall, how many law enforcement officers did you see

11   working on that barricade?

12   A.   I believe just the one.

13   Q.   And around that time how many rioters did you see

14   approaching the Capitol?

15   A.   It's impossible to characterize how many.

16   Q.   Were there more law enforcement officers or more rioters

17   at that point in the exhibit?

18   A.   There is more rioters on the West Terrace of the Capitol.

19   Q.   Let's take a look.  Can we play starting from here.  This

20   is the clip, right?

21        Well, first of all -- yeah.  Let's play from here.

22   Actually, if we could rewind.

23        THE COURT:  I think you're past it.  Are you trying to

24   get to where the officer moved the barricade?

25        MR. VALENTINI:  Yes.

1          THE COURT:  I think -- well, go ahead.  You do it.

2     Don't rely on me.

3     BY MR. VALENTINI:

4     Q.   Let's start from here then.

5          (Video played.)

6          Okay.  Let's stop.  How many law enforcement officers did

7     you see at this portion of the clip?

8     A.   I saw the one that moved the barricade and then maybe two

9     others on the left.

10    Q.   Could you count how many rioters do you see at this point

11    in the video?

12    A.   No.  I can't count them.

13    Q.   Could you try?

14    A.   I mean, it appears to be at least 20 people in the

15    foreground, and I don't know, 40 to 60 in the background.

16    Q.   Dozens of people?

17    A.   Yes.

18    Q.   Was that officer far outnumbered?

19    A.   Yes.

20    Q.   Let's move back to 31 seconds into the clip.  You were

21    asked some questions about this barricade?

22    A.   Yes.

23    Q.   That you see on the bottom right corner?  And it's true

24    that it's not right in the middle of the passageway there.

25    Right?

```
1     A.    Yes.  That's right.

2     Q.    What is the sign on that barricade?

3     A.    The sign says Area Closed.

4     Q.    Same question as before:  How many law enforcement

5     officers do you see at that point in that picture?

6     A.    I don't see any that I can recognize as law enforcement.

7     Q.    How many rioters do you see?

8     A.    Maybe 20.

9     Q.    Fair to say again the police force was overwhelmed by the

10    number of rioters there?

11    A.    Yes.

12          MR. VALENTINI:  Thank you.  Brief indulgence.

13          THE COURT:  Certainly.

14       (Government conferring.)

15          MR. VALENTINI:  No further questions.

16          THE COURT:  The normal process, Mr. Roots, is there's

17    redirect, but there's not re-redirect.  Do you have one

18    question relating to something that was --

19          MR. ROOTS:  A couple questions about what was just

20    said.

21          THE COURT:  I'll allow you to ask one question.

22                         RECROSS-EXAMINATION

23    BY MR. ROOTS:

24    Q.    So if police are outnumbered, they remove the safety

25    barriers?
```

```
 1              MR. VALENTINI:  Objection.  Lacks foundation.

 2              THE COURT:  It's argumentative.  I'll allow it, though.

 3     You can answer if you're able to.

 4              THE WITNESS:  I don't have any information about how

 5     police would react, moving barricades if they were

 6     outnumbered.

 7     BY MR. ROOTS:

 8     Q.   Wouldn't they erect barriers rather than remove barriers?

 9              THE COURT:  This is argumentative.

10              MR. ROOTS:  Okay.  Thank you so much.

11              THE COURT:  All right.  Thank you, Special Agent

12     Giardina.

13              THE WITNESS:  Thank you, Your Honor.

14              THE COURT:  We appreciate your coming.  You may step

15     down.

16              THE WITNESS:  Thank you, Your Honor.

17        (Witness steps down.)

18              THE COURT:  Next witness, please.

19              MR. VALENTINI:  The government calls task force officer

20     Kris Miyasato.

21          KRIS MIYASATO, WITNESS FOR THE GOVERNMENT, SWORN

22                        DIRECT EXAMINATION

23     BY MR. VALENTINI:

24     Q.   Could you please state and spell your name for the

25     record?
```

1    A.    Kris Miyasato.  First name K-R-I-S.  Last name

2    M-I-Y-A-S-A-T-O.

3    Q.    And what do you do for a living?

4    A.    I am a special agent with the Air Force Office of Special

5    Investigations.

6    Q.    And how long have you been a special agent with the Air

7    Force Office of Special Investigations?

8    A.    I've been an agent with OSI for 18 years.

9    Q.    Do you also work with the FBI?

10   A.    Yes.  I've been assigned to the Joint Terrorism Task

11   Force.

12   Q.    How long have you been assigned to the task force of the

13   FBI?

14   A.    In Florida four years, and prior to that in Las Vegas,

15   five years.

16   Q.    What are your authorities as an FBI task force officer?

17   A.    As an FBI task force officer I have my own authority to

18   my agency and I'm also sworn as a Special Deputy U.S. Marshal.

19   Q.    Does that essentially give you all the authorities of an

20   FBI special agent?

21   A.    It does.

22   Q.    And which FBI office are you assigned to, if you're

23   assigned to one?

24   A.    I'm assigned to the Melbourne, Florida, office, the SSRA

25   there.

1    Q.   And since being assigned as a task force officer to the

2    FBI, what type of cases have you been handling?

3    A.   They're terrorism cases, mostly centered around that.

4    I also work cybercrime too.

5    Q.   And what kind of training did you have to undergo to

6    become a special agent with the Air Force?

7    A.   I went to the Federal Law Enforcement Training Center.

8    I've had training in investigations, evidence collection,

9    evidence handling, law.

10   Q.   Did you receive additional training how to become an FBI

11   task force officer?

12   A.   I received specialized training in counterterrorism

13   tactics, legal training.

14   Q.   How about since becoming an FBI task force officer, do

15   you have ongoing training that you do?

16   A.   Yes.  There is ongoing training we have to meet.

17   Q.   What type of subject areas?

18   A.   It ranges, legal training, training on policies and

19   procedures.

20   Q.   Now I would like to turn to the investigation in this

21   case.  Were you involved in the investigation of an individual

22   named David John Lesperance?

23   A.   I was.

24   Q.   Now, how did David Lesperance come to your attention?

25   A.   The FBI received a tip from the tip line at headquarters.

1    The office in Melbourne was sent a lead, and one of the task

2    force officers received that lead.

3    Q.   And based on that tip, did you obtain any public records

4    pertaining to Mr. Lesperance?

5    A.   Yes.  We searched public records, DMV, to identify where

6    he is, his location.

7    Q.   Were you able to determine his address?

8    A.   Yes.

9    Q.   Did the public records that you obtained, you said they

10   included DMV records?

11   A.   Yes, they did.

12   Q.   Did those records include any photographs of

13   Mr. Lesperance?

14   A.   It did.

15   Q.   Let me show you what has been marked as Government

16   Exhibit 176.  Do you recognize the photograph in Government

17   Exhibit 176?

18   A.   I do.

19   Q.   And is that photograph a fair and accurate copy of the

20   DMV photograph of Mr. Lesperance that you received in

21   connection with your records search?

22   A.   It appears to be the same one.

23   Q.   It's the same photograph that you made part of the FBI

24   file?

25   A.   Yes.

1          MR. VALENTINI:  The government moves to admit Exhibit

2    176 into evidence.

3          MR. ROOTS:  No objection.

4          THE COURT:  Without objection, 176 is admitted and may

5    be published.

6                              (Government Exhibit No. 176

7                               received into evidence.)

8    BY MR. VALENTINI:

9    Q.   What, if anything, did you decide to do based on the tip

10   that you received?

11   A.   The task force officer that received the tip, I

12   accompanied that individual and we went and spoke to the

13   complainant who generated the tip, got information that

14   pertained to Mr. Lesperance stating that he was at the Capitol

15   and went inside of the Capitol building.

16   Q.   You weren't here with us before, so just to be clear, the

17   tip you received about Mr. Lesperance was not anonymous?

18   A.   It was not an anonymous tip.

19   Q.   And based on the information that you collected as part

20   of that interview, what did you do?

21   A.   After we talked to complainant we decided to go try and

22   speak to Mr. Lesperance.  So we went to his residence that was

23   the residence on the DMV records that we obtained, and we

24   knocked on the door and Mr. Lesperance answered the door.

25   Q.   So you were able to make contact with Mr. Lesperance when

1    you went to his door.

2    A.    We did.

3    Q.    And this is maybe an obvious question, but how do you

4    know now that the person that you spoke to was in fact

5    Mr. Lesperance?

6    A.    We asked, "Are you David Lesperance," he said "I am."

7    Q.    That person -- how did that person's appearance compare

8    to the DMV picture that you had in the records at that point?

9    A.    He looked identical to the DMV picture that we had.

10    Q.    What, if anything, did you tell Mr. Lesperance about the

11    reason for your visit?

12    A.    We told him who we were.  We said that we had a tip that

13    came in specifying that he was at the Capitol, and we asked

14    him if he would talk to us about what he witnessed there, and

15    he agreed to talk to us.

16    Q.    Where were you sort of physically when you were having

17    this conversation with Mr. Lesperance?

18    A.    We were on the porch in front of his front door, outside

19    of his door.

20    Q.    And after Mr. Lesperance agreed to speak with you, where

21    did you go to have that conversation?

22    A.    We had it right there outside of his front door.

23    Q.    Other than you, was anyone else present when you had this

24    conversation with Mr. Lesperance?

25    A.    Yes.  I was accompanied by another task force officer.

1  Q.   So what, if anything, did you ask Mr. Lesperance about
2  the events of January 6 at the Capitol?
3  A.   We asked him about his experience at the Capitol and he
4  told us about his experience at the Capitol.
5  Q.   Did he tell you when he went to the Capitol?
6  A.   I believe he said he traveled to the Capitol on the 5th
7  and he stated he returned on the 8th, I believe it was.
8  Q.   Did he specify how he traveled to Washington, D.C., to
9  go to the Capitol?
10  A.   I don't recall him telling us specifically how he got
11  up there.
12  Q.   Where within the Capitol did Mr. Lesperance say that he
13  went when you first asked him?
14  A.   He said he was at the Trump rally, and then he did say
15  that they walked to the Capitol.  At one point he did say he
16  was on the steps of the Capitol.
17  Q.   So he confirmed to you that he was on the steps of the
18  Capitol?
19  A.   He said he was on the steps of the Capitol.
20  Q.   How did Mr. Lesperance describe the crowd outside the
21  Capitol, if at all?
22  A.   He -- I believe the word he used, he said the crowd was
23  good.  He stated that he saw kids playing around.  He also
24  said that he did see police in riot gear come up and hit
25  batons on their shield.  He spoke about an altercation between

534

1   a man and a woman.  He also stated he witnessed a flash bang
2   go off near him.
3   Q.   Do you know what -- what is your understanding of what a
4   flash bang is?
5   A.   From my understanding a flash bang is a loud device that
6   emits loud flashes and a loud sound, typically used by law
7   enforcement to distract an individual that they are either
8   trying to disperse -- a group of individuals they're trying to
9   disperse or an individual they're trying to arrest.
10  Q.   Is it fair to say that Mr. Lesperance said that the crowd
11  was good but he also saw a flash bang go off?
12  A.   Yes.  He specifically said "flash bang."  And my partner
13  asked me, what's a flash bang, so I explained it to her.
14  Q.   Did you ask Mr. Lesperance if he went into the Capitol
15  building itself on January 6?
16  A.   Yeah.  We asked if he knew what was going on inside.
17  He said that they did not go inside.  He said that they looked
18  through a door.  I don't know which door.  He said they looked
19  through a door.
20  Q.   Did Mr. Lesperance's story about whether he went inside
21  the building, the Capitol building, or not change over the
22  course of your conversation with him?
23  A.   As we talked to him some more and we asked him if he
24  witnessed anything else going on inside, he did say that he
25  did go inside to use the bathroom.  And he did state --

1    because we asked him, what did he see inside, what was going

2    on, and he stated he did see several individuals going in and

3    out of a door.  And when he went in he saw several individuals

4    holding cell phones above their heads, I guess filming and

5    taking pictures.  And that was what he told us he witnessed.

6    Q.   Did he tell you whether in fact he went to a restroom

7    inside the Capitol building?

8    A.   He didn't say.

9    Q.   He said that's the reason why he went in?

10   A.   That's what he told us, that he was going to a restroom.

11   Q.   Did Mr. Lesperance say if he took any photographs or

12   videos while inside the Capitol?

13   A.   Yeah.  He did say he took photos and videos, but he said

14   he subsequently deleted them because of what he saw on the

15   news, and he was worrisome about what he saw on the news.

16   Q.   So he admitted deleting photographs and videos from

17   January 6 after January 6?

18   A.   He just said he deleted them.  I don't know when he

19   deleted them.

20   Q.   All in all, how long did you spend with Mr. Lesperance

21   for this interview?

22   A.   Approximately 15 minutes.

23   Q.   And when was this?

24   A.   This was on -- I believe it was on January 19.

25   Q.   What year?

1    A.    Of 2021.  I'm sorry.

2    Q.    Was Mr. Lesperance wearing a mask or any sort of facial

3    covering at the time?

4    A.    He was not.

5    Q.    So did you have a good opportunity to take a good look

6    at his sort of physical appearance, what he looked like?

7    A.    I did.

8    Q.    And do you see Mr. Lesperance in the courtroom today?

9    A.    I do.  He is sitting at the defense table on the right

10    side of me at the end, wearing a dark suit and white shirt.

11          MR. VALENTINI:  Let the record reflect that

12    Mr. Lesperance is in fact wearing a dark suit and white shirt

13    today.

14          THE COURT:  The record will so reflect.

15    BY MR. VALENTINI:

16    Q.    Let's talk about video evidence.  Did you try to locate

17    Mr. Lesperance in the Capitol Police surveillance videos as

18    part of your investigation?

19    A.    We submitted photos of Mr. Lesperance, the DMV photos,

20    whatever photos we had available, for recognition.  There was

21    a unit at the FBI with several individuals scouring photos and

22    trying to match them up with photos that were submitted.  So

23    we did.

24    Q.    How about your own personal knowledge?  Were you able to

25    ultimately find or locate Mr. Lesperance in the Capitol Police

1    video from January 6?

2    A.    We did.  We did get back hits, and it showed CCTV video

3    from the Capitol Police, and then we also had a hit from the

4    Metropolitan Police Department body cams.

5    Q.    When you compared the results you received from your

6    colleagues to your knowledge of Mr. Lesperance's appearance,

7    did those two match?

8    A.    It did.

9    Q.    Let's pull up Exhibit 101A1.  If we can zoom in.  You see

10    four individuals circled, but one of those individuals is

11    wearing a blue baseball cap.

12    A.    Yes, I see him.

13    Q.    And he's holding up a cell phone?

14    A.    He is.

15    Q.    And based on your familiarity with Mr. Lesperance's

16    appearance in January 2021 when you conducted your interview,

17    do you recognize that gentleman as Mr. Lesperance?

18    A.    I do.  That is Mr. Lesperance.

19    Q.    Let's pull up Exhibit 127.  Approximately 10 seconds into

20    the exhibit.

21         I've circled an individual on the right-hand side of the

22    picture.  Based on your familiarity with Mr. Lesperance's

23    appearance in January 2021, is the individual I just circled

24    on Exhibit 127, approximately 11 seconds into the video, on

25    the right-hand side of the video, Mr. Lesperance?

1    A.   Yes, it is.

2    Q.   Let's pull up Exhibit 131.  At approximately 30 seconds

3    into the exhibit.  We can go back another couple of seconds.

4    You see I've circled an individual wearing a blue cap and a

5    hooded sweater and a gray colored jacket in this picture,

6    wearing sunglasses?

7    A.   I do.

8    Q.   And based on your familiarity with Mr. Lesperance from

9    speaking to him in January 2021, is this gentleman

10   Mr. Lesperance?

11   A.   Yes, it is Mr. Lesperance.

12   Q.   And for all three exhibits that we've discussed so far,

13   Mr. Lesperance is wearing the same clothing, a blue cap,

14   sunglasses and a hooded sweater.

15   A.   Yes.

16   Q.   When you interviewed Mr. Lesperance back in January of

17   2021, did you also have an opportunity to hear his voice?

18   A.   I did.

19   Q.   So let's pull up Exhibit 206, approximately 35 seconds

20   into the exhibit.  I'm going to ask you to please pay

21   attention if you can hear something in the exhibit.

22        (Video played.)

23        Did you hear a reference to an inauguration in the

24   basement?

25   A.   Yes, I did.

1    Q.   And based on your conversation with Mr. Lesperance in

2    January 2021, were you able to identify that voice as

3    Mr. Lesperance's voice?

4    A.   Yes.  That is Mr. Lesperance's voice.

5    Q.   Okay.  Let's move forward to 1:28.  Let's play until

6    approximately 1:45.

7         (Video played.)

8         We'll stop the exhibit at 1:37.  Did you just hear some

9    voice saying "woo hoo" and then a reference to an open house?

10   A.   I did.

11           MR. ROOTS:  Objection.  Leading.

12           THE COURT:  That question was not leading, and it's

13   been answered already.  The objection's overruled.

14   BY MR. VALENTINI:

15   Q.   Were you able to identify that voice as Mr. Lesperance's

16   voice?

17   A.   Yes.

18   Q.   Now let's pull up Exhibit 207, approximately 17 seconds

19   into the exhibit.  And let's play for about five seconds.

20        (Video played.)

21        We can stop.  Did you hear a voice say "Look Ma, your

22   troublemaking son at it again"?

23   A.   I did.

24   Q.   And again, based on your familiarity with

25   Mr. Lesperance's voice --

1    A.    That was Mr. Lesperance's voice.

2    Q.    Let's skip forward to 33 seconds into the exhibit.

3          (Video played.)

4          Did you hear a reference to "now this is doing it bigly"?

5    A.    I did.

6    Q.    Again, based on your familiarity with Mr. Lesperance's

7    voice, whose voice was that?

8    A.    That did sound like Mr. Lesperance's voice.

9    Q.    Did you eventually obtain an arrest warrant for

10   Mr. Lesperance?

11   A.    Yes.

12   Q.    When did you obtain that warrant?

13   A.    It was in June, approximately around June 22nd, I believe

14   it was, sometime around there.

15              THE COURT:  2021?

16              THE WITNESS:  2021.  I'm sorry.

17   BY MR. VALENTINI:

18   Q.    And just, without saying the specific address, where did

19   you execute that arrest warrant?

20   A.    I did not personally execute that arrest warrant.

21   Q.    Where was it executed?

22   A.    But it was executed at or around the residence of

23   Mr. Lesperance.

24   Q.    Okay.  As part of your investigation into Mr. Lesperance,

25   did you also come to investigate an individual named James

1    Varnell Cusick?

2    A.    I did.

3    Q.    Did you obtain public records for Mr. James Cusick as

4    well?

5    A.    Yes, we did.

6    Q.    And those public records included the address -- an

7    address for Mr. James Cusick?

8    A.    Yes.  They were DMV records, so we had address and photo,

9    vehicle information.

10   Q.    And were you able to determine whether Mr. James Cusick

11   had a connection with Mr. Lesperance?

12   A.    Yeah.  Later on we did.  We received some tips, actually,

13   it was also in January of 2021.  We -- I should say the FBI

14   received a tip stating that Mr. James Cusick went to the

15   Capitol, went inside of the building, and it also stated that

16   he was a pastor in the local area.

17   Q.    Let me show you what has been marked as Government

18   Exhibit 178.  Is Exhibit 178 a fair and accurate copy of the

19   DMV photograph that you obtained as part of your records

20   search for Mr. James Cusick?

21   A.    That looks like the DMV photo.

22          MR. VALENTINI:  The government moves to admit 178 into

23   evidence.

24          MR. ROOTS:  No objection.

25          THE COURT:  Without objection, Government 178 is

1        admitted and may be published.

2                           (Government Exhibit No. 178

3                           received into evidence.)

4        BY MR. VALENTINI:

5        Q.   And what video database or holding, if any, did you

6        review in connection with your investigation into Mr. James

7        Cusick?

8        A.   We also submitted his photo to the individuals that

9        were -- in the FBI that were doing the facial recognition

10       searches for people on January 6.

11       Q.   And based on your investigation into Mr. Cusick, did you

12       ultimately obtain an arrest warrant for James Cusick as well?

13       A.   Ultimately, we did, based on that, yes, and some other

14       evidence.

15       Q.   And that one was based on his involvement in the events

16       of January 6 at the Capitol?

17       A.   Yes.

18       Q.   And when is it that you obtained that arrest warrant?

19       A.   We obtained the arrest warrant the same time we obtained

20       Mr. Lesperance's arrest warrant, and we executed it at the

21       same time.

22       Q.   And without providing a specific address, where did

23       Mr. James Cusick live generally?

24       A.   In Melbourne, Florida.

25       Q.   Did you coordinate with other agents in Florida to

1      execute the arrest warrants that you obtained?

2      A.   We did.  We coordinated with the Brevard Sheriff's Office

3      and also with the Melbourne Police Department.

4      Q.   And did there come a time when you personally and other

5      agents in fact arrested James Cusick?

6      A.   Yes.

7      Q.   And when was that?

8      A.   That was on June 24, 2021.

9      Q.   And again, without providing the address, where did you

10     execute that arrest warrant?

11     A.   It was at his residence.

12     Q.   What time of day did you --

13     A.   It was in the morning.

14     Q.   Again, same obvious question as before, but how did

15     you know the person you were arresting was in fact Mr. James

16     Cusick?

17     A.   When we went to the door, the agent that was at the

18     lead knocked on the door.  Mr. Cusick's daughter answered.

19     We asked for Mr. James Cusick and he walked out.  We asked,

20     "Are you James Cusick," and he said, "Yes."

21     Q.   And approximately how much time did you spend with

22     Mr. James Cusick on the day of his arrest?

23     A.   Approximately two hours I'd say.

24     Q.   And this was in June of 2021?

25     A.   Yes.

1    Q.   And I asked a similar question before with respect to

2    Mr. Lesperance:  Was James Cusick wearing a mask or any sort

3    of facial covering?

4    A.   He was not.

5    Q.   So, again, you had an opportunity to take a good look at

6    Mr. James Cusick's physical appearance?

7    A.   I did.

8    Q.   And do you see James Cusick in the courtroom today?

9    A.   Yes.  He is at the defense table at the front wearing a

10    dark jacket and a striped shirt.

11         MR. VALENTINI:  Let the record reflect that Mr. James

12    Cusick is wearing a dark jacket and striped shirt today.

13         THE COURT:  The record will so reflect.

14    BY MR. VALENTINI:

15    Q.   Okay.  Let's pull up Exhibit 131.  Approximately 33

16    seconds into the exhibit.

17         I have circled a gentleman at 33 seconds into the exhibit

18    wearing a white baseball cap, white turtleneck and black

19    earmuffs.  Based on the time that you spent with Mr. James

20    Cusick in June 2021, are you able to say whether the gentleman

21    I have circled in this exhibit is in fact James Cusick?

22    A.   It is.

23    Q.   You already testified the individual next to him is --

24    A.   Mr. Lesperance.

25    Q.   Let's pull up Exhibit 151.  Let's go approximately 10

1    minutes and 19 seconds into the exhibit.

2         At approximately 10 minutes and 19 seconds into the

3    exhibit, which is Exhibit 151, what is the time stamp that

4    you see on the top right corner of the exhibit?

5    A.   15:18:31.

6    Q.   Do you know what time that corresponds to?

7    A.   3:18 p.m.

8    Q.   I have circled an individual again wearing a white

9    baseball cap, black earmuffs, white turtleneck, and dark

10   jacket.  Based on your -- on the time that you spent with

11   Mr. Cusick in June 2021, are you able to determine who that

12   person is?

13   A.   Yes.  That is Mr. Cusick.

14   Q.   Let me play a few more seconds of this exhibit until

15   time stamp 15:19, so approximately 29 more seconds.

16        (Video played.)

17        I've stopped playing the exhibit at 10 minutes and 38

18   seconds into the exhibit and circled a gentleman who is

19   wearing a blue cap, sunglasses, and a hooded sweater or

20   jacket.  Based on the time that you spent with Mr. Lesperance,

21   are you able to tell who that gentleman is?

22   A.   That is Mr. Lesperance.

23   Q.   All right.  You testified that in June 2021 you arrested

24   James Cusick at his home?

25   A.   Yes.

1    Q.   When you arrested James Cusick, did you also have a

2    warrant to seize any items from his home?

3    A.   We had a warrant to seize three items of clothing.

4    Q.   Did you and other agents in fact seize items of clothing

5    from Mr. James Cusick's home?

6    A.   We did.

7    Q.   What items of clothing were you particularly interested

8    in?

9    A.   The white Taylor Made hat, a white turtleneck and a black

10   jacket.

11   Q.   Were any of those items in fact seized from Mr. James

12   Cusick's home?

13   A.   All three of them were.

14          MR. VALENTINI:  Brief indulgence.

15          THE COURT:  Certainly.

16          MR. VALENTINI:  Permission to approach?

17          THE COURT:  Just a minute.  We're going to need to take

18   a break.  We can either do it now or if you have one or two

19   minutes you want to finish before we do it, we can do that.

20          MR. VALENTINI:  I think now would probably be a good

21   breaking point.

22          THE COURT:  Let's take our afternoon break.  It's a

23   little bit early, but we'll take a 15-minute break now.

24       (Jury out at 3:03 p.m.)

25          THE COURT:  Time estimate, Mr. Valentini?

1           MR. VALENTINI:  Fifteen minutes, most.

2           THE COURT:  Fifteen minutes more?  Okay.

3    See you in 14 minutes.

4       (Recess from 3:04 p.m. to 3:24 p.m.)

5           THE COURT:  Welcome back, members of the jury.

6       Officer Miyasato, welcome back to you, and I remind you

7    you're still under oath.

8           THE WITNESS:  Yes, sir.

9           THE COURT:  Mr. Valentini.

10   BY MR. VALENTINI:

11   Q.   Welcome back.

12   A.   Thank you.

13   Q.   Before we broke you just testified that you in fact

14   seized three items of clothing during the search of Jim

15   Cusick's residence.  Is that correct?

16   A.   Yes.

17           MR. VALENTINI:  Permission to approach?

18           THE COURT:  Yes.

19   BY MR. VALENTINI:

20   Q.   I'm going to hand you what has been marked as -- excuse

21   me -- an item that has been marked Exhibit 601.  I'm going to

22   ask you to please open the bag without displaying its contents

23   to the jury for now.

24       (Witness complies.)

25   A.   Okay.

1    Q.   Do you recognize what's been marked as Exhibit 601?

2    A.   I do.

3    Q.   And was that item seized from James Cusick's residence?

4    A.   It was.

5         MR. VALENTINI:  The government moves to admit Exhibit

6    601 into evidence.

7         MR. ROOTS:  No objection.

8         THE COURT:  Without objection, Government's 601 is

9    admitted and may be published.

10                          (Government Exhibit No. 601

11                           received into evidence.)

12   BY MR. VALENTINI:

13   Q.   Could you please extract the contents of the paper bag,

14   Exhibit 601?  What is Exhibit 601?

15   A.   It's a Taylor Made hat.

16   Q.   Is Exhibit 601 identical -- is that the hat that was

17   seized from James Cusick's residence?

18   A.   It was.

19   Q.   Is it identical in appearance to the white Taylor Made

20   hat that you used to trace James Cusick in the video footage?

21   A.   It was.

22   Q.   Thank you.  You may put Exhibit 601 back into the bag.

23        (Witness complies.)

24        THE DEPUTY CLERK:  Did all the jurors see that?

25   They did not.  Could you hold it up so they can see it

1      more clearly?

2         (Witness complies.)

3              THE DEPUTY CLERK:  Thank you.

4              MR. VALENTINI:  Thank you.

5              THE COURT:  Yes.  Thank you very much, Mr. Miyasato.

6              MR. VALENTINI:  Permission to approach?

7              THE COURT:  You may.

8      BY MR. VALENTINI:

9      Q.   I'm handing you what has been marked as Exhibit 602, and

10     I would ask you to please inspect the contents of the paper

11     bag containing Exhibit 602 without displaying it to the jury.

12     A.   I have.

13     Q.   Do you recognize what has been marked as Exhibit 602?

14     A.   I do.

15     Q.   And was that item seized from James Cusick's residence?

16     A.   It was.

17             MR. VALENTINI:  The government moves to admit Exhibit

18     602 into evidence.

19             MR. ROOTS:  No objection.

20             THE COURT:  Without objection, Government's 602 is

21     admitted and may be published.

22                            (Government Exhibit No. 602

23                              received into evidence.)

24             MR. VALENTINI:  And with the Court's permission, I

25     would ask you to please stand and display Exhibit 602 to the

1    jury.  (Witness complies.)

2    BY MR. VALENTINI:

3    Q.   Is Exhibit 602 identical to the dark jacket that you used

4    in tracing James Cusick in the video footage?

5    A.   Yes, it is.

6         MR. VALENTINI:  Permission to approach?

7         THE COURT:  You may.

8    BY MR. VALENTINI:

9    Q.   Let me hand you what has been marked as Exhibit 603.

10   Once again I'm going to ask you to inspect the contents of the

11   bag containing Exhibit 603 without displaying its contents to

12   the jury.

13   A.   I have.

14   Q.   Do you recognize what Exhibit 603 is?

15   A.   I do.

16   Q.   What is it?

17   A.   It is a white turtleneck sweater.

18   Q.   Was that item seized from the search of James Cusick's

19   residence?

20   A.   It was.

21         MR. VALENTINI:  Government moves to admit Exhibit 603

22   into evidence.

23         MR. ROOTS:  No objection at all.

24         THE COURT:  Without objection, Government's 603 is

25   admitted and may be published.

 1                              (Government Exhibit No. 603

 2                               received into evidence.)

 3      BY MR. VALENTINI:

 4      Q.   I'm going to ask you again to please extract the white

 5      turtleneck sweater and display it to the jury.

 6           (Witness complies.)

 7           Thank you.  Special Agent Miyasato, is Exhibit 603

 8      identical in appearance to the white turtleneck that you used

 9      to identify James Cusick in the video footage?

10      A.   It is.

11           MR. VALENTINI:  Thank you very much, Special Agent.

12      We have no further questions.

13           THE COURT:  Mr. Roots.  Cross-examination.

14        Before you start your cross-examination, let me say this

15      to the jury, you have now heard some evidence of certain

16      statements made by one of the defendants, Defendant David John

17      Lesperance, before trial to a law enforcement officer.

18        Those statements made by Mr. Lesperance were admitted and

19      are admitted only with respect to him.  They're not admitted

20      against the other two defendants.  You may consider evidence

21      of those statements made before trial only with respect to

22      Mr. Lesperance.  You must not consider them in any way in your

23      deliberations with respect to Mr. Casey Cusick or Mr. James

24      Cusick, Jr.

25           Please, cross-examination, Mr. Roots.

1                           CROSS-EXAMINATION

2       BY MR. ROOTS:

3       Q.   Thank you, Special Agent.  I have trouble pronouncing

4       your name.

5       A.   Miyasato.

6       Q.   Miyasato.  And you're an FBI special agent?

7       A.   I'm a task force officer.

8       Q.   How long have you been that?

9       A.   Four years in Melbourne, Florida, and five years prior

10      in Las Vegas.

11      Q.   Now, you testified that your specialty is terrorism

12      investigations.

13      A.   I'm on the joint terrorism task force.

14      Q.   Is it your testimony that this case falls into an

15      investigation of terrorism?

16      A.   No.

17      Q.   Now, with regard to the tip that launched this

18      investigation, I'm confused.  At one point, maybe the last

19      witness said there was an anonymous tip, and you said it was

20      not anonymous.  Can you explain that?

21      A.   Which investigation are we referring to?

22      Q.   I guess I thought it was the same tipster that led to

23      Mr. Lesperance's arrest.

24      A.   If we're speaking about Mr. Lesperance, that was not an

25      anonymous tip.

 1    Q.   That was not.

 2    A.   No.

 3    Q.   Do you -- it was not -- who was that tipster?

 4         MR. VALENTINI:  Objection.

 5         THE COURT:  Need the phone?

 6      (Bench conference.)

 7         MR. VALENTINI:  The defense has made no showing, no

 8    threshold showing of the need for the informant's information

 9    which is protected.

10         THE COURT:  Mr. Roots?

11         MR. ROOTS:  Well, honestly, I think it is part of this

12    trial.  It's part of this investigation.  I think we would

13    want to know, you know, how this happened.

14         MR. VALENTINI:  Your Honor, if they wanted to know the

15    identity of the tipster, the tip itself was produced in

16    discovery.  They never asked.  This is not the time to begin

17    their own work.

18         THE COURT:  So is your objection just a question of

19    timing of this inquiry?

20         MR. VALENTINI:  No.  There's also no -- under the

21    balancing test that controls the disclosure of tipsters, there

22    is no shown need for the information.  There is no indication

23    here that the tipster had any involvement other than providing

24    the initial tip.

25         THE COURT:  If this had been requested during discovery,

1    would the government have declined to produce the information?

2              MR. VALENTINI:  The information as to the specific name?

3              THE COURT:  Yes.  The identity of the tipster.

4              MR. VALENTINI:  No.  We would not have declined, but

5    under a protective order.  Our concern is that this is being

6    disclosed in open court.  There is a protective order in this

7    case precisely to address these kind of issues.

8              THE COURT:  I think that is the issue, Mr. Roots.

9    The issue is the public disclosure of the information, and I'm

10   not going to at this late date have a public disclosure of this

11   information.  You could have acquired the information earlier,

12   and you could have utilized it in any way that was relevant to

13   the case.  But now to have it publicly disclosed I think is not

14   warranted.  So I will not allow the public inquiry and response

15   on the record.

16             MR. VALENTINI:  And could I make a further record,

17   Your Honor, please?

18             THE COURT:  Go ahead.

19             MR. VALENTINI:  Understanding that the timing now is

20   very different.  I don't know how to use information.  To the

21   extent the information has not been disclosed -- which it may

22   have been disclosed -- if they make a request, we're happy to

23   disclose it under the protective order.  That is not the

24   problem.

25             THE COURT:  All right.  You can take the government's

1    word; if it hasn't been disclosed, they are willing to

2    disclose it to you subject to the protective order.

3         (End of bench conference.)

4         MR. ROOTS:  Okay.  I guess we won't get that

5    information.

6         MR. VALENTINI:  Objection, Your Honor.

7         MR. ROOTS:  Sorry.

8         THE COURT:  I do think that that's not your role,

9    Mr. Roots, to talk to the jury about what you do get or don't

10    get.  You are correct.  You are not getting the information

11    based on the ruling of the Court.  But that's not for you to

12    communicate to the jury.

13         MR. ROOTS:  Okay.

14    BY MR. ROOTS:

15    Q.   Now, I'm still a little bit confused.  Was there more

16    than one tipster in this case?

17    A.   In Mr. Lesperance's case?

18    Q.   In this case of all three of these gentlemen?

19    A.   Okay.  If we're talking about all three, there were

20    more than one tip that came in.  There was a tip that came in

21    initially for Mr. Lesperance.  It was not anonymous.  There

22    was another tip that came in which was not anonymous stating

23    that Mr. James Cusick had went into the Capitol and that he

24    was a pastor.  And the Melbourne office also received an

25    anonymous letter that was a typed letter stating that James

1    Cusick and Casey Cusick both went into the Capitol building

2    and included some pictures also.

3    Q.   Okay.  Interesting.

4         You talked about using facial recognition technology.

5    Was that done before the arrest warrants in this case?

6    A.   Yes.

7    Q.   And if you could just explain how that was done.  You get

8    a name and then you look for the computer information about

9    the facial recognition, or do you get a picture and it's

10   subjected to some software or something?

11   A.   So, typically, when we were submitting photos, we would

12   submit them to a unit at the FBI that basically had several

13   individuals that were scouring videos.  They would take any

14   photos that were submitted.  My understanding is that some

15   software, and I don't know exactly what software was used,

16   was used to aid them.  But the majority of it was done by FBI

17   personnel who would take the photos submitted and scour

18   through whatever video that was coming in at the time, and

19   photos.

20   Q.   So they would scour photos from the Capitol on January 6

21   and then compare them to, what, DMV photos?

22   A.   Whatever photos that we had.  We would submit DMV photos,

23   any other photos that would show the subjects, and they were

24   submitted.  That was used as a reference for the unit to be

25   able to match up the individuals.  And then any matches or

1    potential matches were uploaded to a system.  The case agents

2    would go and look and would have to identify the individuals

3    that were matched.  And based on that, that's how the system

4    works.

5    Q.   So in this case, you had a tip with regard to each name,

6    or was it just James Cusick and David Lesperance?  Was it

7    Casey Cusick also?

8    A.   He was named in the anonymous letter that was sent to the

9    FBI office in Melbourne.  Mr. Casey Cusick was.

10   Q.   And then you proceeded to get DMV driver's license photos

11   of these three?

12   A.   We didn't get all three at the time.  It was

13   individually.  When Mr. Lesperance -- we got a tip on

14   Mr. Lesperance, what we typically do is we pull DMV records to

15   assure that the individual lives in the area that we service,

16   and the DMV records include the photos.  We did that in each

17   of the subsequent cases when we got tips in.  We also would

18   check to see if the individual did live in the area that is

19   part of the Melbourne FBI office's area of responsibility.

20        So, yes, they weren't got at the same time, but they were

21   got as tips came in and as we were examining each one of them.

22   Q.   And then the next stage is looking at all the pictures of

23   people inside the Capitol on January 6 and subjecting them to

24   facial recognition?

25   A.   Are we talking about --

1          MR. VALENTINI:  Objection.  Mischaracterizes the

2     testimony to the extent it's characterizing the testimony.

3          THE COURT:  I think he's asking.  He's not trying to

4     characterize it; he's trying to find out.  I'll allow a few

5     more questions on this subject matter, but we're not in the

6     business of litigating the facial recognition process.  But

7     you may answer the question.

8          THE WITNESS:  If we're talking about these specific

9     cases, of course we got the DMV records, and in

10    Mr. Lesperance's case we went and interviewed him because at

11    that time we didn't have -- the facial recognition database

12    was not set up yet, or the unit wasn't accepting any faces

13    yet.  So that's why we went and interviewed him just like we

14    did many tips we got at the time.

15         Later on, when we did get the tips that came in, both

16    anonymous and nonanonymous if we're talking about the other

17    two individuals, we did submit their photos to the unit to

18    be able to examine the video and photos that were collected

19    as part of the investigation, to identify if they are in any

20    of the video or photos that were in the FBI holdings for

21    January 6.

22    BY MR. ROOTS:

23    Q.   Okay.  So just a couple questions about the entry.  You

24    did show an image of Mr. Lesperance, and I believe this whole

25    group here, Mr. Lesperance specifically walking into the

1    Capitol on January 6, that image.  Do you recall that image?

2    A.    I do.

3    Q.    And he appeared to be holding a cell phone over his head?

4    A.    Yes.

5    Q.    He appeared to be filming as he walked in.

6    A.    Yes.

7    Q.    There was no law enforcement at that door, was there?

8    A.    Outside the door?

9    Q.    Either inside or outside?

10   A.    I was not there.  I do not know if anybody was outside.

11   Q.    Well, you're the FBI case agent in this case.  Correct?

12   A.    Yes.  I'm one of the case agents for these cases.

13   Q.    If there were law enforcement either outside or inside

14   the door, you would let the jury know about that.  Right?

15        MR. VALENTINI:  Objection.  Asked and answered.

16   He said he doesn't know.

17        THE COURT:  The objection to the question as framed

18   is sustained.

19   BY MR. ROOTS:

20   Q.  Signs at the door.  Signs at that door.  There were

21   no signs at the door saying No Trespassing, correct?

22        MR. VALENTINI:  Objection.  Beyond the scope.

23   The witness is not testifying as to his personal knowledge

24   of the Capitol.

25        THE COURT:  I understand.  I understand.

1    Sustained.

2    BY MR. ROOTS:

3    Q.   You did talk about a conversation with Mr. Lesperance

4    in which he talked about needing to use the restroom inside

5    the Capitol.  Do you recall that?

6    A.   Yes.

7    Q.   It is a fact that the restroom inside the Capitol on

8    January 6 was quite packed while the protesters were in the

9    building.  Correct?

10   A.   I do not know.  I was not there.

11   Q.   You don't know.

12        THE COURT:  That's what he said.

13   BY MR. ROOTS:

14   Q.   Okay.  And it is a fact that there weren't many restrooms

15   available for the public outside the Capitol.  Correct?

16   A.   I do not know.

17   Q.   You're the case agent in this case?

18        MR. VALENTINI:  Asked and answered.

19   BY MR. ROOTS:

20   Q.   Were there Porta-Johns set up outside the Capitol for

21   the protesters, or for the public?

22   A.   I do not know.  That is not my area of responsibility,

23   nor was I there.

24        MR. ROOTS:  Thank you so much.  No further questions.

25        THE COURT:  Anything on redirect?

1                    REDIRECT EXAMINATION

2       BY MR. VALENTINI:

3       Q.   Hi.  You were asked some questions about the recognition

4       process used by the FBI to identify suspects?

5       A.   Yes.

6       Q.   But isn't it the case that ultimately, who is responsible

7       for identifying suspects?

8       A.   At the end, it's the case agents.

9       Q.   So in this case, you came to court to -- did you

10      testify -- did you come to court to testify as to the

11      recognition process?

12      A.   No.

13      Q.   You come into court to testify that you recognized the

14      person in the video footage as Mr. Lesperance.

15      A.   Yes.

16      Q.   And that's based on your familiarity with Mr. Lesperance.

17      A.   Yes.

18      Q.   It's regardless of how you received a lead or some

19      information suggesting that maybe Mr. Lesperance was in a

20      particular location at a particular time.

21      A.   Yes.

22      Q.   It was your own comparison of Mr. Lesperance's appearance

23      as you saw him in January 2021 with what you saw in the video

24      footage.

25      A.   Yes.  The case agents have the final --

1    Q.   Let me ask you the same question for James Cusick.

2    Was your testimony today relating to the facial recognition

3    process with respect to James Cusick?

4    A.   No, it was not.

5    Q.   But did you or did you not satisfy yourself that the

6    person that you saw in the footage from inside the Capitol

7    was in fact James Cusick?

8    A.   Yes.

9    Q.   And do you have any doubt about that?

10   A.   I do not.

11         MR. VALENTINI:  Thank you very much.

12         THE COURT:  All right.  Thank you, Officer Miyasato.

13   You may step down and stay in the courtroom.

14      (Witness steps down.)

15       Next witness, please.

16         MS. MURPHY:  Your Honor, the prosecution will call Task

17   Force Officer Joshua Strait.

18         JOSHUA STRAIT, WITNESS FOR THE GOVERNMENT, SWORN

19                     DIRECT EXAMINATION

20   BY MS. MURPHY:

21   Q.   Please state your name for the record, spelling your

22   last.

23   A.   Joshua Strait.  S-T-R-A-I-T.

24   Q.   Are you employed, Mr. Strait?

25   A.   I am.

1    Q.   Where are you employed?

2    A.   I'm currently employed by the Brevard County Sheriff's

3    Office and with the FBI.

4    Q.   Can you tell us exactly what you do with the FBI?

5    A.   I am a task force officer with the Joint Terrorism Task

6    Force.

7    Q.   What are your authorities as a task force officer with

8    the FBI?

9    A.   I'm able to investigate crimes pretty much related to

10   security matters, threats to life, and international and

11   domestic terrorism.

12   Q.   And to which FBI office are you assigned?

13   A.   The Brevard RA.  So Tampa is the headquarters, and then

14   we're on the east side in Brevard.

15   Q.   And can you tell the jury what you did before becoming a

16   task force officer with the FBI?

17   A.   So with the sheriff's office, I was a patrol deputy,

18   pretty much on the road.  Then I became a field training

19   officer.  So I taught new deputies how to be a police officer.

20   I was a corporal on the road, which is a supervisor underneath

21   a sergeant.  I was also a general crimes agent, so a

22   detective.  And then I did SVU, which is your special victims

23   unit, and I am currently a hostage negotiator on our SWAT

24   team.

25   Q.   So Task Force Officer Strait, were you involved in the

1    investigation of an individual named Casey Cusick?

2    A.   I was.

3    Q.   And how did Mr. Cusick first come to your attention?

4    A.   So during the process of becoming a task force officer,

5    I had to go through a clearance and background with the FBI.

6    Once my clearance and background had been completed, I became

7    a task force officer with the field office and was assigned

8    the case.

9    Q.   So at the time that the case was assigned to you, was it

10   brand-new?  Was it just being opened?  What was the status of

11   the investigation when it was assigned to you?

12   A.   So it was already -- there was other individuals that

13   were being looked into, and this was basically the first case

14   that came to me in relation to those other investigations.

15   Q.   And at some point in your investigation did you obtain

16   public records for Casey Cusick?

17   A.   I did.

18   Q.   Did those records include an address for Mr. Cusick?

19   A.   They did.

20   Q.   Did they include a photograph?

21   A.   They did.

22   Q.   If we could please pull up Government's Exhibit 177,

23   which has not yet been admitted into evidence.

24        Officer Strait, do you recognize this photo?

25   A.   I do.

1    Q.   Do you recognize it to be a fair and accurate copy of the

2    photo that is in the FBI file for Casey Cusick?

3    A.   I do.

4         MS. MURPHY:  Your Honor, we would move Government's

5    Exhibit 177 into evidence, please.

6         MR. ROOTS:  No objection.

7         THE COURT:  Without objection, Government 177 is

8    admitted and may be published.

9                         (Government Exhibit No. 177

10                         received into evidence.)

11   BY MS. MURPHY:

12   Q.   What, if anything, did you do in connection with your

13   investigation into Casey Cusick beyond retrieving the public

14   records?

15   A.   Say that one more time.  I apologize.

16   Q.   What, if anything, did you do in connection with your

17   investigation into Casey Cusick beyond retrieving the public

18   records including the DMV records?

19   A.   Okay.  So beyond pretty much looking into Casey Cusick

20   and any information about him, me being with the sheriff's

21   office and having those databases, I also checked to see if

22   there was any involvement with law enforcement in the area or

23   with the sheriff's office itself.

24        I also sent a subpoena to Apple for a preservation, and

25   then ultimately later on in the investigation did spot checks

1    or surveillance to see if Casey Cusick lived at the address

2    that I had for him.

3    Q.   Did you have an opportunity to review any video footage

4    from inside the Capitol as a part of your investigation?

5    A.   Yes, I did.  That was also part of the investigation.

6    Q.   Did you have an opportunity to review any third-party

7    video footage, so not from the Capitol camera footage but

8    other what we call open-source video footage from January 6?

9    A.   Yes.  Yes, I did.

10   Q.   And based on your investigation, did you ultimately

11   obtain an arrest warrant for Casey Cusick for his involvement

12   in the events of January 6?

13   A.   Yes, we did.

14   Q.   What, if anything, did you do in preparation for

15   Mr. Cusick's arrest?

16   A.   So prior to the arrest I had created a PowerPoint

17   presentation of how we would ultimately do the arrest on the

18   date.

19   Q.   I believe you testified that you did spot checks as well

20   at Mr. Cusick's home.  Can you describe what those spot checks

21   would involve?

22   A.   Yep.  I would say about a week before the planning of the

23   arrest, I had driven to the area of Casey Cusick's residence

24   to basically check the outside of it from the street.  I was

25   in my car.  Just kind of getting a layout of how that area of

1    the residence was.  And then ultimately one of the times that

2    I checked I saw Casey Cusick actually exit the home.  He went

3    to a Home Depot, which was approximately a mile I want to say

4    from his house, and then saw him go back to the residence.

5        So that was kind of my confirmation that he actually

6    lived there or was residing there.  And that was basically the

7    spot checks.

8    Q.   And at that time was your understanding of Casey Cusick's

9    identity based on the DMV photo as well as other video footage

10   you've seen from inside the Capitol?

11   A.   Yes.  The same individual I saw at the residence, leaving

12   the residence, was consistent with what I had already gathered

13   and seen.

14   Q.   And did there come a time when you and other agents

15   arrested Casey Cusick?

16   A.   We did.

17   Q.   When was that?

18   A.   That was June 24.  It was a Thursday.

19   Q.   And do you remember, without stating the specific

20   address, where you arrested Mr. Cusick?

21   A.   Yes.  I know the address too, but...

22   Q.   Don't say the address on the record, but was it at his

23   residence?

24   A.   Yes.  It was at his residence.

25   Q.   And do you remember what time of day it was?

1    A.    Approximately eight o'clock in the morning.

2    Q.    And how did you know that the person you were arresting

3    was indeed Casey Cusick?

4    A.    By identifying him through the pictures and also the

5    communication that we had.  So.

6    Q.    So at some point did you ask him, was he Casey Cusick?

7    A.    Yes.  At the time of making contact with him at the door,

8    I had said, hey, Casey, I need you to come talk to me and step

9    out.

10   Q.    And he stepped forward affirmatively?

11   A.    Yes, ma'am.

12   Q.    Indicating he was indeed Casey Cusick?

13   A.    Correct.

14   Q.    About how long did you spend with Casey Cusick on the day

15   you arrested him?

16   A.    I would say probably about two, two and a half hours.

17   Q.    And was he wearing a mask or any other face covering?

18   A.    No.

19   Q.    So did you have a good opportunity to observe his facial

20   features and get an idea of what he looked like?

21   A.    Yes, ma'am.

22   Q.    And do you see Casey Cusick in the courtroom here today?

23   A.    I do.

24   Q.    Could you identify him to the jury, describing any item

25   of his clothing?

1    A.   He's wearing a beige suit jacket and a black shirt.

2         MS. MURPHY:  Your Honor, let the record reflect that

3    Defendant Casey Cusick is indeed wearing a black shirt and a

4    beige suit jacket.

5         THE COURT:  The record will so reflect.

6    BY MS. MURPHY:

7    Q.   Now, you testified that you arrested Casey Cusick at his

8    home in June of 2021.  Did you also have a warrant to search

9    his home at that time?

10   A.   We did.

11   Q.   Were there any items that you were specifically searching

12   for?

13   A.   Yes.  There was a red beanie cap and a black North Face

14   jacket.

15        MS. MURPHY:  Court's indulgence.

16        THE COURT:  Certainly.

17        MS. MURPHY:  Your Honor, permission to approach?

18        THE COURT:  Please.

19   BY MS. MURPHY:

20   Q.   For the record I've just handed the witness what's been

21   labeled as Government's Exhibit 604.  Without revealing the

22   contents of Exhibit 604, can you take a look and see if you

23   recognize that?

24   A.   Yes, I do.

25   Q.   What do you recognize it to be?

1    A.    It would be a black jacket with the "North Face" on it.

2           MS. MURPHY:  Your Honor, we'd move Government Exhibit

3    604 into evidence at this time.

4           MR. ROOTS:  No objection.

5           THE COURT:  Without objection, 604 is admitted and may

6    be published.

7                            (Government Exhibit No. 604

8                             received into evidence.)

9    BY MS. MURPHY:

10   Q.    Officer Strait, if you will, would you open the bag?

11   Do you have gloves?

12   A.    Yes.

13   Q.    Open the bag and display Government Exhibit 604, maybe by

14   standing for the jury so they have an opportunity to see it?

15   (Witness complies.)

16         Officer Strait, is that black jacket identical to the

17   black jacket that you retrieved from Defendant Casey Cusick's

18   home pursuant to your search warrant upon arrest, or that was

19   retrieved?

20   A.    Yes.  The jacket was retrieved.  I did not personally

21   retrieve the jacket.  I can go further into that if you want.

22   Q.    I don't think you have to.  But it is the jacket that was

23   retrieved.  And that jacket -- based on the video footage that

24   you had seen of Defendant Casey Cusick at and inside the

25   Capitol building, that is the black North Face jacket he was

1    wearing?

2    A.   Yes, ma'am.

3    Q.   I am now going to hand you Government's Exhibit 605.

4         And once again, without revealing its contents, could you

5    take a look at Government's Exhibit 605 and let us know if you

6    recognize it.

7    A.   Yes, I do.

8    Q.   Can you tell us what you recognize it to be?

9    A.   It's a red skull cap.

10        MS. MURPHY:  Your Honor, we would move Government's

11   Exhibit 605 into evidence at this time.

12        MR. ROOTS:  No objection.

13        THE COURT:  Without objection, Government's 605 is

14   admitted and may be published.

15                        (Government Exhibit No. 605

16                          received into evidence.)

17   BY MS. MURPHY:

18   Q.   Officer Strait, will you open Government's Exhibit 605

19   and display it to the jury, explaining exactly what it is and

20   when and where it was retrieved?

21   A.   So it's a red skull cap with a signature in gold, "Trump

22   45th president."

23   Q.   And Officer Strait, is that red skull cap identical to or

24   consistent with the red skull cap in the video footage you saw

25   of Casey Cusick during your investigation of the events at the

1    Capitol on January 6?

2    A.    It was.

3    Q.    If we could please pull up Government Exhibit 206, which

4    has already been admitted into evidence.  And forward to about

5    1:40, please.

6         Officer Strait, I'm going to play a bit of video for you.

7    Will you just keep an eye out and see what you observe?

8         (Video played.)

9         Officer Strait, did you recognize anyone in that video?

10   A.    I recognized Casey Cusick.

11   Q.    Did you have an opportunity to hear what Casey Cusick

12   said in that video?

13   A.    Yes.

14   Q.    Can you tell us what you heard?

15   A.    Basically "Whoa, hey, he fell off the wall.  Someone fell

16   off the wall."

17   Q.    And was Casey Cusick wearing the red hat and the black

18   jacket that we just looked at as Government's Exhibit 604 and

19   605?

20   A.    He was.

21   Q.    Can we pull up 211, please.  We'll just play the first 15

22   seconds or so.  I'd ask you to watch this as well.

23        (Video played.)

24        And again, did you recognize the red skull cap in this

25   video as well?

JOSHUA STRAIT - DIRECT

1    A.    I did.

2    Q.    Based on the time that you spent with Mr. Cusick in June

3    of 2021 when he was arrested, would you say that this is the

4    same Casey Cusick that you arrested?

5    A.    Yes.  That's Mr. Casey Cusick.

6    Q.    That's reflected in the video that's Government's Exhibit

7    211?

8    A.    Yes.

9         MS. MURPHY:  Thank you.  I have no further questions,

10   Your Honor.

11        THE COURT:  Mr. Roots.

12                      CROSS-EXAMINATION

13   BY MR. ROOTS:

14   Q.    Thank you, Officer Strait.

15   A.    Yes, sir.

16   Q.    You're from Brevard County, Florida?

17   A.    Yes, sir.

18   Q.    What is the largest city in Brevard County?

19   A.    Population-wise?

20   Q.    Yeah.  If you could just orient the jury, where in

21   Florida is Brevard County?

22   A.    Okay.  So Brevard County, if you've ever been to Orlando,

23   which is going to be kind of in the center of your state,

24   Brevard County would be approximately 45 minutes to the east.

25   So we have Cocoa Beach, you have Titusville, Melbourne.  You

1    have a slew of cities.  But if I was going to explain to you

2    guys, Brevard County is where NASA is at.  So that's where

3    the Kennedy Space Center is at, where your rockets go off.

4    We also have defense contracts.  We have the port.  If you've

5    ever taken a cruise ship, we have Port Canaveral.  So we have

6    quite a few.

7              MR. ROOTS:  I don't have any other questions.

8    Thank you.

9              THE WITNESS:  Okay.

10             THE COURT:  I assume there's no redirect, Ms. Murphy.

11             MS. MURPHY:  No redirect, Your Honor.

12             THE COURT:  All right.  Thank you very much, Officer

13   Strait.  We appreciate it, and you may step down.

14        (Witness steps down.)

15             THE COURT:  Mr. Valentini.

16             MR. VALENTINI:  Government rests.

17             THE COURT:  All right.

18        Mr. Roots and Mr. Pierce.

19             MR. ROOTS:  Your Honor, we would like to make an oral

20   Rule 29 motion on the grounds that the government has not --

21             THE COURT:  You don't have to describe the grounds.

22   Why don't we give the jury a five-minute break.

23        (Jury out at 4:04 p.m.)

24             THE COURT:  Mr. Roots.

25             MR. ROOTS:  Thank you, Your Honor.

1          Yeah, there are four criminal charges in this case.

2     Count 1 is entering and remaining in a restricted area.  There

3     hasn't even been enough evidence for this to go to the jury.

4     There is no evidence that the government has produced that the

5     defendants crossed a barrier, that they crossed any

6     cordoned-off fencing, that they crossed any sign, that they

7     defied any law enforcement command, that they even saw a

8     single sign that was in their direct path in front of them as

9     they went forward.

10         The most I think that the government has put on is some

11    noises, there are some alarm sounds.  That's just insufficient

12    for this to go to the jury as a case for unauthorized entry or

13    remaining in a restricted area.  And so Count 1 has not --

14    there just is insufficient evidence for this to go to the jury

15    at all.

16         Count 2 is --

17         (Defense conferring.)

18         Yeah, exactly.  There's no evidence of either the

19    subjective knowledge of any aspect of the area being

20    unauthorized.  Honestly, there isn't much evidence of the

21    other -- a trespassing charge requires both proof of control

22    by the owner of the property and that there is knowledge of a

23    warning or an announcement.  So both of those haven't been

24    met.  There really hasn't been any evidence put on that it was

25    an unauthorized area at the time, and there certainly is not

enough evidence that these gentlemen were given warning or notice of any kind.

Like I said, the most that they put on is some sounds, some alarms. But, you know, in the context of alarms, there were outside, there were sirens of all kinds, noises of all kinds. That just is insufficient to go to the jury for Count 1.

Count 2, the government has put on even less evidence. That's disorderly conduct in an unauthorized or restricted area. I submit that the definition of the term "disorderly conduct" requires -- I believe the word "jostling" is in that definition. There's no jostling, there's no jumping up and down. They never jumped, they never moved even quickly. They never ran. They never impeded anyone's traffic. They never disrupted anything inside the Capitol.

Walking or standing and talking at a conversation level cannot be disorderly conduct. As a matter of law, they cannot be found guilty of Count 2.

Count 3 is similar. It's disorderly conduct in the U.S. Capitol, and the same problems exist there. As a matter of law, the government has not put on sufficient evidence for the jury -- no reasonable jury could convict with what's been put on. Finally, there's Count 3 --

THE COURT: You mean Count 4.

MR. ROOTS: Count 4, picketing and parading inside the Capitol. The definition of picketing requires some signage, a

1    poster, a flag.  The government has put on no -- nothing,

2    indicating that any of these three defendants held anything,

3    that they gave any insignia, any announcements.  Parading

4    requires I think some kind of, at least -- I wouldn't say

5    organized but some kind of an orchestrated or deliberate

6    marching or walking so as to display to viewers.  There's none

7    of that.  The government has put on no evidence of parading.

8    Nothing.

9       Parading by definition must mean that you're trying to

10   express some position, or at least you are wanting to be seen

11   by others.  Parading might be walking in a deliberate or

12   orchestrated manner.  The government has shown none of that.

13   And then picketing is even -- there's nothing.  Picketing,

14   they didn't have flags, they didn't have signs of any kind,

15   not placards.  There's evidence that they heard people

16   chanting, but they did not chant themselves inside the

17   Capitol.

18      I don't believe there's any evidence even outside the

19   Capitol that they -- that any of these defendants chanted or

20   yelled or shouted anything.  They certainly didn't do anything

21   untoward or outside the normal conversation al tone of people

22   outside on the Capitol grounds on any given day.

23      So this case cannot go to the jury.  They just have not

24   proven their case and we shouldn't even have to put on a

25   defense.

1          THE COURT:  The third operative term for Count 4 is

2     demonstrate.  There's picketing, there's parading, and there's

3     demonstrating.

4          MR. ROOTS:  Nothing.  Nothing that's been put on shows

5     any demonstrating.  And I believe that has been further

6     refined by courts, at least in the *Bynum* decision, that it

7     has to be demonstrating in a way that is disruptive of the

8     proceedings inside.  Merely walking or standing, talking to

9     others cannot be demonstrating, picketing or parading.  The

10     government has not provided enough evidence for this to go

11     to the jury, and this trial should end right now.

12          THE COURT:  All right.  Thank you, Mr. Roots.

13       For the government, anything you want to say on the one

14     question that I have, and that is evidence relating to

15     disorderly or disruptive conduct by these three individuals.

16     And that relates to three of the counts.  Not so much to

17     Count 1, but to Counts 2 and 3, and then indirectly to

18     Count -- not indirectly, but less directly to Count 4 because

19     part of the definition usually used for demonstrate would be

20     to include conduct that would disrupt the orderly business of

21     Congress.

22       So what's the evidence that is sufficient to allow the case

23     to go to the jury with respect to disorderly or disruptive

24     conduct?

25          MR. VALENTINI:  Yes, Your Honor.  A jury instruction

1    in this case I believe will reflect that disruptive conduct

2    includes a disturbance that interrupts an event, activity, or

3    the normal course of a process.  When the defendants entered

4    the Capitol building and joined a large mob, which they could

5    see and which was clearly intent on itself disrupting an

6    official proceeding within the Congress or at a minimum

7    disrupting the function of the Capitol Police officer and its

8    ability to carry out its function -- their joining of that mob

9    in and of itself constitutes disruptive conduct.

10        The fact that from there they did not just stop, enter

11   the building, turn around and leave, but they went deeper and

12   deeper into the building, crowding out the space that the

13   police officers need to clear the building constitutes

14   disruptive conduct.

15        You could see in Exhibit 101, for example, a line of police

16   officers in riot gear.  Those officers, the jury could infer

17   and should infer, were ready to clear the area.  They did not

18   clear it because they were outnumbered.  And that is what

19   Captain Summers testified.  The Capitol Police could not

20   operate because they were crowded out.  And that -- and the

21   defendants in this case added to that fire.

22        It's like a flood and drops of water.  It's a simile that's

23   often used in these cases.

24            THE COURT:  That I've heard before.

25            MR. VALENTINI:  It's not the first January 6 case.

Another analogy is a stampede.  Walking in and of itself does not cause a danger to anybody, but a stampede is a dangerous activity.  And joining knowingly and willfully a stampede constitutes disruptive conduct.  And that is the case that we have here, Your Honor.

THE COURT:  All right.  Thank you, Mr. Valentini.  Anything further, Mr. Roots?

MR. ROOTS:  Well, I think there's case law that a criminal conviction has to be based on individual conduct, not the conduct of others.  No one can be convicted of what others do.  So this idea of collective guilt or crowding out cannot be the law.  Each one of these individuals is on trial for his own conduct, not the conduct of the mob or the group or the crowd.  That's a concept that I believe has no support in the law.

THE COURT:  I'm not sure that's right with respect to the January 6 cases.  But in any event, I'm going to reserve judgment on the motion and allow the trial to proceed, and we will deal with this at a later time as appropriate.  So we will allow the -- first of all the defense to put on its case, and then deal with the Rule 29 motion when it's properly resurrected, which may be at the close of the evidence, but it may also be following the return of a verdict from the jury.

In any event, I'm reserving judgment, and we therefore can go forward with the defense case.

1    So I'd like to bring the jury back in and have the first

2    45 minutes of the defense case.

3    MR. VALENTINI:  Your Honor, before we proceed, may I

4    inquire what is the order of witnesses that the defendants --

5    MR. PIERCE:  The first two witnesses will be Ruth

6    Cusick and then Casey Cusick.

7    MR. VALENTINI:  Your Honor, with respect to the first

8    witness, if I may be heard?

9    THE COURT:  You may.

10    MR. VALENTINI:  I understand that the first witness,

11    Ruth Cusick, will testify as a character witness.  I just want

12    to make sure that we are clear about the boundaries of the

13    type of testimony that can be elicited in that context.  Under

14    Rule 405 this must be evidence, testimony, that is elicited in

15    the form of an opinion.  It has to be of a relevant character

16    unless there's a different proffer.  I believe the only

17    possibly relevant character trait in this case is character of

18    being law-abiding.  If that is the type of opinion testimony

19    that will be elicited, I just don't want this to be a surprise

20    to the Court, but there is --

21    THE COURT:  Oh, you're worried about me?

22    (Laughter.)

23    MR. VALENTINI:  I --

24    THE COURT:  I'm teasing you, Mr. Valentini.  Go ahead.

25    MR. VALENTINI:  There will be evidence of violent

1    conduct by one of the defendants which resulted in an arrest.

2         THE COURT:  All right.  They are --

3         MR. VALENTINI:  I just want it to be on notice that

4    there's no surprise.

5         THE COURT:  All right.  Let's bring the jury in.

6       (Jury in at 4:18 p.m.)

7         THE COURT:  Welcome back, members of the jury.

8    We're ready to proceed with the defense case.  Mr. Pierce.

9         MR. PIERCE:  Thank you very much, Your Honor.

10   The defense calls Ruth Cusick.

11        RUTH CUSICK, WITNESS FOR THE DEFENSE, SWORN

12                    DIRECT EXAMINATION

13   BY MR. PIERCE:

14   Q.   Good afternoon, Ms. Cusick.

15   A.   Hi.

16   Q.   Could you please first state and spell your name for the

17   record, please?

18   A.   Yes.  It's Ruth Cusick.  R-U-T-H, C-U-S-I-C-K.

19   Q.   And where are you from, Ms. Cusick?

20   A.   I am originally from Mexico.  I was born there.  And then

21   our family moved to Colorado and I was raised there.  Lived

22   there until I went to college.  And then after that I married

23   Casey and we went to Florida.

24   Q.   Okay.  And what part of Florida do you live in?

25   A.   I don't currently live in Florida.  Now we live in

1    Oklahoma.

2    Q.    There we go.  So you moved to Oklahoma.  Where in

3    Oklahoma do you live?

4    A.    It's a town called Bixby.

5    Q.    And you and Casey and your children --

6    A.    Yes, our family.

7    Q.    -- live there now?

8    A.    Yes.

9    Q.    Thank you.  Can you please just very briefly describe

10   your educational background?

11   A.    My educational background.  I did -- I graduated high

12   school and I went to college, bible college in Oklahoma.

13   Q.    And what do you do for a living?

14   A.    I'm currently a stay-at-home mom.

15   Q.    Okay.  And so you are married?

16   A.    I am married.

17   Q.    And who are you married to?

18   A.    I'm married to Casey Cusick.

19   Q.    How long have you and Casey been married?

20   A.    We've been married since October 25, 2015.

21   Q.    Okay.  And how long did you know him before that?

22   A.    I knew him since 2012.

23   Q.    And in case you didn't say it already, how did you get

24   to know Casey originally?

25   A.    I met him at bible college in Oklahoma.

1    Q.    Okay.  And do you and Casey have children?

2    A.    We do.  We have three.  We have a six-year-old, a

3    three-year-old, and a 13-month-old.

4    Q.    And how is your relationship with Casey?

5    A.    Currently?

6    Q.    Yes.

7    A.    Yeah.  It's good.  It's actually better than it's ever

8    been.

9    Q.    Have you ever been separated?

10   A.    We were for a time.

11   Q.    And how long was it?

12   A.    Maybe like a month?  Two weeks to a month.  I can't

13   really remember.  It was a long time ago.

14   Q.    Do you remember what year that was, by chance?

15   A.    2019.

16   Q.    Okay.

17   A.    I think.

18   Q.    And aside from that brief separation, have you

19   essentially lived together continuously aside from somebody

20   taking a business trip or something like that?

21   A.    Yes.  Yes, we have.

22   Q.    Do you feel that you have a sufficient basis to have

23   formed an opinion about Casey's character --

24   A.    Yes.

25   Q.    -- for law-abidingness?

```
1    A.   Yes, I do.  I can say --

2    Q.   And just so I get the question on the record --

3    A.   Sure.

4    Q.   -- what is that opinion?

5    A.   Well, before I met Casey I really honestly never had met

6    anyone that followed the rules as much as he did.  Even in

7    like games and -- board games and everything.  He's very

8    wanting to follow the right thing to do.

9    Q.   Okay.  And without going into any specific examples, if

10   you have anything to say as to why you have that opinion or

11   what you base that opinion on.

12   A.   What I base it on?

13   Q.   Yeah.

14   A.   Sorry.  I'm not understanding the question.

15   Q.   Yeah.  What do you base that opinion on?

16   A.   Well, personal everyday experience with him.

17   Q.   Do you feel that you have a sufficient basis to have

18   formed an opinion about Casey's character for peaceability,

19   whether he is generally speaking a peaceable person?

20   A.   Yes.  Yeah.

21   Q.   And what is that opinion?

22   A.   My opinion is that he's very peaceful.  My children love

23   him and they are who they are because he is their dad.

24   Q.   Now, despite those opinions, has there ever been a time

25   when you filed a police report against Casey?
```

1    A.    I did.

2    Q.    And when was that, if you recall?

3    A.    That was end of 2018.

4    Q.    All right.  And please just tell us what happened.

5    A.    Sure.  I did, I filed a police report.  It's something

6    that I regret that I did.  That choice came from anger.  I

7    allowed anger to cloud my judgment in that moment.  In that

8    season I had just had our firstborn, and I can say I was very

9    emotional.  I was extremely emotional, hormonal, of course,

10   and in a dark place.

11        I had never -- now looking back, I guess some would say

12   I was struggling with postpartum depression.  And it speaks a

13   lot to where we are now because Casey was a big part of the

14   reason to why we have three kids now.  He helped me out of that,

15   and he has shown me more of what true unconditional love is.

16   Q.    Have you ever filed any other police reports against

17   Casey after that?

18   A.    No.

19   Q.    Has Casey been a good father?

20   A.    Yes.  Very good.

21   Q.    And just briefly, describe that for the jury.

22   A.    He's -- I mean, my girls are obsessed with him.

23   They want to be with him all the time.  He's a fun dad.

24   He's a loving dad.  Even our little boy, he loves him so much.

25   He is the sweet boy that he is because Casey is his father.

```
 1    Q.   Are you glad that Casey is your husband?
 2    A.   Yes.
 3    Q.   Is Casey -- based on the opinion that you have that we
 4    talked about, is Casey the type of person who would follow a
 5    mob?
 6    A.   No.  No.  Not if he saw that it was going to end up in
 7    something wrong.
 8    Q.   Based on the opinion that you talked about earlier, is
 9    Casey the type of person who would become part of a riot?
10    A.   No.
11    Q.   Okay.  And moving on to the other defendants in this
12    case, do you know either of the other two defendants in this
13    case?
14    A.   I do.  Yes.
15    Q.   And let's talk first about the gentleman sitting in the
16    first seat here.  Do you know who that is?
17    A.   Mm-hmm.
18    Q.   Who is it?
19    A.   Yes.  This is my father-in-law.
20    Q.   Mr. James Cusick?
21    A.   Mm-hmm.
22    Q.   Okay.  And how long -- how long have you known him?
23    A.   Well, since I -- um, well, we were dating, so maybe a
24    year before we got married.  So since 2014?
25    Q.   And have you had consistent interactions with him during
```

1    that time in terms of frequency of interactions?

2    A.   Yeah.  Yes.

3    Q.   And how would you describe generally your relationship

4    with him?

5    A.   He is very concerned that I always have what I need.

6    He is very involved in the well-being of us as a family, of me

7    as a daughter-in-law.  He treats me like his own daughter.

8    Q.   So you're close to him.

9    A.   Yes.

10   Q.   And do you feel that you have sufficient basis to have

11   formed an opinion about James's character for law-abidingness?

12   A.   Yes.

13   Q.   What is that opinion?

14   A.   Well, I mean, he loves his country.  He's a veteran.

15   He volunteered to serve his country.  And so that in itself

16   I think says a lot.

17   Q.   Do you feel that you have a sufficient basis to have

18   formed an opinion about James's character for being a

19   peaceable person?

20   A.   Yes.

21   Q.   And what is that opinion?

22   A.   He's very peaceable.  Yes.  I don't think I've ever

23   seen him in a confrontation of any sort.  He's very friendly.

24   He gets along with anyone that we go around.  Whenever we

25   travel, we normally have so much favor because he's so

589

1    likeable.

2    Q.   Consistent with the opinions that you talked about,

3    is James the type of person who would follow a mob?

4    A.   No.

5    Q.   And based upon the opinions you talked about, is he

6    the type of person who would become part of a riot?

7    A.   No.

8    Q.   Has James been a good father-in-law?

9    A.   Yes.

10   Q.   Are you happy that he's your father-in-law?

11   A.   I'm happy he's my father-in-law.

12   Q.   Okay.  And let's talk about the third gentleman in the

13   row there.  Do you know who that individual is?

14   A.   I do.

15   Q.   Who is that?

16   A.   That is Dave Lesperance.

17   Q.   And what is the nature of your relationship with

18   Mr. Lesperance?

19   A.   Well, he at one time employed my husband, and just

20   through church I met them.

21   Q.   And how long have you known him?

22   A.   Since I married Casey.

23   Q.   So again for several years?

24   A.   Yeah.  2015.

25   Q.   Have you had relatively consistent interactions with

1    him during that time frame?

2    A.   Yes.

3    Q.   Do you have a good relationship with him?

4    A.   Yeah.  I would say that I do.  My children love him.

5    He loves my children.  He's very -- I love Dave.  He's very

6    humorous, very warm, very caring, loving.  That's just who he

7    is.

8    Q.   And do you feel that you have a sufficient basis with

9    respect to Mr. Lesperance to have formed an opinion about his

10   character for law-abidingness?

11   A.   Yes.

12   Q.   And what is that opinion?

13   A.   That he is law-abiding.  I've never -- I mean, never,

14   ever, have I ever heard anything as far as like -- like this.

15   Q.   Do you feel that you also have a sufficient basis to have

16   formed an opinion about Dave's character for peaceability?

17   A.   Yes.  I would say he's very peaceful.

18   Q.   Based on those opinions, do you believe Dave is the kind

19   of person who would follow a mob?

20   A.   No.

21   Q.   Based on those opinions, do you think Dave is the kind of

22   person who would become part of a riot?

23   A.   No.

24   Q.   Has Dave been a good family friend?

25   A.   Yes.

```
1     Q.   And you're glad he's your family friend?

2     A.   Yes.  We're glad he's a family friend.

3          MR. PIERCE:  Thank you very much.  No further

4     questions, Your Honor.

5          THE COURT:  Mr. Valentini.

6                        CROSS-EXAMINATION

7     BY MR. VALENTINI:

8     Q.   Good afternoon.

9     A.   Good afternoon.

10    Q.   Your name is Ruth Cusick.  Right?

11    A.   Yes.

12    Q.   Should I refer to you as Ms. Cusick?

13    A.   Sure.

14    Q.   Ms. Cusick, you said you're currently not working?

15    A.   Right.

16    Q.   You're a stay-at-home mom?

17    A.   Yes.

18    Q.   You're married to one of the defendants in this case,

19    Casey Cusick, right?

20    A.   Yes.

21    Q.   And how long have you been married?

22    A.   We've been married since 2015.

23    Q.   So seven or eight years?

24    A.   Yes.

25    Q.   And you testified before that you and Mr. Casey Cusick
```

1      have three children?

2      A.    Yes.

3      Q.    And you care about Mr. Casey Cusick?

4      A.    Of course.

5      Q.    And you wouldn't want anything unpleasant to happen to

6      Mr. Cusick?

7      A.    Right.

8      Q.    And so being convicted on federal charges, that would be

9      something unpleasant?

10     A.    Yes.

11     Q.    And you don't want that to happen to Mr. Cusick?

12     A.    Right.

13     Q.    Because you've been married for a long time?

14     A.    Yeah.  Not only that, we have children.

15     Q.    You have children.  And so if he were to be convicted on

16     federal charges, that would be bad not only for you but for

17     your children as well?

18     A.    Yes.  Our whole family.

19     Q.    So you really don't want that to happen.

20     A.    Right.

21     Q.    You also testified that in your experience in your view

22     Casey Cusick is law-abiding.

23     A.    Yes.

24     Q.    But you yourself were not in Washington, D.C., on January

25     6, 2021.

1    A.    I was not.

2    Q.    You didn't go with him when he went to Washington?

3    A.    No.

4    Q.    So you were not with Casey Cusick when he saw a man

5    fall off a wall of the Capitol.

6    A.    I was not.

7    Q.    And you were not with Casey Cusick when after seeing

8    the man fall off the wall of the Capitol he kept marching on

9    towards the Capitol.

10   A.    I was not there.

11   Q.    You were not with Casey Cusick when he entered the

12   Capitol?

13   A.    No.

14   Q.    Seeing a line of police officers in riot gear on the

15   left-hand side of the building and he went into the building.

16   You were not with him that day?

17   A.    Right.

18   Q.    You were not with Casey Cusick as he walked the length of

19   the Capitol from the Senate Wing door to the House Wing door

20   and back.

21        MR. PIERCE:  Objection, Your Honor.  Asked and

22   answered.  He's essentially established she wasn't there and

23   couldn't know any of this.

24        THE COURT:  I'll let her answer this question.  We're

25   not going to have many more along these lines.  You may answer

1    that question.

2            THE WITNESS:  No.

3    BY MR. VALENTINI:

4    Q.   Let me ask you another question:  You were not with Casey

5    Cusick after he left the Capitol when he spent nearly an hour,

6    approximately an hour on Capitol grounds as police officers

7    were clearing the area?

8    A.   I was not in D.C. on January 6.

9    Q.   Okay.  Let me ask you about your testimony that Casey

10   Cusick is peaceable.  I also wanted to ask you about the

11   police report that you mentioned in your direct examination.

12           So on December 13, 2018, you filed a police report?

13   A.   Right.

14   Q.   And when you filed that police report, you told the

15   police officer that Casey Cusick swung his right elbow at you?

16   A.   Mm-hmm.

17   Q.   And that was true?

18   A.   Right.  The accident happened.  Yes.

19   Q.   It did happen.

20   A.   Right.

21   Q.   And you also told the police officer that he struck you

22   in the bridge of your nose?

23   A.   I did.  That was in the report, right?

24   Q.   I'm not asking you -- I'm asking you whether you asked --

25   I'm also asking you did that in fact happen?

1    A.   It happened, yes, but it --

2    Q.   And you told the truth when you filed the police report.

3         MR. PIERCE:   Objection.   I'd just like her to finish

4    her answer.

5         THE COURT:   I agree.   And I think Mr. Valentini

6    probably agrees.

7         MR. VALENTINI:   I believe the witness was completed

8    her answer.   But please answer.

9    BY MR. VALENTINI:

10   Q.   You told the truth when you told the police officer that

11   Casey Cusick struck you in the bridge of your nose.   Right?

12   A.   Yeah.   The accident happened.   How the accident happened

13   is up for interpretation.   But like I said, I regret making

14   that report.   I should not have involved the police in that

15   incident.

16   Q.   I understand that you're testifying today that you regret

17   that choice, but the fact that he swung his elbow backward and

18   struck you in the bridge of your nose, that is true.

19   A.   Right.   Yes, that is true.

20   Q.   And you also told the police officer that he possibly

21   knocked you unconscious?

22   A.   No.   I did not say that.

23   Q.   You did not say that?

24   A.   No.

25   Q.   Let me show you the police report that was filed on

1    December 13 --

2         THE COURT:  Just so we have a record of it, not that

3    you're necessarily offering it into evidence, but let's just

4    mark it.

5         MR. VALENTINI:  Let's mark the police report as

6    Exhibit 701.3.

7         THE COURT:  701.3?

8         MR. VALENTINI:  Yes.

9         THE COURT:  Complicated.  Okay.  Go ahead.

10   BY MR. VALENTINI:

11   Q.  Ms. Cusick, I just handed you this police report.  And

12   I'm going to read a sentence, and then I'm going to ask you to

13   read the sentence that follows that.  It's approximately

14   halfway -- or two-thirds of the way in the second paragraph of

15   this police report.

16        "Mr. Cusick then swung his elbow backwards, striking" --

17        THE COURT:  Wait a minute.  This isn't in evidence.

18   Ask her to read it to herself and then ask her a question.

19        MR. VALENTINI:  Okay.

20   BY MR. VALENTINI:

21   Q.  Could you please read the sentence beginning "Mrs. Cusick

22   stated that the strike."

23        THE COURT:  Just read it to yourself.

24        THE WITNESS:  Okay.

25        (Witness reviewing document.)

1          THE WITNESS:  I'm sorry.  You're going to have to come

2     show me exactly where.

3          THE COURT:  You may approach.

4        (Counsel approaches.)

5          THE WITNESS:  Okay.  Starting here?  Oh, here.  Okay.

6       Okay.  No.  I can say that I did not say that.

7     BY MR. VALENTINI:

8     Q.   So the police report misrepresented what you said?

9     A.   No.  This last part was definitely added by the --

10    whoever wrote this.  Matthews.

11    Q.   So your testimony today is that this police report

12    misstated what you said --

13    A.   I never, ever -- the word "unconscious" --

14    Q.   It's a yes-or-no question.

15    A.   -- never came out of my mouth.

16         THE COURT:  Let her finish.  Go ahead and ask another

17    question.

18    BY MR. VALENTINI:

19    Q.   It's a yes-or-no question.  Does this report accurately

20    state what you said, what you told the police on --

21    A.   No.

22    Q.   -- December --

23    A.   The answer's no.

24    Q.   -- 13, 2018?

25    A.   The answer is no.

```
 1    Q.   The statement is added?  So it was not something you ever
 2    said?
 3    A.   I did not say those words, no.
 4    Q.   Did you tell the police officer when you made that report
 5    that your nose started bleeding profusely?
 6    A.   It did bleed, yes.
 7    Q.   Did you tell the police officer that the blood covered
 8    the front of your shirt?
 9    A.   Yeah.
10    Q.   And all of that was true.
11    A.   Right.  It was a nosebleed.
12    Q.   The blood in fact was covering the front of your shirt.
13    A.   Yes.  Some.
14    Q.   You also testified a little bit about your opinion of
15    James Cusick.
16    A.   Mm-hmm.
17    Q.   And James Cusick you testified is your father-in-law?
18    A.   Yes.
19    Q.   And you love James Cusick, you care for him?
20    A.   Right.  Yes, I do.
21    Q.   And your husband, Casey Cusick, also cares for him?
22    A.   Yes.
23    Q.   And again, you would not want anything unpleasant to
24    happen to James Cusick.
25    A.   Right.
```

599

```
 1      Q.   And being convicted on federal charges for participating
 2      in the January 6 riot, that would be something unpleasant?
 3      A.   Right.
 4      Q.   And you really don't want him to be convicted.
 5      A.   Mm-hmm.
 6      Q.   Let me also ask you the same questions that I asked you
 7      before about Casey Cusick.  You were not with James Cusick in
 8      Washington, D.C., on January 6?
 9      A.   I was not.
10      Q.   So you did not see what James Cusick did in Washington,
11      D.C., on January 6.
12      A.   Right.  I did not.
13           MR. VALENTINI:  I have no further questions.
14           THE COURT:  Mr. Pierce?  Redirect?
15           MR. PIERCE:  Thank you very much, Your Honor.
16                         REDIRECT EXAMINATION
17      BY MR. PIERCE:
18      Q.   Mrs. Cusick, you did not write that police report, did
19      you?
20      A.   I did not.
21      Q.   Those are not your exact words that are on that paper,
22      are they?
23      A.   No.
24      Q.   Somebody else wrote that police report.  Right?
25      A.   Yes.
```

1    Q.    You're not suggesting here -- you didn't come on the

2    stand suggesting you were some kind of unbiased witness in

3    this case, did you?

4    A.    No.

5    Q.    You're not pretending that you're indifferent about the

6    outcome of this case?

7    A.    No.

8    Q.    All right.  Now, you weren't in -- Mr. Valentini asked

9    you a series of questions about what you observed or didn't

10   observe on January 6 in D.C.  Do you recall that?

11   A.    Yes, I do.

12   Q.    You weren't in D.C. on January 6.

13   A.    I was not.

14   Q.    But you were at your home when the house got raided by

15   the FBI at eight o'clock in the morning, weren't you?

16   A.    Yes.

17   Q.    How many agents were there?

18           MR. VALENTINI:  Objection.

19           THE COURT:  When your house got raided?  Is that what

20   you said?

21           MR. PIERCE:  Yes, Your Honor.

22           MR. VALENTINI:  Objection.  This is way outside the

23   scope of the cross.  It's way out of bounds.

24           THE COURT:  It does seem to me to be beyond the scope

25   of the direct examination and the cross-examination.  It's an

1    entirely new subject.

2         MR. PIERCE:  He was asking her about her percipient

3    knowledge about January 6 and I wanted to ask her percipient

4    knowledge about June 2021.

5         THE COURT:  That's a different subject and you didn't

6    cover it in direct.

7         MR. PIERCE:  Understood.

8       Ms. Cusick, thank you very much.

9         THE WITNESS:  Thank you.

10        THE COURT:  Thank you for coming.  We appreciate it.

11   You may step down.

12      (Witness steps down.)

13        THE COURT:  Next witness.

14        MR. PIERCE:  Defense will call Mr. Casey Cusick.

15        CASEY CUSICK, WITNESS FOR THE DEFENSE, SWORN

16                      DIRECT EXAMINATION

17   BY MR. PIERCE:

18   Q.   Good afternoon, Mr. Cusick.

19   A.   Good afternoon.

20   Q.   I'm actually going to jump ahead to a topic that I was

21   going to cover a little bit later in your examination.

22   A.   Okay.

23   Q.   But when did you first learn that you were under

24   investigation by the FBI for your conduct on January 6?

25   A.   The FBI came to my door at 7:45, eight o'clock in the

1    morning with about eight to nine police officers, as many

2    cars, with AR-15s pulled on me and my children, and pistols as

3    well.  Every single one of them had a gun drawn at my door.

4    Knocked on my door, immediately told me to come out.  I

5    followed exactly what they said because what else would I do

6    when people have guns drawn on me.  And I turn around and an

7    officer immediately arrested me, took me over to his vehicle.

8    Q.   You have children?

9    A.   I do.

10   Q.   How old are they?

11   A.   They are currently 6, 3, and 1 years old, but at the time

12   I only had two children.  One was 3, and one was 1.

13   Q.   And what were those two children's genders?

14   A.   Both females.

15   Q.   And how did your children react to the 7:30 a.m. FBI raid

16   with AR-15s at your house?

17            MR. VALENTINI:  Objection.  Relevance.

18            MR. PIERCE:  He opened the door about --

19            THE COURT:  Easy, easy.  Why don't you pick up the

20   phone and let's discuss it.

21        (Bench conference.)

22            THE COURT:  The objection is?

23            MR. VALENTINI:  The relevance.  The reaction of the

24   children to the arrest is completely irrelevant to any facts.

25   As to 403, this is just an attempt to put on trial and inflame

1          the jury about perceived law enforcement misconduct.

2                MR. PIERCE:  I actually had no intent, Your Honor, to

3          go into the arrest whatsoever in this trial, but they have

4          opened the door with all three defendants talking about

5          specifically the arrests at their house.  And I'm asking him

6          about the arrest at the house.

7                THE COURT:  The children's reactions to the arrest are

8          not relevant and I will not let you go into that.  If you have

9          something that is directly relevant to the charges in this

10         case that involves the arrest, I'll let you explore that.  I

11         don't know what it would be.  But nothing about reactions.

12               MR. PIERCE:  Understood, Your Honor.

13            (End of bench conference.)

14               MR. PIERCE:  Thank you, Your Honor.  Thank you,

15         Mr. Cusick.

16         BY MR. PIERCE:

17         Q.   Mr. Cusick, let's start from the beginning.

18         Could you please state and spell your name for the record.

19         A.   Yes.  My name is Casey Evan Cusick.  My name is spelled

20         C-A-S-E-Y, E-V-A-N is my middle name, and my last name is

21         C-U-S-I-C-K.

22         Q.   And where are you from at this point as we speak?

23         A.   I currently live in Bixby, Oklahoma.  I'm from Melbourne,

24         Florida, which is where the arrest happened.

25         Q.   Okay.  And could you please just briefly describe your

1    educational background for the jury?

2    A.   Yes.  I graduated high school as well as going to bible

3    college.

4    Q.   What have you done for a living in your life?

5    A.   Mostly spent time in real estate, which I had started my

6    own company early 2021, and as of June 24, 2021, after the

7    raid on my house, I at that point had multiple realtors and

8    brokers I was working with, and unfortunately, everything that

9    happened was public and it was on the local news, and so I

10   lost that business on account of that.  So since then I --

11        MR. VALENTINI:  Objection.  Move to strike.  The

12   question was what do you do for a living.

13        THE COURT:  I will instruct the witness to answer the

14   questions asked to you, not to give additional information,

15   and stick to the question that you've been asked.  I'm not

16   going to strike anything but will go ahead and also ask you,

17   Mr. Pierce, to bear that in mind.

18        MR. PIERCE:  Yes, Your Honor.

19   BY MR. PIERCE:

20   Q.   So specifically, what do you do now?

21   A.   So currently I am in the process of starting my own

22   not-for-profit as well as my own LLC because I have struggled

23   since January 6 to get work anywhere.

24   Q.   And what does this sort of planned nonprofit involve, if

25   you have --

1    A.    It would be sort of like a men's ministry.

2    Q.    And what does that mean?

3    A.    It means -- it's called -- you want me to tell you what

4    it's called?

5    Q.    Sure.

6    A.    Okay.  It's called Project Gideon.  It would be for -- in

7    the Bible, there's a book called the Book of Judges, and in

8    the Book of Judges there's a story about Gideon, and Gideon

9    was basically a coward, and angel of the Lord came to him and

10    told him he was a mighty man of valor.  And I believe there's

11    a lot of men out there that are struggling and have struggles

12    in their lives and, you know, in ministry a lot of times -- my

13    parents are pastors so I grew up in ministry --

14         COURT REPORTER:  Could you slow down, please.

15         THE WITNESS:  Sorry.

16      And so I always saw the side of it -- I saw the bad side of

17    ministry, I saw people abusing, you know, time that my parents

18    spent with them but I just always saw the need for men --

19         MR. VALENTINI:  Objection.  Your Honor, the question

20    was what do you do now for a living.  This is pretty far

21    afield from that.

22         THE COURT:  Try to stick to the point, Mr. Cusick.

23         MR. PIERCE:  Okay.  That's fine.  Thank you.

24    BY MR. PIERCE:

25    Q.    Now, you are married?

1    A.    I am married.

2    Q.    Who are you married to?

3    A.    My wife, Ruth Cusick.

4    Q.    How long have you been married?

5    A.    We've been married for -- this year will be eight years

6    in October.

7    Q.    And you mentioned you now have three --

8    A.    We have three children.  Yes, sir.

9    Q.    Two girls and a boy now?

10   A.    And a boy.

11   Q.    How is your relationship with your wife?

12   A.    As she said, better than it's ever been.

13   Q.    Now, we heard about an incident when she was testifying

14   where your wife filed a police report against you.  Do you

15   recall that?

16   A.    I do.

17   Q.    What happened?

18   A.    What happened was we were driving in the car.  As she

19   stated, it was a not so good time in our marriage early on.

20   And it was an accident.  I was driving.  I was holding the

21   phone.  She was trying to get hold of the phone and I was

22   trying to tell her to get back, and when I did I pushed my arm

23   back like that and it just caught her perfectly exactly in the

24   bridge of the nose where if you just flick it, it would bleed.

25   Q.    Do you regret that --

1    A.    A hundred percent.

2    Q.    How was that -- you were arrested?

3    A.    Embarrassingly, yes, I was.

4    Q.    And how was that case against you resolved from a legal

5    standpoint?

6    A.    It was dropped.  There was no -- judifi -- the

7    adjudification was withheld.  Forgive me, I'm not so familiar

8    with law terms, but I was never charged with anything.  I was

9    dropped all the way down to a third-degree misdemeanor, I want

10   to say.  And I think it was actually a disorderly conduct or

11   something similar to that.

12   Q.    And has anything like that ever happened again --

13   A.    Never.

14   Q.    -- between you and your wife?

15   A.    No, sir.

16   Q.    So you're happily married now?

17   A.    Yes, sir.

18   Q.    Now, Mr. Cusick, do you follow politics closely?

19   A.    Since I was a child.

20   Q.    Are you a Democrat, Republican, independent?

21   A.    I'm a Republican, but to be honest I've had it with both

22   sides.  But I am a registered Republican, yes.

23   Q.    You're on sort of the right side of the spectrum versus

24   the left side of the --

25   A.    That's correct.  Conservative side.  Yes, sir.

1    Q.   Did you follow the 2020 election --

2    A.   I did.

3    Q.   -- closely?

4    A.   I did.  Very --

5    Q.   Did you -- did you vote?

6         COURT REPORTER:  One at a time.

7         MR. PIERCE:  Sorry.

8         THE WITNESS:  Yes, I voted.

9    BY MR. PIERCE:

10   Q.   Who did you vote for?

11   A.   I voted for Donald Trump.

12   Q.   Did you follow the actual election night, what was

13   happening on the election night on the news, etc.?

14   A.   Absolutely.

15   Q.   Closely?

16   A.   I followed it very closely.  Yes, sir.

17   Q.   And did you -- did you follow what the result was when

18   the results were reported late that night or that next

19   morning?

20   A.   I followed the results where, when they stopped counting

21   he had a 70 percent chance of winning and by the time we got

22   to the morning they were declaring Joe Biden the President of

23   the United States.

24   Q.   So sounds to me like you've developed some feelings about

25   the nature of how the 2020 election unfolded or occurred?

1    A.    I did.  I felt that it was definitely stolen when you see

2    graphs and charts of numbers that are going like this and all

3    of a sudden it just goes directly straight up for one side, I

4    would say it was stolen for either side, it wouldn't just be

5    for one side.

6    Q.    Now, you understand there are a lot of people in this

7    country who disagree with you.  Right?

8    A.    I do.  I understand that.

9    Q.    And do you respect those folks and their viewpoints?

10    A.    Absolutely 100 percent.  That's why I love America.

11    Q.    Now, at some point did you learn about a certain event or

12    events that would be happening in D.C. on January 6, 2021?

13    A.    I did.  Just from following, you know, the news like I

14    always have and politics and following President Trump, I knew

15    there was going to be a rally that was going to be called Stop

16    the Steal and it was going to take place here in D.C. on

17    January 6.

18    Q.    So that's what you learned, that there was going to be a

19    rally for President Trump?

20    A.    That's correct.  Yes.

21    Q.    Were you aware just based on your knowledge that January

22    6, 2021, was also going to or is the date for the

23    certification and any objections to the Electoral College

24    votes?

25    A.    I was aware of that, yes.

1    Q.   At a certain point -- let me back up.  Did you go to --

2    strike that.  I'll come to that question in a moment.

3         At a certain point did you decide to go to D.C. for

4    January 6?

5    A.   Yes.

6    Q.   And why did you decide to do that?

7    A.   Because, like I said, I felt the election was stolen and

8    I -- I mean, I love President Trump, I always have, and I

9    believe that he won the election and I wanted to go there to

10   support him if nothing else, and hope that the electorates

11   would send it back to the states as they should have done.

12   Q.   Did you want to stop that process from happening?

13   A.   No.  Absolutely not.  I hoped that they would be of the

14   integrity that they all say they are and do what they were

15   supposed to do by law.

16   Q.   Did you actually plan to go to the Capitol grounds or the

17   Capitol building itself that day before you went to D.C.?

18   A.   No.

19   Q.   What did you plan specifically to do in D.C.?

20   A.   Go to the rally.

21   Q.   Did you decide to go to D.C. with anyone else?

22   A.   Yes.

23   Q.   Who was that?

24   A.   Dave Lesperance and my dad.

25   Q.   Just generally speaking, without going into every detail,

1    can you tell the jury sort of about the process of making

2    plans to go to D.C. on January 6?

3    A.    Yes.  Basically, we made plans.  We decided we were going

4    to go, we booked a flight, we rented a car, our flight plan

5    was to come up on the 5th, which was the day previous to

6    January 6.  We all stayed in the same hotel and then we got a

7    car and we were planning on going home on the 8th of January.

8    Q.    So when did you in fact fly up there?

9    A.    The 5th of January.  We flew into Baltimore.

10   Q.    And where did you stay?

11   A.    We stayed at an Embassy Suites, I want to say in Crystal

12   City.  So I guess just over the line in Virginia.

13   Q.    Did you take any weapons with you?

14   A.    No, sir.

15   Q.    Did you take any sort of what I'll call tactical gear?

16   A.    Absolutely not.

17   Q.    Did you take any sort of gas mask with you?

18   A.    No.

19   Q.    So when you went to D.C. -- back up.  So you're at D.C.,

20   you're staying at a hotel, you get up on January 6, and just

21   tell us kind of initially what happens that morning.

22   A.    So the morning of January 6 we woke up, I want to say the

23   rally was supposed to start at 10:00 but it went late as

24   normal events like that go.  So we just got up, we got

25   dressed.  We rode the Metro into town.  I don't remember the

1    exact Metro stop, but it was somewhere close to the White

2    House on account of that's where -- I think it's called the

3    Ellipse is.  And so that's where the -- what we understood the

4    rally was going to be held there.

5        So of course -- I mean, there was mostly only Trump

6    people out in public anyways.  There really wasn't that many

7    people even out.  So we got up, like I said, we walked however

8    far it was from the Metro down to that area to which there was

9    just thousands and thousands and thousands of people.  As far

10    as your eye could see there was people.

11        MR. PIERCE:  That might be a good place to stop,

12    Your Honor, if you'd like, although I could certainly keep --

13            THE COURT:  Two more minutes.

14        MR. PIERCE:  Sure thing.

15    BY MR. PIERCE:

16    Q.   So you get to the Ellipse.  And is there sort of a

17    security process that you need to undergo when you get there?

18    A.   So when we first got there, you know, we -- and it was a

19    little wet.  It was freezing, freezing cold that day.  It was

20    only like in the 30s but the wind was blowing pretty hard so

21    it was colder than normal and anyway, we walked across all the

22    of the people through there and, you know, it was pretty neat

23    because just pushing and shoving, you didn't deal with any of

24    that in that area, and people let you through and stuff but it

25    was like muddy.  We did end up after probably like over an

1    hour or more -- we at first had no idea you could even get to

2    the front.  We just assumed because of how many people there

3    were you couldn't even get to the stage where President Trump

4    was going to be speaking and there were other speakers besides

5    him throughout this time.

6         And they had some screens and I was like we didn't come

7    all the way up here to watch this from a screen standing way

8    back here, and we had gotten up to go to the bathroom and

9    there was a line of porta-potties up there by that.

10         And when we did, I realized there was a line you could

11    actually wait through to go through Secret Service to get into

12    the area where the stage actually was held, and so I realized

13    you could get through but they told us they mentioned that we

14    had to wait, it was probably going to be at least an hour from

15    where we waited, but we figured we're standing here anyway, so

16    who cares to wait the time, it's no different than standing

17    and we're closer than we were.  So we did wait and go through

18    Secret Service is what it was.

19    Q.    So you went through some sort of security screening?

20    A.    Yes, sir.  It was like metal detectors.  You got wanded.

21    They first told you you were not allowed to have anything on

22    you except a cell phone, your wallet, no bags whatsoever.  No

23    drinks.  There was no water, nothing liquid like that.  I

24    wasn't even allowed which is why we had to put -- where Dave

25    put his bag ended up there was a pile of bags probably no lie

614

six feet high.  And the funny thing is nobody was afraid that
anybody was going to steal any of their stuff because they
were nice -- I mean nice bags, it wasn't just trash sitting
there.  And so Dave had to put his bag there and we just
assumed like most people, everybody's willing to do this then
probably nobody's going to mess with it.

Q.   And approximately what time did you get to the Ellipse?
Like what time frame are we talking about?

A.   Gosh.  I want to say around 10.  It was probably around
10.  I think that President Trump was slated to speak around
noon although -- or maybe he was supposed to speak at 11, but
he ended up not even speaking until I think noon.  But I want
to say we were there between nine and 10.  That was two and a
half years ago so I'm not exactly sure of the time, but we
were there fairly early.

Q.   And do you know what time the speeches actually began?

A.   I want to say it was around noon because usually
President Trump always speaks for about an hour and a half on
his regular speeches, so that was about the length of time
because I remember time-length-wise that we were, you know,
based on what time he got finished what time it was because we
were looking at our phones and talking.  That's when we went
back out and had to look for Dave's bag for a bit.

        THE COURT:  Now's a good time.

        MR. PIERCE:  It's a good time.  I can obviously keep

1    going, but it's a good time also.

2            THE COURT:  We'll end for the day and give the jury a

3    good evening at home.  We'll look for you tomorrow morning to

4    start at 9:30.  Same rules apply.  Don't talk about the case

5    with anybody.  Come together tomorrow morning ready to go at

6    9:30 and we'll resume this testimony.  And thank you very much

7    for your attention.  Have a good evening.

8        (Jury out at 5:02 p.m.)

9            THE COURT:  Mr. Cusick, you can step down.

10           THE WITNESS:  Thank you.

11       (Witness steps down.)

12           THE COURT:  All right.  So we're making progress.

13   Mr. Pierce and Mr. Roots, any estimate in terms of your case

14   and how much time you think it's going to take?

15           MR. PIERCE:  Today's Wednesday --

16           THE COURT:  I'm not going to hold you to it.  Just

17   looking for the best --

18           MR. PIERCE:  I'm anticipating some not insubstantial

19   cross-examination for the three main witnesses.  I mean, I

20   would suspect we'll be able to rest our case in the first half

21   of the day on Friday likely.

22           THE COURT:  You think it'll go into Friday.

23           MR. PIERCE:  I think with having to get into, you know,

24   a lot of the, you know, videos and whatnot, you know,

25   sufficiently as we can.

1          THE COURT:  How much longer do you think Mr. Casey
2    Cusick is going to be on the stand for your examination.
3          MR. PIERCE:  For my examination, I'd probably say an
4    hour and a half, two hours.
5          THE COURT:  Okay.  We will see you in the morning,
6    ready to go.  We need to have conferences with respect to jury
7    instructions.  They shouldn't be too complicated for you.
8    Maybe we'll do the first one of those at noontime tomorrow.
9    We'll take some of your lunchtime to deal with jury
10   instructions.  I won't make you come in early in the morning
11   to do it.
12       Mr. Valentini, you have something you want to say.
13         MR. VALENTINI:  Yes.  Two brief inquiries.  The first
14   one is I believe there's a witness who was listed in a
15   different order on the defense witness list who was --
16         THE COURT:  Mr. Pierce is going to tell you the order
17   of witnesses now.
18         MR. PIERCE:  Oh, sure.  After Mr. Casey Cusick, it will
19   be Carol Lesperance, and then it will be Mr. David Lesperance.
20   And then it will be Ms. Katie Cusick.  And then it will be
21   Ms. Stacie Cusick.  And then -- Peterson.  I'm sorry.  My bad.
22   Stacie Peterson.  And then it will be Mr. James Cusick and
23   then it will be Mr. David Sumrall.
24         THE COURT:  All right.
25       Okay.  We'll see you in the morning.

1            Mr. Valentini.

2            MR. VALENTINI:  The last related inquiry is given the

3     prognosis of the defense, we expect that closing arguments

4     will happen at the earliest on Friday?

5            THE COURT:  Well, if the defense is right that it's

6     going to take all of tomorrow and into Friday morning.  We'll

7     see, maybe it'll move quicker.

8            MR. VALENTINI:  We'll be ready.

9            THE COURT:  Be ready.  I'm not going to have the jury

10    sit for any unnecessary time, although undoubtedly there will

11    be some time while we're doing jury instructions.

12            MR. VALENTINI:  Can I ask one last one.

13            THE COURT:  Promises, promises.

14            MR. VALENTINI:  Is it this court's practice to read the

15    jury instructions before closing arguments or after?

16            THE COURT:  After.  But we'll finalize them before so

17    you'll know what the jury instructions are.

18            MR. VALENTINI:  Okay, thank you.

19            THE COURT:  You're welcome.  See you in the morning.

20        (Proceedings adjourned at 5:06 p.m.)

21

22

23

24

25

\*   \*   \*   \*   \*   \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify
that the foregoing pages are a correct transcript from the
record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne