UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .
          Plaintiff,               .   CR No. 21-0575 (JDB)
                                   .
     v.                            .
                                   .
01 DAVID JOHN LESPERANCE,          .   Washington, D.C.
02 CASEY CUSICK,                   .   Thursday, July 13, 2023
03 JAMES VARNELL CUSICK JR.,       .   9:44 a.m.
                                   .
          Defendants.              .   Pages 619 through 885
. . . . . . . . . . . . . . . .    .


DAY 4
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Government:          FRANCESCO VALENTINI, ESQ.
                             U.S. Department of Justice
                             Criminal Division
                             950 Pennsylvania Avenue NW
                             Washington, DC 20530

                             SONIA MURPHY, ESQ.
                             U.S. Department of Justice
                             Civil Division
                             1100 L Street NW
                             Washington, DC 20530

For Defendants:              JOHN M. PIERCE, ESQ.
                             ROGER ROOTS, ESQ.
                             John Pierce Law, P.C.
                             21550 Oxnard Street
                             Suite 3rd Floor OMB 172
                             Woodland Hills, CA 91367

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001

# C O N T E N T S

### TESTIMONY

CASEY CUSICK:          Direct Examination Cont'............... 622
                       Cross-Examination ..................... 649
                       Redirect Examination .................. 688

CAROL LESPERANCE:      Direct Examination .................... 694
                       Redirect Examination .................. 704

DAVID LESPERANCE:      Direct Examination .................... 705
                       Cross-Examination ..................... 743
                       Redirect Examination .................. 759

KATIE CUSICK:          Direct Examination .................... 760

STACIE PETERSON:       Direct Examination .................... 768

JAMES CUSICK JR.:      Direct Examination .................... 772
                       Cross-Examination ..................... 805
                       Redirect Examination .................. 829

DAVID SUMRALL:         Direct Examination .................... 833
                       Cross-Examination ..................... 859
                       Redirect Examination .................. 876

\*   \*   \*

### EXHIBITS RECEIVED

Defendant Exhibit No. 99 ................................ 840
Defendant Exhibit No. 98 ................................ 842
Defendant Exhibit No. 2 ................................. 849
Defendant Exhibit No. 96 ................................ 853
Defendant Exhibit No. 95 ................................ 856
Defendant Exhibit No. 93 ................................ 857

\*   \*   \*

<pre>
 1                    P R O C E E D I N G S
 2          THE DEPUTY CLERK:  Criminal Case No. 2021-575, the
 3     United States of America versus David John Lesperance,
 4     defendant No. 1; Casey Cusick, defendant No. 2; and James
 5     Varnell Cusick Jr., defendant No. 3.  Francesco Valentini and
 6     Sonia Murphy representing the government, John Pierce and
 7     Roger Roots representing the defendants.  This is day four
 8     of the jury trial.
 9          THE COURT:  All right.  Good morning again.  Anything
10     preliminarily before we bring the jury in and resume Mr. Casey
11     Cusick's testimony?
12          MR. VALENTINI:  Not from the government, Your Honor.
13          MR. PIERCE:  Not from the defense, Your Honor.
14          THE COURT:  All right.  Let's bring the jury in.
15     I think they'll be out there ready for you, Kym.
16          THE DEPUTY CLERK:  Thank you.
17          THE COURT:  Mr. Cusick, you can come on up to the
18     witness chair.
19        (Witness resumes the stand.)
20        (Jury in at 9:45 a.m.)
21          THE COURT:  Good morning, members of the jury.  Please,
22     everyone be seated.  Welcome back.  Hope you had a pleasant
23     evening.  We're ready to resume the testimony of Mr. Casey
24     Cusick.
25        And Mr. Cusick, I remind you you're still under oath.
</pre>

```
1              With that, Mr. Pierce.
2                   MR. PIERCE:  Thank you, Your Honor.
3           CASEY CUSICK, WITNESS FOR THE DEFENSE, PREVIOUSLY SWORN
4                      DIRECT EXAMINATION CONTINUED
5      BY MR. PIERCE:
6      Q.   Good morning, Mr. Cusick.
7      A.   Good morning.
8      Q.   And let's remind ourselves, both you and I, to speak a
9      little bit slower today for the benefit of the court reporter
10     and everyone.
11     A.   Okay.
12     Q.   Do you deny that this is you in all these videos that we
13     watched?
14     A.   No, I do not.
15     Q.   Do you deny that the clothes that -- I believe it was the
16     FBI case agent or one of them showed to the jury, do you deny
17     those are your clothes?
18     A.   No, I do not.
19     Q.   Do you deny the red hat is yours?
20     A.   I do not.
21     Q.   And does it say "Trump" on it?
22     A.   It does.
23     Q.   Is that something that you're ashamed of?
24     A.   I am not.
25     Q.   And are -- to your knowledge, are the individuals who've
```

1    been identified in the videos as your dad, James Cusick, and

2    as Mr. Lesperance, are those them in those videos?

3    A.    Yes, it is.

4    Q.    And to the extent that you know, with the voices that

5    we've heard on some of the videos that have been identified by

6    some of the witnesses as your voice, your dad's voice, and

7    Dave Lesperance's voice, are those your voices?

8    A.    Yes, they were.

9    Q.    So there's no dispute about the identity of the three of

10   you, that you're in those videos and this is you.

11   A.    No.

12   Q.    Now, also, sort of a preliminary question here before we

13   dive into things.  Is everything that was said among the three

14   of you or by the three of you that day, is every word, every

15   moment captured on video?

16   A.    No.

17   Q.    So there are times when there would have been

18   interactions between you, things that would have been said

19   amongst you that are not going to be on one of these videos

20   or audio recordings here.

21   A.    Correct.

22   Q.    Now, we left off yesterday with you getting to the

23   Ellipse and getting through security and getting ready to

24   watch the speech -- by the way, did you just watch President

25   Trump's speech or were there other speeches that you watched?

1     A.    There were numerous other speakers, including Kimberly

2     Guilfoyle and Don Junior.  So there were multiple speakers

3     that we watched, but President Trump was the final speaker.

4     Q.    So you watched President Trump's speech?

5     A.    To the entirety, all the way through the music playing to

6     him walking off the stage.  Yes, sir.

7     Q.    Do you recall approximately what time the speech ended?

8     A.    I want to say it was between 1:30 and 1:45-ish, somewhere

9     around there.  P.m.

10    Q.    And then what happened next?

11    A.    What happened next was we had to wait because there was a

12    crowd obviously that was in the front.  By the time the speech

13    had been over the security -- you know, the Secret Service

14    wasn't there any more so people were a lot freer to move out

15    of that area, so it wasn't like a single file line or

16    anything.  But like I said, we watched all the way to the end.

17    Music was playing.  At that point, there was from what my view

18    was I would say hundreds of thousands of people at that point

19    heading down towards the Capitol building, which like I said

20    wasn't something we even intended on attending or doing until

21    the president said let's go down to the Capitol now and

22    peacefully protest our right to be heard.

23        So we waited some time, we got out of the fenced-in area

24    because the area we were in was fenced off.  At that point we

25    went out to see if we could find Dave's backpack that was in

1    the pile of backpacks.  And once we started searching, for

2    whatever reason, his backpack was one of the ones that was

3    missing.  So there were multiple backpacks that you could see

4    within the backpacks that were probably looked alike so

5    somebody maybe mistook it for theirs.  Dave didn't have

6    anything valuable really in it anyways, but we still wanted to

7    go and we looked probably I would say between 25 to 30

8    minutes-ish for the backpack.  We waited around, we looked

9    here there, because you could see where people had taken

10   something and put it back down so it was more scattered.  But

11   we scavenged the area, we looked, and we never found it.

12        So then at that point --

13   Q.   Okay.  So let's stop now that we've talked about the

14   backpack and let me get another question in here.  So you --

15   let's drill down a little bit on what you said about something

16   that Trump mentioned in his speech.

17        So when you went to Washington, D.C. -- and I believe I

18   asked you this already, but just to orient folks here to this

19   issue again -- when you went to Washington, D.C., did you plan

20   to or intend to go to the U.S. Capitol grounds and building?

21   A.   No.

22   Q.   And what specifically changed that?

23   A.   When President Trump asked us to go down to the Capitol

24   to peacefully protest the stolen election.

25   Q.   And that was something that you recall him saying during

1     his speech that you listened to?

2     A.   One of the last things that he said before he went on to

3     do his "make America great again" like he always does for

4     every speech.

5     Q.   And did the three of you have a discussion about -- once

6     President Trump said that, did the three of you -- because

7     obviously you all three went down there ultimately -- did the

8     three of you have a discussion to agree on hey, let's go down

9     there, or what -- how did that occur?

10    A.   We just decided to go down there because we were in D.C.,

11    there was nothing else for us to do, there was really nothing

12    open because I think that was still during the COVID lockdown

13    and there really -- the museums weren't open up here.  I mean,

14    pretty much nothing was open.  There was a few restaurants

15    here and there.  Even to eat we had to go outside into

16    Virginia.

17         So we had nothing else to do.  Every -- all the hundreds

18    of thousands of people were going down there so we said well,

19    why don't we just go down there as well.

20    Q.   Now, at this point, when you made the decision to head

21    toward the Capitol grounds, at that point in time did you

22    intend and plan to actually go inside the Capitol building?

23    A.   No.  Not at all.

24    Q.   And why is that?

25    A.   We were just planning on going down there to peacefully

1    protest.  I honestly had no idea what to expect.  I had no
2    idea what was even going on because, like I said, we didn't
3    know anything about any planned protest at all.
4    Q.   Okay.  So now sort of walk the jury through the process
5    of the three of you starting to head down from the Ellipse to
6    the Capitol grounds.
7    A.   So, as we begin to head down to the Capitol grounds, it's
8    quite a walk and, you know, from the Washington Monument down
9    to the Capitol, I guess we would have -- now, knowing the
10   street names, I guess it would have been up Constitution
11   Avenue is where we would have walked.  And Dave has a bad knee
12   or maybe both knees, I'm not sure, but he can only walk for so
13   long.  So him and my dad -- my dad would wait with him and I
14   kept walking.  But like I said, walking, we weren't by any
15   means rushing because like I said Dave really could hardly
16   walk very far without having to sit down because his knee hurt
17   him.
18       So, anyway, we walked up through there.  There were --
19   like I said, there was people preaching with megaphones, you
20   know, there was people singing.  There was a number of things
21   on the way up through there that were taking place before we
22   reached all the way, reached up to where the Capitol grounds
23   were.
24   Q.   When you started walking to and were walking to the
25   Capitol with your dad and Mr. Lesperance, were you moving as

1   fast as you possibly could?

2   A.   No, not at all.  We were just walking regular speed.

3   Q.   You weren't making sort of a bee line to the Capitol on a

4   mission?

5   A.   No.

6   Q.   Okay.  What was the -- when you got down to the Capitol

7   grounds, what did you see?  What was the atmosphere like?

8   A.   The atmosphere looked like you couldn't really even see

9   from when you first come down to where I think it's the last

10  street that you can cross over to go onto the Capitol grounds,

11  you really couldn't even see the grounds because there was

12  such a sea of people, I mean just standing everywhere.  All I

13  could see was just people everywhere all over the grounds.

14  Q.   And how would you describe the mood, generally speaking?

15  A.   It was very patriotic.  You know, people were enthused to

16  be able to have their voices heard.  You know, there was

17  people just standing around honestly in groups of people that

18  they went with.  I mean, there was large groups of different

19  people from all over, even all over the world I seen people

20  there, you know, in support of this.  But mostly just people

21  standing around talking, you know, I didn't see anything other

22  than that when we were walking up to the Capitol.

23  Q.   On the Capitol grounds and as you moved closer to the

24  Capitol building, which we'll talk about in a moment, did you

25  see any children?

1    A.   I did, yes.  Many children.  Many children, many

2    families.

3    Q.   Did you see any folks you would describe as on the

4    elderly side?

5    A.   Many, yes.

6    Q.   When you got to the Capitol grounds, at a certain point

7    you start moving toward the Capitol building, right?

8    A.   Mm-hmm.

9    Q.   Is that right?

10   A.   Yes.

11   Q.   Now, in that process, do you personally, do you see any

12   signs indicating that it was a restricted area?

13   A.   I didn't see any signs whatsoever, no barricades, you

14   know, as I walked -- as I said I walked up Constitution Avenue

15   and as I crossed over, you know, there was people on either

16   side of the street because that street was still being used

17   from what I remember for cars that were going by.  And so as I

18   crossed over the street I just walked up -- I guess it was

19   the -- I had gotten separated from them like I said they were

20   stopping every couple hundred yards to have Dave rest because

21   he couldn't -- like I said, his knee's messed up.

22       So as I crossed over the street and I went into the -- I

23   guess it was a parking lot, I think it was a parking lot that

24   went kind of up into the Capitol side and then I ended up --

25   so like I said, thousands of people walking right next to me.

1      There was no -- nothing.  I saw nothing, honestly.

2          So then as I got to the actual grass part of the Capitol

3      was when I ran back into -- matter of fact, it was one of the

4      videos that was shown, where I ran back into my dad and Dave.

5      Somehow they beat me there and I still to this day I don't

6      understand how they -- kind of like the tortoise and the hare

7      they got back in front of me.  I'm confused as to how that

8      even happened.

9      Q.   So at any point while you were walking onto the Capitol

10     grounds or when you ultimately walked up to and in the Capitol

11     building, did you personally see any signs indicating that it

12     was a restricted area?

13     A.   No, I did not see any.

14     Q.   Did you see any barriers that were directly in your way,

15     stopping you from proceeding, that indicated to you in your

16     mind that it was a restricted area?

17     A.   I did not.

18     Q.   If you recall, we've seen a video a couple times in the

19     case where there was some -- I guess some folks have described

20     it as snow fencing or plastic fencing that was laying down on

21     the ground when you walked by.  Do you remember seeing that on

22     these videos?

23     A.   I do -- saw it on the video, but I did not see that in

24     person.

25     Q.   So you do not recall at the time you were there on

1    January 6, you do not recall seeing that.

2    A.   I don't.  And like I said, I didn't even go up that

3    particular way where that -- I got separated from them so I

4    came up through a parking lot which there was people standing

5    all through the parking lot so I didn't even walk up the grass

6    the way my dad and Dave did.

7    Q.   At any point when you were on the Capitol grounds or

8    inside the building -- and again, we'll get to when you go

9    inside the building in a little bit more detail -- but at any

10   point when you were on the grounds of the Capitol building do

11   you recall personally hearing any announcements to the effect

12   that it was a restricted area?

13   A.   No, there was no announcements.

14   Q.   Do you recall hearing any announcements indicating to you

15   that you should leave?

16   A.   No.

17   Q.   Did you encounter any police officers that told you that

18   you shouldn't be there or that you should leave?

19   A.   Never.

20   Q.   Now, you also recall in one of the videos that we watched

21   that you made a reference somewhat explaining that somebody

22   had fallen off a wall.  Do you recall seeing that --

23   A.   I do.

24   Q.   -- in the videos?  And do you recall actually seeing that

25   and saying that on January 6?

1    A.   I had forgotten that I said that until I resaw the video

2    but I do and I did remember that after seeing that again.

3    Yes, I saw.

4    Q.   And now that you recall that happening, do you recall

5    what your thinking was at the time when you saw that?

6    A.   Well, just my own personal opinion, I was unsure why

7    anybody would be scaling the wall in the first place or

8    climbing the scaffolding, because I wasn't there for that.

9    And the people that were doing that I thought were foolish in

10   the first place.

11   Q.   Now, when you saw that, why didn't that cause you to turn

12   around and leave?

13   A.   Because I wasn't a part of -- I wasn't that guy.  I

14   wasn't a part of doing that so that never even entered my mind

15   to be doing anything like that or to cause any destruction to

16   the Capitol.

17   Q.   At a certain point in these videos also there were some

18   moments where a group of folks were chanting "USA, USA."  Do

19   you recall seeing that in the videos?

20   A.   I do, and I recall hearing it there as well.

21   Q.   And at some point did you for some period of time join in

22   in that chant if you recall?

23   A.   I really don't remember.  Maybe.  Maybe I did.  I don't

24   remember.

25   Q.   And why didn't the fact that a group of Americans were

1    standing outside the Capitol chanting "USA" cause you to turn

2    around and leave?

3    A.   Because we're in the USA and I feel that these people

4    that were chanting that are lovers of our country and so I

5    don't see what's wrong with chanting "USA" at the

6    United States Capitol.

7    Q.   Now, at some point you made the decision to go inside the

8    Capitol building.

9    A.   That's correct.

10   Q.   So were there -- was it just one reason you decided to

11   go in?  Were there multiple reasons?

12   A.   I guess you could say there was multiple reasons we

13   decided to go in but the main reason I decided to go in was

14   because after -- and you know, seeing the time stamps now and

15   witnessing it at the time, you know, we were standing out

16   there, it seemed like hours almost because it was so cold, and

17   at the same time, you know, after standing in a place for, I

18   don't know, 15, 20 minutes, I guess it just felt longer, but

19   we stood outside for I would say maybe almost even a half hour

20   and watched.

21        After I saw that door open, you know, where we were

22   standing, and I just continually saw people go in and then I

23   saw the same people that would come back out, and I seen

24   people go in and I saw the same people coming back out.  So

25   I'm like, well, there's nothing happening to these people that

1    are going in.  I at that point had to go to the restroom.

2    It was, I don't know, three something in the afternoon.

3    There was porta-potties down by where the speech was given.

4    But there was no bathrooms up around the Capitol at all.

5         So I mentioned that, you know, I needed to go to the

6    bathroom and after I saw children, you know, and children,

7    I mean 15, 14-year-olds coming out with their parents or their

8    dad and/or older elderly women going in and out, I thought,

9    and seeing police officers standing right beside the door and

10   not saying anything, I thought there would be no reason for us

11   to not be able to go inside and use the restroom and see what

12   was going on.

13   Q.   And so you also, in addition to wanting to use the

14   restroom, you also did want to go in and see what was going on

15   inside the Capitol.  Is that fair?

16   A.   Yes.  That's fair.

17   Q.   Now, at a certain point you get up to the door of the

18   Capitol building that you went into.  I think we've heard it

19   referred to as the Senate Wing door.

20   A.   Right.

21   Q.   As you go in, are there any police officers telling you

22   to not come in?

23   A.   No.  There was no police officers telling us not to come

24   in at all, which is one other reason why I thought it was okay

25   for us to go in.

1     Q.   Now, also if you recall on some of these videos, as you

2     walked in it sounds like there's sort of a piercing sort of

3     alarm going off.  Do you recall seeing that in these videos?

4     A.   I do.

5     Q.   Do you recall hearing that at the time?

6     A.   I did hear that.

7     Q.   But that didn't cause you to turn around and walk out?

8     A.   The reason it didn't cause me to turn around and walk out

9     is because at that point, you know, it's easy -- everybody's

10    seeing this from watching it.  We were there that day.  We

11    didn't see any of those things.  So when we were walking up to

12    the Capitol, we had no idea anything had happened, anything

13    was going on.  All we knew was there's a sea of people

14    everywhere and everybody's all over the Capitol, there's no

15    policemen anywhere to be seen, because I didn't even see one

16    at that point until we got to the top of the steps where we

17    walked around and we got up on the steps.

18        And so when we were there, like I said I had no -- the

19    fact that the alarm was going off, the police were standing by

20    the door it was almost like maybe something had happened but

21    they were there and they had taken charge of it to where it

22    was like, you know, everything's fine now, you know, go about

23    your business type thing.

24    Q.   And so to -- you reminded me to ask you another thing,

25    which is did you see any violence as you were heading up on

1    the Capitol grounds and into the Capitol building?

2    A.    I never saw any violence whatsoever between police and

3    what I call protesters at all.

4    Q.    So the things that happened that we've all seen on TV

5    that did involve a lot of violence, when did you realize that

6    those things had occurred?

7    A.    Not until that night when we got back to the hotel and

8    turned the news on.

9    Q.    Now, when you walked inside the door -- and again, we've

10   seen this on a couple of the videos -- there were some police

11   officers that were standing over sort of to your left.

12   A.    Correct.  That is exactly right.

13   Q.    Do you recall seeing them when you walked in?

14   A.    I do.

15   Q.    And you did not, however, move toward them; you moved in

16   the other direction.

17   A.    That's correct.  Because I figured if they don't want us

18   to go down that way, we won't go that way.  I mean, I have

19   nothing against the police, I'm not trying to combat a police

20   officer at all for any reason.

21   Q.    Also when you walked in -- and I believe we saw this in

22   one of the videos -- you made a statement, I think you said

23   something to the effect of "Pepper spray, Dad."  Do you recall

24   seeing that on the video?

25   A.    I do.

1    Q.    Do you recall saying that at the time?

2    A.    I don't recall saying it.  I mean I remember it after

3    watching the video but I had forgotten about it, that I said

4    it.  But I remember why I said it once I rewatched the video.

5    Q.    Why is that?

6    A.    The reason I said it was because there was a sour stink

7    smell when you first walked in the door, which ended up being

8    after we walked in a little more, you would actually hear Dave

9    say "That's not pepper spray, that's weed."  So evidently

10   somebody was smoking weed inside the Capitol building.

11   Q.    And despite that, you didn't turn around and leave.

12   A.    I didn't.

13   Q.    Why not?

14   A.    Because like I said still I felt in no way, shape, or

15   form that we weren't supposed to be in there.  Like I said

16   even when we walked in there was regular people, men and women

17   walking in and out, and nobody seemed urgent like they were

18   hey, we gotta get out of here, and at the same time -- so I

19   never felt threatened or scared in any way in regards to that.

20   Q.    There were also, if you recall in the videos, a couple of

21   different comments from other protesters.  I believe one was

22   the effect of "there's a heck of a lot of people out here."  I

23   think one was the effect of "don't back down."  Do you recall

24   hearing those in these videos?

25   A.    I did.  I heard the guy say "don't back down."  I don't

1    remember the first one.

2    Q.   You do or do not remember the first one?

3    A.   The first one I didn't remember what you said.  But the

4    second one when the guy said "don't back down," I do remember

5    that, yes.

6    Q.   So you heard that?

7    A.   Yes, I did.

8    Q.   But that didn't cause you to leave?

9    A.   No, because again we weren't there to cause any violence

10   or disturbance and especially not to battle the police.  I

11   mean, that's pretty stupid to me.

12   Q.   Okay.  So now, you walk in, and we talked about how you

13   saw the police, and then tell us -- on the left.  And then

14   tell us -- just kind of walk us through what occurred inside

15   the Capitol.

16   A.   So as we walked inside, as you could see, I was videoing,

17   but we just kept walking because some lady and actually in the

18   video you see this lady turn around and say to us just keep

19   going that way just keep going that way, and she seemed a

20   plain clothes person.  And so we went right, we went down a

21   little ways, and at that point I was looking for the restroom

22   to see where it was.  I had no idea.  I mean I've heard now

23   through video and maps that that was the Senate side, the

24   congressional side, all that.  I had no idea where any of that

25   was or that I was right beside that as I even went in that

1    door.  But as we begin to walk down through there, you know,

2    we walked into the room where you got the circular stuff that

3    was there.  We walked around there for a bit just videoing and

4    seeing people, you know, walking -- as you saw, walking

5    around.  Yes, there was chanting.  But other than that, you

6    know, we kept walking.  It seemed like the whole thing was a

7    lot faster than it seemed watching the video, but -- so at one

8    point or another, and I don't remember exactly at what point

9    it was, I did ask a police officer which way it was to the

10   restroom, and he showed me and I think there was a video at

11   the end that we saw yesterday I want to say, of me and Dave

12   standing outside the bathroom when we had lost my dad.  I

13   wasn't sure where he went.  But I had gone in the restroom to

14   open the door to see -- which wasn't on video -- if I could go

15   to the bathroom, but there was like 40 or 50 people in line so

16   I just said forget it I'm not doing it.

17   Q.   Is it fair to say it was kind of one of those, you know,

18   scenes we've all experienced, where you're at a stadium at a

19   game and there's a bunch of people in line?

20   A.   It was like that, yes.  Mostly inside the bathroom.  You

21   couldn't really see it from the outside, but once you got in

22   there, it was a big line.

23   Q.   At any point, either outside or inside the Capitol

24   building, did you consider yourself to be part of a mob?

25   A.   Absolutely not.

1    Q.    At any point outside or inside the Capitol did you

2    consider yourself to be a rioter or part of a riot?

3    A.    Never, no.  I did not.

4    Q.    When you were inside the Capitol, you recall in these

5    videos we heard some chanting, "Whose house?  Our house,"

6    etc.?

7    A.    Mm-hmm.

8    Q.    Did you yourself join in that chanting?

9    A.    No.

10   Q.    At a certain point in the video I believe we also saw, I

11   think it was you and Mr. Lesperance high five each other.  Do

12   you remember seeing that?

13   A.    I remember seeing that.  I honestly don't remember what

14   that was even about.  I mean, I was showing him my phone.  I

15   might have been showing him something from the social media.

16   I have no idea what it was honestly.

17   Q.    Were you celebrating the fact that people were storming

18   or taking over the U.S. Capitol?

19   A.    No.  Not at all.  Because like I said, at that point we

20   had no idea anything had even happened other than that door

21   was open and there was people inside.

22   Q.    When you were -- again, now I'm talking about at any

23   point when you're on the Capitol grounds or inside the Capitol

24   building, did you ever push anyone?

25   A.    Never.

1    Q.   Did you ever confront anyone in any way?

2    A.   No, I did not.

3    Q.   Did you carry any signs?

4    A.   No, I did not.

5    Q.   Did you carry any flags?

6    A.   I did not.

7    Q.   Did you picket?

8    A.   No.

9    Q.   Did you parade?

10   A.   No.

11   Q.   Did you engage in any violence whatsoever?

12   A.   None whatsoever.

13   Q.   Did you yell at any police officers?

14   A.   Of course not.  No.

15   Q.   Did you have any interaction with any police officers?

16   A.   My only interaction was when I had asked one of them, I

17   don't remember who it was, where the restroom was.

18   Q.   Now, there were a number of police officers that at some

19   point you saw inside the building.  Is that fair?

20   A.   That's fair, yes.

21   Q.   And how would you describe their mood?  How were they

22   acting?

23   A.   They were acting as if they were just their presence was

24   there to make sure things were safe.  There was no -- they

25   weren't talking to any people unless people were talking to

them but they were discussing things amongst themselves, just

chitchatting as though it was just another day.

Q.   Had you been to the Capitol building before in your life?

A.   Yes, I have.

Q.   How many times, approximately?

A.   Gosh, it goes back to when I was a kid, so I really -- I

don't know.  More than 10, I would say.

Q.   And what was your experience, generally speaking,

regarding whether or not the Capitol building is a public

building, open to Americans, the public, or a closed building?

A.   As far as anything that I've ever known, and like I said,

it had been a long time since I had been in the Capitol, but I

thought it was the people's building and I thought it was open

to the public at all times.

Q.   Were you ever asked by police to leave the Capitol

building?

A.   Never.  If I was, I would have left immediately.

Q.   Now, did you leave at some point?

A.   We did.

Q.   How long -- and we've seen some time stamps, but how long

do you think you were inside the Capitol building?

A.   I mean, the time stamps showed 12 minutes.  I thought it

was less than 10.

Q.   Did you destroy any property on the Capitol grounds or in

the Capitol building?

1    A.    I did not.

2    Q.    Did you go there with any intent to do such a thing?

3    A.    Definitely not.

4    Q.    Now, when you left the building did you leave at the

5    exact same time as your dad and Mr. Lesperance?

6    A.    I think my dad -- well, you saw in the video we got

7    separated, so Dave and I were there -- we waited -- the reason

8    we were in there a little longer was because we were trying to

9    wait to see if maybe he had got behind us and he was coming

10   out.  So that's why you see us standing for a time, for a

11   minute or two minutes.  But then after we just figured out

12   maybe he had already gone out, so that's when we decided to

13   just go out and leave.

14   Q.    So when you left the building, what did you do?

15   A.    We left the building, we walked out.  There was like some

16   kind of a ramp that you walk down.  It was like an L, like

17   that, that came in and then you went in this way.  And so we

18   walked back out, we went back around the ramp, went down the

19   bottom of it, walked over back to where we originally were,

20   which was there on the corner of the building, and at that

21   point we just stood there probably, gosh, I'm not sure exactly

22   how long, maybe less than another half hour.  We stood there

23   for a time.  And at that point there was police in riot gear

24   starting to gather, and we all said, you know, listen, we're

25   not here to battle the cops so there's no reason for us to

1    stay at this point.  And at that point, I want to say there

2    was a tweet that was sent out by President Trump that said you

3    don't battle the police, they're there, they're on our side.

4    Go home.  You've let your voices be heard, now go home, you

5    know, and evacuate the grounds, basically.

6         So anyways we at that point were already -- that was

7    probably as we were walking away from the building.

8    Q.   And then, what?  You get on the Metro and go back to your

9    hotel?

10   A.   Yes.  We didn't go back the same way we had come in

11   because of the fact we were trying to catch the Metro, and

12   being familiar with D.C., like I said I've been here lots of

13   times since I was a kid with my dad, and so when we were

14   going -- we knew there was a Capitol South Metro stop so we

15   went -- I guess I want to say that would be went to the north

16   side and then we went east I guess it is?  The east?  And that

17   was why there was a picture -- Dave I think took a picture on

18   the east side as we were walking away.  I don't know why he

19   took the picture but we were walking that way because we were

20   trying to catch the Metro.

21        And unfortunately at that time for whatever reason that

22   Metro was closed due to refurbishment or construction.  So we

23   actually ended up having to walk much farther that way.

24   Q.   Any other events of note that happened the rest of the

25   afternoon or evening of January 6 --

```
1     A.    No, that evening --

2     Q.    You specifically.

3     A.    No.

4     Q.    But go ahead.  You were going to say something.

5     A.     No, I was just going to say that evening we went back to

6     the hotel and that's when we first started seeing -- we knew,

7     we had gotten the word that there was a curfew in D.C. and we

8     were going to go get something to eat.  We weren't staying in

9     D.C. anyways; we were in Virginia, in Arlington.  And so we

10    went back to the hotel where our rental car was, we got in the

11    rental car and we went and searched out a place to eat, and

12    that's at which point we realized when you turned on the news

13    all you heard was the words insurrection, insurrection,

14    insurrection, insurrection on every news channel, and that's

15    when we were like, what in the world?  Because at that point,

16    we hadn't seen anything that took place up till we got to the

17    Capitol and we were there.  We didn't see any, you know,

18    preliminary, we didn't see pushing shoving, we didn't see

19    anything being breached or nothing like that.  So we were like

20    pretty shocked in ways.

21    Q.    Did you end up the next day driving past the Capitol

22    building?

23    A.    We did.  I mean, we were in D.C.  We were trying to --

24    Dave hasn't been around -- I guess he had been to D.C. before

25    but it's been a long time and we didn't just want to sit in
```

1    the hotel all day so we drove -- I think we went to Ford's

2    Theater.  I can't remember where else we went, a couple places

3    just -- of course they weren't open but we drove by them, and

4    in driving, you know, we drove by the Capitol and that's when

5    we had noticed that they were putting up fencing and had

6    National Guardsmen coming in, what we had seen on the news

7    that they were coming in that afternoon.

8    Q.    And did you drive past the Capitol to sort of return to

9    the scene of the crime, so to speak?

10   A.    I wouldn't have returned to a scene of a crime because

11   I didn't realize or think that I even committed a crime.

12   Q.    Fair point.  But did you drive past the Capitol

13   specifically to observe the place where you had just, you

14   know, been the day before?

15   A.    No.  Absolutely not.  It wasn't because of that.  It was

16   just because the way the GPS took us while we were driving in

17   D.C.  I mean, if you're not from D.C., good luck on the roads

18   because if you don't know where you're going, you can get

19   turned around really quick.

20   Q.    When did you leave D.C.?

21   A.    We left D.C. the 8th, early in the morning on January 8.

22   I want to say it was a Friday morning.

23   Q.    And you drove or flew?

24   A.    We flew.  We flew out of Baltimore, so we were up very

25   early.  By the time we got home I think it was around noon on

1    Friday.

2    Q.   Back to --

3    A.   Back to Melbourne.

4    Q.   Now, sort of in the aftermath of January 6 and getting

5    back home, even having seen the things on TV that you're

6    talking about with folks talking about insurrection, etc.

7    Did you feel you had done anything illegal on January 6?

8    A.   No.

9    Q.   Did you think that what you did on January 6 was sort of

10   going to land you here with the Secret Service and FBI

11   testifying against you?

12   A.   Absolutely not.

13   Q.   Now, I'm just going to run through some final questions

14   here, Mr. Cusick.

15        In all the things that you did on January 6, did you have

16   any intent to impede any function of Congress?

17   A.   Absolutely not.

18   Q.   Did you have any intent to disrupt any function of

19   Congress?

20   A.   Absolutely not.

21        MR. VALENTINI:  Objection, Your Honor.  These all call

22   for legal conclusions.

23        MR. PIERCE:  I'm asking his intent.

24        THE COURT:  The objection is overruled.  It's what his

25   intent was, and that's a factual matter.

1    BY MR. PIERCE:

2    Q.   And did you have any intent to obstruct any function of

3    Congress?

4    A.   Absolutely not.

5    Q.   Did you have any intent to impede any function of any law

6    enforcement officer?

7    A.   No, sir.

8    Q.   Did you have any intent to disrupt any function of any

9    law enforcement officer?

10   A.   I did not.

11   Q.   Did you have any intent to obstruct any function of any

12   law enforcement officer in any way?

13   A.   No.

14   Q.   Did you have any intent to impede, disrupt, or obstruct

15   any other government function or government officer that day?

16   A.   No.

17   Q.   Did you ever know or believe anywhere that you went on

18   the Capitol grounds was restricted?

19   A.   I did not.

20   Q.   Did you ever know or believe that when you went inside

21   the Capitol building, that that was restricted?

22   A.   I did not.

23   Q.   Did you ever intend to enter any area or building on that

24   day that was restricted?

25   A.   No.

```
 1                    MR. PIERCE:  One moment.

 2              No further questions at this time, Your Honor.  Thank you.

 3                    THE COURT:  Mr. Valentini.

 4                            CROSS-EXAMINATION

 5       BY MR. VALENTINI:

 6       Q.   Good morning, Mr. Cusick.

 7       A.   Good morning.

 8       Q.   As you know, I'm Francesco Valentini.  I'm one of the

 9       prosecutors in this case.

10       A.   Yes, sir.

11       Q.   Mr. Cusick, is it fair to say you follow politics pretty

12       closely?

13       A.   It is fair to say.

14       Q.   In fact, you're pretty passionate about politics.

15       A.   I would say I'm pretty passionate about the United

16       States.  I wouldn't say I was so much about politics.

17       Q.   Let's talk a little bit about the 2020 presidential

18       election.  You followed that one pretty closely?

19       A.   I did, of course, yes.

20       Q.   In fact, very closely was your testimony yesterday,

21       wasn't it?

22       A.   Yes.

23       Q.   And you knew that Congress was ultimately responsible

24       for certifying the results of that election?

25       A.   I did.
```

1    Q.   And you knew that that proceeding of Congress was going

2    to happen on January 6 at the Capitol?

3    A.   I did.

4    Q.   And you knew that even before you went to Washington,

5    D.C., on January 5, 2021.

6    A.   Yes.

7    Q.   And the reason you came to D.C. on January 5 is because

8    you thought that the election was stolen?

9    A.   That's correct.

10   Q.   And you hoped that Congress would, quote, throw it back

11   to the states, your words yesterday.

12   A.   Yes.

13   Q.   You also knew that the certification would take place at

14   the Capitol as you just testified?

15   A.   I did.

16   Q.   And to be clear, again, you knew that all along.

17   A.   Mm-hmm.

18   Q.   And you also knew it because before going to the Capitol

19   you were down at the Ellipse for the president's speech that

20   day?

21   A.   Right.

22   Q.   And you listened to that speech very carefully.  Right?

23   A.   Mm-hmm.

24   Q.   Beginning to end.

25   A.   Mm-hmm.

1    Q.    Including the part where the president told his

2    supporters to go down to the Capitol?

3    A.    Peacefully, yes.

4    Q.    And in fact, that decision to go down to the Capitol,

5    that was not the president that made that decision for you.

6    A.    He did not, no.

7    Q.    You made that decision for yourself.  Right?

8    A.    That's correct.

9    Q.    Because you're an adult?

10   A.    That's --

11   Q.    How old are you?

12   A.    -- right.

13        COURT REPOERTER:  One at a time, and slow down.

14        MR. VALENTI:  I'll slow down.

15   BY MR. VALENTI:

16   Q.    How old are you?

17   A.    I'm 37.  At the time I would have been 35.

18   Q.    And so at 35 years of age, you make decisions for

19   yourself.

20   A.    That's correct.

21   Q.    But yet you said that even at the Ellipse you didn't yet

22   know or intend to go to the Capitol.

23   A.    That's right.

24   Q.    You made that decision after the president told you.

25   But again, that decision is yours.

1    A.    That's right.

2    Q.    Let me ask you a little bit about your trip to D.C. in

3    the first place.  You said you flew up on January 5?

4    A.    That's correct.

5    Q.    You didn't fly alone.  Right?

6    A.    No.

7    Q.    You flew up with your father --

8    A.    Mm-hmm.

9    Q.    -- James Cusick?

10    A.    Yes.

11    Q.    And David Lesperance?

12    A.    Mm-hmm.

13    Q.    Did you pay for the airfare?

14    A.    I honestly think that I did, but I really don't remember.

15    That would have been something my dad and I worked out between

16    the two of us.

17    Q.    In fact, you are the one that convinced your dad to come

18    up to Washington, D.C.?

19    A.    Um, I don't know if I would say I convinced him.  I mean

20    my dad's been coming to D.C. for a long time so he loves

21    coming to D.C.  Dave hadn't been in 50 years, so I mean, it

22    was kind of a group decision.

23    Q.    Well, do you have -- did you hold a podcast with your dad

24    around Father's Day this year?

25    A.    I did, yes.

1    Q.   And in that podcast your dad stated he didn't intend to

2    go to Washington, D.C., until you and another person convinced

3    him to go.

4    A.   I mean, that's his testimony.  I'm just telling you from

5    my point of view how I would have -- what it was for me.

6    Q.   You just looked at it different.

7    A.   Yes, sir.

8    Q.   Kind of a joint decision.

9    A.   Yeah.

10   Q.   How about Mr. Lesperance airfare.  Do you know who paid

11   for that?

12   A.   I don't.

13   Q.   Before boarding that flight to D.C. -- actually, strike

14   that.  Let me ask you, which airport in Florida did you leave

15   from?

16   A.   We left from MCO.  I want to say it's Orlando

17   International Airport.

18   Q.   That's a big airport, right?

19   A.   Very big, yes.

20   Q.   Before you boarded that flight to Washington, D.C., on

21   January 5, did have to go through any security?

22   A.   We did.

23   Q.   Did you have to go through a metal detector?

24   A.   Yes.

25   Q.   Or maybe a scanner?

1    A.    Mm-hmm.

2    Q.    And you probably had to run your bags through one of

3    those x-ray machines?

4    A.    Mm-hmm.

5    Q.    Did you have to take off your shoes?

6    A.    Of course.

7    Q.    Take out your laptops?

8    A.    Mm-hmm.

9    Q.    Discard any liquids?

10   A.    Mm-hmm.

11   Q.    You had to do all that just to board an airplane.

12   A.    Right.

13   Q.    Now fast-forward to the morning of January 6.

14   A.    Mm-hmm.

15   Q.    That morning you went to the Ellipse, right?  And you

16   said that -- correct me if I'm wrong, I think yesterday you

17   said that at some point you realized that if you went through

18   a security line you'd be able to get closer to the stage?

19   A.    That's right.  We had to go through Secret Service.  Yes.

20   Q.    And you did that.

21   A.    We did that, yes.

22   Q.    And when you went through that security line you said you

23   had to go through a metal detector?

24   A.    Yes, that's correct, and be wanded down after the metal

25   detector.

1    Q.    Oh, not just the metal detector, also the wands?

2    A.    That's right.

3    Q.    How about bags?

4    A.    Couldn't take bags in.

5    Q.    Oh, you couldn't take them at all.

6    A.    No.

7    Q.    That's pretty tight security, isn't it?

8    A.    That's right.

9    Q.    And you said you had to wait in line how long,

10   approximately an hour I think you said yesterday?

11   A.    At least, it might have been more.

12   Q.    How close did you actually get to the stage where former

13   President Trump was giving the speech?

14   A.    I mean, there was a couple thousand people within there,

15   so we stayed at the back of the grass, but within the

16   fenced-in area, so not so close but I was closer than the

17   people standing back by the Washington Monument.

18   Q.    That was the whole point, right?

19   A.    Yeah.

20   Q.    If you can give me -- without guessing, your estimate of

21   how far you were from the stage?

22   A.    Few hundred feet I guess.

23   Q.    You were a few hundred feet from the stage --

24   A.    Hundred yards?

25   Q.    So you had to go through a metal detector and a wand and

1    you had to leave your bags outside just to be within a few

2    hundred feet of the stage.

3    A.    Mm-hmm.

4    Q.    So by the time -- and later that day, you did end up

5    going to the Capitol?

6    A.    That's right.

7    Q.    You're not saying that the person in the red beanie was

8    someone other than you --

9    A.    It was me.

10   Q.    -- in the videos that we saw over the last few days?

11   A.    That's correct, yes, sir.

12   Q.    So by the time you went to the Capitol on January 6, you

13   had gone through at least two security screenings within the

14   prior 24 hours.

15   A.    Yes.

16   Q.    One was down in Florida, just to get on a commercial

17   plane?

18   A.    Mm-hmm.

19   Q.    And the other one was at the Ellipse just to get within a

20   few hundred feet of a stage.

21   A.    That's right.

22   Q.    And you say you've been to the Capitol before?

23   A.    When I was much younger, yes, I mean, I've taken school

24   trips there.  Like I said, my dad's lobbied there for the

25   nation of Israel for some time, so yes, I've been there.

1    Q.   When was the last time before January 6 that you went

2    to the Capitol?

3    A.   I honestly don't remember exactly when the last time,

4    but it was at least 10 years, maybe more, maybe more like 15,

5    maybe even in high school I want to say.

6    Q.   But this time when you went to the Capitol you went

7    through no screening whatsoever?

8    A.   That's correct.

9    Q.   And you thought that was A-okay because the Senate Wing

10   door that you went through was open?

11   A.   I thought that, yes, as well as I've seen many protests

12   over the years where they have sit-ins and they have people

13   that come in there and walk into the Capitol.  I mean you see

14   it on TV all the time there's people that walk into the

15   Capitol without being screened in order to protest.  That

16   never crossed my mind for one minute.  And like I said, the

17   main reason it never crossed my mind was on account of the

18   police presence there made me feel safe and made me think it's

19   okay for me to go inside.

20   Q.   You'd seen it on TV; that's why you thought it was okay?

21   Is that your testimony?

22   A.   That is my testimony.  I've seen multiple protests at the

23   Capitol happen before very similar to this from what I saw.

24   Q.   You saw a lot of protests inside the walls of the Capitol

25   building?

1    A.    I have seen sit-ins, yes, that even senators have -- what

2    do you want to say, they participated in, yes.

3    Q.    Okay.  Let me ask you about those sit-ins.  In those

4    sit-ins when people walk into the Capitol were the windows to

5    the Capitol door broken?

6    A.    I don't know who broke those windows.  I didn't see that.

7    Q.    That's not my question.  My question is in the sit-ins

8    that you've seen, were the windows to the Capitol broken?

9    A.    I don't know that.  I wasn't there.  I wouldn't have been

10   able to walk in.  I just saw what happened inside.

11   Q.    But you've seen enough about those protests to come to

12   the conclusion that it was A-okay to just waltz into the

13   Capitol?

14   A.    I did.  Yes.  That's how I felt.

15   Q.    And you made that decision as a 35-year-old rational

16   adult at the time.

17   A.    That's correct.

18   Q.    Now, you're not testifying today that you did not see the

19   broken window that you walked right by.

20   A.    No.  I saw the broken window.

21   Q.    There was glass shards on the floor.  You walked over

22   those?

23   A.    Not on the side -- on the outside there was nothing on

24   the ground.  I think that would have been pushed onto the

25   inside from what I saw in videos now.

1    Q.   Let me ask you, how many broken windows you saw at the

2    Senate Wing door?  Certainly, the window to the door was

3    broken.

4    A.   It would just be the ones that were right directly --

5    like you saw a picture of my dad looking in.  So it would be

6    those two.

7    Q.   Well, let's start with that.  Let's look at that.  Can we

8    pull up Exhibit 211, the first frame, please?  Could you play

9    it frame by frame.

10       (Video played.)

11       Stop here.  How about that window right there?  That one

12    you saw?

13    A.   I want to say I didn't probably pay attention because the

14    door was open, so I don't know that I did or didn't see it.

15    Q.   How about the window right before that?

16    A.   The one to the right, that would have been the one I was

17    talking about, the two, it was two panels I want to say there.

18    It was just that.

19    Q.   So you saw those?

20    A.   I did.

21    Q.   Okay.  So you walked past those to get to the door and

22    then you made a left?

23    A.   Well, it would actually be there was a ramp and you make

24    a left and then a right into the door.  So it would be a right

25    like that.

1  Q.   Did you see any other rioters that were hopping through

2  that broken window as well or not?

3  A.   I don't remember seeing any of them personally.

4  Q.   You might?

5  A.   Maybe on videos I've seen it, but not when I was in that

6  moment, I didn't see any of that, no.

7  Q.   Had you seen that, would that have stopped you?

8  A.   I just want to bring it back to the fact that the police

9  were there, they weren't telling anybody not to go anywhere,

10  and so I really -- like I said, police presence was there made

11  me feel safe enough to be able to go inside.  They were

12  just -- I mean, like you see the line that we saw on the way

13  in, and it's shown from back here.

14      Well, I couldn't see back from that side.  I only saw it

15  from this side.  So in my line of sight I just see a line of

16  police officers standing there, and like I said, they were

17  talking to people, people were asking them questions, they

18  were interacting, it wasn't like they were posted up as in,

19  you know, coming or threatening in any way.

20  Q.   So if you see police, unless they're actually threatening

21  you, you think it's okay to walk through a broken window into

22  the Capitol.

23  A.   I didn't walk through a broken window.

24          MR. PIERCE:  Objection.

25          MR. VALENTINI:  No, no --

```
 1            MR. ROOTS:  Mischaracterizes --

 2            MR. VALENTINI:  -- I asked you -- go ahead.

 3            MR. ROOTS:  I'm sorry.  Go ahead.

 4            MR. VALENTINI:  I asked --

 5            MR. ROOTS:  Withdrawn.

 6            MR. VALENTINI:  You go first.

 7            MR. PIERCE:  I withdraw the objection.  I'm sorry.

 8   I didn't mean to interrupt the flow.

 9   BY MR. VALENTINI:

10   Q.   So you said -- I asked you, if you'd seen someone jump

11   out of that window, would that have been okay.  And you said,

12   well, I don't know because the police were just standing

13   there.

14        So my question is, if you had seen someone jump out of

15   there and the police standing there, would you have thought

16   that that was okay?

17   A.   I really don't know what I would have thought because I

18   didn't see that.

19   Q.   Okay.  But to you the fact that the police were not

20   coming out and telling you specifically that you're not

21   allowed to go in, that was enough.

22   A.   Yes.  Because I wasn't there to destroy or destruct

23   anything.  I'm not for destruction.  I think that's a hundred

24   percent, if somebody did that, I -- I'm not that guy.  I

25   didn't do it.
```

1    Q.    Right.  And all that matters -- but to you all that

2    matters is that you in your mind don't intend to destruct

3    things.

4    A.    I went there to do no violence.

5    Q.    And you are again a 35-year-old adult and you think that

6    all that matters in the midst of a riot is that you yourself

7    are walking into the building without the intent to destroy

8    anything.

9    A.    I think intent is pretty important, yes.

10   Q.    And so you expect the police to divine your intent by

11   just looking at you.

12   A.    Well, I mean, even the officer that sat up here, the

13   Metropolitan Police officer --

14   Q.    It's a yes or no.  Is that what you expect the officer

15   to do?

16   A.    I expect them to discern whether someone's good or bad,

17   yes.

18   Q.    So good would-be -- good visitors like you yourself,

19   those were okay to go in, but bad would-be rioters, those were

20   not.

21   A.    I guess you could say that.

22   Q.    Now, that broken glass that you saw at the Senate Wing

23   door, that was not the first clue that you were not allowed

24   to be there, was it?

25   A.    I told you I didn't feel like I wasn't allowed to be

1    there, so I don't know what clue that would be.

2    Q.   So you testified that on your way to the Capitol you

3    didn't see any barriers or any barricades?

4    A.   I didn't.

5    Q.   You and your group, you're not disputing you did walk

6    right over snow fencing on the front lawn of the Capitol?

7    A.   I personally was not with my dad and Dave when they

8    were -- where that video was that was on -- in evidence, I was

9    not with them at that point.  We met up a little bit farther

10   up the hill, so I walked up the pavement, it was in a parking

11   lot.  It wasn't really -- the grass that I got onto was just

12   as you get to the top, wherever you see that, what looks like

13   some kind of a mobile trailer sitting on the grounds in the

14   video where Dave is talking, where I said I saw someone fall

15   from the wall.

16   Q.   Yeah.  Let's talk about that.  Can we pull up, please,

17   Exhibit 206, two minutes into the exhibit?

18          THE COURT:  What exhibit are we in?

19          MR. VALENTINI:  206, Your Honor.

20      Yes, you can play.

21      (Video played.)

22   BY MR. VALENTINI:

23   Q.   So that was you.

24   A.   It was me.

25   Q.   You were genuinely surprised to see someone fall off the

1      wall of the Capitol building?

2      A.    I was.

3      Q.    And understandably so.

4      A.    Right.

5      Q.    But that didn't give it away to you that maybe you were

6      not supposed to be there?

7      A.    No.  Because the person that fell was foolishly climbing

8      the side of the wall, which isn't something I would have

9      participated in anyways.

10     Q.    I'm asking about your decision.  Did you realize -- did

11     you think that being in the midst of a place where people were

12     jumping off the wall of the Capitol was not okay?

13     A.    Well, they didn't jump.  They actually fell.  But no, I

14     never thought any of that.

15     Q.    You also testified you did not -- and correct me if I'm

16     wrong, I think you testified that you did not see any police

17     in riot gear until you got inside the building?

18     A.    Even then I don't recall actually seeing them in what you

19     would call I guess the definition of what riot gear actually

20     is.  I mean, I saw a couple of police officers I want to say

21     in the -- when you first go in with their helmets pulled up,

22     like with a helmet on?  I mean, the only place that I actually

23     saw cops in riot gear would have been when they were trying

24     to -- when they started gathering after we had come back

25     outside with shields, at which point we were like well, we're

1    leaving because we're not interested in combating the cops.

2    Q.   I'll come back to that.  Let's play Exhibit 208 at 1:50.

3         (Video played.)

4         You didn't see those police officers, these?

5    A.   I want to say that I just don't remember if I saw them

6    when I was up there or not.  I really don't.

7    Q.   But your testimony today was you had not seen any police,

8    any officers in riot gear until you got inside the building,

9    was it not?

10   A.   Yes.

11   Q.   But then maybe you saw these ones too?

12   A.   I don't recall.  I mean, it was two and a half years ago.

13   I don't remember everything exactly the way it unfolded.

14   Q.   Do you remember how close you were to this corner of this

15   building where you may or may not have seen this line of

16   police in riot gear?

17   A.   I mean, at that, I want to say that's the north side from

18   what I saw in the maps, so that's where we turned the corner

19   and went left to go on the west side.  I just genuinely don't

20   remember if I saw them or not.  I really specifically remember

21   seeing them after I came out.

22   Q.   My last question was do you recall how far you were from

23   the side of this building at this point.

24   A.   I don't.  I don't recall.  I'm sorry.

25        (Video played.)

```
1    Q.   Did you hear a voice say "The people are home"?

2    A.   I did.

3    Q.   That was Ms. Lesperance?

4    A.   Yes.

5    Q.   And right there on the corner from that did you see these

6    police officers?

7    A.   I honestly just don't remember.

8    Q.   Didn't see those either?

9    A.   I don't remember.

10   Q.   Don't remember.  Do you think if you did see the officers

11   that would tell you that maybe it was a good time to turn

12   back?

13   A.   Like I said, no, because I wasn't intending any violence

14   and wasn't participating in any violence.  And if they were

15   stopping violent people, I would be all for them stopping

16   violent people.

17   Q.   Let me try to understand this.  Are you saying that so

18   long as you don't intend any violence, you're entitled to be

19   wherever you want, whenever you want, however you want?

20   A.   I'm telling you that if there was a sign on the door or

21   one of them would have said, sir, you're not allowed in here,

22   I would have said yes, sir, and I would have not gone inside.

23   Hundred percent.

24   Q.   Just needed them to come up to you and tell you?

25   A.   Or there had been a sign saying don't come inside.  Yes,
```

1    a hundred percent.

2    Q.    Let's take this exhibit -- actually, could we go back to

3    about 1:10?  Can we play from here?

4        (Video played.)

5        When you say if you'd seen a sign, you mean a sign like

6    this sign?

7    A.    I do.  I did not see that that day.

8    Q.    Oh, you did not see that?

9    A.    As you can see, that has been pushed and pulled together

10   as if it was all moved out of the way.  So from my point of

11   view, I had no idea if the police officers would have moved

12   that.  I had no idea who would have moved that for that to

13   have been moved out of the way.  Like I said, the police

14   presence there made me feel like we were allowed to go in and

15   out.  The fact that they were saying nothing to anybody going

16   in or out --

17   Q.    So are you saying --

18   A.    I did not see that sign that day.

19   Q.    Let me understand that.  You're saying that you did not

20   see the sign, but you know the sign was pushed to the side.

21   Is that what you're saying?

22   A.    I'm saying I know the signs were pushed to the side

23   because you can see the bike racks stacked on top of each

24   other.  There were one, two, three, four, five of them pushed

25   together as if they were moved out of the way.  That's why I

1    walked through that way.  I did not see the Area Closed sign.

2    No, sir.

3    Q.   So now looking back and trying to explain your

4    decision-making, you're saying those bike racks are stacked;

5    but at the time your testimony of what you know at the time is

6    you didn't see them.

7    A.   I never saw anything like this until this is paused right

8    here.  Yes, that's why -- I'm just --

9    Q.   Now, those bike racks take up the right-hand side of the

10    walkway.  You see that.

11    A.   I do see that, yes.

12    Q.   Okay.  So when you say pushed to the side, they're still

13    in the walkway.  They're just on the right-hand side of the

14    walkway.

15    A.   But again, like I said, there's an elderly gentleman

16    right there, there's all kinds of people walking up through

17    there, which made me feel in no way, shape, or form that we

18    were not allowed.

19    Q.   You had to walk around those bike racks.  Fair?

20    A.   I don't know exactly where that was.  I don't remember.

21    So I really -- I don't want to say yes or no because I don't

22    remember.

23    Q.   Of course.  Let's roll the video.

24         (Video played.)

25         Now, that's you walking around those bike racks into the

1    walkway, right?

2    A.    Correct.

3    Q.    Then eventually you did arrive at the shattered window

4    that we're talking about, right?

5    A.    Mm-hmm.

6    Q.    Let's go to Exhibit 211, again the first frame.  Let's

7    maybe play three seconds in.

8         (Video played.)

9         Let's stop.

10        So this is not just a broken window.  Did you hear -- you

11   said you testified before you also heard the high-pitched

12   blaring noise?

13   A.    Mm-hmm.

14   Q.    That, too, didn't tell you that you were not supposed to

15   be there?

16   A.    Again, I would have had no idea or why that alarm was

17   even going off, because I didn't see anything other than what

18   you see that I saw which was just walking in.  I wasn't there

19   to see what would have caused the alarm to go off.  In my

20   experience, I've traveled the world before with my dad, and

21   you're in foreign countries and there could be alarms that go

22   off in hotels.  Even there was a alarm on 9/11 where they told

23   the people, pay no attention to the alarm, stay where you are.

24   Of course the buildings fell after that.  But I was not

25   alarmed by the alarm, because like I said, there was police

1    officers standing there, so to me it was like we're taking

2    care of everything and -- so I never felt alarmed.

3    Q.   So your testimony is you were not alarmed by the alarm.

4    A.   Correct.

5    Q.   Now, it's not just the alarm and a broken window, right?

6    There's also dozens of people in there.

7    A.   Mm-hmm.

8         COURT REPORTER:  Is that a yes?

9         THE WITNESS:  Yes.

10   BY MR. VALENTI:

11   Q.   That too did not give you any indication that maybe you

12   were not -- those people were not allowed to be in there?

13   A.   No, it didn't.  And I would actually say there was more

14   than dozens.  I would say there was hundreds if not thousands

15   of people inside there.

16   Q.   In that room?  No.

17   A.   In that particular room right there, no, I would say

18   you're right.  Dozens.

19   Q.   Maybe hundreds.  Thousands, that's...

20   A.   Yeah.

21   Q.   Now, if we can rewind a few seconds.  Can we play from

22   here?

23        (Video played.)

24        So this was established on direct examination.  That's

25   you saying "pepper spray"?

1    A.   That's right.

2    Q.   That's because you could smell a sour stink smell?

3    A.   That's correct.  And you could hear a lady before even I

4    said it, which is what made me realize, she said something

5    about pepper spray, and that's why I said that I think it's

6    pepper spray we're smelling.

7    Q.   You had no disagreement with that.  You agreed that what

8    you were smelling was pepper spray.

9    A.   I honestly have never smelled pepper spray before, so I

10   just assumed.  I didn't know.  I mean, as we're walking down

11   the hall a little bit more, you hear Dave say "it's not pepper

12   spray, that's weed."  I don't know.

13   Q.   But your operating assumption at that point was this is

14   pepper spray smell.

15   A.   It smelled like something sour.  I will say that.

16   Q.   And you understand that pepper spray is used to keep

17   people out of places, to disperse people.

18   A.   Okay.

19   Q.   But that too didn't give you any indication that maybe

20   the pepper spray had been used to keep people out.

21   A.   It didn't.

22   Q.   At least not to keep you out.  Right?  Was that your

23   thinking?

24   A.   No.  It wasn't just me specifically, but no, I didn't

25   think anything about it honestly.

1    Q.   You thought officers were just randomly spraying pepper

2    spray around the air?

3    A.   I wouldn't have known.  I really wasn't trying to

4    speculate at the time.

5    Q.   Now, you smelled pepper spray right at the threshold.

6    A.   I smelled something sour.  I don't want to say for sure

7    that it was that.  That's what I thought it was.

8    Q.   We can play it again.  You declared "Pepper spray, Dad"

9    as you walked in the door, did you not?  We can play --

10   A.   I did.  I did say that.

11   Q.   Play it again.

12        (Video played.)

13        Just to be absolutely clear, that's you saying "Pepper

14   spray, Dad."

15   A.   That's me.

16   Q.   Okay.  Then you saw another line of police officers in

17   riot gear when you got immediately inside that door?

18   A.   I'm sorry.  I didn't understand what you said.

19   Q.   I'm sorry.  You saw another line of police officers in

20   riot gear inside the Capitol?

21   A.   I saw them with a helmet.  I don't know what riot gear

22   consists of but I did see them with a helmet with a face

23   shield on that was pulled up like that.

24   Q.   Fair to say that's not the gear that police officers on a

25   regular patrol you usually see wearing?

1    A.    Okay.

2    Q.    But your testimony is that even after you saw the line of

3    police officer, you thought it was okay to just keep going.

4    A.    I did because there was no urgency or anything of them

5    telling you people to get out.  Like I said, I saw people

6    taking pictures with them.  I saw people asking them

7    questions, thanking them for being there.  So it didn't -- it

8    never entered my mind.

9    Q.    So when you say you saw people thanking them, that's

10   before you made the decision -- between the time you walked

11   through this door and the time you make the decision to turn

12   right and go towards the Crypt?

13   A.    I would say, yeah, they were right there talking to them.

14   Q.    So you said you saw them -- you understood people were

15   thanking them and they were talking to people.

16   A.    As we walked in the door you could see a little bit of

17   that.

18   Q.    Let me know at which point which officers you're talking

19   about.

20         (Video played.)

21         Stop for a second.  Are these the two officers whose

22   visor you said was pulled up?

23   A.    Oh, I see now that they're pulled down.

24   Q.    Let's keep playing.

25         (Video played.)

```
 1            Stop.  At what point during this video did you see
 2    officers -- members of the mob thank the officers?
 3    A.   It wasn't in this video.  I have my own video.  As you
 4    see there I'm taking a video and I saw it with my own eyes
 5    when I was in there.
 6    Q.   But it's not in this video here?
 7    A.   No.
 8    Q.   You also testified that you heard other rioters chant
 9    inside the Capitol building?
10    A.   I heard people, yes, chanting.
11    Q.   Did that make you think that maybe those people were
12    doing something that was not allowed to happen within the
13    Capitol?
14    A.   I honestly didn't see anything wrong with people chanting
15    "USA" inside the Capitol.
16    Q.   Did you not -- when you saw those officers and people and
17    that number of people, did you realize that those officers
18    were maybe outnumbered?
19    A.   No, because anybody that I saw in there wasn't trying to
20    combat an officer in any way.
21    Q.   That's not the question.  The question is did you
22    realize --
23    A.   No.  I never thought about the police officers being
24    outnumbered.
25    Q.   Could you please let me finish the question for the court
```

1    reporter's sake?  Did you realize that there was too many

2    rioters in that room for the officers to clear the room at

3    that point?

4    A.    I did not.

5    Q.    But you saw nothing wrong later on when you saw other

6    rioters chant in the Capitol.

7    A.    I saw nothing wrong with chanting "USA" in the United

8    States Capitol, no.

9    Q.    How about "Whose house?  Our house"?  Did you see

10   something wrong with that?

11   A.    I didn't for the fact of I thought according to the

12   government law that the Capitol building belongs to we, the

13   people, that it's the people's house.

14   Q.    Yeah, so that was your thinking at the time, right, that

15   oh, they're singing "whose house" because --

16   A.    It's the people's house.

17   Q.    Right.  It's not because they just took over the Capitol?

18   A.    No, no, not at all.

19   Q.    How about the chant, "Stop the Steal"?  You heard that

20   inside the Capitol?

21   A.    I didn't.

22   Q.    You never did?

23   A.    I never heard "Stop the Steal" inside the Capitol.

24   I heard that at the rally.

25   Q.    Okay.  You heard it at the rally?

1    A.    Not inside the --

2    Q.    It stopped at the rally?

3    A.    Yeah.

4    Q.    Okay.  I just wanted to ask you very briefly about

5    January 7.  You testified that when you -- you didn't deny

6    that you were in that car that went back to the Capitol on

7    January 7 the following morning?

8    A.    I was in the car.

9    Q.    But your testimony was that that was pure happenstance.

10   There was no plan to actually go by the Capitol that morning.

11   A.    No.  There was no plan for us to specifically go there to

12   search out anything.

13   Q.    The Capitol when you got there looked like some sort of

14   fortress, right?

15   A.    And actually, you're exactly right, and we were actually

16   wondering why, if they had the knowledge beforehand that there

17   was going to be any kind of pushing and shoving, why didn't

18   they do that the day before.

19   Q.    And they were high, high unscalable fencing?

20   A.    There sure was.

21   Q.    And when you got there you took -- your companion took a

22   video of the fencing?

23   A.    He did.

24   Q.    But you guys that morning, you just ended up there by

25   accident?

1    A.    That's correct.  It wasn't necessarily by accident.

2    I mean, we were in D.C.  It's not that big.

3    Q.    But you had no interest in going back to the place where

4    you invaded the Capitol the day before.

5    A.    Absolutely not.

6    Q.    Totally coincidental?

7    A.    Like I say, I wouldn't say it's coincidence because we

8    were in D.C. and the way the map takes you where we were

9    going, we were going to end up driving by it one way or

10    another.

11    Q.    Let's shift gears a little bit and let me ask you about

12    an incident that you heard about yesterday in December 2018.

13    A.    Mm-hmm.

14    Q.    That you also testified on direct examination.  That's

15    when you hit your wife, right?

16    A.    Elbowed, yes.

17    Q.    Does elbowing someone's spouse not count as hitting

18    someone's spouse?

19    A.    I don't know.  If you say it does.

20    Q.    No, no.  It's your testimony, not mine.

21    A.    No, because to me hauling off and hitting someone is

22    completely different than an accidental elbow.

23    Q.    So your testimony is that the elbow was completely

24    accidental?

25    A.    A hundred percent.

1    Q.   That incident happened when you and your wife were in the
2    car?
3    A.   It did.
4    Q.   And your daughter was in the car too?
5    A.   She was.  She was asleep.  I had picked up my wife from
6    the airport.  She had just come back from being in Michigan to
7    see her family.
8    Q.   And this was in December 2018?
9    A.   That's correct.
10    Q.   How old was your daughter at the time?
11    A.   She would have been born 2017, so she would be almost
12    two.  She'd be a year and a half.
13    Q.   And your wife Ruth was in the back seat at that time?
14    A.   She was.
15    Q.   With the baby?
16    A.   She was.  Putting her to sleep.
17    Q.   And your wife asked you to stop talking on the phone?
18    A.   Yep.  That's correct.
19    Q.   Because she --
20    A.   Would you like me to explain what happened?
21    Q.   No.  I can ask you some questions.  That's because she
22    thought you were being distracted in your driving?
23         MR. PIERCE:  Objection.  Calls for speculation as to
24    her state of mind.
25         THE COURT:  If you know.

1              THE WITNESS:  It had nothing to do with me driving.

2      She wanted me off the phone because I was driving, no.  It was

3      because the airline lost her luggage, so we were at the

4      airport for probably another two hours after I had picked them

5      up and which caused the argument between us in the first place

6      because I wanted -- she was trying to be cordial with the

7      airline and I was like they lost our luggage and all of my

8      daughter's stuff was in there.  So that's what led to the

9      argument in the first place and it just spilled over into the

10     car with me on the phone and her trying to get the phone out

11     of my hand, and I just said get back, and my elbow just

12     coincidentally hit her right in the perfect spot for her nose

13     to bleed.

14     BY MR. VALENTINI:

15     Q.   So, just to be clear, I'm going to try to use your word,

16     just right before your elbow coincidentally hit right on the

17     spot where she started bleeding, you were having an argument

18     with your wife?

19     A.   At that point it really wasn't an argument, no, but she

20     was trying to get the phone out of my hand.

21     Q.   So she was reaching for your phone?

22     A.   Correct.

23     Q.   And just elbow back?

24     A.   That's right.

25     Q.   And she was in between the seats, she was leaning forward

1    in between the seats.

2    A.    That's correct.

3    Q.    And you intentionally swung your right elbow backward

4    toward Mrs. Cusick's face?

5    A.    No.  Absolutely not.

6    Q.    Now, after this incident, do you recall that a police

7    officer came to interview you?

8    A.    He did.

9    Q.    And you know -- and you spoke to that officer?

10   A.    I did.

11   Q.    And that interview was recorded?

12   A.    I don't know if it was or not.

13   Q.    Well, you know that a report was produced as a result of

14   that interview.

15   A.    I don't know that either.

16        MR. VALENTINI:  Court's indulgence.

17        THE COURT:  Certainly.

18   BY MR. VALENTINI:

19   Q.    You don't know if a report was produced?

20   A.    I don't.

21   Q.    Let me -- with the Court's permission, let me approach

22   the bench --

23        MR. PIERCE:  Your Honor, at this point we're going to

24   object.  Relevance grounds.  We're getting pretty far afield

25   here.

1          THE COURT:  That objection is overruled.  You've had

2     another witness, your witness testify about it, and then you

3     had this witness testify about it.

4       You may approach the witness, not the bench.

5          MR. VALENTINI:  Oh, I'm sorry.  I misspoke.  If I said

6     the bench, I misspoke.

7     BY MR. VALENTINI:

8     Q.   Mr. Cusick, I've handed you what has been marked as

9     Exhibit 701.3.  And I will ask you to please -- we're going to

10    have it on the screen as well but not published to the jury.

11    If we could scroll back to the bottom of the page.

12       Mr. Cusick, have you had an opportunity to review this

13    report?

14    A.   I haven't.  I'm just seeing it for the first time,

15    honestly.

16    Q.   The date on this report is December 16, 2018?

17    A.   Yes.

18    Q.   And that would have been two days after the incident?

19    A.   I'm not sure if it was two days.  I thought it was one

20    day.  But maybe it was two days.

21    Q.   But shortly thereafter?

22    A.   Yes.

23    Q.   Now it's more than four years later.

24    A.   Yes.  It would be almost five years, yes.

25    Q.   And your testimony is that you did not tell an officer

1      that you intentionally swung your elbow.

2            MR. PIERCE:  Objection.  He's testified that he doesn't

3      recall if a recording was made, and it seems like he's trying

4      to impeach the witness now based on that.  So I'm not sure

5      it's -- objection, improper impeachment.

6            THE COURT:  I don't understand.  Ask your question.

7      Let me hear what the question is.

8      BY MR. VALENTINI:

9      Q.   Can you please read the third to last sentence of the

10     second to last paragraph.

11           THE COURT:  Read aloud or to himself?

12           MR. VALENTINI:  Read to yourself.

13           THE WITNESS:  I'm sorry.  I didn't hear what you said.

14     Read what part?

15     BY MR. VALENTINI:

16     Q.   Please read the third to last sentence in the second to

17     last paragraph.

18           (Witness reviewing document.)

19           THE COURT:  He's read it.  Now you ask a question.

20     BY MR. VALENTINI:

21     Q.   Let me read it for you.

22           MR. PIERCE:  Objection.

23           THE COURT:  This is not in evidence.

24           MR. VALENTINI:  I'm only reading for impeachment

25     purposes.  I'm not asking for this --

 1          THE COURT:  Ask him the formal question:  Did you...

 2     BY MR. VALENTINI:

 3     Q.   Did you say that you intentionally swung your right -- I

 4     believe I asked the framing question before, I'm sorry.  Did

 5     you tell the officer that you intentionally swung your right

 6     elbow backwards toward Mrs. Cusick's face and struck her?

 7     A.   I did not say that.

 8     Q.   Now, let me read the third to last sentence of this

 9     report.

10          MR. PIERCE:  Objection.  This is now just hearsay.

11          MR. VALENTINI:  It's impeachment.

12          THE COURT:  It's permissible impeachment, and you may

13     go ahead.

14          MR. PIERCE:  Can we go to the phones, please,

15     Your Honor?

16          THE COURT:  Sure.

17       (Bench conference.)

18          MR. PIERCE:  So I mean, he's now going to read words

19     from a piece of paper that is pure hearsay.  I mean, if

20     there's an actual, you know, recording in which it's clear

21     that he said that, that is one thing.  But I mean, this is

22     just what some other human being wrote on a piece of paper.

23          MR. VALENTINI:  If I may respond.  And defense counsel,

24     as with any impeachment, can make that point on redirect if he

25     wishes.  That's how impeachment works.

1          THE COURT:  You'll be able to do redirect of your

2     witness.  I'll allow it.

3          (End of bench conference.)

4     BY MR. VALENTINI:

5     Q.   So let me read to you the third to last sentence in the

6     second to last paragraph of this police report.

7          "Mr. Cusick stated that he intentionally swung his right

8     elbow backwards towards Mrs. Cusick's face and struck her."

9     Did I read that correctly?

10    A.   You read that correctly, but I --

11    Q.   Thank you.  That's the only question for you.

12         Now, when you hit your wife in the face, she also

13    recoiled backwards into the seat from the strike.

14    A.   I couldn't see that.  I was driving and it was very dark

15    out.

16    Q.   Did you tell a police officer who interviewed you after

17    the fact that in fact Ms. Cusick recoiled backwards into the

18    seat from the strike?

19    A.   No.  I wouldn't have given what her reaction was because

20    I didn't see her reaction.

21    Q.   Let me read to you the second to last sentence of the

22    report that has been marked as Exhibit 701.3.

23         THE COURT:  Second to last sentence or do you mean the

24    third to last sentence of that paragraph?  Where are you?

25         MR. VALENTINI:  The second to last sentence.  Oh.

1    Third to last sentence.  I missed a period.  I'm so sorry.

2           THE COURT:  All right.

3           MR. PIERCE:  For the record, Your Honor, I'm just going

4    to object again.  I believe this is hearsay and it's improper

5    impeachment.

6           THE COURT:  Overruled.

7    BY MR. VALENTINI:

8    Q.    "Mrs. Cusick recoiled backwards into the seat from the

9    strike."  Did I read that correctly?

10   A.    According to what it says, yes.

11   Q.    And that strike caused your wife, Ruth, to bleed.

12   Is that right?

13   A.    It did.

14   Q.    Now, you were charged criminally for hitting your wife

15   in December 2018, were you not?

16   A.    I was charged, yes.

17   Q.    And you were charged with battery, domestic violence;

18   is that correct?

19   A.    I was charged with that, yep.

20   Q.    Now, on direct, and I may have misunderstood, I think

21   I heard you say yesterday that all charges were dropped?

22   A.    They dropped the charge of domestic violence and it

23   was -- from what I understand -- like I said, I don't know

24   legal terms very well -- adjudification was withheld and it

25   was dropped down to a third degree misdemeanor from what I

1    was told by my attorney.

2    Q.   But you did plead guilty to an offense as a result of

3    this charge.

4    A.   I guess I did.  I'm unsure.  If that means I pled guilty

5    by taking -- for it dropping to that, then I would say yes.

6    I had a public defender.  It was not a private attorney.  I

7    talked to him maybe twice during the process.

8    Q.   Do you recall signing a plea agreement in connection with

9    the handling of that case?

10   A.   Now that I'm thinking about it, I did sign something, yes.

11   Q.   And that was closer in time than it is today?

12   A.   What's that?

13   Q.   That was closer in time than it is today?

14   A.   Closer in time?

15   Q.   To the event, to the actual disposition of the case than

16   it is today?

17   A.   Yeah.  It would have been in January, I want to say.

18   Maybe February.

19           MR. VALENTINI:  Court's indulgence.

20           THE COURT:  Certainly.

21   BY MR. VALENTINI:

22   Q.   I'm going to ask Ms. Roberts to pull up Exhibit 703.  If

23   you can scroll down to the bottom of the page, to the middle

24   of the next page, a little bit further up.  A little bit

25   further up.

1          I'm going to direct your attention to the handwritten

2      portion.  Does this document help refresh your recollection

3      about the disposition of your case in 2018?

4      A.   It does.  I mean, I don't really remember at this time

5      because like I said it wasn't a fun thing to go through but I

6      see that I did sign this paper on January 24.

7      Q.   So you were convicted of an offense as a result of

8      striking your wife in December 2018.

9          MR. PIERCE:  Objection.  Calls for a legal conclusion.

10          THE COURT:  Overruled.

11     BY MR. VALENTINI:

12     Q.   Do you recall what the offense that -- what offense you

13     pleaded guilty to?

14     A.   I don't know the exact term, but I want to say it had

15     something to do with disorderly conduct.

16     Q.   Disorderly conduct you said?

17     A.   The way my attorney described it is it would be as if you

18     were in a bar fight and you get a disorderly conduct charge.

19     Q.   I just want you to be sure.  You pleaded guilty to a

20     disorderly conduct charge as a result of hitting your wife in

21     December 2018.

22     A.   Yes.

23     Q.   And that was, what, approximately, a little bit over two

24     years before you entered the Capitol?

25     A.   Yes.

1    Q.   Have you pleaded guilty to disorderly conduct in any

2    other instances?

3    A.   No.

4         MR. VALENTINI:  I have no further questions.

5         THE COURT:  Mr. Pierce.

6         MR. PIERCE:  Thank you very much, Your Honor.

7                    REDIRECT EXAMINATION

8    BY MR. PIERCE:

9    Q.   Mr. Cusick, are you trying to hide anything whatsoever

10   from this jury about the incident that happened --

11   A.   No, I'm not.

12   Q.   Do you recall saying these things to this police officer

13   that Mr. Valentini pointed out?

14   A.   I honestly don't remember.  I mean, this is almost five

15   years ago.  And it was like 12:30 in the morning.

16   Q.   Have you ever been arrested for anything else in your

17   life?

18   A.   Never.  Never.  Well, January 6.

19   Q.   Fair point.  Aside from this and January 6, have you ever

20   been charged with anything else?

21   A.   I have not.

22   Q.   Did the events, the incident with respect to your wife,

23   does that have any connection directly or indirectly that you

24   can possibly conceive with your conduct on January 6 in

25   Washington, D.C.?

1    A.    Absolutely not.

2    Q.    Okay.  You testified about having seen some other

3    protests on television with respect to people in the Capitol.

4    Do you recall that testimony?

5    A.    I do.

6    Q.    And I don't know the answer to this question, but did

7    that include the protests in connection with Justice Brett

8    Kavanaugh's confirmation hearings?

9    A.    I think that was one of them.

10   Q.    And if you recall anything, as you sit there on the stand

11   about seeing that, what do you recall seeing?

12          MR. VALENTINI:  Objection.  Relevance.

13          THE COURT:  Well, it came up before, so I'm going to

14   let one or two questions go forward on this.  The objection is

15   overruled.

16          THE WITNESS:  I honestly don't remember what it

17   entailed, honestly.

18          MR. PIERCE:  Okay.  No problem.

19          THE COURT:  I'll let one question go forward.

20   BY MR. PIERCE:

21   Q.    Now, in -- being from Florida, have you ever seen a gas

22   station or retail establishment, any other office building

23   have a broken window before?

24   A.    Yes.

25   Q.    Have you ever experienced that such an establishment or

1    building that may have a broken window --

2              THE COURT:  Just a minute.  This seems like a very

3    leading question that you're asking, Mr. Pierce.  So ask the

4    question without leading the witness.

5              MR. PIERCE:  I'm sorry.

6    BY MR. PIERCE:

7    Q.    Have any of those buildings, were they ever open?

8    A.    Yes.

9    Q.    Now, you testified about having gone through the airport

10   and having gone through essentially security at the airport.

11   A.    Mm-hmm.

12   Q.    As everybody in this courtroom painfully has experienced.

13   A.    Right.

14   Q.    And you testified about going through the Ellipse

15   security.

16   A.    That's correct.

17   Q.    But the point was made on cross essentially that you

18   didn't go through the same kind of security when you went into

19   the Capitol building.

20   A.    That's correct.

21   Q.    Now, when you went through the airport security, did you

22   have any understanding as to what would happen if you did not

23   go through the security process and did not comply with that

24   process?

25   A.    Sorry.  Repeat that again?  I'm sorry.

1    Q.    What would happen to you going through the airport

2    security process if you didn't comply with it, if you

3    didn't --

4    A.    Oh.  Then there would be an officer that would come and

5    arrest you.

6    Q.    And what would happen going through the Ellipse security

7    to go stand a few hundred feet from the former president of

8    the United States and you didn't comply with that process?

9    A.    Secret Service would have arrested.

10   Q.    And what is the difference between those two situations

11   and what you personally firsthand experienced as you were

12   walking into the Capitol building?

13             MR. VALENTINI:  Objection.  Is the question what --

14             THE COURT:  I don't understand the question.  The

15   question's pretty broadly worded.  Let's be more specific.

16   BY MR. PIERCE:

17   Q.    Did you have any understanding as you were walking into

18   the Capitol building that you were going to get arrested by

19   the police you saw as you were walking into the Capitol

20   building?

21   A.    I didn't.  I never thought I was going to get arrested

22   by the police.

23   Q.    Now, with respect to the pepper spray or alleged pepper

24   spray or whatever it was that we've talked about, and that

25   you -- you did say the phrase "pepper spray."

1   A.   I did.

2   Q.   Did you say that the police had used pepper spray?

3   A.   I just said it smelled like pepper spray, Dad.

4   Q.   If it was pepper spray, did you have any idea where it

5   came from?

6   A.   I didn't.  I don't know.

7   Q.   If it was pepper spray, do you have any idea when it

8   would have been deployed?

9   A.   I don't.

10  Q.   Do you happen to be aware one way or another whether

11  there are January 6 defendants who are actually criminally

12  charged and part of those charges or evidence for those

13  charges is that protesters used pepper spray?

14       MR. VALENTINI:  Objection.  Relevance.

15       THE COURT:  I'll let this question be answered if the

16  witness has an answer to it, but that'll be the end of this

17  line of questioning.

18       THE WITNESS:  I'm not aware of that.

19       MR. PIERCE:  Okay.

20  BY MR. PIERCE:

21  Q.   Now, could we actually -- I'm just going to have you

22  watch one short video clip here.  Could we pull up

23  Government's Exhibit 101, please.  And go ahead and play that

24  from the beginning until the two-minute mark, please.

25       THE COURT:  Wait, wait, wait.  Oh, you're playing two

1     minutes of it?

2            MR. PIERCE:  Yes, Your Honor.  The first two minutes.

3            THE COURT:  Go ahead.

4        (Video played.)

5     BY MR. PIERCE:

6     Q.    Pause for a second.  What I'd like you to actually focus

7     on, Mr. Cusick, is the police officers that are along the

8     bottom sort of left corner here of the video.

9            THE COURT:  Not the people going through the windows?

10           MR. PIERCE:  Correct.

11           THE WITNESS:  Right here.  Is that what you're talking

12    about?

13           MR. PIERCE:  Yes.

14    BY MR. PIERCE:

15    Q.    By the way, are these police officers in the area that

16    you saw police officers as you came into the Capitol building?

17    A.    Yes.  And you can see the ones standing back a little

18    further on the right side of the screen.  It was more like a

19    line there.  These two guys standing out here, I guess I

20    didn't see them as much because I was already looking that

21    way, but I do recall seeing police officers there, yes.

22    Q.    I'm generally pointing to the police officers at the

23    bottom of the screen.  I really am not intending to point you

24    to these couple police officers.

25    A.    Okay.

1    Q.   Please just keep an eye on the police officers.

2    A.   Okay.

3    Q.   Okay.  Go ahead.

4         (Video played.)

5         Okay.  And did you observe any confrontation in this

6    video between the protesters who were interacting with the

7    police officers and the police officers?

8    A.   No.  They seem to be doing just what I said, talking to

9    them.  I even saw one gentleman down here, not where you

10   pointed but on the other side, fist bump one of the police and

11   give him a thumbs up, and they fist bumped him back.

12        MR. PIERCE:  Thank you very much, Your Honor.

13        THE COURT:  All right.  Mr. Cusick, you may step down.

14   We'll take our morning break and resume just after 11:30,

15   please.

16        (Recess from 11:19 a.m. to 11:44 a.m.)

17        THE COURT:  Welcome back, members of the jury.  We're

18   ready to proceed.  Mr. Pierce, next witness, please.

19        MR. PIERCE:  Yes, Your Honor.  Next witness the defense

20   will call is Mrs. Carol Lesperance.

21        CAROL LESPERANCE, WITNESS FOR THE DEFENSE, SWORN

22                    DIRECT EXAMINATION

23   BY MR. PIERCE:

24   Q.   Good morning, Mrs. Lesperance.

25   A.   Good morning.

```
 1      Q.   Where are you from?

 2      A.   Florida.

 3      Q.   How long have you lived in Florida?

 4      A.   33 years, 34.

 5      Q.   And how about before that?

 6      A.   Rhode Island.

 7      Q.   And do you know the defendant in this case, the third

 8   gentleman at the table there, Mr. David Lesperance?

 9      A.   I do.

10      Q.   And how do you know him?

11      A.   He's my husband.

12      Q.   And how did you meet Mr. Lesperance?

13      A.   At a family friend's wedding.

14      Q.   And was that in Rhode Island?

15      A.   Yes.

16      Q.   And when was that?

17      A.   1980.

18      Q.   And when did you get married?

19      A.   '82.

20      Q.   And so you've been married for approximately 40 years?

21      A.   Yes.

22      Q.   Have you ever been separated or anything like that?

23      A.   No, we have not.

24      Q.   Have you essentially lived together during that entire

25   time aside from business trips or --
```

```
 1    A.    Yes, we have.

 2    Q.    And do you and Mr. Lesperance have any children?

 3    A.    Yes, we have two, a daughter and a son.

 4    Q.    And I assume they're grown now.

 5    A.    They are.  They're in their 30s.

 6    Q.    And how is your relationship with Mr. Lesperance?

 7    A.    Wonderful.

 8    Q.    Do you feel that you have a sufficient basis to have

 9    formed an opinion about Mr. Lesperance's character for

10    law-abidingness?

11    A.    I do.

12    Q.    And could you please describe to the jury what that

13    opinion is.

14    A.    He's very good.  He's very respectful.  He's honest,

15    and he's a godly man.

16          THE COURT:  For lawfulness.

17          THE WITNESS:  For lawfulness, he's always been

18    respectful and obeys the law.

19    BY MR. PIERCE:

20    Q.    Do you feel that you have a sufficient basis to have

21    formed an opinion about Mr. Lesperance's character for being

22    a peaceable person?

23    A.    Yes, I do.

24    Q.    And please describe for the jury what that opinion is.

25    A.    He's very honest.  He's very good.  He's peaceable.
```

```
 1        He has an air-conditioning company for thirty-something years
 2        in our town.  Everyone recommends him because he is honest and
 3        truthful and will treat you right, do the right thing.
 4             THE COURT:  I'm going to ask the witness to respond to
 5        the question.  And that is a reputation for --
 6             THE WITNESS:  His reputation is he's very --
 7             THE COURT:  -- peacefulness.
 8             THE WITNESS:  Oh, peacefulness.  Yes, he's very
 9        peaceful.
10        BY MR. PIERCE:
11        Q.   And by the way, I didn't ask, what do you do or what have
12        you done for a living in your life just by way of background?
13        A.   I started out in a hospital as a nurse's assistant and
14        then went into cosmetology for hair.
15        Q.   Are you happy that Mr. Lesperance is your husband?
16        A.   Yes, I am.
17        Q.   Based on the opinions you've testified about, is
18        Mr. Lesperance the type of person who you think would follow a
19        mob?
20        A.   No.
21        Q.   Is he a type of person who you think would become part of
22        a riot?
23        A.   Be part of --
24        Q.   Part of a riot.
25        A.   No.  No, sir.
```

1    Q.    Okay.  Do you know either of the other two defendants --

2    A.    I do.

3    Q.    -- in this case?  Let's take -- in sequence here.  Let's

4    take the younger Mr. Cusick, Casey Cusick.  Do you know him?

5    A.    I do.  For 33 years.

6    Q.    You've known him for 33 years?

7    A.    Yes, I have.

8    Q.    And what is the -- sort of how did you become -- come to

9    know him?  In what context have you come to know --

10   A.    Through the church.  We went to their church and knew him

11   as a child all the way through now.

12   Q.    Have you had a consistent number of interactions with him

13   over those years in terms of the frequency of the

14   interactions?

15   A.    Yes.

16   Q.    And do you feel that you have a sufficient basis to have

17   formed an opinion about Casey's character for lawfulness?

18   A.    Yes, I have.

19   Q.    And please tell the jury what that opinion is.

20   A.    Very peaceable.  He will do the right thing all the time.

21   Q.    In terms of -- and we're talking about law-abidingness.

22   A.    Yes.

23   Q.    And do you feel that you have a sufficient basis to have

24   formed an opinion about Casey's character for being a peaceful

25   or a peaceable person?

1    A.    Yes.

2    Q.    And what is that opinion?

3    A.    He's very peaceable.

4    Q.    Based on those opinions and your experience with him,

5    is Casey the kind of person who would join with a mob?

6    A.    No, he is not.

7    Q.    Is Casey the kind of person who would become part of a

8    riot?

9    A.    No, he is not.

10   Q.    All right.  And have you had a chance to get to know in

11   your life the third defendant in this case, Mr. James Cusick?

12   A.    Yes, I have.

13   Q.    How did you come to know him?

14   A.    Pastor of the church.

15   Q.    And how long have you known Mr. James Cusick?

16   A.    33 or 34 years.

17   Q.    And have you had a consistent number of interactions in

18   terms of frequency during that entire time frame with

19   Mr. James Cusick?

20   A.    Yes.  Can I say how?

21   Q.    Sure.

22   A.    Through church every week, several times a week.  Also

23   through functions like dinners with the church, but also went

24   to Israel with him on a tour.

25   Q.    And you feel you have a sufficient basis to have formed

1    an opinion about Mr. James Cusick's character for lawfulness?

2    A.   Yes, I have.

3    Q.   And what is your opinion on that?

4    A.   Very peaceable.  Law-abiding.  Even preaches law-abiding.

5    Q.   Okay.  And I think you touched on peaceableness right

6    there in your answer, so I'll skip that question.

7         Based on your opinion that you just testified about, is

8    Mr. James Cusick the type of person that you think would

9    become part of a mob or follow a mob?

10   A.   Never.

11   Q.   Do you think Mr. James Cusick is the type of person who

12   would become part of a riot?

13   A.   No.

14   Q.   Are you happy that Mr. James Cusick and Casey Cusick are

15   part of your life?

16   A.   Yes.

17             MR. PIERCE:  No further questions, Your Honor.

18             THE COURT:  Ms. Murphy.

19                       CROSS-EXAMINATION

20   BY MS. MURPHY:

21   Q.   Good morning.

22   A.   Good morning.

23   Q.   How are you?

24   A.   Good.

25   Q.   My name is Sonia Murphy.  I'm one of the prosecutors in

1    this case.  I know we haven't met.  We've seen each other over

2    the course of the last week throughout the courthouse.

3    A.    Yes.

4    Q.    You testified that you're married to the defendant, David

5    Lesperance?

6    A.    Yes.

7    Q.    You've been married over 40 years?

8    A.    Yes.

9    Q.    You have two adult children?

10   A.    Yes.

11   Q.    You consider Mr. Lesperance to be the head of your

12   household?

13   A.    Yes.

14   Q.    You trust him to make good decisions for you and for your

15   family?

16   A.    Yes.

17   Q.    And you've trusted him over the last 40 years to make

18   good decisions.

19   A.    Yes.

20   Q.    You weren't with him, though, on January 6 when he

21   entered the Capitol building.  Correct?

22   A.    Correct.

23   Q.    You didn't travel to D.C. with him?

24   A.    No, I did not.

25   Q.    You testified to his character for lawfulness.  You had

1    an opportunity to sit here in the courtroom and see some of

2    the videos, correct?

3    A.    Yes.

4    Q.    And you've heard some of the videos from his phone?

5    A.    Yes.

6    Q.    You heard the comments like, "Look Ma, your troublemaking

7    son is at it again"?

8    A.    I did, and I know in which context it was said --

9    Q.    You heard --

10    A.    -- in the video.

11    Q.    You heard his comment, "This is my house, don't break

12    anything"?

13    A.    Yes.

14    Q.    You had an opportunity to see the video where he entered

15    into the Capitol?

16    A.    Yes, I did.

17    Q.    You had an opportunity to see the video where he walked

18    through the Capitol, entered the center area of the Crypt,

19    etc.?

20    A.    I did.

21    Q.    And the same with respect to Casey Cusick.  You testified

22    that you also knew him to be lawful.  Correct?

23    A.    Yes.

24    Q.    And you had an opportunity to observe the videos of Casey

25    Cusick entering the Capitol building?

1    A.    I did, yes.

2    Q.    Same thing with respect to James Cusick?

3    A.    Yes.

4    Q.    You had an opportunity to -- you've been here through the

5    trial, you've seen the videos with James Cusick inside the

6    Capitol building as well.

7    A.    I did.

8    Q.    And again, you weren't here in D.C. in January of 2021?

9    A.    No.

10   Q.    You weren't at the Capitol with the three defendants when

11   they entered the Capitol building?

12   A.    Right.

13   Q.    You didn't have an opportunity to hear the alarm that

14   they heard when they entered the building.  So you heard it on

15   the video.  Is that right?

16   A.    I heard it on the video.

17   Q.    You heard it on the video.

18   A.    Yes.

19   Q.    You also saw the police officers on the video?

20        MR. PIERCE:  Objection.  Relevance.  Doesn't go to her

21   opinion of their character.

22        MS. MURPHY:  Well, it goes to -- she gave her opinion

23   on lawfulness.

24        THE COURT:  It's certainly relevant.  So that objection

25   is overruled.

1    BY MS. MURPHY:

2    Q.    Ms. Lesperance, you testified again that you've been

3    married to Mr. Lesperance for over 40 years.

4    A.    Yes.

5    Q.    And that you've known Defendant Casey Cusick for 30 or so

6    years?

7    A.    Yes.

8    Q.    Same with respect to James Cusick?  For a long time?

9    A.    Yes.

10    Q.    So you wouldn't want anything bad to happen to the

11    defendants now, would you?

12    A.    No, I would not.

13         MS. MURPHY:  Thank you so much.  I have no further

14    questions, Your Honor.

15         THE COURT:  Mr. Pierce?

16                        REDIRECT EXAMINATION

17    BY MR. PIERCE:

18    Q.    Just very quickly.  You're not pretending to come up on

19    the stand as an unbiased witness, are you?

20    A.    No.

21    Q.    You care very much about what happens in this proceeding.

22    A.    Yes, I do.

23         MR. PIERCE:  Thank you.

24         THE COURT:  Thank you, Mrs. Lesperance.  You may step

25    down.

```
1            (Witness steps down.)

2           Next witness, please.

3               MR. ROOTS:  The defense will call David Lesperance.

4          DAVID LESPERANCE, WITNESS FOR THE DEFENSE, SWORN

5                        DIRECT EXAMINATION

6    BY MR. ROOTS:

7    Q.   Good morning.  David, would you spell your full name for

8    the record?

9    A.   David Lesperance.  D-A-V-I-D, L-E-S-P-E-R-A-N-C-E.

10   Q.   And you are one of the defendants in this trial.

11   Correct?

12   A.   Yes, sir.

13   Q.   Where do you live, Dave?

14   A.   I live in Indian Harbour Beach, Florida, which we've been

15   calling Melbourne.  It's in that area.

16   Q.   And what do you do for a living?

17   A.   I'm an air-conditioning contractor.  Air-conditioning and

18   heating.

19   Q.   And how long have you been in that business?

20   A.   Since 1988.

21   Q.   You are the business owner; you're a contractor?

22   A.   Yes, I am.

23   Q.   Do you do any other kind of work?  Plumbing, electrical,

24   anything like that?

25   A.   No, we're licensed for air-conditioning.  We only do
```

 1    plumbing and electric wherever it relates to air-conditioning.

 2    Q.   Let me just ask, have you ever been to Washington, D.C.,

 3    before?

 4    A.   Yes.  Many, many years ago.

 5    Q.   That was before January 6, 2021?

 6    A.   Yes.  Way before.

 7    Q.   What was the circumstances?

 8    A.   51 years ago I attended May Day here in Washington, D.C.

 9    Q.   And that was during the May Day protest --

10    A.   Yes.  The May Day protests.

11    Q.   And that was the famous protest against the Vietnam War?

12    A.   Yes, it was.

13    Q.   Let me just ask you this sort of -- open this topic.

14    Are you political?  Are you into politics?

15    A.   Yes.  I would say so.

16    Q.   Do you follow politics?

17    A.   Yes, I do.

18    Q.   Have you ever run for political office yourself?

19    A.   No, I haven't.

20    Q.   And I guess we'll assume you're a Republican?  Are you

21    Republican oriented?

22    A.   I haven't always been a Republican.  I was here on May

23    Day so I was a Democrat at the time and probably half of my

24    life.  And then I was an independent for years and became a

25    Republican only recently, actually.

1    Q.   You said you were a Democrat.  Have you voted for

2    Democrats as president?

3    A.   Yes.  The last Democrat I voted for for president was the

4    first term of Barack Obama.  And I wasn't too pleased with his

5    performance so he didn't get my vote the second time.

6    Q.   Was there ever a time when you came to support Donald

7    Trump?

8    A.   Yes.  I thought that Donald Trump had some good ideas,

9    particularly for the rejuvenation of some of the poorer

10   neighborhoods in the country.  He wanted to have school

11   vouchers which would allow them to attend schools outside

12   their district, where they could get an actual education

13   instead of some of the schools that are just so poor in

14   quality.  He had incentive programs for businesses to move

15   into these areas, to provide jobs, because the problems in

16   these areas are mostly economic and educational.

17             THE COURT:  Just a second.

18             THE WITNESS:  Okay.  Sorry.

19             THE COURT:  I don't think you should spend time going

20   through all the political views that Ms. Lesperance has.

21             MR. ROOTS:  Okay.

22   BY MR. ROOTS:

23   Q.   Have you attended Trump rallies other than January 6?

24   A.   Yes.  I attended one of the first Trump rallies when he

25   began to run for president in Melbourne, Florida.

1    Q.   Have you ever met Donald Trump?

2    A.   Not personally, no.

3    Q.   How big of a Trump supporter are you?  Do you possess

4    Trump T-shirts or --

5            MS. MURPHY:  Objection, Your Honor.  Relevance.

6            THE COURT:  I've allowed a little bit.  I'll allow him

7    to answer this one question, but then we need to move on.

8    BY MR. ROOTS:

9    Q.   Do you have Trump memorabilia?

10   A.   Yes.  I have Trump hats.  We had signs in our yard during

11   the election, that kind of thing, sure.

12   Q.   Now, the election.  Let's forget 2016; let's go right

13   into 2020.  Did you follow that election?

14   A.   Closely.

15   Q.   Can you describe what you were following on election

16   night 2020?

17   A.   Election night, I think I finally wound up my coverage of

18   it at 11:30 at night, and at that point they had Donald Trump

19   at 70 percent to win.  I woke up the next morning and they

20   were declaring Biden the president.

21   Q.   And what were your feelings?

22   A.   My feelings were what happened?  I mean, over the

23   following days, discrepancies came out in different areas,

24   that kind of thing, and I started to question the results.

25   Q.   Were you all alone in that, or were there others around

1   you that did so?
2   A.   Oh, there were a lot of people that questioned it, yes.
3           MS. MURPHY:  Objection, Your Honor.  Relevance.
4           THE COURT:  Overruled.  I'll allow limited questions on
5   this subject.
6   BY MR. ROOTS:
7   Q.   Were you the only one questioning the 2020 election?
8   A.   No.  The people that showed up on January 6 questioned
9   the election, and there were probably -- I'm guessing that
10  crowd was over half a million.
11  Q.   All right.  Let's go right to the -- let's cut to the
12  chase.  January 5.  What did you do on January 5, 2021?
13  A.   We attended a rally at a square -- I'm not sure exactly
14  where it was because I'm not too familiar with Washington
15  anymore.  We attended a rally with speeches and that kind of
16  thing and went basically back to our hotel.
17  Q.   And that was the night before January 6?
18  A.   Yes.
19  Q.   And then January 6 you woke up -- where were you?  Were
20  you with these other gentlemen?
21  A.   Yes.  We traveled together.  We got to the monument area
22  at probably nine o'clock in the morning, maybe earlier, worked
23  our way through the crowds to what would be the -- probably
24  north end of the area where the park is.  And I don't know
25  what that park is called but there's a park at the end by the

1    Washington Monument.  We went over to that area.

2    Q.    Would that be the Ellipse or another park?

3    A.    No.  There was another park.

4    Q.    Okay.  Now, obviously, you've been sitting in this trial

5    and you watched the testimony of Casey Cusick just now.  You

6    pretty much -- the three of you were pretty much together

7    throughout the day on January 6.  Correct?

8    A.    Mostly, yes.

9    Q.    And so his story is similar to your story in terms of

10   that?

11   A.    Pretty much exactly.

12   Q.    You were separated from a couple of these guys.  Were you

13   separated ever during the day at all?

14   A.    We were separated in the route going up to the Capitol,

15   yes.

16   Q.    And there was testimony about this backpack issue.  Is

17   there anything more that you could add?

18   A.    No.  The backpack was put in the pile, we went to the

19   speech, we came out, the backpack was gone basically.  So at

20   this time they'd taken the big six-foot pile and spread it out

21   all over the place so it took us about a half an hour to kind

22   of rifle through everything trying to find it.  And then we

23   started slowly walking towards the Capitol.

24   Q.    And I'll just go back to the security screening that has

25   been discussed.  Did you go through Secret Service screening?

1    A.    Yes, we did.

2    Q.    Metal detector?

3    A.    Metal detector, the hand screening, yes, all that.

4    Q.    Anything about that process that you found either overly

5    secure or undersecure?

6         MS. MURPHY:  Objection, Your Honor.  Relevance.

7         THE COURT:  Sustained.

8    BY MR. ROOTS:

9    Q.    Obviously -- well, did you have any weapons or anything

10   that --

11   A.    No.  No, nothing.

12   Q.    What about body armor?

13   A.    No.

14   Q.    Helmet?

15   A.    No.

16   Q.    Combat boots?

17   A.    No.

18   Q.    Okay.  What were the conditions that day?

19   A.    Very cold, windy.  I don't think it was overcast.  I

20   think it was a fairly nice day as far as that goes, but it was

21   windy and cold.

22   Q.    There was earlier testimony about your knees, walking

23   slowly toward the Capitol.  What can you add about that?

24   A.    I had both my knees wrapped, and I had my back wrapped

25   because I have trouble with my right knee, and if I walk too

1    much, that causes problems with the other knee.  So I had a

2    back brace on and two knee braces.

3    Q.   And what -- about how long did it take to walk from the

4    Ellipse area to the Capitol grounds?

5    A.   At least a half an hour.

6    Q.   And did you stop along the way?

7    A.   Yeah.  We stopped a couple times.  There were preachers

8    on the corners and we stopped to listen to several of them.

9    Q.   How were you with the crowd around?  Were you talking to

10    other people?

11    A.   On the way over there?  No.  Not really.  With each

12    other.

13    Q.   Did you meet -- other than these two codefendants, did

14    you know anyone else there?

15    A.   No.

16    Q.   Okay.  So let me just -- we'll ask some of the same

17    questions that were asked to Casey.  Did you have any

18    knowledge about what might happen at the Capitol?

19    A.   No, I had no idea.

20    Q.   Did you have any plans for going to the Capitol that day?

21    A.   No, I did not.

22    Q.   And did you have any plans for going inside the Capitol?

23    A.   No, I did not.

24         I'm sorry.  Can I make a correction?

25    Q.   Absolutely.

1    A.    There was another person there that I knew.

2    Q.    Okay.  Now, let's -- we'll just cut to the chase.  When

3    you got toward the Capitol grounds at the very beginning, the

4    grassy area, did you see any snow fencing?

5    A.    I don't recall seeing any, but from the video, I probably

6    did.  I mean -- I didn't give it much of a thought because

7    it's January and we're in D.C.  So I thought snow fence was

8    not that unusual to see.

9    Q.    But you don't actually recall seeing it that day?

10   A.    No, I don't.  Not until I saw the video.

11   Q.    What about barricades, these bike racks?  Did you

12   remember seeing any of those?

13   A.    No.

14   Q.    Do you remember seeing any signs that said Area Closed?

15   A.    No, sir, I did not.

16   Q.    What about any law enforcement officers there at the

17   Capitol grounds?  Any law enforcement officers that you

18   recall?

19   A.    We didn't -- I didn't see any law enforcement officers

20   until we got up on the west -- what do they call that area --

21   Q.    The west side of the Capitol?

22   A.    Well, the decking area, whatever they call that.

23   Q.    Now, you were filming with your cell phone camera?

24   A.    Yes.

25   Q.    Would you say you filmed everything?

1    A.    No.

2    Q.    Let's play 206, Government 206.

3          (Video played.)

4          And this is video that you took from your camera?

5    A.    Yes, sir.

6          (Video played.)

7    Q.    And we can stop along here.  Let me just ask a couple

8    questions.  First of all, that crowd that you're seeing there,

9    what would you describe them -- what was the atmosphere there?

10   A.    Friendly and peaceable from the people that I interacted

11   with.

12   Q.    In terms of their movements, what did they seem to be

13   doing mostly?

14   A.    Milling around would be the best description.

15   Q.    There were some -- throughout this trial they've played

16   some statements and comments that you made on your video.  You

17   recall some of those?

18   A.    Yes, I do.

19   Q.    At some point I think you might have said "look at your

20   troublemaking son now."  What did you mean by that?

21   A.    I was filming the guys climbing up the wall, and I was

22   kind of commenting on the fact that they were climbing up the

23   wall when there was a set of stairs not 30 feet to the left.

24   Q.    You weren't talking about yourself being the

25   troublemaker.

1    A.    No, sir, I was talking about them.

2    Q.    Okay.  Now, there's another time when you said something

3    to the effect of is the inauguration -- the inauguration might

4    be in the basement?

5    A.    Yeah.  That was because Joe Biden's campaign was largely

6    launched from his basement.  So I thought that would be an

7    appropriate place for the inauguration.

8    Q.    And that was -- you were joking.

9    A.    I was joking, of course.

10   Q.    Okay.  Let's play some more of this.

11         (Video played.)

12         Did it seem like this was a restricted area to you?

13   A.    Not at all.  I mean, just look at the number of people

14   that are there.  There's nothing about that that says

15   restricted.  There's no barriers, there's no signs.  Even the

16   actions of the police officers we met later on was cordial.

17   Q.    Real quick question:  How is your hearing?

18   A.    Not very good.

19   Q.    Can you expand on that?

20   A.    Well, I have hearing aids in now on full, and I've had to

21   have you repeat a couple of questions already.

22   Q.    And why is your hearing so bad?

23   A.    I'm just getting old, I guess.

24   Q.    What about your -- has your business, anything you've

25   done in your life contributed to that?

1    A.   Yeah, I work.  In the weeks leading up to coming here I

2    was working 40, 50 hours a week.

3    Q.   Let's go ahead and play Government 207, which is the next

4    segment of this.

5         (Video played.)

6         Now, let me just ask you, did you see any law enforcement

7    there in that scene?

8    A.   None.

9    Q.   What about announcements?  Any kind of announcements?

10   A.   No, no announcements at all.

11   Q.   Did it appear that you were in a restricted place?

12   A.   No, it did not.

13   Q.   Did anyone there seem like they were in a restricted

14   area?

15   A.   No.

16   Q.   Okay.  Let's go to the first video that's -- let's see...

17        MR. ROOTS:  Court's indulgence.

18        THE COURT:  Certainly.

19   BY MR. ROOTS:

20   Q.   Let's go to the first one where you're inside, Government

21   212.

22   A.   Okay.

23        (Video played.)

24   Q.   So what were your thoughts inside the building there?

25   A.   Well, I had never been to the Capitol.  It's an awesome

1    looking building.  I had never been inside the Capitol.  So

2    that would be one reason for going in in the first place.  I

3    also knew it was a historic day and I wanted to record it to

4    have it as a record of a historic event.

5        Inside was just as peaceful as it was outside as far as I

6    saw.  I didn't see one confrontation of police and anybody in

7    there the whole time I was there.

8    Q.  If you want to just make a comment about what you're

9    looking at at the still on the screen right here.  You see

10   that officer?

11   A.  Yes.

12   Q.  What -- you know, what was going on there?

13        MS. MURPHY:  Objection, Your Honor.  Leading.

14        MR. ROOTS:  Just what was going on there.

15        THE COURT:  What was going on there?

16        MS. MURPHY:  It was the question before that.

17        THE COURT:  The question before that, the objection is

18   overruled.  No objection to this question.

19   BY MR. ROOTS:

20   Q.  We won't even say this is an officer.  We'll just say

21   what's going on in that scene?

22   A.  We're walking around the dome area there.  I walked

23   completely around it looking at all the statues.  There was

24   also a Plexiglas display of some kind of -- buildings, I

25   guess, future plans, I'm not sure what it was.  I stood and

1   looked at that for a few minutes.

2        Stacie -- I mean Casey and Jim came over and we were

3   deciding to leave.  And we lost track of Pastor Jim for a

4   while.  We thought he had gone into the bathroom so Casey and

5   I posted up outside there waiting, and he went to look for

6   him.

7   Q.   Do you see that man who looks like -- well, he's dressed

8   maybe in a uniform?

9   A.   Yes.

10  Q.   Do you recall him saying anything to you about restricted

11  area or anything?

12  A.   No, sir, I do not.

13  Q.   Any officer inside there, do you recall them telling

14  you --

15  A.   None.  And we spoke to several of them.

16  Q.   And they didn't say "get out"?

17  A.   No.

18  Q.   What did they say, in terms of it being -- well, along

19  the lines of this question, whether it was restricted to be

20  there?

21  A.   They said nothing about it being restricted.

22  Q.   Let's talk about your entry, when you entered.  How did

23  you get inside?

24  A.   Through an open door.  We walked in and there were

25  several police officers off to the left and a hallway behind

1    them.  So we assumed that meant they didn't want us to go that

2    way, so we didn't.  We went to the right.  We weren't there to

3    confront anybody.

4    Q.   Any signs that you remember?

5    A.   No signage.

6    Q.   Some discussion has occurred about noise inside the

7    Capitol.  What do you remember about that?

8    A.   I didn't remember anything about it until I saw the

9    video, and then I recall thinking as I walked in there that

10   there was a smoke alarm going on somewhere.  And then with

11   them blocking that hallway, I assumed it was probably down

12   that hallway.

13   Q.   Did you know -- did you have any plan inside the building

14   in terms of where to go or what to see?

15   A.   No, sir.  I was just looking at it.

16   Q.   And you said you'd never been in the building before?

17   A.   Never been that close to the Capitol in my life.

18   Q.   Were you parading or marching to be seen by anyone?

19   A.   No, sir.

20   Q.   What about any pushing or shoving?

21   A.   I saw none.  I saw nobody push anybody the entire time I

22   was in there.

23   Q.   Did you -- were you -- how would you describe your

24   movements?  Walking?

25   A.   Yeah.  Slowly.  Meandering would be more like it.

1    Q.   Did you push anyone yourself?

2    A.   No, sir.

3    Q.   What about kneeing someone or elbowing someone?

4    A.   No, sir.

5    Q.   Did you jostle or fall against anyone?

6    A.   No, sir.

7    Q.   Did you jump up and down at all anywhere?

8    A.   No.

9    Q.   In terms of -- would you describe yourself as a protester

10   inside the Capitol?

11   A.   No.  Not at that point, no.

12   Q.   Did you hold any kind of a sign or anything?

13   A.   No, I did not.

14   Q.   What about a flag?

15   A.   No.

16   Q.   Any kind of a banner or anything?

17   A.   Nothing.

18   Q.   You heard some of the chanting by people.  Do you recall

19   that?

20   A.   Yes, I do.

21   Q.   What did you --

22   A.   They were mostly chanting "Whose house?  Our house" or

23   "USA."

24   Q.   And did you respond in any way to that?

25   A.   At one point when we were walking in, they were going

1    "Whose house?  Our house."  And I said, "Our house, so use a

2    coaster."

3    Q.   And that was sort of a -- what was that?

4    A.   That was don't damage this building.  This building

5    belongs to the people of this country.  Do not deface it.

6    Q.   Now, there was discussion about the bathrooms there.  Do

7    you recall visiting a bathroom?

8    A.   Yes.  I didn't personally, but -- there was a huge line.

9    It spilled out into the corridor, several feet down the

10   corridor.

11   Q.   And I think Casey said that he had lost -- or maybe you

12   had lost -- you got separated at some point?

13   A.   We got separated when we were in that Rotunda area for a

14   little while.  We lost track of Pastor Jim.  He evidently

15   headed outside, but we didn't know that at the time.  So as we

16   were going out, we stopped to search the bathroom line to see

17   if that's where he was.

18   Q.   Did you ever see any member of Congress?

19   A.   No.

20   Q.   Did you have any intention of seeing any member of

21   Congress?

22   A.   No, I did not.

23   Q.   What was your idea about Congress in there?  What was

24   your awareness of what was going on, if anything, in there?

25   A.   Well, at the time the building had been cleared.  There

1    was nothing going on.  Congress had recessed.  I'm not sure

2    how we knew that, but we knew that.  I think it was pretty

3    much from -- little comments go through the crowd as to what's

4    going on and somehow we knew that they were in recess.

5    Q.   Now, you know that today at this time.  Did you know it

6    at that time?

7    A.   Yes, we did.  I don't recall how, but we did.

8    Q.   In terms of organization inside there, did it look like

9    things were organized?

10   A.   No.

11   Q.   Now, at some point, obviously, you left the building.

12   A.   Yes.

13   Q.   Describe that.  Did you leave voluntarily?

14   A.   Yes.  We just walked out of the building.

15   Q.   Did you walk out a different place or the same place?

16   A.   The same door we went in, we left through.

17   Q.   Was there discussion of leaving?  Why did you leave the

18   building?

19   A.   There was just nothing going on inside and we'd seen the

20   building, time to go.

21   Q.   Now, there was -- did you see any broken windows?

22   A.   Yes.

23   Q.   Did you see anyone break a window?

24   A.   No, I did not.

25   Q.   Did you see any damage at all?  Did you see anyone

1    damaging anything?

2    A.    I saw, as I walked past an officer, there was a young

3    man, he was getting ready to pull a poster off of a wall in

4    this office, and I stuck my head in and I said we don't do

5    that here, and he let go of it and walked out.

6    Q.    And that was inside or outside?

7    A.    That was inside.  That was shortly after we walked in.

8    We walked past a row.  There was office doors I believe on the

9    left-hand side, and as we walked by one I looked in and they

10    were going like that, grabbing -- it was like a health poster,

11    you know, like they do in government buildings, first aid

12    poster, something like that.  But he had his hands on it, and

13    I said that's not what we're about.  And he let go and walked

14    out of the office.

15    Q.    Now, so you walked out voluntarily.  Did anyone -- any

16    discussion about needing to leave the building?

17    A.    No.

18    Q.    About how long, to your knowledge, were you inside the

19    Capitol?

20    A.    It seemed like a long, long time, but the time stamp says

21    it was, what, 15 minutes, 14 minutes, more or less?

22    Q.    Now, you had booked a trip to Washington, D.C., for how

23    many total days?

24    A.    We were supposed to arrive on the 5th, and we left on the

25    8th, I believe.

1    Q.   Okay.  So after -- on January 6, after you'd been inside

2    the Capitol and then you had left the building, what happened

3    after that?

4    A.   We stood outside on that west patio area for, I don't

5    know, probably half an hour or so, and now the riot police

6    were starting to line up over there.  And about the same time

7    we got the text, the message from Trump that said please leave

8    the Capitol area.  So between that and him, we just decided

9    it's time to go, and started walking out.

10   Q.   Were you following the crowd or with the crowd or all by

11   yourself?

12   A.   There was a pretty good crowd walking with us.

13   Q.   And so when you left that part of the west patio area,

14   what did you do then?  Where did you go after that?

15   A.   Well, we headed -- we went to the north -- I believe the

16   north end and down -- we were headed for the subway or the

17   Metro to go back to the hotel.

18   Q.   Are you familiar with the subway system in D.C.?

19   A.   No, not at all.

20   Q.   So you were relying on information --

21   A.   Yes.  They knew where the subway was, so that's where we

22   were headed.  But when we got there, that station was closed,

23   so we had to walk a pretty good distance to the next one.

24   Q.   And where ultimately that evening, where did you end up?

25   A.   Back at the hotel.

1    Q.    Did you find out anything?

2    A.    Yeah.  When we turned on the news and they were saying

3    this is worse than Pearl Harbor and worse than 9/11, I was

4    going -- I was thinking, where was I through all of this?

5    Because I saw nothing of that kind at all.  I was completely

6    unaware any of that had occurred.

7    Q.    And you were -- what about this curfew?  Were you aware

8    of a curfew declaration?

9    A.    They were discussing it in the crowd.  I didn't know

10   whether it was true or just people talking, but they said

11   something about a curfew at six o'clock or -- but I don't know

12   that there actually was one or...

13   Q.    And you don't know -- where were you at six o'clock?

14   A.    Probably back at the hotel by then.

15   Q.    Okay.  So let's talk about the next day.  That would be

16   January 7.

17   A.    Yes.

18   Q.    You were -- what did you do after waking up --

19   A.    Well, we had a rent-a-car, so we decided we would go on a

20   tour of D.C.  Particularly, we wanted to go to the Vietnam

21   Memorial and the World War II Memorial.  But we went past the

22   Supreme Court, we went past the Capitol building, we went past

23   all the monuments, basically all around the city.  And we

24   ended up at the Vietnam Memorial.  We went there, we went to

25   the World War II Memorial.

1    Q.   Did you see the video that maybe even you took of the

2    tall fence?

3    A.   Yes, sir.

4    Q.   What do you recall about that?

5    A.   We were amazed that they could erect a fence all the way

6    around there that tall and that quickly, and kind of wondering

7    why they hadn't done it the day before.

8         MR. ROOTS:   I'm getting near the end of my direct.  I

9    know it is lunchtime.

10        THE COURT:   If you think you're going to finish in less

11   than five minutes, go with it.

12   BY MR. ROOTS:

13   Q.   So, go ahead and if you want to just tell the jury what

14   did you do after the 7th -- or what other thoughts do you have

15   about this experience?

16   A.   We never intended to be a problem.  I came here to

17   petition my government to investigate an election that I

18   didn't feel right about.  That was it.  No more and no less.

19   As far as going into the building, in hindsight it was

20   probably a pretty bad idea; I'm here.  But at the time it just

21   seemed kind of like an open house.  I mean, it was like -- I

22   realize that with the broken window that something had

23   happened earlier, but it seemed like they had just decided to

24   let people just tour the building.

25        And we saw people go in, we saw people come out.  The

1    officers were friendly and cordial.  My feeling was that it

2    was a good day until we got to the news that night.

3           MR. ROOTS:  Okay.  Well, I have no further questions.

4    Thank you so much.

5           THE WITNESS:  Thank you.

6           THE COURT:  All right.  We will take our lunch break

7    now.

8      Ladies and gentlemen, we're actually going to give you a

9    little bit longer lunch break today because we have some work

10    to do during part of the lunch break.  So let's be back at --

11    let's be ready at 1:45.  It's not much longer a lunch break.

12        (Jury out at 12:33 p.m.)

13           THE COURT:  Mr. Lesperance, you may step down.

14        (Witness steps down.)

15           THE COURT:  Counsel, how about 1:15 to start a jury

16    instructions conference.  See you then.

17        (Recess from 12:34 p.m. to 1:22 p.m.)

18           THE COURT:  All right.  Thank you for giving up part of

19    your lunch hour so we can make some progress on jury

20    instructions.  Here's how I would like to make that progress.

21    I'd like to start with the objections that the defense very

22    recently filed on the docket to the jury instructions.  I

23    believe there are six of those, and I'm just going to deal

24    with those right up front.

25       There's a renewal of an objection to instruction 2.107

1    dealing with burden of proof, dealing with the question of the

2    use of the word "duty."  I think without any real support, the

3    defense is asserting that a proper instruction would be that

4    the jury may find the defendant guilty.  I don't think that is

5    correct.  The red book instruction is much more definitive and

6    speaks in terms of the jury's duty to find one guilty of an

7    offense if the government has proven beyond a reasonable doubt

8    every element of the offense.  So I will not adopt that

9    proposal and I will reject that objection.

10       The second is an objection to an instruction on preparation

11   of witnesses.  That's on page 23, I believe, of the

12   instructions.  I think the concern is that this may be giving

13   a false impression by the focus of the instruction.

14       I don't really agree with that.  The instruction is very

15   simple and straightforward.  However, if the government is of

16   a similar view, I'm not opposed at all to modifying the

17   instruction as the defense asks, because I don't think that

18   it's really all that important.  But my inclination is to

19   leave it as is, but if the government is of the same view as

20   the defense, then I would certainly be inclined to cut it.

21       MR. VALENTINI:  No, Your Honor.  We would prefer to

22   leave it as is especially because we don't yet know what could

23   be argued in closing.

24       THE COURT:  All right.  So we'll leave it, because it

25   does not seem to me that the instruction is misleading or has

1    the potential for a false impression.

2        Next the argument from the defense is -- and this is not

3    something that was initially proposed -- is that I should add

4    a definition for "remaining," and they give a definition.  I

5    don't think the definition that is provided is actually what

6    the word "remaining" means.  It's chosen from a portion of a

7    dictionary definition, not the bulk of a dictionary

8    definition.  And "remaining" is not really a complex legal

9    term, so my inclination there is to allow the jury to simply

10   apply a common definition of the word without any instruction.

11   But I will hear from the government if it has a view on that.

12       MR. VALENTINI:  We agree, Your Honor.  That's plain

13   English, Your Honor.  I think there have been many January 6

14   cases.  I have not heard of a case or any of your colleagues

15   who have adopted such an instruction.  It seems completely

16   unnecessary.

17       THE COURT:  And that's my view and that's what we will

18   do.  Next is an objection that "restricted" shouldn't be

19   defined as "restricted" but instead it should say otherwise

20   marked off or designated.  I'm not sure I fully understand

21   this, but the instructions really don't define the specific

22   word "restricted"; they define the statutory term "restricted

23   building or grounds."  And the instructions that I've adopted

24   and provided to you actually adopt the defendant's proposed

25   definition of that statutory term pretty much exactly.  So to

some extent, the defense is objecting to a proposed definition that the defendants in this and other cases have agreed to.

I'm afraid that I would have to reject this proposal because the narrower definition doesn't really have any support under the law, and it could exclude some types of restrictions while including others.  And I'm not going to adopt that position either, so I'll reject that objection.

Next there is a request for an instruction regarding the requirement of individualized guilt as opposed to collective guilt.  Again, this was not proposed earlier by the defense, although you were supposed to be proposing instructions.  I don't know where this view of the law comes from.  The courts dealing with the January 6 cases, the judges dealing with the January 6 cases have been pretty clear that participation in a mob can be an important and indeed therefore relevant consideration in these cases.

And I do think that some of what the concern is is actually addressed in another instruction, the instruction on considering only offenses charged.  The last part of that instruction says, "The question of possible guilt of others should not enter your thinking as you decide whether these defendants have been proven guilty of the offenses charged."

But in any event, I'll open this one up to any position from the government and any response from the defense on this request for an instruction on the requirement of

1    individualized as opposed to collective guilt.

2         MR. VALENTINI:  Yes, Your Honor.  The instruction

3    proposed by the defense is incorrect.  The circumstances that

4    one encounters when the circumstances are created by others

5    are clearly relevant to the actor's state of mind or can be

6    relevant to the actor's state of mind.  It can determine also

7    the obvious and natural consequences of what the actor does

8    and what he accomplishes.  And that is precisely the case when

9    someone, for instance, screams fire in a movie theater or

10   joins a riot in the Capitol building.  Thank you.

11        THE COURT:  All right.  Anything from the defense on

12   this?

13        MR. ROOTS:  Yes.  So this occurs to me that the

14   government is trying to argue that being present is committing

15   four crimes.  So it's entering and remaining, you know, in a

16   restricted area.  But they're also saying that mere entering

17   and remaining in a restricted area also is disorderly conduct

18   and picketing and parading.  This cannot be the law.

19        THE COURT:  No, there are elements of each of the

20   offenses.  And they will have to establish beyond a reasonable

21   doubt each of those elements in order for the jury to convict

22   on any one of the offenses.  So I don't think your

23   characterization -- maybe it's a characterization of what the

24   government would hope for, but it's not a characterization of

25   what the government can expect.

1          MR. ROOTS:  I think this actually is the crux of this

2    trial, this case, where these gentlemen -- I don't think

3    there's any evidence of disorderly conduct in the classic

4    sense.  We all know what disorderly conduct might mean, might

5    be yelling, shouting, jumping.  There's no evidence of that.

6    So this case is probably -- this could go to the U.S. Supreme

7    Court if these guys are convicted of disorderly conduct based

8    on walking or standing.

9          THE COURT:  All right.  Well, thank you for that,

10    Mr. Roots.  I appreciate that.  We have a jury that will

11    decide this first, and then of course I will deal with any

12    lingering Rule 29 motion as well.

13          But with respect to a jury instruction, the question is a

14    little bit narrower than your observation that this case will

15    go to the Supreme Court, which is the kind of observation that

16    lawyers like to make to judges to extract caution from the

17    judge.  I will ignore what the purpose of that may have been

18    but focus back on the request for the instruction, and the

19    request for this instruction is rejected.

20          The last point is -- you're asking for again not something

21    you've initially proposed, but basically a First Amendment

22    instruction on Count 4.  I've dealt with the First Amendment

23    arguments preliminarily in the course of the proceedings in

24    this case, and the instruction that you propose is focusing

25    the jury on prayer walking and speech making.  Those are not

things of relevance to this case, and I don't want to get the
jury off on that.  And I don't think it's necessary to have
the First Amendment instruction that you ask for, and I think
that that's been dealt with and therefore would be
inappropriate in this case following the rulings of the Court
in earlier proceedings.

So, with that, let me turn to one other three-part
observation.  With respect to the instructions that you have,
I added two things that are in here, but I just want to flag
them.  With respect to the definition of "restricted area," I
added the sentence that "a restricted area does not need to be
established by the Secret Service specifically to qualify as a
restricted building or grounds."  And that's added because
that is the law in this district.

I have decided that in numerous cases, and other judges
have decided that as well.  In *United States v. McHugh*, I
analyzed that issue pretty carefully and concluded that
because the text of 1752 does not speak to who must do the
restricting, an area does not need to be established by the
U.S. Secret Service itself in order to qualify as a restricted
building or grounds under that statutory provision.  And
that's at 583 F.Supp 3d 1, jump cite 30.

I also noted there in that case that in addition to not
having a textual basis, the arguments that it has to be the
Secret Service that does the restricting would ignore the

1    realities of Secret Service protection, as the Secret Service

2    invariably relies on other law enforcement agencies for

3    support.  One example would be the Park Police, who share

4    responsibilities for park lands around the White House, state

5    and local police when there's travel of protectees outside of

6    the District, and the Capitol Police when the vice president

7    or the president visits the Capitol as part of their duties.

8    And the vice president specifically as president of the

9    Senate.

10        And as I said, there are numerous cases, both from me -- in

11    addition to the *McHugh* case, there's the *Neely* case, there's

12    the *Bozell* case -- and several cases from other judges:

13    *United States v. Griffin* at 549 F.Supp 3d 49, *United States v.*

14    *Nordean* at 579 F.Supp 3d 28, and *United States v. Mostofsky*,

15    at 579 F.Supp 3d 9.

16        So the next point, I also added on the instruction on page

17    37 that there will not be any transcripts, so the jury is not

18    wondering and looking for transcripts of the testimony.

19        Then lastly, I've made a change to Count 3.  It's only a

20    change in the introductory language on page 28, to include the

21    word "disruptive."  The way this had been framed, Count 2 had

22    disorderly and disruptive and Count 3 only had disorderly.  I

23    went back -- indeed, I asked Mr. Van Leer to go back and look

24    at the statute, and the statute does include both disorderly

25    and disruptive.  I didn't want the jury to be confused between

1   the two, so I've changed the -- it hasn't changed the

2   substance of the instruction, but the introductory language

3   says both disorderly and disruptive.  And that change has been

4   made in one or two other places where there's a reference to

5   Count 3.

6        So, with that, what I now want to do is just go through by

7   blocks a couple of the sections.  We might not get through

8   everything.  But wanting to feel like I've accomplished a lot,

9   why don't I ask you whether, bearing in mind those rulings

10  I've just given you, if there are any objections or suggested

11  changes to the instructions through page 23.

12       MR. VALENTINI:  Your Honor, there's one.

13  Unfortunately, in this case, on page 8, which is the

14  instruction that has to do with evidence in the case and

15  stipulations.

16       THE COURT:  We don't have much.

17       MR. VALENTINI:  We were not lucky enough to reach any

18  stipulations, so I think the references to stipulations might

19  be confusing to the jury.  They might not know what a

20  stipulation is.

21       THE COURT:  So would you suggest deleting this entire

22  instruction, the purpose of which is to address stipulations?

23  Or would you suggest some modification of it?

24       MR. VALENTINI:  My inclination would be to edit out the

25  reference to stipulation in the heading, and then to make

1    some -- omit the second paragraph, which is entirely about

2    stipulation, and then I think there would be some line editing

3    to do --

4        THE COURT:  I think the only other line edit would be

5    at the end of the first paragraph, the "and any facts or

6    testimony stipulated to by the parties."

7        MR. VALENTINI:  Exactly.  And maybe add just for

8    grammar purposes "and" before "the exhibits."

9        THE COURT:  I think the exhibits are in the previous

10    clause, "exhibits which were admitted into evidence."

11        MR. VALENTINI:  Right.  We just need the connector

12    before that.  Yes.

13        THE COURT:  So any concern with that suggestion from

14    the defense, since there are no stipulations?

15        MR. ROOTS:  We don't object to that change.

16        THE COURT:  So we'll make that change.

17     Then anything else through page 23 other than what has

18    already been discussed?

19        MR. VALENTINI:  My second point, this is more of a

20    question of omission.  I don't know if this is the segment

21    where the Court might consider adding an instruction.  The red

22    book has some standard instructions when character evidence is

23    presented.  The current form, they're not in the instructions.

24    We're not necessarily requesting that instruction.  I just

25    want to make sure they've been considered by the Court if the

1    Court is inclined to use them.

2        THE COURT:  I've thought about that.  And the parties

3    haven't suggested anything.  I was going to raise with you,

4    and I forgot to initially, whether we need any instruction on

5    character evidence.  If the government isn't suggesting any,

6    then I'll turn to the defense and ask the defense if you're

7    suggesting a standard red book type instruction with respect

8    to character evidence, or you, like the government, are

9    prepared to leave that alone and not include it in the

10   instructions.

11       MR. ROOTS:  We haven't thought about it.  I don't think

12   it's necessary.

13       THE COURT:  Let's leave it as we don't think it's

14   necessary at the moment.  We may not finish here with all the

15   instructions, so if we have a continuation of this conference

16   I'll allow you to again raise that if anyone wants to raise

17   it.

18     So with that, covering through page 23, let's skip the

19   substantive instructions because they may take a little more

20   time, and let's just go to the end, the instructions that

21   begin on page 33, and ask whether there are any modifications,

22   additions, deletions that you want to make with respect to the

23   instructions that run from page 33 through the end of the

24   instructions on page 46.

25       MR. VALENTINI:  Not from the government, Your Honor.

1          MR. ROOTS:  From the defense, there's this -- on page

2     43, instruction 2.510.  Now, this is something that we

3     actually got removed by Judge Friedrich in another trial.  And

4     the reason is is this instruction just doesn't seem like it's

5     necessary, and I'm not even sure it really is the law.  It's a

6     good idea.  Basically it says jurors, upon entering the

7     deliberation room, you know, maybe they shouldn't voice a

8     strong opinion at the beginning and maybe they should wait --

9     I mean, no one I think would say this is not a nice way to

10    think about jury deliberations, but I don't believe that it's

11    the law.  I don't believe there's a case that's ever held this

12    and it seems unnecessary.

13         THE COURT:  I think your point is not invalid.  I'm not

14    sure there are cases that so direct.  I think most standard

15    model jury instructions do include this or something very

16    close to it.  So when you say it's not the law, to the extent

17    that those constitute a model of the law, I do think this is

18    pretty typical.  On the other hand, if both sides think it's

19    unnecessary, then I'm not opposed to taking it out.

20         MR. VALENTINI:  Your Honor, I've never been in a trial

21    in which this instruction or something like this has not been

22    given.  Not that I have a ton of experience.

23         THE COURT:  How many trials have you done,

24    Mr. Valentini?

25         MR. VALENTINI:  We'll do that off the record.  Mostly

1    an appellate lawyer.  But it seems that some guidance to the

2    jury would be helpful.  And for that reason, unless there's

3    some principle of law that stands against what is stated in

4    this instruction, we would be inclined to prefer to keep it.

5        THE COURT:  I guess the theory is if it ain't broke,

6    don't fix it.  And this is pretty typically used, and so we'll

7    just continue to use it.  We'll go along our merry way and

8    include this instruction, as I have in not only other

9    January 6 cases but pretty regularly in all jury trials.

10       So I appreciate the observation, and I don't disagree with

11    it, but I do think that on balance, slightly, this is useful

12    to include for the jury.

13       All right.  Anything else with respect to the instructions

14    from page 33 through 46?

15        MR. VALENTINI:  Again, not from the government,

16    Your Honor.

17        THE COURT:  Anything else from the defense, Mr. Roots

18    and Mr. Pierce?

19        MR. ROOTS:  Nothing I can think of.

20        THE COURT:  All right.  Then that brings us to the

21    instructions from pages 25 through 32.  And we have only three

22    or four minutes, so let's just do it page by page.  I assume

23    there's nothing on page 25.  So that would bring us to the

24    first count.  Is there anything that either side wishes to

25    raise with respect to the instructions on page 26 regarding

1    Count 1?

2            MR. VALENTINI:  No, Your Honor.

3            MR. ROOTS:  We'll just say -- we'll reserve our prior

4    arguments, but with what we have, we'll --

5            THE COURT:  Those are preserved.

6            MR. ROOTS:  Yeah.  Nothing further.

7            THE COURT:  All right.  Nothing further.

8        Page 27 would be Count 2.  Anything with regard to Count 2

9    on page 27?  From the government?

10           MR. VALENTINI:  No, Your Honor.

11           MR. ROOTS:  Same position.

12           THE COURT:  All right.  Your previous objections and

13   suggestions are preserved for the record.

14       Count 3.  And here at the top is where I modified it

15   slightly to say disorderly and disruptive.  It doesn't change

16   either the elements or the definitions.  Anything with respect

17   to Count 3?

18           MR. VALENTINI:  Not from the government, Your Honor.

19           MR. ROOTS:  Nothing further than what we've already

20   argued previously.

21           THE COURT:  All right.  And we might as well do one

22   more before we bring the jury in, and that would be Count 4 on

23   page 29.  Anything there?

24           MR. VALENTINI:  No objection from the government again,

25   Your Honor.

1          MR. ROOTS:  And we'll say no further objection.

2          THE COURT:  All right.  And anything previously is

3    preserved.  So that just leaves the last three pages, 30, 31,

4    32.  So we might as well cover them rather than leave them

5    hanging.  So is there anything with respect to the

6    instructions on those three pages?

7          MR. VALENTINI:  Not from the government, Your Honor.

8          MR. ROOTS:  Nothing.  Actually, now that I look at page

9    30, it does indicate that the fact that another person also

10   may be guilty is no defense to a criminal charge, the question

11   of the possible guilt of others should not enter your

12   thinking.  So I actually think that sort of is that

13   individualized requirement for guilt.

14         THE COURT:  I think that's what I said earlier to some

15   extent is that it's covered in part by this instruction.

16         MR. ROOTS:  Okay.

17         THE COURT:  All right.  Anything else on pages 30, 31,

18   and 32?

19         MR. VALENTINI:  No, Your Honor.

20         MR. ROOTS:  Nothing further.

21         THE COURT:  All right.  That's about the most efficient

22   jury instruction conference I've ever had, and I commend all

23   of you.  The last thing would be the verdict forms, to make

24   sure no one has any question on the verdict forms.

25          The one change made to the verdict forms is with respect to

1    Count 3 to add in the disorderly and disruptive conduct.

2        Anything on the verdict forms?

3        MR. VALENTINI:  No, Your Honor.  That was going to be

4    our only question.

5        MR. PIERCE:  One housekeeping question, Your Honor.

6    Apparently the defendants didn't realize they were going to

7    have to come in here at 1:15.  That may be my fault.  Somebody

8    has to go to the bathroom.

9        THE COURT:  That's okay.  We'll take a five-minute

10   break.  Why don't we do that and we'll get the jury ready and

11   we'll be ready to resume.  The next witness will be who,

12   Mr. Pierce?

13       MR. PIERCE:  The next witnesses will be --

14       THE COURT:  Oh, we're still in the middle of

15   Mr. Lesperance.  I'm sorry.  We're on cross of Mr. Lesperance.

16       MR. PIERCE:  Just so everybody knows, the next

17   witnesses will be Katie Cusick, Stacie Peterson, and then

18   James Cusick and then David Sumrall.

19       THE COURT:  Okay.  Thank you.

20      (Recess from 1:47 p.m. to 1:57 p.m.)

21       THE COURT:  All right.  The jury's coming in.

22      (Jury in at 1:57 p.m.)

23       THE COURT:  Welcome back, ladies and gentlemen, and

24   thank you for your patience.  We're ready to resume.

25      Mr. Lesperance, if you would take the stand again, please.

```
 1              (Witness resumes the stand.)

 2                  THE COURT:  Good afternoon, Mr. Lesperance.  I remind

 3         you you're still under oath.  For cross-examination,

 4         Ms. Murphy.

 5                            CROSS-EXAMINATION

 6         BY MS. MURPHY:

 7         Q.   Good afternoon, Mr. Lesperance.

 8         A.   Good afternoon.

 9         Q.   My name is Sonia Murphy.  I'm a prosecutor in this case.

10         I know we've seen each other throughout the course of the

11         trial.

12         A.   Yes, ma'am.

13         Q.   You testified earlier that you own your own business?

14         A.   Yes, ma'am, I do.

15         Q.   It's an air-conditioning business?

16         A.   Air-conditioning and heating, yes.

17         Q.   And you are the owner.  You're an entrepreneur?

18         A.   Yes.

19         Q.   You are your own boss.

20         A.   Yes.

21         Q.   You make the decisions.

22         A.   Yes.

23         Q.   So you're capable of making decisions.

24         A.   Yes, ma'am.

25         Q.   You testified that you've been to D.C. before?
```

1    A.   Yes, ma'am.

2    Q.   You said you came to D.C. for the May Day protests.

3    Is that back in the '70s?

4    A.   I believe it was 1972.

5    Q.   And you described them as the May Day protests.  Correct?

6    A.   Yes, ma'am.

7    Q.   So would you consider yourself a protester then when you

8    were here back in 1971?

9    A.   In 1971, yes.

10   Q.   And you didn't go inside the Capitol building when you

11   came for --

12   A.   No, ma'am.  I didn't go anywhere near the Capitol

13   building.

14   Q.   Now, let's turn our attention then to January 2021.

15   You traveled here from Florida?

16   A.   Yes, ma'am.

17   Q.   And you traveled with the --

18              -- [Q&A overlapping] --

19        COURT REPORTER:  You need to let her finish the

20   question before you answer.

21        THE WITNESS:  Yeah, I'm sorry.

22        COURT REPORTER:  Repeat the question?

23   BY MS. MURPHY:

24   Q.   And you traveled with the other two defendants, Casey

25   Cusick and Cusick?

1    A.    Yes, I did.

2    Q.    And you went through security at the airport?

3    A.    Yes, ma'am, I did.

4    Q.    You put your bag through?

5    A.    Yes, ma'am.

6    Q.    You went through metal detectors?

7    A.    Yes, ma'am.

8    Q.    All right.  You then testified that you attended a rally

9    on the 5th of January.  Is that correct?

10    A.    Yes.

11    Q.    And you didn't recall where that rally was.

12    A.    I don't remember the name of the square that it was in,

13    no.

14    Q.    But in Washington, D.C., area.

15    A.    Yes.

16    Q.    And then January 6 came and you attended the Stop the

17    Steal rally.  Correct?

18    A.    Yes.

19    Q.    Down on the Eclipse?

20    A.    Yes.

21    Q.    And you testified that there was one other person outside

22    of the other two defendants that you knew that was there on

23    January 6.  Who was that?

24    A.    Yes.  I saw an acquaintance there.

25    Q.    Okay.  Who was that acquaintance?

1              MR. ROOTS:  Objection.  Irrelevant.

2              THE COURT:  It's something he testified to on direct.

3        So the objection is overruled.

4              MR. ROOTS:  Could we have a sidebar on this,

5        Your Honor?

6              THE COURT:  Sure.

7           (Bench conference.)

8              MR. ROOTS:  The only person that I believe he's

9        speaking of is an acquaintance who -- I believe they're -- I

10       believe the government might want to out someone or something

11       like that, and I think it's not only irrelevant to this case,

12       it's prejudicial, it puts him in a very bad, awkward position.

13       He's not in a position where he should be, you know, giving

14       the government information about other people there.  I think

15       to the extent there's any relevance at all, it's just that it

16       is an acquaintance.

17             THE COURT:  Ms. Murphy.

18             MS. MURPHY:  Your Honor, he testified that he saw

19       someone that he knew and he did not testify that that person

20       went inside the Capitol.  So I don't think there's any concern

21       about whether or not the government plans to use that material

22       in some nefarious way.  But it is consistent with his direct

23       testimony that he saw an acquaintance.

24             THE COURT:  Why is the identity of that person relevant

25       to this case?

1          MS. MURPHY:  I don't know who the person is, but it

2    could be one of the other character witnesses, for example.

3          MR. ROOTS:  Your Honor, we believe the government very

4    well knows who that individual is.

5          THE COURT:  Well, if the government knows who it is,

6    then why are you worried?

7          MR. ROOTS:  Let's put it this way:  We do not believe

8    that Mr. Lesperance should be put in this awkward position

9    where he is snitching on, you know, acquaintances.  It's not

10   something that -- it just puts him in a very bad, awkward

11   position.  And it's not relevant.  This is a tangential

12   question that has nothing to do.  And it's so tangential to

13   this trial, there's no relevance whatsoever.

14         MS. MURPHY:  Your Honor, I'll withdraw the question.

15         THE COURT:  Thank you.

16      (End of bench conference.)

17   BY MS. MURPHY:

18   Q.   We were talking about the rally on the 6th, the morning

19   of the 6th.  You testified that you attended the Stop the

20   Steal rally?

21   A.   Yes, ma'am.

22   Q.   You testified earlier you attended that rally because you

23   believed the election was stolen.  Is that right?

24   A.   Yes, ma'am.  I believed there were improprieties, yes.

25   Q.   And you described January 6 as a historic day?

1    A.    Yes.

2    Q.    And you understood that the certification of the

3    presidential election votes was occurring on January 6.

4    A.    Yes, ma'am.

5    Q.    And you knew it was occurring at the Capitol building?

6    A.    Yes, ma'am.

7    Q.    And you're aware that the Capitol building is a federal

8    building?

9    A.    Yes.

10    Q.    Now, you also testified that at the rally down on the

11    Eclipse you went through additional security.  Is that right?

12    A.    Yes, we did, ma'am.

13    Q.    And you went through that security so you could get

14    closer to the stage to hear the speech given by the former

15    president.

16    A.    Yes.  That's correct.

17    Q.    And at some point you decided to take a walk towards the

18    Capitol.  Correct?

19    A.    Yes, ma'am.

20    Q.    And you testified you had bad knees and a bad back --

21    A.    Yes, ma'am.

22    Q.    -- but nevertheless you decided to join others in walking

23    to the Capitol?

24    A.    Yes, ma'am.

25    Q.    And that was at the direction of the former president who

1    had said during his speech that you should --

2    A.   Yes.  He said to go to the Capitol and peacefully

3    protest.

4    Q.   Go to the Capitol to protest.

5    A.   To peacefully protest.

6    Q.   But you testified earlier that you didn't consider

7    yourself a protester.

8    A.   Did I?

9    Q.   On direct.  You did.

10        So is it your testimony now that you were a protester?

11   A.   I guess so.  Yes.

12   Q.   So you testified earlier, too, that you saw snow

13   fencing --

14   A.   Yes, ma'am.

15   Q.   On the Capitol grounds?  And you said during your direct

16   testimony that you didn't think snow fencing was unusual to

17   see in D.C.

18   A.   Well, in a city that gets snow, no, I honestly didn't.

19   Q.   So it's your testimony that --

20        MR. ROOTS:  Objection.  I think that actually misstates

21   his direct examination.  I think he said he's familiar with

22   the snow fencing from the videos.  That was my recollection.

23        THE WITNESS:  Right.  I don't remember seeing the snow

24   fencing when I was actually here.

25        THE COURT:  Wait a second.  Now you're answering in

1    response to an objection and we don't do that.

2                THE WITNESS:  Okay.  I'm sorry.

3                THE COURT:  So I'm going to let the testimony stand as

4    it is.  The objection will be denied and you may proceed with

5    the next question.

6    BY MS. MURPHY:

7    Q.   I was saying I believe you testified that snow fencing

8    was not unusual to you, for you to see it in D.C. in January.

9    Is that right?

10   A.   Well, it was wintertime and I honestly don't know.

11   Q.   So was it your understanding that snow fencing is used

12   for something to do with snow?

13   A.   Yeah.  It's used to stop snow from drifting in high

14   winds.

15   Q.   Now that you've sat through four days of trial here and

16   seen all the videos and heard all the testimony, are you under

17   the understanding that snow fencing was being used by the

18   Capitol Police to block off the areas?

19   A.   Yes, ma'am.  You told us that.

20   Q.   You recall seeing some of the videos that you recorded on

21   your phone as you approached the Capitol?

22   A.   Could you repeat that, please?

23   Q.   You recall us reviewing during the trial some of the

24   videos that you recorded on your phone as you approached the

25   Capitol?

1   A.   Yes, ma'am, I do.

2   Q.   And I think on direct examination you were asked about

3   some of the things you said on those videos.

4   A.   Yes, ma'am.

5   Q.   You admit that that's you speaking on the videos that

6   we've reviewed throughout the course of the trial.

7   A.   Yes, it is.

8   Q.   And so on direct you were asked about your comment that,

9   "Look Ma, your troublemaking son is at it again."  You recall

10  that?

11  A.   Yes, ma'am.

12  Q.   And you recall your testimony that you were referring to

13  the person you were recording --

14  A.   Climbing the wall.

15  Q.   -- as the troublemaker.  Is that --

16  A.   Well, yes.

17  Q.   Yes.  So when you say "Look Ma, your troublemaking son is

18  at it again," you weren't actually speaking about yourself;

19  you were talking about the person who was scaling the wall?

20  A.   Yes, ma'am.

21  Q.   Is that your testimony?  So it's your belief that that

22  person is a troublemaker?

23  A.   That person was a young person climbing a wall, and

24  that's something young people do.  Now, being older, I don't

25  agree with it and I think it was kind of silly because there

1    was a staircase right there.  Yeah, the fact that you're

2    climbing a wall instead of using the staircase is sort of

3    troublemaking I would say.

4    Q.   So it's your testimony that that person was silly and a

5    troublemaker.

6    A.   In a sense, yes.

7    Q.   And then you also say on the video, "This is doing it

8    bigly."

9    A.   Yes, ma'am.  That's a term that Trump uses all the time,

10   is "bigly."  There was a large crowd there, and in my mind

11   "bigly" came to -- you know, came to mind as a word.

12   Q.   So I'm more curious about the "this."  When you say "this

13   is doing it bigly," were you referring to the number of people

14   at the Capitol or were you referring to you and the

15   defendants' actions and being at the Capitol?  What were you

16   describing as "this" being bigly?

17   A.   The event.  It was huge.  There was a huge number of

18   people there.

19   Q.   The historic event of January 6.

20   A.   Yes, ma'am.

21   Q.   Now, you also described the Capitol in your video as an

22   open house.  Do you recall that?

23   A.   Yes, because there were so many people there.  I mean

24   there were people literally everywhere.

25   Q.   So it's your testimony that an open house is defined by

1    the number of people who attend?

2    A.    Well, it's called the people's house.  That's where I got

3    the house part of it.  And the fact that everybody was there

4    seemed to indicate it's open.  So, yeah.  I put the two

5    together and said open house.

6    Q.    But you also testified that you saw broken glass.

7    A.    Yes, ma'am.

8    Q.    And you testified that you saw police officers.

9    A.    Yes, ma'am.

10   Q.    And again, you testified that you were recording because

11   it was such a historic event.

12   A.    Yes, ma'am.

13   Q.    Now, on direct, I believe you testified as well that you

14   understood that Congress was in recess at the time when you

15   and the other defendants were inside the Capitol?

16   A.    Yes, ma'am.  When you're in a crowd like that, you get

17   your information rumor-wise, people speaking and getting

18   together and talking, and they're saying -- so, yes.  I had

19   overheard when we were out on the west patio that Congress had

20   recessed.

21   Q.    So when you were outside on the West Terrace --

22   A.    Right, when I --

23   Q.    -- of the Capitol --

24   A.    Yes, there were people talking about it, discussing it.

25   Q.    So you knew, though, that again Congress was certifying

1    the presidential electoral college votes?

2    A.   Yes, ma'am, I did.

3    Q.   And you knew they were in recess or had taken a break.

4    A.   Right.

5    Q.   And did you know that that was as a result of the number

6    of people who had joined in with you in attending the Capitol

7    "open house"?

8    A.   No.  I didn't really know the reason for it.  They said

9    that they had left.

10   Q.   But you understood Congress was in recess.

11   A.   Yes.

12   Q.   Now, at some point you and the other defendants decided

13   to go inside the Capitol.  That was your testimony.  Correct?

14   A.   Yes, ma'am.

15   Q.   Could we pull up Government's Exhibit 211, please.  And

16   play just the very start of it.

17        (Video played.)

18        You recall the loud blaring noise you heard when you

19   walked into the Capitol?

20   A.   I didn't until I had my memory refreshed with this video.

21   Q.   But your testimony on direct was that you heard it and

22   you thought it was a smoke detector.

23   A.   Yes.  This reminded me of it, yes.  I remember thinking

24   it's a smoke detector, and I thought because they had that

25   hall blocked off maybe there was some problem down there that

1    set off a smoke detector.

2    Q.   So you didn't remember the alarm but you now remember

3    thinking then that it must have been a smoke detector?

4    A.   Yes, ma'am.

5    Q.   And you didn't turn around and leave when you heard this

6    alarm, did you?

7    A.   No, ma'am.

8    Q.   You made the decision to continue inside the Capitol?

9    A.   Yes, I did.

10   Q.   Can we go to about a minute and 30 seconds of the video,

11   please.

12        (Video played.)

13        Did you hear yourself on that video, Mr. Lesperance?

14   A.   No, I didn't.

15   Q.   I'll play it for you again.

16   A.   Okay.

17        (Video played.)

18   Q.   First did you hear some type of announcement being played

19   in the video just now?

20   A.   No, I didn't.

21   Q.   Did you hear yourself say "Did he say we're not supposed

22   to be here?"

23   A.   Yes, ma'am.

24   Q.   Let's pull up Exhibit 213, please.

25        Mr. Lesperance, you didn't turn around and leave at that

1    point either, did you?

2    A.   Well, no, ma'am.  I didn't understand what the

3    announcement said.  That's why I asked.

4    Q.   That's why you asked the question, "Did he say we're not

5    supposed to be here?"

6    A.   Right.  Yes.

7    Q.   If we could play the video, please.

8        (Video played.)

9        I think it was your testimony earlier that eventually you

10   all did leave, and I think when you were asked on direct you

11   said you left because nothing was happening, there was nothing

12   further to see.  Is that right?

13   A.   Right.  I had seen the inside of the building and I was

14   just trying to get out of everybody's way and get outside.

15   Q.   You were trying to get out of everybody's way?

16   A.   Well, just -- it was time to leave the building.  That's

17   all.

18   Q.   Time to leave.  Okay.  We can continue playing.

19       (Video played.)

20       Do you remember this discussion, Mr. Lesperance?

21   A.   Well, I do now, yes.  But no.  From two years ago, no.

22   Q.   It was your testimony on direct that at some point you

23   and Mr. Casey Cusick got separated from Defendant James

24   Cusick --

25   A.   Right.

1    Q.   -- and you were trying to locate him.

2    A.   Yes.

3    Q.   And I guess this was outside of the bathrooms --

4    A.   Right.

5    Q.   -- as you described?

6    A.   Yes.

7    Q.   And did you hear the discussion between you and Casey

8    Cusick where you say "I don't want to leave him, but I don't

9    want to get hit with a billy club"?

10   A.   Was that just on there?

11   Q.   Yes.  Would you like for us to play it again?

12   A.   Yes, please.

13        (Video played.)

14        No.  That's not me.

15   Q.   No, the question wasn't was it you.  The question was do

16   you remember the conversation between you and Casey Cusick

17   where --

18   A.   No, ma'am.  That was over two years ago.

19   Q.   But you heard it just now.

20   A.   Yes, ma'am.

21   Q.   And you testified on direct about hearing rioters

22   chanting "Whose house?  Our house."

23   A.   Yes, ma'am.

24   Q.   And I think you testified that you saw someone trying to

25   rip a poster or something and you told them --

```
 1    A.   To leave it alone, yes.
 2    Q.   -- to leave it alone.  And you also testified that you
 3    said use a coaster?
 4    A.   Yes.
 5    Q.   Which is a reference to --
 6    A.   Don't damage this building.
 7    Q.   So would you consider the person ripping the poster down
 8    to be a troublemaker?
 9    A.   Well, it's a poster, but I mean, I didn't want anybody to
10    touch anything in the building.  It's a government building.
11    You leave it alone.
12    Q.   This is a government building too, isn't it,
13    Mr. Lesperance?
14    A.   Yes, ma'am.
15    Q.   Did you go through security this morning when you entered
16    this government building?
17    A.   Yes, ma'am, I certainly did.
18    Q.   You've been through security every day this week when
19    you've entered this government building?
20    A.   Yes, ma'am.
21    Q.   And you eventually left Washington, D.C., and went back
22    to the airport at BWI, correct, or Baltimore?
23    A.   Yes, we did.
24    Q.   And you went through security there.
25    A.   Yes, ma'am.
```

```
 1                MS. MURPHY:  I have no further questions for you.

 2                THE WITNESS:  Thank you.

 3                THE COURT:  Mr. Roots?

 4                     REDIRECT EXAMINATION

 5    BY MR. ROOTS:

 6    Q.   You've indicated you have hearing problems?

 7    A.   Yes, sir.

 8    Q.   Do you also have any problems with thinking or memory?

 9    A.   Yes, sir.  I'm on memory medications from the VA.

10                THE COURT:  That's a leading question, Mr. Roots.  He's

11    your witness.  Try not to lead.

12    BY MR. ROOTS:

13    Q.   Can you expand on that a little bit?

14    A.   The VA has put me on medication for my memory because I

15    have a terrible time with names and that kind of thing.

16    Q.   When you heard that person inside the Capitol say

17    something to the effect of we're not supposed to be here, that

18    was worded in the form of a question?

19    A.   Yes.

20    Q.   Sorry.  That was a leading question.  I apologize.

21         Was there anyone directing you through security at the

22    Capitol?

23    A.   No, sir.

24    Q.   Did it indicate there was any way to go through security

25    at the Capitol?
```

1    A.    No, sir.

2    Q.    Do all government buildings require this -- require

3    security?

4    A.    No.

5    Q.    This courthouse here that we have security that we come

6    through every day, to your knowledge, is that in every

7    government building?

8    A.    No, it is not.

9              MR. ROOTS:  No further questions.  Thank you so much.

10             THE COURT:  All right.  Mr. Lesperance, you may step

11   down.

12             THE WITNESS:  Thank you.

13             THE COURT:  And resume your place at the tables.

14        (Witness steps down.)

15             THE COURT:  And the next witness, please, Mr. Pierce.

16             MR. PIERCE:  Thank you, Your Honor.  The defense will

17   now call Ms. Katie Cusick.

18             KATIE CUSICK, WITNESS FOR THE DEFENSE, SWORN

19                        DIRECT EXAMINATION

20   BY MR. PIERCE:

21   Q.    Good afternoon, Ms. Cusick.  Could you please state and

22   spell your name for the record?

23   A.    Katie Cusick.  C-U-S-I-C-K.

24   Q.    And where are you from, Ms. Cusick?

25   A.    Melbourne, Florida.

```
 1    Q.   And just by way of background, can you briefly describe
 2    your educational background?
 3    A.   High school and I went to bible college.
 4    Q.   And do you know the three individuals who are sitting at
 5    the defense seats there?
 6    A.   Yes, I do.
 7    Q.   And let's take them one by one.  So let's take them in
 8    order.  Do you know the individual in the first seat?
 9    A.   Yes.  That's my father.
10    Q.   James Cusick?
11    A.   James Cusick.
12    Q.   And this may be self-evident, but how long have you known
13    Mr. Cusick?
14    A.   36 years, my life.
15    Q.   And how is your relationship with your dad?
16    A.   My relationship with my dad is excellent.
17    Q.   During that period of time, how -- have you lived with
18    him?  How often during that period of time have you lived with
19    him?
20    A.   I lived with him until I went away to college.  My mom
21    passed away after college and I moved back in with him and I
22    live with him right now, currently.
23    Q.   So you lived with him while you were growing up.
24    A.   Yes.
25    Q.   And then how long did you go away for --
```

1    A.   I went away to bible college for maybe three or four

2    years I was gone, then I came back, and been with him since.

3    Q.   So you've been with him since you came back --

4    A.   Yes.

5    Q.   -- from college.

6    A.   Yes.  Maybe ten or twelve years.

7    Q.   And setting aside the college years, have you lived with

8    him continuously, setting aside trips that either one of you

9    might have --

10   A.   Yes.

11   Q.   And, it's probably obvious, but during that time frame,

12   have you had consistent ongoing interactions with him?

13   A.   Yes, of course.

14   Q.   And do you feel that you have a sufficient basis to have

15   formed an opinion about your father's character for

16   lawfulness?

17   A.   Absolutely.

18   Q.   And what is that opinion that you have?

19   A.   My dad has always raised us to follow the rules, to

20   respect authority.  I've always seen him be kind with police,

21   speaking with them, pay for their coffee whenever we're in a

22   coffee shop, donut shop.  When I was a kid, we'd gone to D.C.

23   millions of times with groups that my dad held.  And when I

24   was younger, if we were running up the stairs or being silly

25   with friends, my father reprimanded us and told us this is a

1    memorial, to show respect and not to be foolish and take it

2    lightly.  That's been my experience with him here in D.C.

3         MS. MURPHY:  Objection.  Your Honor, objection.  I

4    would just ask that the witness be limited to not specific

5    incidents but to answering counsel's questions.

6         THE COURT:  You're not supposed to, under the rules of

7    evidence, talk about specific instances or events with your

8    father.

9         THE WITNESS:  Sure.

10        THE COURT:  Bear that in mind.

11      Mr. Pierce.

12        MR. PIERCE:  Thank you, Your Honor.

13   BY MR. PIERCE:

14   Q.   And do you feel like you have also had a sufficient basis

15   to have formed an opinion about your father's character for

16   peacefulness or peaceability?

17   A.   Absolutely.

18   Q.   And what is your opinion about that?

19   A.   I have only really ever seen him be peaceful.  He's not

20   a confrontational person.  He's not a rioter, he's a calm,

21   mannered man.

22   Q.   Based on your opinion, is he the type of person who would

23   follow or become part of a mob?

24   A.   Absolutely not.

25   Q.   Is he the kind of person who would become part of a riot

1    or be a rioter?

2    A.    Not ever.

3    Q.    And are you happy that he's your father?

4    A.    Absolutely, a hundred percent.

5    Q.    And do you know the second individual at the table here

6    next to your father?

7    A.    Yes, I do.

8    Q.    And who is it?

9    A.    That's my brother, Casey Cusick.

10    Q.    And how long have you known your brother for?

11    A.    I have known him 36 years, my whole life.

12    Q.    How is your relationship with your brother?

13    A.    My brother and I are much more than siblings.  We're very

14    good friends.  We're less than two years apart.  We've gone

15    through every phase of life together.

16    Q.    And so during that 36 years, how much of that time period

17    have you actually lived together?

18    A.    Probably 20 years?  25 maybe?

19    Q.    And during the years when you were living together, did

20    you have consistent frequent interactions with him?

21    A.    Absolutely.

22    Q.    And during the years when you have not lived together,

23    have you continued to have frequent interactions with him?

24    A.    Absolutely.  We're very close.

25    Q.    And do you feel that you have a sufficient basis to have

1    formed an opinion about Casey's character for lawfulness?

2    A.    Definitely.

3    Q.    And what is your opinion?

4    A.    I've been with him at all kinds of events and stadiums,

5    concerts, different things.  I've never seen him try to buck

6    up against the system, policemen, anything like that.  Only

7    ever seen him be lawful in my experience.

8    Q.    Have you -- do you feel that you have a sufficient basis

9    to have formed an opinion about his character for being a

10   peaceful or peaceable person?

11   A.    Yes, I do.

12   Q.    And what is your opinion on that?

13   A.    Again, I've seen him be peaceful.  I've never seen him

14   getting in fights and rioting or anything.

15   Q.    And are you glad Casey is your brother?

16   A.    Yes, I am.

17   Q.    And how about the third gentlemen on the defense side

18   there, do you know him?

19   A.    Yes, I do.

20   Q.    Who is that?

21   A.    That's David Lesperance.

22   Q.    What is the nature of your relationship to David

23   Lesperance?

24   A.    I would say he's a close family friend.

25   Q.    How long have you known Mr. Lesperance?

1    A.   I've known him maybe 35 years, 33 years.

2    Q.   And during that time period -- and by the way, how did

3    you -- in what context have you known Mr. Lesperance or

4    engaged with him?

5    A.   My father's a pastor, and he's been part of our church

6    since I was a little girl.

7    Q.   And during that time frame, you feel that you've had

8    frequent interactions with him?

9    A.   Definitely.

10   Q.   And do you feel that you have a sufficient basis to have

11   formed an opinion about Mr. Lesperance's character for

12   law-abidingness?

13   A.   Definitely.

14   Q.   And what is that opinion?

15   A.   I've only seen him follow the rules, abide.  He's gentle.

16   He's a very gentle man.  And I haven't witnessed anything

17   other than that.

18   Q.   Do you feel you have a sufficient basis to form an

19   opinion about his character for being a peaceful person?

20   A.   Definitely.

21   Q.   What is that opinion?

22   A.   He's very peaceful.  I've never witnessed him even raise

23   his voice anywhere.

24   Q.   Do you think that -- I think I forgot one or two

25   questions.  Do you think that either your brother or

1    Mr. Lesperance are the kind of people based on those opinions

2    that would be part of a mob?

3    A.    Absolutely not.

4    Q.    Be part of a riot?

5    A.    Definitely not.

6    Q.    Are you happy that Mr. Lesperance is a family friend?

7    A.    Yes, I am.

8    Q.    Are you coming up on the stand purporting to be an

9    unbiased witness in this case?

10    A.    Can you rephrase it?

11    Q.    Sure.  Do you care what happens in this case?

12    A.    Absolutely.

13    Q.    Okay.  Thank you.

14          THE COURT:  Ms. Murphy?

15          MS. MURPHY:  The government has no cross for this

16    witness, Your Honor.

17          THE COURT:  All right.  Thank you very much,

18    Ms. Cusick.  You may step down.

19        Next witness, please.

20        (Witness steps down.)

21          MR. PIERCE:  Next witness, Your Honor, will be Ms.

22    Stacie Peterson.

23          THE COURT:  All right.

24

25

1          STACIE PETERSON, WITNESS FOR THE DEFENSE, SWORN

2                        DIRECT EXAMINATION

3     BY MR. PIERCE:

4     Q.   Good afternoon, Ms. Peterson.

5     A.   Hello.

6     Q.   Could you please state and spell your name for the

7     record?

8     A.   My name is Stacie Peterson, P-E-T-E-R-S-O-N.

9     Q.   And where are you from, Ms. Peterson?

10    A.   Melbourne, Florida.

11    Q.   And do you know the three individuals who are defendants

12    in this case?

13    A.   I do.

14    Q.   Okay.  So let's take them one by one.  Do you know the

15    first gentleman here?

16    A.   Yes.  That's my father.

17    Q.   All right.  And how long have you known your father?

18    A.   48 years.

19    Q.   And how many of those years have you lived with your

20    father?

21    A.   21.

22    Q.   And do you live with your father now?

23    A.   No.

24    Q.   Okay.  And during the time that you lived with him, fair

25    to say you had frequent interactions with him?

1    A.   Yes.  Very much so.

2    Q.   And how about the time periods when you've not lived with

3    him, have you still had frequent interactions with him?

4    A.   Always.  Very close.

5    Q.   How is your relationship with your father?

6    A.   Very good.

7    Q.   Do you feel you have a sufficient basis to have formed

8    an opinion about your dad's character for lawfulness?

9    A.   Yes, I do.

10   Q.   What is that opinion?

11   A.   He is very lawful.

12   Q.   Do you feel that you have sufficient basis to have formed

13   an opinion about your dad's character for peacefulness?

14   A.   Absolutely.

15   Q.   And what is your opinion about that?

16   A.   He's peaceful.

17   Q.   And is your dad somebody based on those opinions you

18   think would be part of a mob?

19   A.   No.

20   Q.   Be part of a riot?

21   A.   No.

22   Q.   Are you happy that James Cusick is your father?

23   A.   I am.

24   Q.   Let's move to the next gentleman.  Who is that?

25   A.   That's my brother Casey.

```
 1    Q.   And how long have you known Casey?

 2    A.   37 years.  We're 10 years apart.

 3    Q.   Have you had frequent interactions with him during that

 4    time period?

 5    A.   Yes.

 6    Q.   How much of that time period did you actually live with

 7    him?

 8    A.   I would say 11 years.  I'm 10 years older than him, so.

 9    Q.   I never would have guessed it.  During that entire time

10    period, even when you didn't live with him, did you have

11    frequent interactions with him?

12    A.   Always.

13    Q.   Well, do you have a sufficient -- do you feel that you

14    have a sufficient basis to have formed an opinion about

15    Casey's character for lawfulness?

16    A.   Yes.

17    Q.   And what is that opinion of yours?

18    A.   That he is also lawful.

19    Q.   And do you feel that you have a sufficient basis to have

20    formed an opinion about Casey's character for being a peaceful

21    person?

22    A.   Absolutely.

23    Q.   And what is your opinion?

24    A.   That he is also peaceful.

25    Q.   Do you think that Casey is the kind of person based on
```

1    those opinions who would follow a mob?

2    A.    No.

3    Q.    Become part of a riot?

4    A.    No.

5    Q.    And are you glad Casey's your brother?

6    A.    Yes.

7    Q.    And the third gentleman, do you know him?

8    A.    I do.

9    Q.    Who is that?

10    A.    That's David Lesperance.

11    Q.    And what is the nature of your relationship to David

12    Lesperance?

13    A.    I've known him for about 30 years.  He was a member of

14    our church and has become an even closer family friend over

15    the years.

16    Q.    And have you had occasion to have frequent interactions

17    with him during that entire time frame?

18    A.    Yes.

19    Q.    And do you feel that you have a sufficient basis to have

20    formed an opinion about Mr. Lesperance's character for

21    lawfulness?

22    A.    Yes.

23    Q.    And what is your opinion?

24    A.    That he is also lawful.

25    Q.    And do you feel you have a sufficient basis to have

1    formed an opinion about Mr. Lesperance's character for

2    peacefulness?

3    A.   Yes.

4    Q.   And what is your opinion?

5    A.   He is a peaceful man.

6    Q.   Do you think Mr. Lesperance, based on the opinion, would

7    be someone who followed a mob?

8    A.   No.

9    Q.   Or become a rioter?

10   A.   No.

11        MR. PIERCE:  No further questions, Your Honor.

12        MS. MURPHY:  Same, Your Honor.  Government has no cross

13   for this witness.

14        THE COURT:  Ms. Peterson, thank you.  You may step

15   down.

16     (Witness steps down.)

17     Next witness, please.

18        MR. PIERCE:  Moving right along.  Thank you, Your

19   Honor.  Our next witness will be Mr. James Cusick.

20        JAMES CUSICK JR., WITNESS FOR THE DEFENSE, SWORN

21                      DIRECT EXAMINATION

22   BY MR. PIERCE:

23   Q.   Good afternoon, Mr. Cusick.

24   A.   Good afternoon.

25   Q.   Could you please state and spell your name for the

1    record.

2    A.   My name is James Varnell Cusick Jr.  I usually go by Jim,

3    but it's J-A-M-E-S, V-A-R-N-E-L-L, Cusick, C-U-S-I-C-K, Jr.

4    Q.   Thank you.  Where are you from, Mr. Cusick?

5    A.   Melbourne, Florida.

6    Q.   Before we come back to a little bit of background on you,

7    in this trial you've seen various videos and pictures where

8    witnesses have identified you as being in the videos and the

9    pictures.  Do you recall that?

10    A.   Absolutely.  Yes.

11    Q.   Is that you?

12    A.   It's me.

13    Q.   And there's also been some testimony and we've heard on

14    some of the videos some statements made by a voice that's been

15    identified as you.  Do you recall watching that?

16    A.   I think so.  Somewhere in there I heard myself, yes.

17    Q.   And is that your voice?

18    A.   Yes.

19    Q.   Okay.  And we've also seen some -- not demonstrative,

20    we've seen some physical exhibits.  I believe there was a hat

21    and a turtleneck.  Do you recall seeing those?

22    A.   It's my white hat, black jacket and white turtle -- what

23    do you call it, turtle collar?  Anyway.  And I also have a

24    teal green sweater that's missing someplace.  But that's me.

25    Q.   And you apparently prefer Taylor Made golf clubs.

1   A.   Oh, that's right.  I love white hats.  Mostly golf hats

2   but I like white hats.

3   Q.   So could you please describe briefly your educational

4   background?

5   A.   I have a year of junior college, and I went to bible

6   college.

7   Q.   And how about, do you have any military service?

8   A.   Yes.  I was in military August 1968 till April 1, '70.

9   Q.   And were you forced to join the military?

10  A.   Absolutely not.

11  Q.   Can you explain that, please?

12  A.   It was the end of the Vietnam War and a lot of people

13  were burning draft cards and running to Canada.  I was born

14  and grew up early years in east Tennessee, which is a very

15  patriotic state, as a matter of fact it's called the Volunteer

16  State because of the number of volunteers in a couple of wars,

17  and Davy Crockett grew up down the street, and Daniel Boone,

18  and so you become very patriotic growing up in that area.

19      And so when the war was taking place, as a matter of

20  fact, the first book report I ever did was on -- what's his

21  name? -- from down in Moodyville, Tennessee, World War I, most

22  decorated man.  Anyway.  I did a book report on him and I

23  really liked it a lot.  And so I grew up patriotic and during

24  the Vietnam War, like I say, a lot of people burning draft

25  cards and running to Canada.  And I believed the theory that

1    there's a domino effect could take place in Southeast Asia,

2    Vietnam would fall, Cambodia and Laos and Thailand and then it

3    could just keep sweeping until they took control.

4    Q.   Okay.  So you essentially volunteered.

5    A.   I volunteered for the draft.

6    Q.   And I'm not going to ask you to go into too much detail

7    about the specifics of your service, but did you actually

8    serve in theater in Vietnam?

9    A.   Yes.  I was in the infantry, and I was 15 months in

10    Vietnam.

11    Q.   And what was your job?

12    A.   I was a command -- company commander's radio operator.

13    Q.   And did you serve in actual combat?

14    A.   I actually did, yes.

15    Q.   And how long would you estimate?

16    A.   The whole time.  I was just a month -- so might be in the

17    rear, but even the rear was not the rear as far as support

18    base.  So there was no rear.

19    Q.   And did you receive any commendations for your service in

20    Vietnam?

21    A.   I did.  I received a Purple Heart and a Bronze Star.

22    Q.   And again, I won't ask you to dwell on it but what were

23    the circumstances of your receiving the Purple Heart?

24          MR. VALENTINI:  Objection, Your Honor.  Could we have

25    a sidebar?

1          THE COURT:  Does seem to be off the relevant target.

2     So let's move on.

3          MR. PIERCE:  We can move on, Your Honor.  Thank you.

4     BY MR. PIERCE:

5     Q.   And when did -- when you came back from Vietnam, can you

6     just briefly walk us through what your life entailed then?

7     A.   I came home, I'd been working in banking before I left

8     and I went back to the bank for a year or so, went into

9     advertising, and from advertising went to school, went to

10    bible school in Tulsa, Oklahoma.  In between there I got

11    married.  But anyway, then went to Tulsa, Oklahoma.  Came back

12    to -- that time we lived in Polk County, which is the center

13    part of the state.  And began to do some bible studies,

14    eventually became associate pastor in Lakeland.  Then we got

15    involved in bible study in Melbourne, which is on the east

16    coast of Florida, just south of the space center, and the

17    bible study -- they wanted to do a church.  Anyway, the bible

18    study grew real fast, so we started a church, later on started

19    a Christian school.

20    Q.   When was that that you started the church?

21    A.   May 1983.

22    Q.   And so have you been a pastor from that point on?

23    A.   For the most part, yes.  For the last three, four years,

24    I have not -- when my wife passed away I slowed down a lot.

25    We did a lot of mission activity.  I used to go to the former

1    Soviet Union a couple times a year.  We took bibles into

2    public schools.  Actually probably half a million bibles we

3    passed out in a few years there.  We took medical supplies,

4    school supplies.  And probably for about eight years I would

5    go once sometimes twice a year, also took groups over there.

6    We got involved with Israel, I took many groups to Israel.

7        We met the man here in Washington who had a lobby in

8    Washington.  It was CIPAC, not the conservative thing.  His

9    was Christian Israel Public Action Committee.  And the sole

10   purpose of it was to get America to, according to Galatians

11   12:3, God said he'd bless those who bless Israel and curse

12   those who curse Israel, and so he always wanted America to be

13   on Israel's side so the blessing of God would be upon our

14   nation.

15   Q.   Okay.  And you mentioned you were married?

16   A.   I was married 40 years.  My wife passed away in 2012.

17   Q.   And you have -- we've seen some of them.  You've had some

18   kids?

19   A.   I have four children.  Three of them are here today.

20   Q.   In connection with the trips with the church or church

21   school, did you bring -- did you ever do that to D.C.?

22   A.   I brought lots of schoolchildren up here, and church

23   children, and actually schoolchildren from some other schools

24   we came up and would visit the city.

25   Q.   If you can estimate, how many times did you do that?

1    A.    Maybe a dozen.

2    Q.    And did you visit the Capitol building in connection with

3    those trips?

4    A.    We did.  Usually we came to visit a congressman,

5    Congressman Weldon and different ones.  But anyway, they would

6    give us a guide and take us through the Capitol mostly.

7    Q.    And did you come to any sort of impressions from those

8    experiences as to either way, the public or nonpublic nature

9    of the Capitol building?

10          MR. VALENTINI:  Objection.

11          THE WITNESS:  Thank you.  Because I don't understand it.

12          THE COURT:  Just a second.  What's the ground for the

13   objection?

14          MR. VALENTINI:  I struggle to say -- the question was

15   unintelligible to me, Your Honor.

16          THE COURT:  Ask the question again.

17          MR. PIERCE:  -- to the witness as well.

18   BY MR. PIERCE:

19   Q.    Based on your experiences coming to the Capitol with

20   these church trips, was it a -- did it seem like a public

21   building?

22   A.    Yes.

23   Q.    Now, let's fast-forward to the present here, or the

24   relatively recent past.

25   A.    Can I bring up my wife just one second?

1          MR. VALENTINI:  Objection.  There's no question

2      pending.

3          THE WITNESS:  Okay.

4          THE COURT:  The witness is listening to you,

5      Mr. Valentini.

6          MR. VALENTINI:  I'm glad.

7        (Laughter.)

8          THE WITNESS:  I had a wonderful wife, and she did great

9      things.  If I had an opportunity to talk about her and brag on

10     her, I was just going to do it.  I'm sorry.  I apologize.

11         THE COURT:  That's okay.  Mr. Valentini likes to be

12     compared to loved ones.  Mr. Pierce.

13     BY MR. PIERCE:

14     Q.   So do you follow politics at all?

15     A.   I do.

16     Q.   And would you describe yourself as being on the left side

17     of the spectrum so to speak or the right side of the spectrum?

18     A.   Well, personally, I don't like right or left or walk the

19     political line.  I wish there's no such thing as right or

20     left, Republican, Democrat, but I registered Republican back

21     in 1972 only because the platform of the Republican party was

22     more in line with my beliefs.

23     Q.   And did you, leading up to the 2020 -- leading up to the

24     2020 election, were you following that election?

25     A.   I was.

1    Q.   And did you follow the events on election night and the

2    next --

3    A.   I did.

4    Q.   What did you -- did you come to any feelings about the

5    integrity of the 2020 presidential election based on following

6    those events?

7    A.   I did.

8    Q.   Please describe what those were.

9    A.   Well, we set up during the election and somewhere during

10   the night, it seemed like it was one or two o'clock, the count

11   stopped.  And it was unusual, I'd never seen this happen

12   before, and then couple hours later it picks back up and then

13   the candidate, in this case President Trump, who was way ahead

14   before they stopped, is all the sudden now behind.  I didn't

15   understand that, what happened here.

     The other thing, the candidate, President Biden now, who

16   won, I couldn't understand how a guy can run a campaign out of

17   a basement, and when he does come out, he's got three or four

18   hundred people that's meeting him.  The other guy's going to

19   three or four cities a day getting 30, 40, 50,000.  I'm

20   thinking, how can this guy in the basement end up with more

21   votes than anybody in history and he doesn't even campaign?

22   And it just seemed odd to me.  I didn't care which party he's

23   with.  That just seemed odd to me.

24   Q.   Okay.  So you had some strong feelings?

25

1    A.    Yes.

2    Q.    Did there come a time when you started thinking about

3    going to Washington, D.C., in early January 2021?

4    A.    Yes.  Casey and Dave -- I don't do all this social media

5    stuff.  I don't have TikTok and Facebook and Facetime, all

6    that kind of stuff.  I don't have any of that.  They do.  They

7    keep up with it.

8         But anyway, they told me about the president is going to

9    have a rally to support, you know, or bring into question that

10   there was some irregularities in this election.  And so they

11   want to go.  You want to go to Washington?  I'll take you.

12   Anybody here want to go to Washington, call me, I'll load you

13   up and take you because I love to come up here.  I love to

14   visit Washington.

15        Like I say, I've taken lots of groups, I've taken

16   individuals.  Sometimes I just come up here because I like

17   being here.  So when they talked, let's go, absolutely, let's

18   go.

19        So I'm the one that planned it all.  I got the airline

20   tickets, I got the hotel, I got the car, they paid me later as

21   you saw on the text that you guys showed.  And so we came.  I

22   put it together for us, and we came.

23   Q.    Did you plan to actually go to the Capitol --

24   A.    Absolutely not.  I knew nothing about the Capitol.

25   Nothing.

1    Q.   And just let me make sure I finish the question before

2    you answer, just for the court reporter.

3         And let me just repeat.  Did you have any plans to go to

4    the Capitol grounds specifically?

5    A.   None.  Zero.

6    Q.   Did you have any plans to go inside the Capitol building

7    that day?

8    A.   Zero.

9    Q.   You were essentially coming to see Trump speak?

10   A.   Correct.

11   Q.   And then -- so tell us about the actual trip up briefly

12   to D.C.

13   A.   The trip?  We got on a plane and it took off.  We landed.

14   We got a car.  Up at BWI, is that what it is?  We drove down.

15   We stayed in Crystal City.  That's why the curfew that went

16   into effect that night didn't affect us because we were over

17   in Crystal City.  I love to stay over there a lot.

18        THE WITNESS:  (To Reporter)  Did I go too fast?

19   I'm sorry.  I'll try to slow down.  I preach that way too, and

20   they do the same thing, get mad at me.

21     So anyway, we came and stayed in Crystal City.  And we got up

22   the next morning -- no, that was the 5th.  Then we came downtown

23   for a little bit to -- is it liberty?  Whatever the square is

24   down here.

25

1    BY MR. PIERCE:

2    Q.    So just to take it a little bit step by step.  You came

3    up on January 5?

4    A.    5th.

5    Q.    And you stayed in a hotel?

6    A.    Yes.

7    Q.    That was in --

8    A.    Crystal City.  Crystal City.

9    Q.    And the next morning you got up and headed to D.C.?

10   A.    Correct.  We took the Metro up to probably the

11   Smithsonian I think Metro stop, and then walked down to the

12   Washington Monument where we saw most people gathering.

13   Q.    Did you take any weapons with you?

14   A.    My glasses and my cell phone.  I don't think I even

15   brought my wallet.

16   Q.    No tactical gear of any sort?

17   A.    None.  I don't own any.

18   Q.    And did you come with two other people?

19   A.    Correct.

20   Q.    Who was that?

21   A.    My son Casey and his friend, our friend, David

22   Lesperance.

23   Q.    And so you got to the Ellipse at some point on January 6?

24   A.    Actually, we started off at the Washington Monument.  I

25   didn't know what the Ellipse was.  I thought maybe you had to

1    pay to get over there, special people, I didn't know.

2    Finally, Casey said look, you can go there.  You just have to

3    go through security and go over there.  Okay.  I'm so far

4    away, but let's go.  I don't want to come up here and watch it

5    on a jumbotron.

6        So we went over, and we did go through security there.

7    But before you went through security, they were taking

8    everybody's backpacks, which I understand.  I didn't have one,

9    Dave had one.  And so, I don't know how many thousand people

10   are there, but they were throwing the backpacks in a stack.

11   And I thought wow, that's insane, you know?  Is it going to be

12   there when we come back?

13       Anyway, so we go through security, we go inside and

14   listened to some people.  Casey mentioned earlier there was a

15   couple speakers.  And then the president came out and he

16   spoke.

17   Q.   And so you listened to the president's speech there in

18   person?

19   A.   Correct.  Yes.

20   Q.   And this was around the noon time period?

21   A.   I think so.  I'm not sure of the time frame, being there.

22   I just lost track.  I wasn't paying any attention.  But

23   sometime around noon or 12:30, something like that.

24   Q.   At a certain point, you made a decision to decide that

25   you were going to walk down to the Capitol area?

1    A.    Yes.  During the president's speech, even from the time

2    he started, I noticed behind me, going up Constitution were

3    hundreds and hundreds and hundreds of people.  I couldn't

4    figure out where they going.  Why they going to the Capitol.

5    I thought you came up to listen to the man's speech.  Why are

6    you going to the Capitol?

7        I couldn't figure out why they were walking up

8    Constitution.  And I think I asked him a couple of times,

9    where are these people going?  How come they're not listening

10   to the president?  I had no idea anything about the Capitol at

11   all.

12       When he finished, yes, he -- these guys have already

13   referenced it, that the president said that we were going to

14   go up there and do a demonstration, I guess, a peaceful lawful

15   demonstration.  At that time I thought that the certification

16   was over.  I think it was supposed to be at one o'clock.  I

17   thought it was over.  Actually, I didn't know what time it was

18   but for some reason I had in my mind that it was going to be

19   over at one o'clock.

20       But again, I'm not thinking about them being in session,

21   I'm not thinking anything about the Capitol.  He said we'd go

22   up there.  So we leave the Ellipse and go out to try to find

23   Dave's backpack, and we waited and waited and waited.  Finally

24   there was probably only about 20 or 30 left and one of them

25   was not his.  And he said there's nothing important there.

1    Let's go.  So we started up Constitution.

2    Q.   And about how long, if you recall, was it from the time

3    that the speech ended and you actually started moving toward

4    the Capitol?

5    A.   I'm sorry.  I would just have to guess.  Probably 30 or

6    45 minutes.  But I could be wrong.

7    Q.   Just to clarify one point, were you aware that there was

8    this certification and/or objection process and the Electoral

9    College --

10   A.   Yes.  That was part of the president's speech.  He was

11   hoping that the vice president would do the right thing and

12   put this thing back to the states.  And like I say, I thought

13   that that was supposed to happen at one o'clock.  I don't know

14   where I got that idea, but that just stuck to me.  At one

15   o'clock is when that was supposed to happen.

16   Q.   Now, when you started walking down to the Capitol grounds

17   and made that decision, at that point in time had you decided

18   that you were going to go inside the Capitol building?

19   A.   Absolutely not.  I didn't think about it.  I didn't think

20   about going up to the Capitol at that time.  Even as I'm

21   walking towards it.  My idea, when he said we're going to do

22   this demonstration, I thought well, maybe they're going to go

23   up there and do a Jericho march around the Capitol.  Maybe

24   we're going to go walk around a couple times, just let them

25   know we're here, we're letting you know we think there's

1    something wrong here and we think it should be investigated.

2         That was my thought, we'd just walk around.  And then I

3    had the thought, well, maybe they'd just walk to the Capitol,

4    just walk from one end to the other.  I had been in the

5    Capitol a number of times even when there was no security.

6    Used to, as the Captain testified right here, there was a time

7    you could walk around the Capitol.  I guess that's before

8    9/11.  But you could go places in there.  So I'm thinking

9    maybe we'll just go in one door, through a hall, and come out

10   the other door, and not thinking that Congress is there.  Just

11   never thought about it.

12        But anyway, so when he said let's go do this, that's when

13   I thought this is what it's going to be.  I had no idea it's

14   going to be people just scattered everywhere, everybody kind

15   of doing their own thing.

16   Q.   And when you started walking toward the Capitol were you

17   in the group, the three of you?

18   A.   Correct.

19   Q.   Did you move there as fast as you could?

20   A.   Well, if I could have, I would have.  But Dave was with

21   me.  I walk fast.  Usually people who walk with me have to run

22   to keep up with me.  But I couldn't that day.  I had to go

23   slowly for David's knees.

24   Q.   And what was the atmosphere of the crowd like as you were

25   walking towards the Capitol?

1    A.   Well, just I think happy to be there.  There was

2    preachers on every corner.  Some of them were singing.  Some

3    of them were getting people saved.  Some of them getting

4    people filled with the Holy Ghost.  Some of them were praying

5    for people.  They were singing patriotic songs.  Some people

6    were singing worship songs to God.  Nothing violent or

7    anything.  They were just kind of enjoying being there.

8    Q.   When you got down near the Capitol grounds, what did you

9    initially see?

10   A.   I thought what in the world's going on here?  People are

11   just -- they're everywhere.  I was amazed at how many people

12   were down there.

13   Q.   And what was the -- generally speaking, what was the sort

14   of mood of the crowd?

15   A.   Same thing.  I loved the guy Cartwright who testified.  A

16   great guy.  I'd like to know him.  He's a wonderful guy.  But

17   anyway, he talked about it was a mixed bag.  And he said some

18   people are passionate, you know, and they're doing things out

19   of passion; some people are doing things out of love.  And

20   that's the way it was.  Some of them were, you know, loud and

21   saying things and some of them were just milling around.

22   Q.   And so when you got down to the Capitol grounds, at a

23   certain point you -- you've seen the videos where the three of

24   you start moving toward closer to the Capitol building?

25   A.   Sure.  Yes.  I remember it.

1    Q.    And why did you do that?

2    A.    You know, I don't think that we didn't just decide let's

3    do this.  I think we just did it.  We saw people up there, up

4    on the terrace, and let's just walk up there and see what's

5    going on.  Again, I'm looking for some kind of something that

6    I thought might be organized that you would do as a group, you

7    know, and okay, let's go up there.

8    Q.    And as you were moving in that direction toward the

9    Capitol building, did you see any signs that you were in a

10   restricted area?

11   A.    I did not.  I didn't see any signs anywhere.  If they

12   were there, I didn't see them.  But one thing is, there's so

13   much going on.  I mean, this wasn't like something posted -- I

14   understand somebody made the testimony they were every five

15   feet.  If it had been every five feet you would have seen

16   them.  I'm not criticizing the lady that said that, but we saw

17   nothing because there was nothing there.  There might have

18   been some things on the ground, I don't know.

19        But anyways, there's so much stuff going on, you know, if

20   someone over here is doing something, someone there doing

21   something, someone else doing something and you're doing this

22   and this and this, you're not seeing a sign.  There was -- I

23   didn't see anything.  I didn't see a sign.  I didn't see a

24   fence.

25   Q.    At any point while you were on the Capitol grounds or in

1    the Capitol building, did you see any signs indicating you

2    were in a restricted area?

3    A.    None.

4    Q.    Did you see any or come across any barriers as you were

5    moving toward the Capitol building that --

6    A.    Not me personally, I did not.  Now, if they got a video

7    down there that's got me in it, I guess so.  But I don't

8    remember any such thing.

9    Q.    Did you see any law enforcement officers on the Capitol

10   grounds as you started to move towards the Capitol --

11   A.    Not until we got to the Capitol.

12   Q.    Did anybody say to you or indicate to you in any way that

13   you should not be where you were?

14   A.    No one.

15   Q.    Did you hear any announcements --

16   A.    Outside the Capitol?

17   Q.    Any announcements over any kind of loudspeaker indicating

18   that you should not be there?

19   A.    None.

20   Q.    That you should disperse?

21   A.    None.  If there would have been, we would have dispersed.

22   Q.    As you were -- we've seen a video in the trial here where

23   Casey makes a statement to the effect of "some guy just fell

24   off the wall."  Do you remember seeing that?

25   A.    I saw the video, yes.

```
 1    Q.   Do you remember that from the day of January 6?

 2    A.   I do not.  I didn't see it.

 3    Q.   We've seen some videos where there are some folks outside

 4    the Capitol chanting "USA, USA."  Do you recall seeing those

 5    videos?

 6    A.   Yes.  And I actually heard them.  I heard --

 7    Q.   So you recall that from January 6?

 8    A.   Yes.  I heard it.

 9    Q.   But you didn't turn around and leave.

10    A.   Because they're saying "USA"?

11    Q.   So was there any reason that you would have thought to

12    leave based on --

13    A.   No, no, no.  They could have said, you know, jump for joy

14    and I wouldn't have left.  I don't know.

15    Q.   Now, when -- at a certain point you walked up -- by the

16    way, did you observe that there were any doors that gave you

17    access to get into the Capitol building?

18    A.   Yes.  Once we got up there, I did.

19    Q.   And were those doors open or closed?

20    A.   They were open.

21    Q.   Did you -- and at a certain point you actually walk in

22    through those doors?

23    A.   Yes, I did.

24    Q.   Did any police officers indicate to you that you should

25    not do that?
```

1    A.   No.  Actually, I don't remember seeing anybody when I

2    first walked in, any police officers.

3    Q.   Do you recall seeing a video in this case here where

4    Casey makes a statement to the effect of "pepper spray, Dad"?

5    A.   I don't remember him saying -- I saw it in the video, but

6    I don't remember it happening then.

7    Q.   Okay.  Do you recall smelling any pepper spray?

8    A.   No.

9    Q.   Do you recall hearing anything to the effect that there

10    was a curfew that was going to be in place?

11    A.   That night when we got back to the hotel, we understood

12    in D.C. there was a curfew.  I don't remember what time it was

13    but it didn't, you know, bother us because we were in Crystal

14    City, so we could go.

15    Q.   Now, when you see the video where you walked in and you

16    can hear sort of an alarm sound --

17    A.   Right.

18    Q.   -- do you recall hearing that?

19    A.   I do recall hearing it.

20    Q.   And despite that, you didn't turn around and leave.

21    A.   You know, like I say, I've traveled for years, a lot of

22    Eastern Europe, Europe, Central America, and in hotels these

23    things go off all the time.  And nobody pays any attention to

24    it.  And I think Dave, or one of these guys made the -- gave

25    testimony to these police -- once we got inside there was some

1    policemen, Capitol Police, I guess, in a hallway, that maybe

2    something was going on down there.  They were kind of blocking

3    an area and maybe there was something going on down there.

4    But there seemed to be no urgency or emergency as we turned to

5    the right so I didn't -- I didn't feel like there was any

6    reason to --

7    Q.   So those police officers you're mentioning, those are the

8    ones we've seen on the video that are --

9    A.   Must have been, yes.

10   Q.   And you did not move toward them.

11   A.   Oh, of course not.

12   Q.   And then you started walking in the other direction?

13   A.   Yes.  We went right.  It seemed to be the way to go.

14   Q.   And, at a certain point, you've seen a video where you're

15   in what I think we call the Crypt?

16   A.   Yes.

17   Q.   Sort of a roundish --

18   A.   Yes.

19   Q.   -- area.  And you make a statement, or seem to be asking

20   a question about what was being said.

21   A.   Oh, the --

22   Q.   What was being said.  Do you recall that?

23   A.   I heard it on the video.  I don't remember that being

24   said at all.  It might have been, I just, I don't recall it.

25   Q.   Do you recall anybody saying -- during the time you were

1   in the Capitol building, do you recall any police officers or

2   anyone else telling you that you should leave?

3   A.   Nobody told us we should leave the Capitol building ever.

4   We actually left on our own without being told.

5   Q.   And just very briefly, when you walk in the Capitol, can

6   you just describe what occurs when you're inside the Capitol

7   building?

8   A.   A lot of activity.  People moving around.  A lot of them,

9   like Dave, never been to the Capitol before.  I had been.  So

10  that's why I just walked in, I didn't go very far.  I'm

11  surprised how far that I did go, because I think I walked down

12  it.  And there was nothing to see.  There was nothing there.

13  I guess look at people if you enjoy watching people.  So I

14  stood there, I think my total time inside the Capitol was nine

15  minutes, and they were -- they'd lost me and they were looking

16  for me, I'd walked back outside.

17  Q.   Did you see any violence while you were inside?

18  A.   Never.

19  Q.   Did you observe anybody having any confrontations with --

20  A.   Never.

21  Q.   -- police officers?

22  A.   Well, actually, I did.  But it was a family squabble

23  outside on the terrace.  It was just a family thing and they

24  dealt with it themselves.  That's the only thing I saw.  There

25  was no -- nobody shoving, hitting, anything like that while I

1  was in there.

2  Q.   Now, ultimately, you did come to learn that there was

3  some serious violence that had occurred at the Capitol that

4  day.

5  A.   Correct.  We did not know it.  As weird as it may sound,

6  God as my witness, I didn't swear on the Bible but I'm telling

7  you, God as my witness, that we did not know what --

8         MR. VALENTINI:  Objection.  Move to strike.

9         THE COURT:  Yeah.  We can't have those kinds of oaths

10  during the testimony.  So just give your testimony but

11  without --

12         THE WITNESS:  I thought I was doing it.  Anyway.  Now

13  I'm lost.  We didn't know until we got back to the hotel that

14  night that -- you threw me.  I can't say "God"?  That we got

15  back to the hotel and then we saw it on the news.  That's when

16  we saw what happened.  We weren't aware what happened on the

17  House side.  All that was over before we ever got up there.

18         MR. VALENTINI:  Objection.  Could we have a brief

19  sidebar, please?

20         THE COURT:  Okay.

21      (Bench conference.)

22         MR. VALENTINI:  Your Honor, I apologize for the

23  interruption.  After you admonished the witness, I understand

24  that the witness made a comment, oh, I cannot even say "God."

25  I don't have a ready solution for this.  But I'm beginning to

 1    suspect that this is a planted attempt to influence the jury,

 2    and it's completely out of bounds and I would request that the

 3    Court take any appropriate action that the Court may see

 4    appropriate under the circumstances.

 5            THE COURT:  Well, there's no action that I'm going to

 6    take at the moment because I think any action will just

 7    highlight and make it worse.  But I will counsel Mr. Pierce

 8    and Mr. Roots to ensure that we don't go down that route.

 9            MR. VALENTINI:  Thank you.

10        (End of bench conference.)

11    BY MR. PIERCE:

12    Q.   Now, during the time you were inside the Capitol

13    building, you saw various police officers?

14    A.   Yes.

15    Q.   Or -- hold on.

16    A.   There were police officers.  I don't know who was from

17    what department.  There were officers in there, yes.

18    Q.   How would you describe their mood or their affect

19    generally?

20    A.   Me, they were just doing their job.  I thought they were

21    there more for -- because I didn't know all this other stuff

22    had gone on.  I thought they were there more just to maintain

23    the crowds moving around.  That's what I thought.  Since they

24    weren't saying anything or doing anything, that's what I

25    thought, they're just there to control this crowd that's in

1    there.

2    Q.   Okay.  Now, just going through your conduct while you

3    were in the Capitol building and on the Capitol grounds, did

4    you ever push anyone?

5    A.   Never.

6    Q.   Did you ever confront anyone?

7    A.   Never.

8    Q.   Carry any signs?

9    A.   None.

10   Q.   Carry any flags?

11   A.   None.

12   Q.   Did you picket?

13   A.   No.

14   Q.   Did you parade?

15   A.   No.

16   Q.   Did you engage in any kind of physical violence?

17   A.   None at all.

18   Q.   Did you yell at anyone?

19   A.   I didn't even say "USA."

20   Q.   Did you personally have any interaction with any police

21   officers?

22   A.   I did.  I thanked one or two officers for being there and

23   for their service and we appreciated them.

24   Q.   Now, there's a picture we've seen in the trial of you

25   looking sort of at or through a broken window.  Do you recall

1   seeing that picture?

2   A.   I don't remember doing it, but I saw the picture.  But I

3   think what it was, it was a window.  It wasn't a door, it was

4   a window.  As you went in through that door it was open into

5   the Senate, and I was just looking at it just like you'd look

6   at a broken window or something.  You just looked at it,

7   that's all.

8   Q.   And why didn't you turn around and leave at that point?

9   A.   I didn't do it.  I didn't break the window.

10  Q.   Understood.  Now, when you were on the Capitol grounds or

11  inside the Capitol building, did you see any children?

12  A.   Of course, yes.

13  Q.   Did you see any elderly folks?

14  A.   I did.  What's elderly?  Look in the mirror, look at

15  myself.

16  Q.   Now, at some point, you decided to leave the Capitol

17  building?

18  A.   Yes.

19  Q.   Why did you decide to leave the building?

20  A.   Because there was nothing there.  There was no need to be

21  in there.  I just walked in to see what was going on.  And

22  Casey wanted to go to the bathroom.  So I was waiting for

23  that.  Then of course we got in that line and -- so just,

24  there was no need to be in here, get out.  So I walked out.

25  Q.   Did you destroy any property?

1    A.    No.

2    Q.    Did you go there with any intent to destroy any property?

3    A.    I had no intent of even going up there so certainly I

4    didn't go to destroy any property.

5    Q.    How long do you recall being inside the Capitol building?

6    A.    They gave me the time frame, I think it was 9 minutes.  I

7    think it was 7:09 to 7:18 according to the government's

8    videos.  I think that's right.

9    Q.    When you left the building, then what did you do?

10   A.    We went out and stood on the terrace there for a little

11   while, I think just watching what was going on.  And then

12   Casey or somebody said that the president tweeted -- or do you

13   call it tweeted or twitted, whatever -- and said it's time to

14   leave.

15        At that time then the Capitol Police, I guess it was, got

16   on line between the Senate and the -- between the Senate and

17   the dome... anyway.  They got in line, probably 20 lined up,

18   and they had their shields, clear shields, and their billy

19   clubs I guess, and they began to pound them, "bam bam bam bam

20   bam bam bam," to get everybody's attention.  And this is what

21   they're saying is, okay, it's time to leave, the party's over,

22   get out of here.

23        And so as they did that, the people turned around and we

24   walked away.  We started out, but as we got around the corner

25   of the building, the north side of the building, as we came

1    around that, Casey's wife, Ruth, called because their daughter

2    had jumped off of a sofa and cracked her head on like a coffee

3    table --

4              MR. VALENTINI:  Objection.  Hearsay.

5              THE WITNESS:  Well, I'm telling you when we stopped --

6              THE COURT:  Just a second.  Sustained.  You've given

7    the -- you can't go into an explanation of what someone said

8    because that's hearsay.  So I sustained the objection and you

9    can now ask your next question, Mr. Pierce.

10   BY MR. PIERCE:

11   Q.   And, at a certain point, did you end up actually leaving

12   the Capitol grounds?

13   A.   I'm sorry?

14   Q.   At a certain point did you leave --

15   A.   Yes.

16   Q.   -- the Capitol grounds?

17   A.   Yes.

18   Q.   Approximately, if you recall, how long after leaving the

19   building did you leave the Capitol grounds?

20   A.   30 minutes, maybe 40 minutes, something like that.  We

21   went around the north side, I can say that, and off to the

22   east over towards the Supreme Court, to get on the Capitol

23   South Metro and go back.  But the Capitol South was shut down

24   that day for repair or whatever, so we had to walk down to the

25   next one.  I don't know what the name of it was, but we had to

1    walk down to the next one.

2    Q.    And you already testified about you saw some things on

3    the news later that night.  And then the next day what did you

4    do?

5    A.    The next day -- well, the reason we were there, stayed

6    the next day was because again, Dave was with us and I wanted

7    to take him around and show him the city, whether this event

8    happened in the Capitol or not.  That was the plan.  We came

9    up on the 5th.  Then we were going to go to the rally on the

10    6th.  On the 7th I was going to take him to the monuments and

11    the different venues around the city, and then go home the

12    8th.  So the 7th, that was our plan, to get up and do that, no

13    matter what happened.

14        So we got up and I drove him up to show him the Supreme

15    Court, the congressional office buildings, the Hart and

16    Rayburn and Cannon and so on buildings.  Brought him around to

17    see Union Station, and then we came on down to the mall.  I

18    don't remember if we went into any museums.  I think they

19    might have been closed.  So we went to the Vietnam Memorial,

20    Lincoln Memorial and some of those things, and then up to

21    Arlington.

22    Q.    Do you recall ending up driving past the Capitol

23    building?

24    A.    We did.

25    Q.    And was that on purpose, to go back past the Capitol

1    building?

2    A.    No.    You can't get up to the Supreme Court without going

3    past the Capitol.    If there's a way, I don't know how to get

4    up there.

5    Q.    And we've seen on a short video, there was some tall

6    fencing that was in that video?

7    A.    Amazing, yes.    It was eight or 10 feet high.    We couldn't

8    figure out, did they put that up overnight?    And there was

9    National Guard guys about every 10 or 15 feet.    And we thought

10    why didn't they do this the day before?    We wouldn't have had

11    all this problem.    If they knew this crowd was coming, why

12    didn't they put the fence up on the 5th or something?

13    Q.    At any point in time when you're on the Capitol grounds

14    or in the Capitol building, did you believe that you were in

15    any way in a restricted area?

16    A.    150 million percent no.    When the guy came to arrest me,

17    I had no clue why he was there.    Banging on my door, there's a

18    army of cops outside my house.    I'm thinking somebody's been

19    shot, somebody got killed or something, and then they ran into

20    my house.    I had no idea what was going on.    I go out, they

21    asked me my name and --

22            MR. VALENTINI:    Objection.    Relevance.    403.

23            THE COURT:    Yes.    This is not responsive to the

24    question.    Ask your next question.

25            MR. PIERCE:    Yes, Your Honor.

```
 1        BY MR. PIERCE:
 2        Q.   Did you have -- in going to D.C., did you have any intent
 3        to impede any function of Congress?
 4             MR. VALENTINI:  Objection.  Calls for a legal
 5        conclusion.
 6             THE COURT:  I'll allow the question.
 7             THE WITNESS:  No, of course not.  Of course not.
 8        BY MR. PIERCE:
 9        Q.   Did you have any intent to disrupt or impede any law
10        enforcement officer from doing their job?
11        A.   Of course not.  We're big supporters of the police.
12        Q.   Okay.  And very quickly, I'm just going to show you about
13        10 seconds of a video.  If we could bring up -- and this is a
14        much, much shorter segment of the video we watched a little
15        bit earlier.  This is Government Exhibit 101.  Could you
16        please go to 1 minute and 40 seconds.
17             THE COURT:  I'm assuming you're about done with your
18        examination?
19             MR. PIERCE:  This is my last line of questioning, Your
20        Honor.
21        BY MR. PIERCE:
22        Q.   And Mr. Cusick, I'm going to ask you to focus on this
23        sort of the area of the police officers standing down here.
24        A.   Okay.
25             (Video played.)
```

1    Q.    Okay.  And what did you just see right there, Mr. Cusick?

2    A.    Down here?

3    Q.    Yeah.

4    A.    Oh, the girl?

5    Q.    Yeah.

6    A.    Back up, let me see it again if you would, please.

7    Q.    Could you just play that 10 seconds one more time.

8    A.    I was looking at myself.

9    Q.    Yeah, where it's circled there.

10         (Video played.)

11   A.    That's right.  A lot of people did that.  We were

12   grateful for them being there.

13         MR. PIERCE:  Okay.  Thank you very much, Your Honor.

14   No further questions.

15         THE COURT:  All right.  We'll break till 25 after.  So

16   I will see you in about 12 minutes.

17      (Jury out at 3:13 p.m.)

18         THE COURT:  All right.  See you in a few minutes.

19      (Recess from 3:13 p.m. to 3:31 p.m.)

20         THE COURT:  Please everyone be seated.  Welcome back,

21   members of the jury and Mr. Cusick.  And Mr. Cusick, I remind

22   you you're still under oath.

23      Mr. Valentini, cross-examination.

24         MR. VALENTI:  Thank you, Your Honor.

25

805

```
 1                      CROSS-EXAMINATION
 2    BY MR. VALENTINI:
 3    Q.   Good afternoon, Mr. Cusick.
 4    A.   Good afternoon.
 5    Q.   As you know, I'm one of the prosecutors in this case.
 6    A.   I understand, you're one of the prosecutors.  We're going
 7    to get along great.
 8    Q.   Mr. Cusick, fair to say that you too follow politics
 9    pretty closely?
10    A.   Yes.
11    Q.   That includes the 2020 presidential election that you
12    discussed on direct examination?
13    A.   Yes.
14    Q.   You spoke at some length in direct examination about your
15    feelings about that election.
16    A.   Yes.  I had feelings about it.
17    Q.   And you didn't like the outcome of that election?
18    A.   I like it or dislike it?
19    Q.   You did not like the outcome of that --
20    A.   Oh, of course not.
21    Q.   It made no sense to you.
22    A.   No.  I just thought there were problems there.
23    Q.   Because you thought there were problems, you decided to
24    go to D.C.?
25    A.   Yes.
```

1    Q.   And you knew when you decided to go to D.C. that Congress

2    was responsible for certifying the results of that election.

3    A.   No.  That was not the issue.  I didn't think of that.

4    Q.   Is your testimony that you were not aware of the

5    certification proceeding that Congress was required to have?

6    A.   I mean, I didn't know it was taking place --

7    Q.   Yes or no, were you not aware of the time of the

8    proceeding?

9    A.   No.  I was not.

10   Q.   You were not aware that the Congress was the institute --

11   the branch of government charged with certifying the results

12   of the Electoral College?

13   A.   Yes, I did.

14   Q.   You did.  Okay.  So the answer is yes, you did know that.

15   A.   Okay.

16   Q.   And you hoped that Congress would throw the election back

17   to the states.  Right?

18   A.   Yes.

19   Q.   You also knew that that proceeding was set to take place

20   in Washington, D.C., on January 6.

21   A.   Correct.

22   Q.   And you knew -- that was the reason why you and your son

23   Casey and Mr. Lesperance decided to go to Washington, D.C., on

24   January 6.

25   A.   No, not necessarily.

1    Q.   To protest the results of the election?

2    A.   Yes.  Just to come to support President Trump, who felt

3    like there was irregularities there, and just to support him.

4    Period.  At the -- at the Ellipse, where he was making a

5    speech.  That's all.

6    Q.   And at some point you also came to learn that the

7    certification proceeding was supposed to happen at one o'clock

8    p.m., right?  You testified on direct examination.

9    A.   Yes.  You're right.

10   Q.   And you also knew that proceeding was supposed to take

11   place in the United States Capitol?

12   A.   Sure, yes.

13   Q.   You came to learn that?

14   A.   Yes.

15   Q.   And to be clear, you came to learn all of these things

16   before you entered the Capitol on January 6, 2021?

17   A.   I thought it was over before we went to the Capitol.  Is

18   that what you --

19   Q.   No, you learned about the certification proceeding before

20   you got to the Capitol --

21   A.   Yes.

22   Q.   -- on January 6, 2021?

23   A.   But I thought it was over.

24   Q.   We'll get to that.

25   A.   Okay.

1    Q.   You also testified that you went to the President Trump's

2    speech at the Ellipse on January 6.

3    A.   Yes.

4    Q.   That was earlier in the day.

5    A.   Correct.

6    Q.   And you were there for a few hours?

7    A.   Several hours, yes.

8    Q.   And like Casey Cusick, your son, and Mr. Lesperance, you

9    at some point went through security screening there?

10   A.   Yes.

11   Q.   Now, your decision to go down to the Capitol, I believe

12   it was your testimony, correct me if I'm wrong --

13   A.   Okay.

14   Q.   -- was in part prompted by the president's speech.

15   A.   Correct.

16   Q.   That's because, again, correct me if I don't remember

17   your testimony correctly, because the president made clear

18   that the protest was to try to influence some members of

19   Congress.

20   A.   I don't know about influence them, but just let them know

21   we're dissatisfied with what's taken place here.  I never

22   understood that we were trying to influence anything, except

23   the fact that we think there's some irregularities.  But not

24   the vote in the House that was taking place.

25   Q.   Let me be clear.  Did you or did you not -- did you

 1     listen to the president's speech on January 6?

 2     A.   Yes.

 3     Q.   Did the president or did he not say that the point was to

 4     go cheer some of our senators and some of our members of

 5     Congress?

 6     A.   I was not aware of that.  If he said it, I didn't hear

 7     it.

 8     Q.   That speech that the president gave was not over until

 9     after 1 p.m.?

10     A.   It was after.

11     Q.   And you went down to the Capitol because the president

12     told you that something of relevance to the election was going

13     to happen at the Capitol.

14          MR. ROOTS:  Objection.  Mischaracterizes.

15          THE WITNESS:  No.  No.

16          THE COURT:  Wait a minute.  Don't answer.

17          THE WITNESS:  Okay.

18          THE COURT:  The objection is overruled.

19          THE WITNESS:  I thought that the vote was already over.

20     BY MR. VALENTINI:

21     Q.   That's not my question.  My question is you went to the

22     Capitol after 1 p.m.

23     A.   Yes.

24     Q.   And you went to the Capitol after 1 p.m. because after 1

25     p.m. the president in his speech said go down to the Capitol

810

```
1    to do something of consequence to the election.

2    A.   Just be there.

3    Q.   Yes.

4    A.   Okay.

5    Q.   But the point is, at that point, after 1 p.m., you went

6    down to the Capitol?

7    A.   Yes.

8    Q.   Following the president's speech.

9    A.   Correct.

10   Q.   And that was your decision.

11   A.   Yes.

12   Q.   Let me ask you a little bit about your trip to Washington

13   more generally.  Let me ask you about -- you said you left

14   from Florida on January 5?

15   A.   Yes.

16   Q.   And you took the same flight as -- you took the same

17   flight as your son and Mr. Lesperance?

18   A.   Correct.

19   Q.   You went through the same security line at the airport

20   down in Florida?

21   A.   Correct.

22   Q.   Probably went through one of the same metal detectors?

23   A.   Correct.

24   Q.   Maybe a scanner?

25   A.   Yes.  I don't remember, but probably.
```

```
 1    Q.   Ran your luggage, just like your son Casey testified

 2    today, through one of those x-ray machines?

 3    A.   Okay, Yes.

 4    Q.   Again, just to get on an airplane.  Is that a yes?

 5    A.   Yes.

 6    Q.   And again, you mentioned today that you went -- at the

 7    Ellipse you tried to get close to the stage.

 8    A.   Correct.

 9    Q.   And that that required some further screening?

10    A.   Correct.

11    Q.   Further metal detectors?

12    A.   Yes.

13    Q.   Further wanding.

14    A.   Right.

15    Q.   You also testified that you've been to the Capitol dozens

16    of times before.

17    A.   I have.

18    Q.   And this is not just -- strike that.

19         When was the last time that you were at the Capitol prior

20    to January --

21    A.   That's a great question.

22    Q.   -- 6, 2021?

23    A.   Trying to think when's the last time I was in that

24    Capitol.  Most of the lobbying we did over at the

25    congressional offices.  It might have been 20 years ago inside
```

1       the Capitol.

2       Q.   So you've not been to the Capitol in 20 years?

3       A.   I haven't been in the Capitol itself in probably 20

4       years.

5       Q.   But on that day, on January 6 and the prior days, you

6       said you went through at least two metal detectors?

7       A.   Correct.

8       Q.   Just to get on a plane.

9       A.   You're right.  Yes.

10      Q.   And just to attend an open-air speech.

11      A.   Yes.  You're right.

12      Q.   But when it came to Congress, you didn't go through a

13      metal detector when you entered that building, did you?

14      A.   No.  Because there wasn't one there.

15      Q.   You also did not go through any security screening there.

16      A.   No.

17      Q.   You just walked through a door.  Right?

18      A.   We walked through a door.  Yes.

19      Q.   Was that door open?

20      A.   The door was open.

21      Q.   Was the glass intact on that door?

22      A.   I don't know -- I don't remember.

23      Q.   You didn't see it.

24      A.   The door was just open, I didn't see it.

25      Q.   You didn't see it.  Let's pull up Exhibit 228.

1          Do you see any broken windows around there?

2     A.   I saw the window.  You saw me standing in front of the

3     window.  But as far as the door, I did not -- if there was

4     damage to the door, I didn't see it.

5     Q.   How far was the window that you did see from the door

6     that you walked through?

7     A.   I don't know, 10 feet?  I don't know how far it was.

8     Q.   So maybe you saw the broken window, the broken glass pane

9     that you walked through, or maybe you did not.  Right?

10    A.   I saw this one, yes.  I didn't see any breakage on the

11    door itself when I went in.

12    Q.   But within 10 feet of that door, you're not contesting

13    that you did see a broken window.

14    A.   Yes.  Right here.  It's actually like -- there's a step

15    here and so many people going through it, I'm up on a step.

16    That's why I'm so close to that window.  You can see that girl

17    in front of me.  She's lower than me.  She stepped down.  So

18    that's why I was up there in the first place.

19    Q.   And you took a good look at that window.

20    A.   I did.  Yeah.

21    Q.   It caught your attention, right?

22    A.   Well, yeah, wondering who's the fool that did this.

23    Q.   Right?  Like a broken window in the United States

24    Capitol.

25    A.   Exactly.

1    Q.   On the day the certification of the Electoral College is

2    supposed to take place in that building.

3    A.   I don't know what day they did it.  That's the day I

4    thought.  When they did it, I don't know.  But still...

5    Q.   Right.  The fact that there was a broken window --

6    A.   A broken --

7    Q.   -- in the United States Capitol on the day that the

8    certification of the Electoral College was supposed --

9    A.   I saw it on the day.  I don't know when it --

10   Q.   No, I understand.

11   A.   -- was broken.  I saw it that day.

12   Q.   When you saw the broken window, you didn't turn around.

13   A.   I did not.

14   Q.   You said before you had been to the Capitol dozens of

15   times?

16   A.   I have.

17   Q.   In those dozens of times, how many times did you see a

18   broken window in the United States Capitol building?

19   A.   I don't recall.  I mean --

20   Q.   Well, do you recall any times when you saw a broken

21   window in the Capitol?

22   A.   I don't recall there being one, I don't recall there not

23   being one.  I don't remember.  I don't know.

24   Q.   Do you remember ever walking into the Capitol building

25   within you said 10 feet of a broken window?

1    A.    No.  I don't think so.  I don't know.  You're asking me

2    35, 40 years.  I don't know.

3    Q.    It could have happened?

4    A.    It could.  You're right.  I'll go with that.

5    Q.    You just don't remember today.

6    A.    I just don't remember.

7    Q.    Do you remember ever walking through glass shards to walk

8    into the Capitol building?

9    A.    No.

10    Q.    That never happened?

11    A.    Not to my knowledge.

12    Q.    Not before January 6?

13    A.    Not before January 6 or January 6.

14    Q.    Do you remember once you got to the United States

15    Capitol, that's not the first -- that broken window is not the

16    first thing that was unusual compared to your prior visits to

17    the Capitol, was it?

18    A.    What else was unusual?  I don't know.

19    Q.    So in your direct testimony you said that as you

20    approached the Capitol what you saw was a -- and I believe I'm

21    quoting you -- was a mixed bag.  Correct?

22    A.    Yes.

23    Q.    A mixed bag of what?

24    A.    A mixed bag of what the Officer Cartwright said.  There

25    were people that were shouting and there were people that were

1    showing love.  That was his testimony.  And that's what I saw.

2    There were people that were just being there, milling around,

3    and then there were people that "USA" and carrying banners or

4    flags or something like that.  So it was a mixed bag of

5    people.

6    Q.    There were also people climbing up the walls of the

7    Capitol?

8    A.    There was.

9    Q.    And you saw those people?

10   A.    I'm sure I did.  Once you showed me this and the video

11   today, it reminded me that there was probably people climbing

12   up, yes.

13   Q.    But that didn't cause you to -- let me ask you this.

14   Before January 6, in your dozens of visits to the Capitol, how

15   many times had you seen people climbing the walls of the West

16   Terrace?

17   A.    Well, you know, I don't know how many, but I brought

18   school kids up here many times.  And I have seen them try to

19   climb walls there and some of the other museums, and I have to

20   get them down.

21   Q.    Mr. Cusick, I'm not asking you about any walls.  I'm

22   asking you about the wall of the West Terrace of Congress.

23   A.    It's the only time I've seen it there that I know of.

24   Q.    But that, like the broken window, didn't make you realize

25   that something was out of order?

```
 1    A.   No.

 2    Q.   That maybe you were not supposed to be there?

 3    A.   No.

 4    Q.   Another thing that you saw on the way to the Capitol is

 5    snow fencing.  Right?

 6    A.   I do not remember seeing any snow fences anywhere.  Did I

 7    testify to that?  If I did, I don't remember it.

 8    Q.   Let's pull up Exhibit 211.  I'm sorry, 206, at 1:16.

 9         THE COURT:  206 is what we have?

10         MR. VALENTINI:  206 is where we're at.  Yes.  I'm

11    sorry.

12       (Video played.)

13    BY MR. VALENTINI:

14    Q.   First of all, you heard your son's testimony today.

15    A.   Yes.

16    Q.   He testified today that he was somewhere else away from

17    Mr. Lesperance at this point and was in the --

18    A.   Yes.

19    Q.   You were with Mr. Lesperance.  Right?

20    A.   Correct.

21    Q.   So you see here on the ground, you see the snow fencing,

22    right?

23    A.   What are you showing me?  The shoes?

24    Q.   Do you see the green snow fencing?

25    A.   Okay.  Looks like a mat to me.  I don't know what a snow
```

1     fence --

2     Q.   Yeah, the mat.  Do you see that?

3     A.   I see it, yes.

4     Q.   Let's play a few seconds of the exhibit.

5          (Video played.)

6          Mr. Lesperance, who recorded this video, he walked right

7     over this mat?

8     A.   Okay.

9     Q.   Or snow fencing?

10    A.   Okay.

11    Q.   Did you walk over that snow fencing?

12    A.   I don't know.  I don't remember.  There's so much

13    activity going on around you that you're not focused on any

14    one thing.  You're looking at all kinds of things.

15    Q.   Is one of the things you're looking at this --

16    A.   Never saw this --

17    Q.   -- ripped out snow fencing?

18    A.   If I saw it, I don't remember it.  It's the first time --

19    when you showed the video, it's the first time I saw it.

20    Q.   Another thing that you claim you did not see on your way

21    to the Capitol are signs, right?

22    A.   Correct.

23    Q.   Can we go to 208, Exhibit 208, about 24 seconds into the

24    exhibit.  Let's play from there.

25         (Video played.)

1         Did you see this Area Closed sign?

2    A.    No.  If it had a blue circle around it, I might have.

3    But there's so much activity going on out there, who knows

4    what direction I was looking at.  I could be looking straight,

5    left, I have no idea.  But I do not remember seeing any of

6    these signs there.

7    Q.    Is it fair to say that your answer to every question I'm

8    going to ask you today is going to be, oh, there was so much

9    activity, I did not see that?

10   A.    Well, that was the reason.  That's why I say that.

11   Q.    Let's continue.

12        (Video played.)

13        We can skip forward to I believe 1:19.

14   A.    Can I ask you to back that up a little bit?

15   Q.    There's no question pending.

16   A.    Okay.

17   Q.    Let's go to 1:55.  And if you could play from 1:55 to

18   2:10.

19        (Video played.)

20        You can actually stop here.

21        This line of police officers, you testified today that

22   you did not see any riot police officers outside the Capitol

23   building?

24   A.    I saw them later.  I don't remember seeing them then.

25   Q.    These ones you did not see?

820

1    A.    If I did see them, I don't remember seeing them.

2    Q.    Let's continue playing.

3          (Video played.)

4          Let's stop now.  This line of police officers, do you

5    remember seeing that one?

6    A.    I don't think so.  But you're going with David's camera.

7    He's looking that way.  Where am I?  I'm not sure where I am

8    in this video.

9    Q.    You went from the West Terrace into the Capitol building

10   with Mr. Lesperance.  Right?

11   A.    Correct.  We're coming up to the West Terrace, or he is

12   coming up to the north end of the West Terrace now, getting

13   ready to head south.

14   Q.    You did not lose track of each other until later on

15   inside the building?

16   A.    Inside the building, yes.

17   Q.    But at this point, you guys were together?

18   A.    Correct.  Somewhere.

19   Q.    And there was a line of -- well, let's count them.  How

20   many police officers are you able to count here?

21   A.    Me?

22   Q.    Yeah.

23   A.    Oh, I don't know.  Six or eight I guess.

24   Q.    There's a line of at least eight police officers.  Are

25   they wearing hard helmets?

1    A.    Yes.

2    Q.    Visibility vests?  Those would be the bright vests.

3    A.    Yes.

4    Q.    Let's keep playing.

5          (Video played.)

6          We can stop here.  Just to be clear, your testimony today

7    is that you did not see any of that police activity that

8    Mr. Lesperance recorded?

9    A.    From where you showed me that recording when I started, I

10   did not.  When they came around the front here, I do remember

11   them coming in.

12   Q.    Let me also ask you, once you got to the Capitol

13   building, your testimony today is that you did not smell any

14   pepper spray?

15   A.    I did not.

16   Q.    Did you smell any sour stink?

17   A.    I don't remember smelling anything.

18   Q.    Did you hear your son say, "Pepper spray, Dad"?

19   A.    On the video I did.

20   Q.    But not until now.

21   A.    No.

22   Q.    Did you hear a blaring alarm sound when you walked into

23   the Capitol building?

24   A.    Yes.  I don't know when we first walked in, but I did

25   hear it in there.

1    Q.   And your testimony today was you, like your son, you were

2    not alarmed by the alarm?  His words.

3    A.   I was not alarmed with the police standing there, they're

4    not doing anything.  And like I say, I've been in hotels and

5    buildings before, these things go off and nobody does

6    anything, they get it fixed.  I did not understand what it

7    was.

8    Q.   In your dozens of prior visits to the Capitol building

9    were you ever welcomed to the Capitol building by a blaring

10   alarm sound?

11   A.   I'm sorry?

12   Q.   You testified before that you visited the Capitol dozens

13   of times?

14   A.   Yes.

15   Q.   On any of those visits were you welcomed to the Capitol

16   by a blaring alarm sound?

17   A.   I don't remember if I ever did.  I believe I was in the

18   House, in the Cannon building, one day and it went off.  And

19   nobody did anything.  Somebody came running down the hall

20   saying it's okay, it's okay, it's okay.  That was some time

21   ago.  We were lobbying there.

22   Q.   And the testimony today about the alarm that you did hear

23   on January 6 is that you thought it was someone else's

24   business.

25   A.   I wasn't sure.

1    Q.   Your testimony today is that you believed that it was

2    because something probably happened on some other part of --

3    A.   Oh, I understand -- I misunderstood you, sir.  Yes.

4    That's my testimony.  I stand by it.

5    Q.   Let me ask you about that testimony.  Because you said

6    that you put two and two together when you saw a line of

7    police officers to your left and you heard the alarm sound.

8    And at that point you realized that probably something was

9    going on out on that wing of the --

10   A.   That's correct.  You're right.

11   Q.   But earlier in the testimony you testified that you did

12   not see any riot police officers until you got out of the

13   building.

14   A.   Well, I don't know what they are.  I have no idea which

15   unit is which.  I said we came out of the building when it was

16   time to go, these -- I guess they're, I don't know what they

17   are, riot police or whatever, there were about 20 of them,

18   just got on line and beat their shields, it's time to go, and

19   we left.

20   Q.   I'm talking about the police officers you saw once you

21   walked into the Senate Wing door.  Your testimony about the

22   alarm is that well, there were a line of police officers --

23   A.   There were police officers --

24   Q.   -- there, so probably something was going off on that

25   side of the building.

```
 1    A.    Right.

 2    Q.    But earlier in your testimony you testified that you did

 3    not see any riot police officers until you got out of the

 4    building and you heard them banging their batons.

 5    A.    You know, I didn't think about them being riot police

 6    officers.  They were just police officers over there.  I

 7    didn't know what they were.  All I knew was don't go that way.

 8    Q.    Let's pull up 211.

 9          (Video played.)

10          So, just to be clear, you see yourself in this --

11    A.    Yes.

12    Q.    -- frame?  And you saw your son in --

13    A.    I did.

14    Q.    -- the frame --

15    A.    Correct.

16    Q.    -- just a minute --

17    A.    Correct.

18    Q.    -- immediately behind you?

19    A.    Yes.

20    Q.    And he just said "Pepper spray, Dad"?

21    A.    I did.

22    Q.    Your testimony is that you just didn't hear that at the

23    time?  You did not hear --

24    A.    No.  I don't remember.  At the time, no.  Now, since it's

25    in the video, I said yes, I heard it.
```

1    Q.   I'm asking at the time.  At the time you just didn't hear
2    it?
3    A.   I'm sorry.  I don't --
4    Q.   At the time on January 6, 2021, when your son shouted out
5    "Pepper spray, Dad" within three feet of you, you just did not
6    hear him screaming that out?
7         MR. PIERCE:  Objection.  Mischaracterizes his
8    testimony.
9         THE COURT:  Overruled.  You may answer.
10        THE WITNESS:  I don't know.  That's the only way I can
11   answer it.  I don't know.
12   BY MR. VALENTINI:
13   Q.   Earlier in your testimony you said you did not hear
14   anyone, your son, shout "Pepper spray, Dad"?
15   A.   That is correct.
16   Q.   But now, upon seeing the video and realizing how close
17   you were, I understand your answer has changed to I don't
18   know.
19        MR. PIERCE:  Objection.  Mischaracterizes his
20   testimony.
21        THE COURT:  Overruled.  You may answer.
22        THE WITNESS:  I don't remember him saying "pepper
23   spray" until you showed me the video.  He may have said it.  I
24   don't remember him saying it.
25

1    BY MR. VALENTINI:

2    Q.    Let's continue playing maybe two or three seconds.

3          (Video played.)

4          Let's stop.

5          You see these two police officers with --

6    A.    I do.

7    Q.    -- helmets?

8    A.    I do.

9    Q.    Hard helmets?

10   A.    Yes.

11   Q.    And their visors down?

12   A.    Yes.

13   Q.    Those are not riot police officers as you understand it?

14   A.    I see them standing there.

15   Q.    So this is before you saw riot police officers with their

16   batons?

17   A.    Outside, yes.

18   Q.    But those were standing there and those are the police

19   officers whose presence made you think oh, maybe this alarm is

20   because something else is going on on the other side of the

21   building.

22   A.    Okay.

23   Q.    Okay.  I also wanted to ask you about what happened after

24   you left the building on January 6.  You exited the Capitol

25   building at approximately 3:20 p.m.?

1    A.    Yeah.  3:18 I believe it was.

2    Q.    And you left the -- but then after that you went to the

3    Upper West Terrace.

4    A.    I went out on the terrace and stood there a minute.

5    There was a scuffle between a family and we watched it, trying

6    to calm them down.  I didn't get down there personally but

7    others were trying to calm them down.  And we just stood there

8    a little bit.  Actually, I was out there first and was waiting

9    for these two to come out.

10    Q.    When you say a little bit, you were on the Upper West

11    Terrace for over an hour.

12    A.    Oh, I didn't realize I was there an hour.  But I was only

13    standing out there.

14    Q.    Excuse me.  I didn't hear your answer.

15    A.    I said if I was out there that long, I was just standing

16    there.  I wasn't doing nothing.

17    Q.    But in fact, you did not leave from the Upper West

18    Terrace until almost five minutes before the riot police

19    cleared the area.

20    A.    Whatever time it was, however long it was, when they said

21    go, we went.

22    Q.    But until the riot police cleared the area, you did not

23    leave the Upper West Terrace?

24    A.    I was on the terrace.

25    Q.    And after that you did not leave the restricted area

1   around the Capitol.

2        MR. PIERCE:  Objection.  Calls for a legal conclusion.

3   BY MR. VALENTINI:

4   Q.   Where did you go?

5        THE COURT:  Wait a minute, wait a minute.  That

6   objection is sustained.  You don't have to answer the

7   question.  Next question.

8   BY MR. VALENTINI:

9   Q.   Where did you go when you left the Upper West Terrace?

10  Did you leave the Capitol grounds?

11  A.   Yes.  We walked around the north side.  And Casey got a

12  phone call, if I can say this, and he had to stop because his

13  child had busted her head open --

14  Q.   Okay.

15  A.   No, but you're asking me.  So I stopped, we had to stop

16  there.  That was part of exiting, is stop and to deal with

17  that.  And then after we did that, we went on across the

18  parking lot on the east side of the building, headed down to

19  Capitol South Metro.

20  Q.   And all of that was over an hour after you left the

21  Senate Wing door.

22  A.   I don't know how long it was.

23  Q.   You don't know.  You don't know it was less than an hour,

24  do you?

25  A.   I have no idea how long it was.  I was just outside on

1        the terrace.  That's all I know.

2        Q.   You also went back to the Capitol on January 7?

3        A.   No.  We didn't go back to the Capitol.  We went past the

4        Capitol, but I didn't go back to the Capitol.

5        Q.   But you did drive between the Supreme Court at the east

6        side of the United States Capitol?

7        A.   Correct.  We went past the Capitol, but it was fenced

8        off, the whole Capitol was, that block was.  And went by the

9        Supreme Court and the congressional offices and down to Union

10       Station.

11       Q.   And you stopped your car there?

12       A.   No.  We never stopped.

13       Q.   You never stopped?

14       A.   No.

15       Q.   But you did -- Mr. Lesperance did take a recorded video.

16       A.   Well, I'm driving.  I don't know.  I did not stop to take

17       a video.

18       Q.   I have no further questions.

19       A.   Thank you.

20              THE COURT:  Mr. Pierce, redirect?

21              MR. PIERCE:  Thank you very much, Your Honor.

22                        REDIRECT EXAMINATION

23       BY MR. PIERCE:

24       Q.   Mr. Cusick, when Mr. Lesperance was filming, if you

25       recall, was he filming at eye level or was the video

1    perspective altered by him --

2    A.   Had the camera -- a lot of the people had the cameras way

3    up here.

4    Q.   Is it safe to say that -- strike that.

5         THE COURT:  Don't lead the witness, please.

6         MR. PIERCE:  Yes, Your Honor.

7    BY MR. PIERCE:

8    Q.   Would the viewpoint from Mr. Lesperance's handheld camera

9    have been the same as the viewpoint that you had yourself from

10   your eyes?

11   A.   No.  Of course not.

12   Q.   When you went down there to the Capitol grounds and then

13   when you went into the Capitol building, did anyone direct you

14   to go through any kind of security screening or metal

15   detector?

16   A.   No.  There was none there and there was no directions as

17   to which way to go.

18   Q.   Were you given any guidance by authority figures with

19   respect to going through a security screening process?

20   A.   None.

21   Q.   If you were, would you have complied with those

22   directives?

23        MR. VALENTINI:  Calls for speculation.

24        THE COURT:  Overruled.  You may answer that question.

25        THE WITNESS:  Absolutely.  If that's what they asked me

1    to do.  Just like coming in the building here, I'll do what

2    they tell me to do.

3    BY MR. PIERCE:

4    Q.   Okay.  Now I'm going to show you a brief segment of one

5    video.  Can we take a look at Government Exhibit 208, please.

6    And we're going to start at 54 seconds in.

7         (Video played.)

8         Okay.  Stop right there.

9         Mr. Cusick, do you see yourself --

10   A.   I do.

11   Q.   -- in this video?

12   A.   I do.

13   Q.   And I'd like you to just continue to watch the next 10 or

14   15 seconds or so.

15        (Video played.)

16        Okay.  Do you see that police officer moving that

17   barricade?

18   A.   I do.

19   Q.   Did you ever on January 6, on the Capitol grounds or

20   inside the Capitol building, see any protester move any

21   barricade?

22   A.   No.  Never saw a protester.

23   Q.   Just a few more questions, Mr. Cusick.  When you went

24   through the security situation at the Ellipse when you went to

25   President Trump's speech --

1      A.   Right.

2      Q.   -- were there Secret Service personnel there?

3      A.   I don't know what department they were with.  There were

4      people there.  I don't know who they were with.

5      Q.   Were there some form of law enforcement --

6      A.   Correct.

7      Q.   -- officers there?

8      A.   Sure.

9      Q.   Were they outnumbered?

10     A.   Oh, goodness, yes.

11     Q.   When you went through the security screening process at

12     the airport, did you see any TSA officers?

13     A.   I did.

14     Q.   Were they outnumbered?

15     A.   Absolutely.

16     Q.   Two more questions.  What color is grass, Mr. Cusick?

17     A.   Well, in most places it's green.  In Kentucky they say

18     it's blue.

19     Q.   What color was the snow fencing that Mr. Valentini showed

20     you?

21     A.   It was green.

22          MR. PIERCE:  Thank you.  No further questions.

23          THE COURT:  All right.  Mr. Cusick, you may step down.

24          THE WITNESS:  Thank you very much, sir.

25        (Witness steps down.)

1          THE COURT:  Next witness, Mr. Pierce and Mr. Roots?

2          MR. ROOTS:  The defense calls Mr. Dave Sumrall.

3       DAVID SUMRALL, WITNESS FOR THE DEFENSE, SWORN

4                   DIRECT EXAMINATION

5    BY MR. ROOTS:

6    Q.   Good afternoon.  Would you please state and spell your

7    name for the court reporter.

8    A.   David Sumrall.  D-A-V-I-D, S-U-M-R-A-L-L.

9    Q.   And, Mr. Sumrall, where are you from?

10   A.   From the Dallas, Texas area.

11   Q.   And what do you do there?

12   A.   I am in construction.  I'm a carpenter.

13   Q.   And do you also have a hobby or an avocation?

14   A.   I do, the Stop Hate Awareness Program.  Yes, sir.

15   Q.   What is that, if you could just --

16   A.   Stop Hate was founded in 1992 during the LA riots.  We

17   saw what the media did with the little piece of video and have

18   been trying to bring awareness to the role of the media in

19   society for the last 31 years.

20   Q.   And does your organization have a website?

21   A.   It does, at StopHate.com.

22   Q.   And it's existed for how many years?

23   A.   The website, of course, '92 when we started there was no

24   internet.  So as soon as the internet was available we grabbed

25   a website, a couple years back.

834

Q.   And you're still active -- the Stop Hate organization is
still active?

A.   Yes, it is.

Q.   What is the focus, generally speaking, in recent times?

A.   Over the last two and a half years it's been focused on
January 6.  Before that it was demand free speech, looking
into deplatforming, debanking, censorship from big tech and
the media.  And then after January 6 it's been pretty much our
focus.

Q.   And have you had any chance to be on any major media,
television shows or anything?

A.   Yes.  I do several appearances, I guess, on different
talk show hosts.  Tucker Carlson had me on one time talking
about the book that was published, "The American Gulag
Chronicles -- Letters From Prison."  It's another organization
I'm also on the board of directors, and it's a collection of
letters from the J6 prisoners, and it's a fundraiser for them
as well.

Q.   And would you refer to yourself as an advocate for
January 6 defendants?

A.   Absolutely.

Q.   And is there another reason you're interested in
January 6?

A.   I was there, so -- as well as several of my employees,
and several of them were charged with criminal acts, and so we

1    had a vested interest in investigating what actually took

2    place.

3    Q.   Did you have occasion on January 6 to film anything or

4    shoot any videos?

5    A.   That's the entire reason we went.  I took a small team of

6    videographers to film the day.  I'm not a huge Trump fan, so I

7    didn't go for that part of the day, I guess.  I went to

8    document history.  And with our experience, knowing that the

9    media doesn't always show the truth, we thought maybe we would

10   capture some video that would be important.  And we did.

11   Q.   I would like to bring up a snippet of a video which is

12   Defense Exhibit 168, which is not yet in evidence.

13              THE COURT:  168.

14              MR. ROOTS:  168.  Defense 168.

15              THE COURT:  All right.  And do I find that on your

16   exhibit list?

17              MR. ROOTS:  Yes.

18              THE COURT:  Under what number since my exhibit list

19   ends at 129?  Is this additional exhibits you've identified to

20   me and the government?

21              MR. ROOTS:  I believe this was on our original and as

22   well as our --

23              THE COURT:  Well, 168 is not a number that appears on

24   the list you've given me.

25              MR. ROOTS:  I believe that we discussed this in a

1     pretrial conference.

2          THE COURT:  And you then identified a series of

3     exhibits, and I think you're being directed to different

4     numbers than 168.

5          MR. ROOTS:  Okay.  I've just been corrected.  It's now

6     been changed to 99.

7          THE COURT:  It hasn't now been changed.  It was changed

8     some time ago I think, Mr. Roots.

9          MR. ROOTS:  Or it's been redesignated at some point

10    earlier to 99.

11         THE COURT:  All right.  And I just need to make sure

12    that we're dealing with the same list.  The list that you're

13    showing up on the screen now is an earlier version.  The last

14    version I got was changed to this formatting so that I could

15    deal with it.

16      Is the 99 on this formatting the same as the 99 that you're

17    trying to introduce into evidence?  And that would be labeled

18    "open-source video of J6 7."  Or is it a different one?

19         MR. ROOTS:  I believe the answer is yes.

20         THE COURT:  Well, you're hoping.

21         MR. ROOTS:  Hold on.

22         THE COURT:  I need to know what it is.  We need to have

23    a record that's clear.

24         MR. ROOTS:  Yes.  We've had this on our list from the

25    beginning, I believe.  It's 105.

 1          THE COURT:  It's 105.  Now, 105 on this list says

 2     "Cross Tabs D.C. 011822."  Is that really what it is?

 3        (Pause.)

 4          MR. ROOTS:  While she's looking those up, I'll just ask

 5     a couple other questions.

 6     BY MR. ROOTS:

 7     Q.   What was the atmosphere like that you -- well, let's

 8     start with some time questions.  What time did you get near

 9     the Capitol grounds?

10     A.   So we arrived at the Peace Monument, which is at the gate

11     with the infamous push through, about 20 minutes before that

12     happened.  So we were there a little earlier than most people

13     and got to see that it was actually the second gate that had

14     the police.  There was a first gate that nobody ever talks

15     about that was right on the curb, I guess, with people

16     standing.  It was unguarded, no police.  And the police were

17     standing at -- the five police officers were standing up the

18     steps at that next gate, I don't know, 30 yards away or more.

19          And it just seemed like, you know, it was a festive

20     attitude.  People were doing Stop the Steal and God bless

21     America, and it seemed like a pretty festive time at that

22     point.

23     Q.   About what time of the day would you say that was?

24     A.   Oh, that was 12:30 to 12:40 when we got there, somewhere

25     along in there.

1    Q.   If you could summarize the size of the crowd at about

2    12:30 that day.

3              THE COURT:  At the location where he was?

4              MR. ROOTS:  Around the Peace Monument area.

5              THE WITNESS:  There were probably several hundred

6    people that came in over a few minutes, and then it turned

7    into several thousand people very soon after.  People were

8    marching down from the Ellipse at that point.  So we got there

9    earlier than the crowd, but they were right behind us.

10   BY MR. ROOTS:

11   Q.   And just for the record, you talked about the Ellipse.

12   You just talked about 12:30.  What time was President Trump's

13   speech at the Ellipse?

14   A.   He was still speaking at that point, I believe.

15   Q.   And to your knowledge, what time did he finish speaking?

16   A.   I'm not really sure exactly what time he finished.  We

17   were already gone.  We couldn't hear or see him speaking, so

18   we went on down to the Capitol to try to film the crowd.

19             MR. ROOTS:  Okay.  So I've just been told that 99 is

20   the number, which has at another time been called 168.

21             THE COURT:  So 99, which is open-source video of J67.

22             MR. ROOTS:  Yes.

23             THE COURT:  All right.  That's what we're dealing with.

24   It's not in evidence yet.

25             MR. ROOTS:  It's not in evidence.  If we could just

1    have Mr. Sumrall look at the screen.  And we could just show a

2    brief snippet.

3          THE COURT:  I don't think it's coming up.  We're

4    hearing audio but it's not coming up on the screen.

5          MR. ROOTS:  Black screen.

6       There it is.

7    BY MR. ROOTS:

8    Q.   Just a couple seconds just for you to orient yourself.

9         Do you recognize this video?

10   A.   I do.

11   Q.   How do you recognize it?

12   A.   That's the location we were in front of the Peace

13   Monument.

14   Q.   Is this video that you actually took?

15   A.   I'm trying to tell if it is.  Either I did or the guy

16   standing next to me, David Snow did, one of the two of us.

17   Q.   And he is associated with your organization?

18   A.   He was with my team that day to film, yes.

19   Q.   Okay.

20         MR. ROOTS:  With that I would move for the admission of

21   Defense 99.

22         MR. VALENTINI:  No objection.

23         THE COURT:  Without objection, Defense 99 is admitted

24   and may be published.

25

1                                   (Defendant Exhibit No. 99

2                                       received into evidence.)

3           MR. ROOTS:  And we'd like to show this to the jury.

4        (Video played.)

5    BY MR. ROOTS:

6    Q.   And we can stop anytime just to ask a couple questions.

7    Do you recognize the location and the time?

8    A.   Yes, I do.

9    Q.   What location is this?

10   A.   That's the same location there at the Peace Monument as

11   the flag was going onto the property past where the barricade

12   was just a few minutes after 12:00.

13   Q.   Okay.  And by this time would you call this crowd -- how

14   would you call the size of this crowd?

15   A.   The size of the crowd was in the thousands by then.

16   Q.   And, again, how would you describe the mood of the crowd?

17   A.   They were festive.  "USA" chants, you know.  They weren't

18   angry crowd at that point.

19   Q.   Now, you did talk about a barricade.  At this time had

20   the crowd gotten into the grounds of the Capitol?

21   A.   Yes.  Yes.

22   Q.   What did you determine with regard to a barricade or

23   anything?

24           THE COURT:  I'm sorry.  What was the question?

25

1    BY MR. ROOTS:

2    Q.   What was your assessment of a barricade that might have

3    separated the grounds at one time?

4    A.   So at this point the barricades were removed.  There was

5    really no sign of barricades.  Before the barricades were

6    pushed down, there were other sets of barricades stacked up

7    along the sides -- I don't know if they were extras or if they

8    were going to do something, I don't know.  But when the first

9    crowd went through they moved all the barricades to the sides

10   and you couldn't tell that there were barricades there at all

11   at that point.  This crowd with the flag, it was hundreds of

12   people carrying that huge flag and they just walked right by

13   there.

14   Q.   Why don't we roll that to the end.

15        (Video played.)

16        Okay.  Let's go to 167 -- I'm sorry.  98.

17             THE COURT:  167 is not going to work.

18             MR. ROOTS:  I believe it's 98, designated 98.

19             THE COURT:  Is this something that is called

20   open-source video of J6 No. 6?

21             MR. ROOTS:  Yes.  This is Defense 99.

22             THE COURT:  No, no.  We already did 99.  So this is 98?

23             MR. ROOTS:  I'm sorry.  98.  Yes.

24             THE COURT:  All right.

25

1    BY MR. ROOTS:

2    Q.   And we'll just play a snippet again.

3         Mr. Sumrall, do you recognize this video?

4    A.   Yes.

5    Q.   Is this a video that you took?

6    A.   Yes.  I believe so.  You can see the Peace Monument in

7    the background as well.

8         MR. ROOTS:  And I would move for introduction and

9    admission of this exhibit.

10        MR. VALENTINI:  Without objection.

11        THE COURT:  Without objection, Defense 98 is admitted

12   and may be published.

13                            (Defendant Exhibit No. 98

14                              received into evidence.)

15        MR. ROOTS:  And I'd like to publish it to the jury.

16   BY MR. ROOTS:

17   Q.   I do want to circle one thing that just caught my eye

18   now.  Were there lots of signs amidst the crowd?

19   A.   There were.

20   Q.   Do you recognize a sign I just circled?

21   A.   I can't see it.

22   Q.   Okay.

23   A.   Can I get my glasses out?

24   Q.   That's fine.  We'll clear it.  It just caught my eye

25   because of the coloring.  Let me ask you this basic question:

1    With regard to signs that were posted around, did you notice
2    or see any signs posted?
3    A.    No.  The signs we saw, people were carrying.  You know,
4    there weren't many posted signs to give directions as to where
5    people should go from that point.
6    Q.    What about law enforcement presence?
7    A.    I personally never saw any in the crowd.  There was one
8    policeman on a motorcycle that drove through that circle just
9    around the time of the first gate -- or the second gate push.
10    The only policemen I saw were the ones standing behind that
11    second gate, and after that, there was really no police
12    presence at all.
13    Q.    What about violence?  Did you see any violence at this
14    time?
15    A.    I did not.
16    Q.    Let's go ahead and roll this some more.
17        (Video played.)
18        Okay.  Let me just ask this question:  Would you say that
19    this was sort of the entryway of the Capitol grounds?
20    A.    Yes, I would.
21    Q.    Now, did you see as that video panned any barriers?
22    A.    No, I didn't.
23    Q.    Did it look like the crowd was jumping over any fencing?
24    A.    No, they were not.
25    Q.    What did you assume or what did you perceive had happened

1    there?

2    A.    It seemed like the police -- I don't know if it was

3    through negotiation or timing, because it was a little before

4    the hour, I thought maybe that was the time they were supposed

5    to open the gates to let people onto the property.  There were

6    permitted events on the property.  We could see the

7    structures, the white metal structures set up on the grounds,

8    and it seemed like everybody was staged, kind of like a black

9    Friday, waiting for the gate to open so you could go in and

10   see where you're going.

11   Q.    Let me just ask you this question, because I don't know

12   the answer.  Are you familiar with these gentlemen here?

13   A.    Just met them today.

14   Q.    These three defendants?

15   A.    Right.

16   Q.    Are you familiar with when it is that they are accused of

17   coming through this area?

18           MR. VALENTINI:  Objection.  Relevance.

19           THE COURT:  Well, when they're accused of coming

20   through the area is not relevant for this witness's testimony.

21   But I would like to say this, Mr. Roots.  When you ask general

22   questions of the witness, like did you see police or see

23   violence, we need to know what time you're talking about,

24   because we don't even know when this witness was at the

25   Capitol.  We only know that he arrived at around 12:30.  He

1    might have left at 12:45, he might have left at 6 p.m.  We

2    don't know.

3         So if you're going to ask general questions like that,

4    you've got to be specific as to time and location.

5    BY MR. ROOTS:

6    Q.   So let's pin you down.  You're here at this location.

7    What time of the day would this have been?

8    A.   So from before the gate breach until a few minutes after

9    12, we were pretty much within a 50-yard area, and then we

10   moved inside the gate to the left on the grass and stayed

11   there for the remainder of the time.  So we were very close to

12   this entranceway, if you would have it, for the remainder of

13   my stay.  We never went closer to the building or anything.

14   We stayed back and watched.

15   Q.   So would you say you were part of the initial breach?

16   A.   I wouldn't, really.  There were probably several hundred

17   people that went through.  We wanted to wait and let everyone

18   else go and film and just go in later.  So.

19   Q.   And again, your assessment of that -- of how the first

20   groups got in was that -- what's your take on that?

21   A.   You couldn't actually see from where we were standing

22   what was going on as far as the interaction with the police.

23   We saw police standing there.  We saw people up front, you

24   know, talking.  There was one man in particular I remember

25   saying, "where are all the men?"  It seemed like mostly women

1    had been at the front of the gate.

2         And, you know, then after the push, we didn't know what

3    had happened.  Nobody sent word back that said anything other

4    than people were moving forward.  And the cheering began, like

5    hey, they're letting us onto the property, and people spread

6    out and started walking it.  It wasn't a mad dash.  You know,

7    people weren't -- there may have been a few people that ran

8    but I'd say by and large people just walked onto the property.

9    Q.   Okay.  Let's keep rolling that.

10        (Video played.)

11        We can stop right there.  Did you hear a voice ask a

12   question?

13   A.   Yes.

14   Q.   What was the question?

15   A.   "Are we storming the Capitol?"

16   Q.   What was your take on that?

17   A.   There was no intention.  I don't think anybody thought

18   anything at that point that -- they were all standing inside

19   that fence line, and I don't understand even where that

20   question in the crowd came from.  There had been no talk

21   around me of anything like that, just going onto the property.

22   Like I said, there were ticketed events, or permitted I guess,

23   not ticketed but permitted events that were supposed to be on

24   the Capitol grounds.

25        MR. VALENTINI:  Objection.  Move to strike.  Lacks

1   foundation.

2          THE COURT:  Yeah.  That's volunteered information not

3   in response to a question.  Answer the questions and only the

4   questions.  I'll strike that for now.  If we get back to it

5   based on a question with a proper foundation, then we can deal

6   with that.  But for now that is stricken.  You may proceed

7   with the next question.

8      Please just respond to the questions.

9          THE WITNESS:  Okay.

10  BY MR. ROOTS:

11  Q.   Let's keep rolling that to the end, this video.

12       (Video played.)

13     Okay.  Now, did you understand that some people in the

14  crowd believed there were permitted speaking events going on?

15          MR. VALENTINI:  Objection.  Hearsay.

16          THE COURT:  Can you ask a non-leading question, please?

17  BY MR. ROOTS:

18  Q.   Did you know of any scheduled events that were scheduled

19  for the Capitol grounds?

20  A.   Yes.

21  Q.   And to your knowledge, were those officially permitted

22  events?

23  A.   Yes, they were.

24  Q.   And what can you say about those?

25  A.   We didn't know where the locations on the property was.

1    I knew of two different rallies that were supposed to be on

2    the property, and when we got to the edge of the property we

3    didn't know where to go.

4    Q.   And did you know or were you aware of members of Congress

5    that were scheduled to speak at some of those?

6    A.   Yes.

7    Q.   I would like to bring in Defense Exhibit 2.  Do you

8    recognize this document?

9    A.   Yes, I do.

10   Q.   What is this document?

11   A.   It's the Capitol Police directions basically for the

12   protest.

13   Q.   And have you familiarized yourself with this and read it?

14   A.   Not a lot, but I'm familiar with it.

15        MR. ROOTS:  I would move for admission of Defense

16   Exhibit 2.

17        MR. VALENTINI:  I believe the witness testified he's

18   not familiar with the exhibit.

19        THE COURT:  When did you become familiar with this

20   document?

21        THE WITNESS:  This has been out for probably over a

22   year.

23        THE COURT:  So you've become familiar with it since

24   January 6?

25        THE WITNESS:  Oh, yes.

```
1              THE COURT:  2021.
2              THE WITNESS:  As far as this -- yes.  This document.
3    Right.  But this doesn't have anything to do with the
4    scheduled events.
5              THE COURT:  That's fine.
6              THE WITNESS:  Okay.  I just want to make sure --
7              THE COURT:  I know.  So is there a continuing objection
8    to this document?
9              MR. VALENTINI:  No objection.
10             THE COURT:  All right.  Without objection.
11             MR. ROOTS:  I'd like to --
12             THE COURT:  Wait a minute.  Defense Exhibit 2 is
13   admitted.
14                          (Defendant Exhibit No. 2
15                            received into evidence.)
16   BY MR. ROOTS:
17   Q.   To your knowledge, Mr. Sumrall, what is this document,
18   generally speaking?
19   A.   It talks about the events that were happening on the
20   property that day.
21   Q.   And who's the author or the official organization?
22   A.   Capitol Police.
23   Q.   If we could scroll down.  We'll stop right there.  Do you
24   recognize some of the scheduled events that were permitted?
25   A.   Yes, sir.
```

1    Q.   To your knowledge were these permitted for the Capitol

2    grounds?

3    A.   Yes, sir.

4    Q.   So let's scroll down a little bit.  So here's some more.

5    Are you familiar with any of these permits or any of these

6    organizations?

7    A.   Yes, sir.

8    Q.   If you could just read the second one down there.

9    A.   The "USCP permit application for 50 participants.

10   January 6, '21, March rally for election integrity.  0800-1500

11   hours; march from Freedom Plaza with area 15 Union Square as

12   the US Capitol destination."

13   Q.   How about the one right above there?

14           THE COURT:  Excuse me.  Just for my edification, do you

15   know where area 15 Union Square is?

16           THE WITNESS:  I think it's at Union Station somewhere.

17           THE COURT:  It's at Union Station.

18           THE WITNESS:  Right.

19           THE COURT:  Is Union Station on the Capitol grounds?

20           THE WITNESS:  No.  It was from Union Station to the

21   Capitol.

22           THE COURT:  It says Union Square as the U.S. Capitol

23   destination, not the starting point.

24           THE WITNESS:  No.  It's the U.S. Capitol destination.

25   So it would, I guess, be from Union Square to the Capitol.

1          THE COURT:  No.  It says from Freedom Plaza, with area

2     15 Union Square as the U.S. Capitol destination.

3          THE WITNESS:  Okay.

4          THE COURT:  Does it have anything to do with being on

5     the U.S. Capitol grounds?

6          THE WITNESS:  I'm not familiar as much with the

7     grounds, I guess.

8          THE COURT:  Go ahead, Mr. Roots.

9     BY MR. ROOTS:

10    Q.   How about the one directly above, the one beginning with

11    an M?

12    A.   The "January 6, 2021 rally.  Area, Freedom Plaza, 1200

13    hours, disbursal area, U.S. Capitol, disband 1400 hours,

14    route, Freedom Plaza, Pennsylvania Avenue, Constitution

15    Avenue, U.S. Capitol, no planned civil disobedience or

16    arrests."

17    Q.   Okay.  And just to sum up, you were aware that different

18    organizations had applied and gotten permits for events on

19    January 6.

20    A.   Yes.

21    Q.   And did it look like one of these was for an actual

22    parade?

23    A.   Yes.  A march.

24    Q.   And to your knowledge of the crowd that day, did people

25    believe that there were permitted events that --

1          MR. VALENTINI:  Objection.

2          THE COURT:  Sustained.

3  BY MR. ROOTS:

4  Q.   Was it your understanding that people would find speeches

5  and things that were permitted on the Capitol grounds?

6          MR. VALENTINI:  Same objection.

7          THE COURT:  Same ruling.

8  BY MR. ROOTS:

9  Q.   Let me ask you, just you yourself, did you believe there

10  were permitted events on the Capitol grounds?

11  A.   Yes, I did.

12  Q.   Was that one of the reasons you were going there that

13  day?

14  A.   Yes.

15  Q.   Okay.  I would like to show another video.

16          THE COURT:  All right.  What number is this one going

17  to be?

18          MR. ROOTS:  This will be 96.  Defense 96.

19          THE COURT:  Which is labeled "open-source video of J6

20  No. 4."

21          MR. ROOTS:  Yes.

22          THE COURT:  All right.

23          MR. ROOTS:  If I could just ask.

24  BY MR. ROOTS:

25  Q.   Are your videos open-source?

```
1    A.   Yes.

2    Q.   You put them on the --

3    A.   They're public.

4    Q.   So anyone can find them.

5    A.   Absolutely.

6    Q.   Okay.  I'd like to just roll one snippet here for a

7    second.

8         (Video played.)

9         Do you recognize this?

10   A.   Yes, I do.

11   Q.   Is this one of the videos that you filmed?

12   A.   Yes.

13        MR. ROOTS:  I'd like to move for admission of this

14   video.

15        MR. VALENTINI:  No objection.

16        THE COURT:  Without objection, Defense Exhibit 96 is

17   admitted and may be published.

18                              (Defendant Exhibit No. 96

19                               received into evidence.)

20   BY MR. ROOTS:

21   Q.   Let's go ahead and play it.

22        (Video played.)

23        Okay.  Let's stop right there.  Do you see this, what I'm

24   circling here, these things?

25   A.   Yes.
```

1    Q.   What would you call those?

2    A.   Bike rack barricades.

3    Q.   Did you see any of those that day where you were?

4    A.   Yes.

5    Q.   And what was your assessment of those?  Where were they

6    put?

7    A.   Crowd control direction, I guess movement.  They were

8    around the perimeters.  They were around the Peace Monument.

9    So I guess it was for crowd control to move them in one

10   direction.

11   Q.   Specifically at this time, what time would this video

12   right here have been?

13   A.   Just a little after noon, a little after 12:00.

14   Q.   Were you there any barriers that you could --

15   A.   I'm sorry.  A little after 1:00.  I'm sorry.

16   Q.   After 1:00, okay.  Were there any of these that were a

17   blockage or a barrier to the movement of people to the Capitol

18   grounds?

19   A.   Not at this point, no.

20   Q.   And did you notice any signs that said Unauthorized?

21   A.   No.

22   Q.   What about No Trespassing?

23   A.   No.

24   Q.   What about Restricted Area?

25   A.   No.

```
1     Q.   Closed Area?

2     A.   No.

3     Q.   No signs of that nature?

4     A.   No signs like that.

5     Q.   What about law enforcement at this time --

6     A.   No presence.  No presence in the area.

7     Q.   Let's go ahead and roll to the end.

8          (Video played.)

9          Okay.  I'd like to get -- the next one is 95.  Defense

10    95.

11              THE COURT:  That is labeled "open-source video of J6

12    No. 3."

13              MR. ROOTS:  Yes.

14    BY MR. ROOTS:

15    Q.   Again, we'll play just a snippet.

16    A.   Yep.

17    Q.   Do you see this?

18    A.   I do.

19    Q.   Do you recognize it?

20    A.   I do.

21    Q.   How do you recognize it?

22    A.   I took it.

23    Q.   Okay.

24              MR. ROOTS:  I move for admission of Defense 95.

25              MR. VALENTINI:  Objection.  Relevance.  Can we have
```

856

1          a --

2                    THE COURT:  I understand the objection.  I'm going to

3          overrule the objection.  We're going to allow this exhibit in

4          as well.  Defense 95 is admitted and may be published.

5                                        (Defendant Exhibit No. 95

6                                         received into evidence.)

7          BY MR. ROOTS:

8          Q.   Let's go ahead and show it to the jury and play it.

9          We'll just play halfway through.

10              (Video played.)

11              And we can stop anytime.  Okay.  Again --

12                    THE COURT:  Yes, we can.

13              (Laughter.)

14                    MR. ROOTS:  Thank you.

15         BY MR. ROOTS:

16         Q.   What was the atmosphere like at this time?

17         A.   More festive, patriotism.  Just people enjoying the day.

18         Q.   Any violence?

19         A.   No.  None whatsoever.

20         Q.   Any law enforcement giving commands?

21         A.   None.

22                    THE COURT:  And again, this is in the area around the

23         Peace Monument at the time approximately a little after one

24         o'clock.

25                    THE WITNESS:  A little after 1:00 just inside that

1    first step.  Yes, sir.  That's the same place.

2    BY MR. ROOTS:

3    Q.   Let me ask you, to your knowledge, is this the area where

4    many of the people from the Ellipse came to get onto Capitol

5    grounds?

6    A.   Yes, it is.

7    Q.   I would like to play just one more with the indulgence of

8    the Court and the jury.  And that would be 93.  Defense 93.

9         THE COURT:  93, which is labeled as "open-source video

10   J6 No. 1."  All right.

11   BY MR. ROOTS:

12   Q.   Do you recognize this video?

13   A.   I do.  Yes.

14   Q.   Is this a video of the same general area?

15   A.   Yes.  This is between that gate at the Peace Monument and

16   the front.  So yeah.  It's a little bit closer to the Capitol

17   but that's just a little bit, maybe 30 yards.

18        MR. ROOTS:  And I would move for admission of Defense

19   93.

20        THE COURT:  Any objection?

21        MR. VALENTINI:  No objection.

22        THE COURT:  Without objection, Defense 93 is admitted

23   and may be published.

24                              (Defendant Exhibit No. 93

25                                received into evidence.)

 1    BY MR. ROOTS:

 2    Q.   And I would like to just roll this film a little bit.

 3         (Video played.)

 4         Okay.  We can stop right there.  Did you hear a voice?

 5    A.   Yes, I did.

 6    Q.   Did you hear what the voice was saying?

 7         MR. VALENTINI:  Objection.  Hearsay, to the extent it's

 8    admitted for the truth of what is asserted.

 9    BY MR. ROOTS:

10    Q.   What was your impression --

11         THE COURT:  Wait a minute.  Wait a minute.

12         MR. ROOTS:  Okay.

13         THE COURT:  Well, the jury's just heard the voice.  So

14    I'm going to overrule the objection, and you can say what you

15    think the voice --

16         THE WITNESS:  "This was set up for us."

17    BY MR. ROOTS:

18    Q.   You heard a voice say that?

19    A.   Yes.

20    Q.   And what was your perception when someone said "this is

21    set up for us"?

22    A.   There are obviously bleachers that probably don't belong

23    on the property year round.  There was, you know, I understand

24    part of it's inauguration stage, yes, I would think, but I

25    don't know that people realized that going up to it, walking

1    up to it.  So.

2    Q.   So were people confused about what they were at?

3         MR. VALENTINI:  Objection.  Calls for speculation.

4         THE COURT:  It does calls for speculation in a leading

5    fashion.  Sustained.

6    BY MR. ROOTS:

7    Q.   The people around you, did they perceive that this had

8    been set up for them?

9    A.   Yes.

10        MR. ROOTS:  No further questions.  Thank you.

11        THE COURT:  All right.  Cross-examination,

12   Mr. Valentini.

13                    CROSS-EXAMINATION

14   BY MR. VALENTINI:

15   Q.   Good afternoon, Mr. Sumrall.

16   A.   How are you?

17   Q.   Good.

18   A.   Good.

19   Q.   How are you?

20   A.   Good.  Thank you.

21   Q.   My name is Francesco Valentini.  I'm one of the

22   prosecutors in this case.

23        Now, we haven't met before until today.

24   A.   Right.

25   Q.   Mr. Sumrall, were you on Capitol grounds on January 6?

1    A.   Yes.

2    Q.   Were you within the restricted perimeter was put in place

3    in preparation for January 6?

4    A.   Yes.

5          MR. PIERCE:  Objection.  Calls for legal conclusion.

6          THE COURT:  I'm sorry.  Mr. Pierce, you don't have a

7    voice right now.  Mr. Roots has a --

8          MR. ROOTS:  I will object.  Legal conclusion.  That

9    calls for a legal conclusion.

10          THE COURT:  He seems to know what the restricted area

11    is, so overruled.

12    BY MR. VALENTINI:

13    Q.   And were you one of the first -- where within the

14    restricted areas, where within the restricted perimeter were

15    you on January 6?

16    A.   Just to the left inside that gate.

17    Q.   Can we pull up Exhibit 502, which is already in evidence.

18          I'm going to ask you to mark the area on Exhibit 502

19    where you were on January 6.

20          (Witness complies.)

21          Is that the closest you got to the Capitol on January 6?

22    A.   I'd say it's pretty close, yes.

23    Q.   So you never got -- do you know what I mean when I say

24    Upper West Terrace?

25    A.   Oh, no.  I was never on the Upper West Terrace.  No.

1    Q.   Excuse me.  Do you know what I mean when I say Upper West
2    Terrace?
3    A.   On the building?
4    Q.   On the Capitol building.
5    A.   Yes.
6    Q.   Were you ever on the Upper West Terrace?
7    A.   No.
8    Q.   Were you ever inside the building?
9    A.   No.  The green dot is pretty much where I was.
10   Q.   So the entirety of your testimony today about January 6
11   was -- pertained to the area around the dot that you just
12   marked on this exhibit?
13   A.   I would say -- can I draw again?
14   Q.   Absolutely.
15   A.   So this is the place that the main people went in.  We
16   came to here, and we went here.  Oh, sorry, that's too far.
17   But that is basically, I could film everything happening here
18   from where I stood back there.
19   Q.   But you yourself never got any closer than the initial
20   marking on this screen?
21   A.   No.
22   Q.   Now, you were one of the first ones who got to the -- is
23   that area in close proximity to an area that's commonly
24   referred to as the Peace Circle?
25   A.   Yes.

1    Q.   Is the area that is circled on the screen the Peace

2    Circle?

3    A.   Yes.

4    Q.   Were you one of the first individuals at the Peace Circle

5    on January 6?

6    A.   I would say so.  First couple hundred anyway.  Yes.

7    Q.   And in fact, have you stated in the past you were one of

8    the first 12 or 15?

9    A.   When we walked in you could see 12 or 15 people against

10   the fence.  There were other people in the circle walking with

11   us, but we were probably some of the first people to see that

12   fence when we got into that area.  Yeah.

13   Q.   So there was a fence there?

14   A.   That's what I said a few minutes ago, yeah.  There were

15   two actually --

16   Q.   So you were there well before 12:57 p.m.?

17   A.   Yes.

18   Q.   Before that.  And is it your understanding that the

19   barrier was breached at 12:57 p.m.?

20   A.   Yes.  Actually, the first one a little before that.

21   Q.   How long before that?

22   A.   Just a minute or two.  Yeah.

23   Q.   Now, you testified that the atmosphere that you found at

24   that area was festive?

25   A.   Yes.

1    Q.   You said part of the festive nature of the atmosphere is

2    there was a chant of "USA, USA"?

3    A.   Yes.

4    Q.   You also said that part of the festive nature of the

5    atmosphere that you found was there was a chanting of "Stop

6    the Steal"?

7    A.   Some people, yeah.   The signs too.

8    Q.   The Stop the Steal to you is a festive chant?

9    A.   It was a festive mood.

10   Q.   So "Stop the Steal" was sung in a festive mood?

11   A.   I don't know what that means for different people.

12   Q.   Now, before 12:57 p.m. on January 6, 2021, it didn't

13   appear to you that the Capitol was in any way open to

14   visitors.

15   A.   The Capitol building or the grounds?

16   Q.   The area past the fence that you found at the Peace

17   Circle when you got there.

18   A.   Don't know.

19   Q.   Well, the question is yes or no.   Did it appear to be

20   that the area was open to the public or not?

21   A.   It didn't appear to be yet, but it was supposed to be.

22   So I guess we were waiting in line.

23   Q.   You say you believed -- you just said that you believed

24   that the grounds was supposed to be open to the public?

25   A.   Yes.

```
1    Q.   But you found a fence.

2    A.   A fence was there.

3    Q.   In fact, the ground was not open to the public.

4    A.   Not yet.

5    Q.   Not until it was breached.

6    A.   Didn't know if the police were going --

7    Q.   I'm not asking for you --

8    A.   I'm not asking either.  I'm just saying, we didn't know.

9    Q.   And the only people behind the fence were police

10   officers.

11   A.   At that time.

12        MR. VALENTINI:  Brief indulgence.

13        THE COURT:  Certainly.

14   BY MR. VALENTINI:

15   Q.   Mr. Sumrall, you talked a little bit in your direct

16   examination about permitted events on Capitol grounds on

17   January 6.

18   A.   Yes.

19   Q.   You see a map here on Exhibit 502 which is on your

20   screen.

21   A.   Mm-hmm.

22   Q.   You see a red perimeter which you identified as the

23   restricted area.  Now, none of the permitted events that you

24   mentioned were permitted within the red perimeter on Exhibit

25   502?
```

1    A.    They weren't?

2    Q.    I'm asking if you are aware of any events that were

3    permitted within the --

4    A.    Yes.  I believe there was --

5            COURT REPORTER:  Could you please speak one at a time?

6            MR. VALENTINI:  What was you answer?

7            COURT REPORTER:  What was the question?

8            THE COURT:  Ask the question again, and then he'll

9    answer.  And everybody please observe that, both for the

10    listening audience, most importantly the court reporter.

11     BY MR. VALENTI:

12    Q.    You listed a number of -- you were asked questions about

13    certain permitted events at the Capitol on your direct

14    examination.

15    A.    Mm-hmm.

16    Q.    And you were asked to identify, to speak to certain

17    permitted events on a document issued by the Capitol Police.

18    A.    Yes.

19    Q.    To your knowledge, were any of those events in that

20    document permitted for an area within the red perimeter in

21    this area?

22    A.    I believe so.

23    Q.    Do you believe, or do you know?  Is your sworn testimony

24    that there was a permitted event within the restricted area?

25    A.    My sworn testimony is I believe so.

 1    Q.   Okay.  What is the basis of that belief?

 2    A.   Social media posts, communication with other people that

 3    were going, just --

 4    Q.   You saw it online?

 5    A.   Oh, yeah.

 6    Q.   Okay.  You saw it online.

 7         Now, through your entity, Stop Hate, you host a podcast?

 8    A.   Yes.

 9    Q.   And that podcast is called *Discussion Island*?

10    A.   Yes.

11    Q.   And is it fair to say that it's primarily dedicated to

12    January 6?

13    A.   Yes.

14    Q.   And you have dozens of January 6 related podcasts?

15    A.   Yes.

16    Q.   They're all about one hour in length?

17    A.   Usually.

18    Q.   You've also appeared on other individuals' podcasts about

19    January 6?

20    A.   Yes.

21    Q.   How many?

22    A.   Over a hundred I'm sure.

23    Q.   And now, in your own view, January 6, it was just a huge

24    setup, wasn't it?

25    A.   Yes.

1     Q.   And you saw it as a takeover of Congress.

2     A.   Not so much.

3     Q.   What did you see it as?

4     A.   A land grab of money, grab like 9/11.

5     Q.   A land grab?

6     A.   Land grab.  Just a control, that's a way of saying, you

7     know, power -- a way to take control, to blame one group to

8     get more funding, you know, the same old political game.

9     Q.   That's your view of January 6?

10     A.   Yes.

11     Q.   And is it true that on one of your podcasts you also

12     said:  "Now, think about this, in two hours the people took

13     the Capitol of the United States with no weapons"?

14     A.   Yes.

15     Q.   Because what you call the people of the United States did

16     take the Capitol on January 6.  Did they not?

17     A.   Seems like it.  But I don't believe they did.

18     Q.   You also saw January 6 as a warning.

19     A.   In what way?

20     Q.   Well, did you or did you not say in one of your podcasts

21     that if the courts don't do it and the system doesn't do it

22     the protesters might not remain peaceful next time?

23     A.   That would be bad.

24     Q.   No, no.  But that is your view of what happened on

25     January 6.  It's a warning that this may happen?

1    A.   In some ways.

2    Q.   Is it also your view that if the protesters can do that

3    in two hours with no weapons, they really don't want to piss

4    us off?

5    A.   Can I answer that a little bit more than a yes-or-no

6    question?

7    Q.   It is a yes-or-no question.

8         THE COURT:  Ask the question again so I'm clear on what

9    it is.  Ask the question again.

10   BY MR. VALENTINI:

11   Q.   Is it or is it not your view that if the protesters can

12   do this, can do that in two hours with no weapons, they really

13   don't want to piss us off?

14        THE COURT:  Answer it directly and briefly.  Your

15   counsel will have a chance to examine you further on it.

16        THE WITNESS:  I think I was trying to make a point that

17   if we did that without weapons and walked into a building, you

18   really don't want to make that kind of people angry.  If that

19   was peaceful and everybody's so scared of them, and they

20   didn't do anything, didn't kill anybody --

21   BY MR. VALENTINI:

22   Q.   Now, they --

23   A.   They didn't kill anybody.

24   Q.   Your implication is that if people do get really angry,

25   then they may show up with weapons next time?

1    A.   Nobody wants that.  That's what we're trying to avoid, is

2    violence.

3    Q.   Did you also say with respect to the protest -- the

4    rioters on January 6 that their back was against the wall and

5    you don't want to corner wild animals?

6    A.   Probably about the defendants more than anything.  Was it

7    about the protesters?

8    Q.   I'm asking if you ever said that with respect to anyone

9    related to January 6?

10   A.   I probably did.  If you're quoting me, I probably did.

11   Q.   This is your testimony.  Did you or did you not say that?

12   A.   I can't remember off the top of my head, but I may have.

13   Q.   But it wouldn't surprise you if --

14   A.   No, it wouldn't surprise me.

15   Q.   That's how you feel.

16   A.   Well, yeah, sometimes.

17   Q.   And you feel strongly about January 6?

18   A.   I'm sorry?

19   Q.   You feel strongly about the events of January 6?

20   A.   Yes, sir.  I was there.

21   Q.   So strongly, in fact, that you raised funds for many

22   defendants who have been charged with crimes in connection

23   with January 6?

24   A.   Yes, sir.  Proudly.

25   Q.   And those you raised funds for include James Cusick here,

1    one of the defendants in this case?

2    A.   I should imagine.  I hope so.

3    Q.   You also raised -- the question is do you or do you not

4    raise funds for them?

5    A.   I don't know.

6    Q.   You can't rule out --

7    A.   I would have to go to my website and look and see if his

8    name is on my list.  Would you like for me to do that?

9    Q.   No.  You don't need to do that.

10   A.   Okay.

11   Q.   How about Casey Cusick?  Do you raise funds for

12   Mr. Casey --

13   A.   Once again, I'll have to go look and see if his

14   GiveSendGo is on my website.

15   Q.   Okay.  But you also raise funds for many other January 6

16   defendants.

17   A.   Yes.

18   Q.   More than 150 January 6 defendants?

19   A.   Yes.

20   Q.   Does that include an individual by the name of Dominic

21   Pezzola?

22   A.   Yes.

23   Q.   Was Dominic Pezzola engaged in the destruction of

24   property on January 6 at the Capitol?

25   A.   Yes.

1    Q.   This is the Dominic --

2         MR. ROOTS:  Your Honor, we're getting way far afield.

3    Irrelevant.

4         THE COURT:  We're getting pretty far, but I'm going to

5    permit a little more questioning to -- I'm not going to

6    describe what the government's trying to do, because that

7    would not be fair to the witness or the defense.  But I'll

8    overrule the objection and allow some more questioning.  But

9    we're going to have to limit it at some point, Mr. Valentini.

10        MR. VALENTINI:  Understood.

11   BY MR. VALENTINI:

12   Q.   And this is Dominic Pezzola who jumped through a broken

13   window of the Capitol with a police shield --

14        MR. ROOTS:  Objection.  Beyond the scope.  Irrelevant.

15   Foundation.

16        MR. VALENTINI:  Your Honor, it goes to bias.

17        THE COURT:  Yeah.  The objection's overruled.

18        THE WITNESS:  Yes.

19   BY MR. VALENTINI:

20   Q.   Let's pull up Exhibit -- actually, let's not.

21        Do you also know of any people who went into the Capitol

22   building but were not charged with crimes?

23   A.   Yes.

24   Q.   And are you aware -- and are you or are you not willing

25   to name those individuals?

1    A.   Not willing.

2            MR. ROOTS:  Objection.

3            THE COURT:  Are you moving to strike?

4            MR. ROOTS:  Yes.  This witness has no obligation to be

5    a snitch on --

6            THE COURT:  All right.  We don't need to give a long

7    explanation.  The motion to strike is denied.  There's going

8    to be no further examination with respect to this witness's

9    knowledge of names and his willingness or unwillingness to

10   reveal them.

11           MR. VALENTINI:  Could we have just a very brief sidebar

12   for clarification?

13           THE COURT:  If you need it.

14       (Bench conference.)

15           MR. VALENTINI:  Your Honor, I was planning to ask one

16   more question which is:  That's because naming those

17   individuals will go against your cause with respect to

18   January 6.  It would not be a further request for anything

19   specific to these individuals.

20           THE COURT:  You can ask a question related to his

21   thinking and his actions, yes.

22           MR. VALENTINI:  Thank you for the clarification.

23           MR. ROOTS:  Your Honor, I would just point out, this

24   guy doesn't claim to be unbiased.  We're not claiming he's not

25   biased.

1          THE COURT:  They're enabled to establish that to the

2     jury.  What you're claiming in a sidebar is not really

3     important.  They can establish that to the jury if they wish.

4          (End of bench conference.)

5     BY MR. VALENTINI:

6     Q.   You're unwilling to name those individuals because naming

7     those individuals would go against your cause?

8     A.   It would put them in harm's way.

9     Q.   Now, is January 6 your cause?

10    A.   No.

11    Q.   Were you on a TV show hosted by Tucker Carlson?

12    A.   Yes.

13    Q.   Did Tucker Carlson refer to January 6 as your cause in

14    that show?

15    A.   I think he did.  I think he said "the cause," but yeah.

16    Q.   Did you contradict that characterization?

17    A.   No.

18    Q.   Now, to be clear, you did not go into the building on

19    January 6, as you testified a few minutes ago.

20    A.   That's correct.

21    Q.   Why did you not go?

22    A.   Because I was watching the lady that was with me.  I

23    promised her husband I wouldn't let anything happen to her,

24    and we stayed in the back.

25    Q.   Did you think it was illegal for you go into the Capitol

1    building?

2    A.   No.  We saw the police throwing tear gas into the crowd

3    and flash bang grenades into the crowd, so we stayed away from

4    that.

5    Q.   Right.  That made you understand that you were not

6    allowed to be there.

7    A.   No, but I understand where you're going.

8    Q.   No, no.  I'm asking the questions here.

9    A.   Oh, what was the question?

10   Q.   The fact that the police started throwing smoke grenades

11   into the crowd was sufficient for you to understand that

12   members of the public were not allowed --

13              MR. ROOTS:  He said tear gas, not smoke grenades.

14              MR. VALENTINI:  I stand corrected.

15              THE WITNESS:  So what was the question?

16   BY MR. VALENTINI:

17   Q.   The fact that you saw police throwing tear gas into the

18   crowd was sufficient to make you understand that you were not

19   allowed to go any closer to the Capitol.

20   A.   No, it made me sufficient to understand I wasn't getting

21   any closer.  That's all.

22   Q.   Now, finally, let's talk a little bit about your view of

23   what happens next.  You say there's going to be divine justice

24   for what has been done to the January 6 defendants?

25              THE COURT:  I'm sorry.  What is the question?

1    BY MR. VALENTINI:

2    Q.    Do you think there's going to be divine justice with

3    respect to what happened to the January 6 defendants?

4           THE WITNESS:  Did he say divine or denied?

5           MR. VALENTINI:  No, no.  Divine --

6           THE WITNESS:  Divine justice?

7    BY MR. VALENTINI:

8    Q.    Okay, withdrawn.  Do you think there's going to be

9    vengeance as a result of what has happened to January 6

10   defendants?

11   A.    I don't know.  I just want justice, not vengeance.

12   Q.    Did you state on your podcast that you want the

13   January 6 -- our people, the January 6 people, to get out of

14   jail?

15   A.    Yes.

16   Q.    And that you want the bad people to be put into jail?

17   A.    Yes.

18   Q.    That includes the FBI?

19   A.    If they did bad things, yes.

20   Q.    That includes prosecutors?

21   A.    If they did bad things, yes.

22   Q.    Does that include judges?

23   A.    If they did bad things, yes.

24          MR. VALENTINI:  Okay.  No further questions.

25          THE COURT:  Mr. Roots.

1                        REDIRECT EXAMINATION

2    BY MR. ROOTS:

3    Q.   Mr. Sumrall, do you claim to be unbiased?

4    A.   No.

5    Q.   Do you claim to be equally on the side of January 6

6    defendants as on the government?

7    A.   No.

8    Q.   You're an advocate for January 6 --

9    A.   Yes, I am.

10   Q.   -- defendants.  You're not pretending that you're a

11   balanced journalist, that you're just without any bias?

12   A.   No.

13   Q.   You were just asked some questions about someone named

14   Dominic Pezzola.  First of all, do you know who that is?

15   A.   I do know who it is.

16   Q.   Do you know of people who committed property destruction

17   at the Capitol who suspiciously are not indicted by the

18   federal government right now?

19            MR. VALENTINI:  Objection.  This is irrelevant and --

20   403.

21            THE COURT:  Objection is sustained.

22   BY MR. ROOTS:

23   Q.   Do you know, Pezzola is accused of -- or he was convicted

24   of breaking a window at the Capitol.  Is that --

25   A.   Yes.

1    Q.   But was he the first person to break a window at the

2    Capitol?

3    A.   No.

4              MR. VALENTINI:  Objection.  Relevance.

5              THE COURT:  Overruled.

6              MR. ROOTS:  They opened the door to this.

7              THE COURT:  I said overruled.  You can go ahead.

8              THE WITNESS:  No.  He was not.

9    BY MR. ROOTS:

10   Q.   The individual who broke the first window is not

11   indicted.  Isn't that correct?

12   A.   That is correct.

13             MR. VALENTINI:  Objection.

14             THE COURT:  Overruled.

15             THE WITNESS:  That is correct.  He's not been charged.

16   BY MR. ROOTS:

17   Q.   And his face is exposed in all the videos?

18   A.   Yes.

19             MR. VALENTINI:  Objection.

20             THE COURT:  Well, do you know whether that individual

21   has been identified by the government?

22             THE WITNESS:  I do know he has not.

23             THE COURT:  He has not been identified by the

24   government.

25             THE WITNESS:  That's right.

 1          THE COURT:  You may proceed.

 2     BY MR. ROOTS:

 3     Q.   Now, when you say you know he's not been identified, he's

 4     not been indicted?

 5     A.   That's right.

 6     Q.   Do you regard it as strange that the government, with all

 7     its vast technical --

 8          MR. VALENTINI:  Objection.  Calls for opinion

 9     testimony.

10          THE COURT:  Sustained.

11     BY MR. ROOTS:

12     Q.   Do you regard anything about that as strange?

13     A.   I do.

14          MR. VALENTINI:  Same objection.

15          THE COURT:  Sustained.

16     BY MR. ROOTS:

17     Q.   Are there a lot of suspicious aspects to January 6?

18          MR. VALENTINI:  Calls for speculation.

19          THE COURT:  It certainly calls for speculation.  So

20     it's sustained.

21     BY MR. ROOTS:

22     Q.   Now, when you said that you were within a restricted

23     area, what did you mean by that?

24     A.   I mean that after January 6 they published this picture

25     that everybody saw with this red line around it that nobody

1    saw before January 6.  That's how I know that where I stood

2    that day was a bad spot.  I didn't know before that day.

3    That's how I know.

4    Q.   So on January 6, at the time you were there, what was

5    your assessment of whether it was restricted or not?

6    A.   Didn't know.  We thought there was supposed to be

7    permitted events on the property.  So we didn't know.

8    Q.   Did you jump over any barricades to get there?

9    A.   No.

10   Q.   Did you cross any fences to get there?

11   A.   No.

12   Q.   Did you defy any law enforcement to get there?

13   A.   No.

14   Q.   Did you defy any signs or announcements to get there?

15   A.   No.

16   Q.   There was some mention of some tear gas.  About what time

17   did you ever see tear gas?

18   A.   A little after 1:00, between 1:05 and 1:20.

19   Q.   So an hour later, was there a lot of tear gas then?

20        THE COURT:  Wait a minute.  Do we know he was there an

21   hour later?

22   BY MR. ROOTS:

23   Q.   Were you there an hour later?

24        MR. VALENTINI:  Objection.  Can we get some clarity

25   about the location we're talking about?

1          THE COURT:  I think he's given the location.  He never

2     went more than about 30 yards from the Peace Memorial.

3     BY MR. ROOTS:

4     Q.   Were you there an hour later?

5     A.   Yes, I was.

6     Q.   So that would have been around one o'clock -- or two

7     o'clock.

8     A.   Yes.

9     Q.   Do you recall tear gas around that time?

10    A.   Yes.

11    Q.   How about after that?

12    A.   Yes.

13    Q.   Okay.  Was there ever a time when there wasn't tear gas

14    in the air?

15    A.   Yes, there was.  As a matter of fact, in the very

16    beginning, after people went through that first gate, they

17    went all the way to the front and lined up in front of the

18    Capitol, and you could hear them on their megaphones saying

19    please don't shoot us, please don't spray us, we mean you no

20    harm.  We're here to address our grievances.  They're on

21    megaphones, I've got video of it, standing at the front

22    peacefully, the police -- there's no pushing, no interaction.

23         MR. VALENTINI:  This appears to have veered a little

24    off course.

25         THE WITNESS:  He just asked me what I saw up there.

 1          MR. VALENTINI:  Move to strike.

 2          THE COURT:  What you saw where, around the Peace

 3     Memorial?

 4          THE WITNESS:  From where I was and 30 yards in, you can

 5     see that whole side.  Like I said, I was filming the entire

 6     event from there.  We set up and filmed up the steps and the

 7     mayhem down at the front line that started with the grenades,

 8     the people asking not to shoot them and not to spray them, the

 9     police started throwing the grenades -- it's all on video.

10          THE COURT:  But you were a hundred yards or more away

11     from that area.

12          THE WITNESS:  Yes.

13          THE COURT:  Okay.  Go ahead.

14     BY MR. ROOTS:

15     Q.   Just about how long were there crowds of people on the

16     Capitol grounds --

17          MR. VALENTINI:  Objection.  Can we get some --

18     withdrawn.

19          THE WITNESS:  Hours.  Four or five hours, probably.

20     BY MR. ROOTS:

21     Q.   Did the vast majority of people there commit any

22     violence?

23     A.   Not from what I could see.

24     Q.   What about seeing violence?

25     A.   I never saw any.

1        MR. ROOTS:  No further questions.  Thank you.

2        THE COURT:  All right.  You may step down.

3        THE WITNESS:  Well, thank you.

4    (Witness steps down.)

5        THE COURT:  Mr. Pierce, it's three minutes after 5:00.

6        MR. PIERCE:  Yes, Your Honor.  At this point the

7    defense rests.

8        THE COURT:  All right.  Will there be a rebuttal case

9    from the government?  We're not going to have it this

10    afternoon, but I want to know if there's going to be one.

11        MR. VALENTINI:  No.  There will be no rebuttal case

12    from the government.

13        THE COURT:  So, ladies and gentlemen, what that means

14    is I'm going to excuse you for the day and hope you have a

15    pleasant evening.  Please remember not to discuss the case

16    among yourselves or with anyone else.  Report tomorrow morning

17    as you have been.  And what we will do, hopefully beginning

18    right around 9:30, not much after that, is first you will hear

19    the closing arguments of counsel in this case, and then you

20    will receive the Court's instructions on the law, and then

21    you'll retire to deliberate.

22    So you should be deliberating on the case before noon

23    tomorrow.  All right?  So have a pleasant evening and we'll

24    see you in the morning.

25        (Jury out at 5:04 p.m.)

1          THE COURT:  All right.  I'm going to take one minute

2     just to review exhibits with each side.  That's going to be a

3     different process for the government and for the defense.

4        For the government, off of your exhibit list, everything is

5     in evidence except for 126, 128, 130, 401, 402A, 402B, 402C,

6     402D, 403, 404A, 405, 406.  And then the 701.3 and 703 are not

7     in evidence.  That's what I have in terms of the exhibits.  So

8     you'll need to go over that with Ms. Kay.

9        For the defense, I'll do it the other way.  I'll tell you

10    what is in evidence, not what is not in evidence.  What is in

11    evidence is Defense Exhibit 2, Defense Exhibit 12, and Defense

12    Exhibits 93, 95, 96, 98, and 99.  All right?  So you can

13    review that with Ms. Kay.

14       I'm going to give her my exhibit list so she can coordinate

15    them with hers.  If there's any question, she will raise it

16    with me, but that's to ensure that the right exhibits get back

17    to the jury when we do send them back after arguments and

18    instructions.

19       Now, government's argument, how long?

20          MR. VALENTINI:  20 to 25, Your Honor.

21          THE COURT:  And the defense?

22          MR. ROOTS:  I'm sorry.  I didn't hear --

23          MR. VALENTINI:  20 minutes to 25 minutes.

24          MR. ROOTS:  Under 30 minutes.

25          THE COURT:  That sounds like 20 to 25, just different

1    language for the same thing.

2        All right.  So that's what we'll be starting with tomorrow

3    morning and then we'll have the instructions after that.  And

4    the instructions are all done based on our conference.  And

5    we'll give you a final copy of those instructions.  We can

6    give them to you before you leave if you stick around for a

7    few minutes.  Otherwise, you'll get them in the morning before

8    you begin your arguments.  But you know what they are.  We

9    just have to print them off.

10       Okay.  Anything else we need to discuss?

11           MR. VALENTINI:  No, Your Honor.  Thank you.

12           MR. PIERCE:  No, Your Honor.  Thank you.

13           THE COURT:  Thank you all.  And we'll see you in the

14   morning ready to go at 9:30.

15       (Proceedings adjourned at 5:07 p.m.)

16

17

18

19

20

21

22

23

24

25

\*  \*  \*  \*  \*  \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne