**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-575-01 (JDB)** |
| **v.** | : | |
| | : | |
| **DAVID JOHN LESPERANCE,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence defendant David John Lesperance to seven months of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.  The government's recommended sentence is within the 6 to 12-month guideline range as calculated by the government and the United States Probation Office.

## I.     Introduction

Defendant David Lesperance, a 71-year-old retired air conditioning contractor, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

After a jury trial, Lesperance was convicted of entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); disorderly or disruptive conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  As explained in more detail herein, a sentence of seven months of incarceration, within the applicable Guidelines range, is appropriate in this case for multiple reasons.  *First*, on January 6, 2021, Lesperance decided to unlawfully enter the Capitol's restricted area—and then the Capitol building— knowing full well that the certification of the electoral college vote was supposed to take place at the U.S. Capitol that day.  *Second*, Lesperance chose to enter the Capitol despite seeing rioters climbing the Capitol's outer walls, and seeing scores of officers converging on the Capitol just as he and his companions were about to enter, and despite seeing shattered glass panes near the Senate Wing Door and hearing a blaring alarm sound.  *Third*, Lesperance recorded on video—and repeatedly celebrated—the mayhem that was unfolding before his eyes, variously declaring "this is doing it bigly!" and "do the Inauguration in the basement."  *Fourth*, after January 6, Lesperance deleted videos that he had recorded on January 6, in an attempt to avoid the consequences of his conduct. *Fifth*, when interviewed by the FBI, Lesperance falsely stated that he went inside the Capitol building to use the bathroom and that law enforcement let him in.

The Court must also consider that Lesperance's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol building, and

---

million) as reflected in this memorandum.  However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

disrupt the proceedings.  Here, the facts and circumstances of Lesperance's crime support a sentence of seven months in prison.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary repetition, the government refers to the general summary of the attack on the U.S. Capitol set forth in the Presentence Report.  PSR (ECF No. 113) at ¶¶ 11-17.

### ***Defendant Lesperance's Role in the January 6, 2021 Attack on the Capitol***

On January 5, 2021, Lesperance traveled with his co-defendants, James Varnell Cusick, Jr. and Casey Cusick, from his home in Florida to Washington, D.C. to protest the results of the 2020 presidential election.   Lesperance believed that there had been "improprieties" in the 2020 presidential election and that the election had been "stolen."  Trial Tr. 747.  So, on the morning of January 6, Lesperance and the Cusicks went to the Ellipse to hear the former President speak at the "Stop the Steal" rally.  From there, Lesperance and the Cusicks started making their way towards the Capitol grounds, approaching from the west.  Lesperance knew that, on that day, Congress was supposed to convene at the Capitol to certify the results of the 2020 presidential election.  *Id.* at 748.

As the three advanced towards the Capitol building, Lesperance, who was recording the group's progress on his cell phone (*see* GEX 206-208), saw unmistakable signs that a violent riot was unfolding at the Capitol.  Lesperance saw rioters on the Inaugural Stage on the West Front of the Capitol, at which point he celebrated: "They are up in the staging area.  They are up on the staging.  They are in."  GEX 206 (0:14 – 0:21).  As he moved closer, he exclaimed derisively, "Do

the inauguration in the basement." GEX 206 (0:30 – 0:38).[2] Moments later, he panned his cell phone camera toward the crowd behind him and cheered: "Woohoohoo! Alright, come on down – an open house!" GEX 206 (1:25 – 1:39). Then he encouraged his fellow rioters to press on: "We are almost in, man. Let's go!" and "Yeah, let's go!" GEX 206 (1:42 – 1:52).

Tellingly, as Lesperance spoke those words, he was walking right by the remnants of snow fencing that had been used to protect the restricted area around the Capitol. Lesperance and the Cusicks ignored the torn-up barrier and continued toward the Capitol building.



**Figure 1: Screenshot from Lesperance's
cell phone video (GEX 206 at 1:49)**

---

[2] *See* Trial Tr. 715 ("[Lesperance]: That was because Joe Biden's campaign was largely launched from his basement. So I thought that would be an appropriate place for the inauguration.").

A few seconds later, Casey Cusick turned to his father and Lesperance and exclaimed, evidently in disbelief: "Whoa.  Someone just fell from the wall!  Someone fell from the top of the wall!"  GEX 206 (2:00 – 2:04).  Lesperance, who was focused on a different rioter, initially disagreed: "No, he's hanging on the edge.  He's there.  He's still there."  GEX 206 (2:04 – 2:16). After some more debate about who had fallen off and who was still hanging, and after joining in other rioters' chants, Lesperance and the Cusicks reached the outer wall of the Upper West Terrace. GEX 207 (0:01 – 0:25).  There, Lesperance cheered on more rioters as they attempted to climb the wall: "Look, ma, your trouble-making son at it again!" and "Now, this is doing bigly!"[3] GEX 207 (0:17 – 0:25, 0:30 – 0:35).

---

[3] *See* Trial Tr. 752 (Lesperance explained on cross-examination that "bigly" is "a term that Trump uses all the time, and "There was a large crowd there, and in my mind 'bigly' came to … to mind as a word.").



**Figure 2: Screenshot from Lesperance's
cell phone video (GEX 207 at 0:20)**

From the West Front, Lesperance and the Cusicks made their way up the Capitol's front steps and on to the Upper West Terrace.  Along the way, they walked past a set of bike racks that Capitol Police had used as barricades.  GEX 208 (0:25 to 0:35).  At least one of those barricades still bore an "Area Closed" warning sign.  Undeterred, Lesperance declared, "We're home . . . the people are home," and the trio continued towards the Capitol building.  GEX 208 (0:40 – 0:43); *see also* GEX 208 (1:50 – 2:00) (Lesperance: "The people are home").  As they walked towards the Capitol, they came within a few yards of a large line of police officers who were converging on the Capitol.  Lesperance and the Cusicks pressed on.



**Figure 3: Screenshot from Lesperance's cell phone video showing barricades and an "AREA CLOSED" sign (GEX 208 at 0:31)**



**Figure 4: Screenshot from Lesperance's cell phone video showing officers in riot helmets entering the Capitol (GEX 208 at 2:19)**

Lesperance, who wore a grey jacket and a blue hat, and the Cusicks entered the Capitol building at 3:09 p.m. through the Senate Wing Door.  Just moments earlier, Lesperance had taken a photograph of his co-defendant, James Cusick, against the backdrop of a shattered window.  As Lesperance entered the Capitol, he held his cell phone in the air to record what was in front of him: inside the Capitol, Lesperance and the Cusicks were faced with a line of police officers in riot gear.  They also heard a piercing alarm sound, which had been triggered by the emergency exit-only door through which they had entered.  They proceeded nonetheless.



**Figure 5: Photo from Lesperance's
iCloud account (GEX 228)**



**Figure 6: Screenshot from USCP surveillance video showing
Lesperance (circled in red) as he entered the Capitol (GEX 101A, p. 1, at 3:09:47 p.m.)**

Once inside, Lesperance and the Cusicks turned away from the line of police officers and towards the center of the Capitol.  They walked south through the Small Rotunda, the Crypt, the Memorial Door lobby, and the House Wing Doors, which are located on the opposite side of the Capitol building.  Shortly thereafter, Lesperance and his companions turned around and began retracing the same route.  Once again, they passed a group of police officers.



**Figure 7: Screenshot from USCP surveillance video
(GEX 105A, p. 2, at 3:13:32 p.m.)**

Once back in the Crypt, Lesperance heard an announcement that seemed to come from a megaphone.  Lesperance said, "[D]id he say we're not supposed to be here?"  But he did not leave.

Instead, he spent several more minutes with the Cusicks in the Crypt area.  The defendants then briefly separated, as James Cusick – but not Lesperance – looked for a bathroom.  All three defendants ultimately ended up back at the Senate Wing Doors.   James Cusick exited at 3:20 p.m. Lesperance and Casey Cusick exited together shortly thereafter at 3:24 p.m., 15 minutes after their entry.  On their way out, all three were again surrounded by Capitol Police officers in riot gear, who were actively channeling the crowd out of the Capitol building.



**Figure 8: Screenshot from USCP surveillance video**
**(GEX 101 at 16:31, 3:24:31 p.m. on 1/6/21)**

When the defendants left the Capitol building, they did not leave the Capitol grounds. Instead, they remained on the Upper West Terrace for approximately one more hour – until a large number of police officers in riot gear cleared the area at about 4:30 p.m.  As the defendants remained on the Upper West Terrace, Lesperance recorded more videos on his cell phone.  *See, e.g.*, GEX 218 (cell phone video from Lesperance's iCloud account recorded at 3:04:37 p.m., showing a line of police officers in riot gear starting to clear the Upper West Terrace), GEX 219

(cell phone video from Lesperance's iCloud account recorded at 4:25:26 p.m., still showing the Upper West Terrace).

The following day, on January 7, 2021, Lesperance and the Cusicks returned to the edge of the Capitol, as they drove by the United States Supreme Court on the east side of the Capitol. Once on site, Lesperance again used his cell phone to memorialize the scene.  This time, Lesperance's videos showed an eight-foot, unscalable fence, which the Capitol Police had erected overnight to protect the United States Capitol in the wake of the January 6 attack.  *See* GEX 221-223; Trial Tr. 345-348, 459-460, 499-500.

### *Lesperance's Interview*

On January 19, 2021, Lesperance agreed to speak with FBI agents investigating the January 6 attack.  During the interview, Lesperance admitted that he saw police officers arriving at the Capitol with batons and shields.  Lesperance also admitted that he saw a flashbang ignited by police.  Finally, Lesperance admitted that, after January 6, he deleted from his cell phone photographs and videos he took on January 6.  According to Lesperance, he did so because he feared negative repercussions from law enforcement based on what he had heard on the news.

Moreover, during the interview, Lesperance minimized important aspects of his conduct and motives on January 6.  For one thing, Lesperance initially claimed, misleadingly, that he had looked into the Capitol building through a door (i.e., implying that he had not entered).  Trial Tr. 534-535.  Only after further questioning did Lesperance admit that he had in fact gone into the Capitol.  *Id.*  For another, Lesperance claimed that he went inside the Capitol because he needed to use the restroom and that police officers let him into the building.  But as explained above, Lesperance's contemporaneous recorded statements belied that claim. Moreover, the trial testimony and evidence showed that Lesperance did not visit a restroom when he was inside the

Capitol building (Trial Tr. 721), and that he then proceeded to spend another hour outside the Capitol building in the cold on the Upper West Terrace.  Nor was there any evidence that any police officer let Lesperance into the building.

### *The Charges and the Trial*

On June 21, 2021, the United States charged Lesperance by criminal complaint with entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count One); disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Two); disorderly or disruptive conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Three); and parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Four).  On June 22, 2021, law enforcement officers arrested him at his residence in Melbourne, Florida.

On September 23, 2021, the United States charged Lesperance, Casey Cusick, and James Cusick in a four-count Information with the same offenses.  After a five-day trial that started on July 10, 2023, the jury found all defendants guilty on all counts.  (ECF Nos. 99, 101, 103).[4]

### III.    Statutory Penalties

Lesperance now faces sentencing on the four misdemeanor offenses above.  As noted by U.S. Probation Office, Lesperance faces up to one year of imprisonment, one year of supervised release, and a fine of up to $100,000 on Counts One and Two (*see* 18 U.S.C. §§ 1752(b)(2), 3571(b)(5), and 18 U.S.C. § 3583(b)(3)) and up to six months of imprisonment and a fine of up to $5,000 on Counts Three and Fourth (*see* 40 U.S.C. § 5109(b) and 18 U.S.C. § 3571(b)(6)).

---

[4]  Lesperances's co-defendants are scheduled to be sentenced on the same date as Lesperance, October 12, 2023.

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Lesperance's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4) | 10 |
| Adjusted Offense Level (Subtotal) | 10 |
| Total Offense Level: | 10 |

*See* PSR at ¶¶ 34-52.[5]

---

[5] The U.S. Probation Office only calculated the offense level for Count Two, charging Lesperance's violation of 18 U.S.C. §1752(a)(2), because it determined that Counts One and Two are grouped, and Count Two has the highest offense level (*see* U.S.S.G. § 3D1.2; PSR at ¶¶ 41, 42). Although the Sentencing Guidelines dictate that the offense level should be calculated for each count before the counts are grouped, *see* USSG §1B1.1(a)(1), (4), the Probation Office nonetheless correctly concluded that Lesperance's total offense level for Counts One and Two is 10 for the following reasons. While the Statutory Appendix lists two guidelines for Section 1752 offenses (U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass)), the "most appropriate" guideline (U.S.S.G. §1B1.2 n.1) for the offense conduct charged in Count Two—which requires proof of "disorderly or disruptive" committed "with intent to impede or disrupt the orderly conduct of Government business or official functions," 18 U.S.C. § 1752(a)(2)—is Guidelines §2A2.4 (PSR at ¶ 39); therefore, the calculation of the offense level for Count Two is correct. The calculation of the offense level computation for Count One, charging 18 U.S.C. 1752(a)(1) is as follows:

The U.S. Probation Office calculated Lesperance's criminal history as a category I, which is undisputed.  Accordingly, Lesperance is subject to an advisory Guidelines imprisonment range of 6 to 12 months, as the U.S. Probation Office correctly determined.  PSR at ¶ 98.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  In this case, as described below, the Section 3553(a) factors weigh in favor of seven months of incarceration, to be followed by one year of supervised release, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).  While assessing Lesperance's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.  Notably, for a misdemeanor defendant like Lesperance, the

| | |
|---|---|
| **Base Offense Level**: The most applicable guideline for Count One is § 2B2.3 (Trespass). | 4 |
| **Specific Offense Characteristics**: On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B).  Therefore, a two-level enhancement applies. USSG § 2B2.3(b)(1)(A)(vii). | +2 |
| **Adjusted Offense Level (Subtotal):** | 6 |
| **Total Offense Level** | 6 |

Count Two's resulting total offense level (10) is higher than the total offense level for Count One alone (6). Counts One and Two group, and the offense level for group is the highest offense level for any count in the group. USSG §§ 3D1.2, 3D1.3.

absence of violent or destructive acts is not a mitigating factor.  Had Lesperance engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in this case is Lesperance's awareness, at the time of his offenses, that his conduct would result in the delay of Congress' certification of the Electoral College vote.  As he made his way to the Capitol, Lesperance chose to ignore the violence and mayhem. Presented with a riot overtaking the Capitol, Lesperance not only joined the riot, but actively celebrated it.  He celebrated it by making derisive comment after derisive comment – about holding the "inauguration in the basement," about "doing it bigly," and about turning the seat of Congress into an "open house" for rioters.  And Lesperance's conduct after January 6 is aggravating.  As noted, Lesperance returned to the scene of the riot the following day, on January 7.  He then deleted relevant evidence from his cell phone.  And he misrepresented important aspects of his conduct and motives to the FBI.  Together, these factors establish the clear need for a sentence of seven months of incarceration.

**B.  Lesperance's History and Characteristics**

Lesperance, who is 71 years old, ran an air conditioning contracting business for over 30 years, until he retired in December 2020.  PSR at ¶ 61, 82.  Earlier in his life, Lesperance was enlisted in the United States Coast Guard.  *Id.* at ¶ 83.  Lesperance and his spouse have been married for approximately 41 years and have two adult children.  *Id.* at ¶ 71.  Yet, despite his family life and long work history, Lesperance chose to participate in a riot on January 6.

Lesperance's prior military service, though laudable, makes his choices on January 6 even more troubling.  As noted, in his youth, Lesperance spent four years as an enlisted member in the Coast Guard.  Given that past, it is troubling that Lesperance would betray the Military's core

values—including the protection of the Nation's democratic institutions—and participate in an attack on our democracy.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others?  Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur.  And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.").  This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a meaningful term of incarceration.  Lesperance's own recorded words underscore the need for deterrence.  As Lesperance and his companions approached the Capitol building, Lesperance repeatedly bantered about the political and institutional implications of the riot unfolding before his eyes.  Again, he variously exclaimed, "Do the inauguration in the basement", "Woohoohoo!  Alright, come on down – an open house!", and "This is doing it bigly!"  He encouraged his fellow rioters to press on: "We are almost in, man.  Let's go!" and "Yeah, let's

16

go!"  He remained on the Upper West Terrace until large numbers of police in riot gear eventually cleared it.  And he took a victory lap the following day, when he returned to the edge of the Capitol, along with the Cusicks, and memorialized the fortress-like fencing that the Capitol Police had erected overnight.  Nothing Lesperance has done or said since January 6 suggests that he has abandoned that mindset, much less that he is remorseful for what he did on January 6.  A meaningful deprivation of liberty is warranted.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6]  This Court must sentence Lesperance based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."  *Gall v. United States*, 552 U.S. 38, 54 (2007).  In short, "the Sentencing Guidelines are themselves an anti-

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the

defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

While no previously sentenced case contains the same aggravating factors present here (and the government submits that there are in fact no mitigating factors in this case), the Court may consider, for reference, the sentence imposed in *United States v. Russell Alford*, No. 21-cr-263 (TSC). Like Lesperance, Alford was charged with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). Like Lesperance, Alford was found guilty and convicted on all counts after a five-day jury trial. Like Lesperance, Alford walked past obvious signs that the Capitol building and grounds were restricted until he found an unobstructed entrance into the Capitol building. Finally, just as Alford remained in the Capitol building until he was forced by police officers toward the exit, Lesperance remained on the Upper West Terrace until moments before large teams of riot police cleared the area at 4:30 p.m.

One distinction between the cases is that, whereas Alford used social media to celebrate his participation in the riot and spread disinformation about the riot, Lesperance does not appear to have a social-media footprint. But Lesperance still seized on his own opportunities to celebrate the riot – as evidenced by his multiple recordings and derisive commentary as he was approaching the Capitol building. And Lesperance's conduct was more egregious than Alford's in several significant respects. Unlike Alford, Lesperance returned to the edge of the Capitol on January 7, when he recorded videos of the unscalable fencing that had been erected overnight. Lesperance deleted videos and photographs from his cell phone after January 7. And Lesperance misrepresented to the FBI significant aspects of his conduct and motives on January 6. For his offenses on January 6, Alford was sentenced to 12 months of incarceration. A sentence of seven months of imprisonment is both necessary and appropriate on the facts of this case.

In *United States v. Rivera*, No. 1:21-cr-0060-CKK, the defendant was convicted of four misdemeanor offenses after a bench trial. *See* Findings of Fact and Conclusions of Law, *Rivera*, No. 1:21-cr-0060-CKK, ECF No. 62.  The evidence showed that Rivera livestreamed his presence in the Capitol and "He urged his followers watching his Facebook livestream to share his livestream with their friends and followers" and proclaimed he was "about to take [his] ass to the middle of the [United] State[s] Capitol." *See* Sentencing Memorandum, *Rivera*, No. 1:21-cr-0060-CKK, ECF No. 69, pg. 5.  Rivera announced to his followers that MPD officers were firing pepper spray at the rioters. *Id.*, at 7.  Rivera saw rioters climbing a wall and shouted at them, "there's an easier way up!" *Id.*  Rivera engaged in no violence in the Capitol, and left after approximately 20 minutes.  Rivera was convicted of the same four charges of which the defendant stands convicted. The Court sentenced Rivera to eight months in prison. *Rivera*, No. 1:21-cr-0060-CKK, ECF. 82.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

### V.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.  Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).  Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096.  The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).  Because Lesperance was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v.*

21

*United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA).  Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.  *See Papagno*, 639 F.3d at 1097-97;  18 U.S.C. §§ 3663(b), 3663A(b).  Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.  *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."  *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).  The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[7]Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for [his or her] individual contribution to the victims' total losses.  *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *see also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than

---

[7] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."). *Cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Lesperance to pay $500 in restitution for his convictions on Counts 1 and 2. This amount fairly reflects Lesperance's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Lesperance to seven months of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, but is not greater than necessary.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Sonia W. Murphy*
SONIA W. MURPHY
D.C. Bar. No. 483072
Trial Attorney
United States Department of Justice, Civil Division
     Detailed to the D.C. U.S. Attorney's Office
601 D Street NW
Washington, D.C. 20530
(202) 305-3067
sonia.murphy@usdoj.gov

FRANCESCO VALENTINI
D.C. Bar No. 986769
Senior Counsel, Capitol Siege Section
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530
(202) 598-2337
francesco.valentini@usdoj.gov